# In the United States Court of Federal Claims

### No. 13-821C
### Filed: March 22, 2016

|  |  |  |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| | * | |
| INGHAM REGIONAL MEDICAL | * | Money-Mandating Statute and |
| CENTER, ET AL., | * | Regulation; Failure to State a Claim; |
| | * | Breach of Express and/or Implied in |
| Plaintiffs, | * | Fact Contract; Release; Mutual |
| v. | * | Mistake; Breach of the Covenant of |
| | * | Good Faith and Fair Dealing; Statute |
| UNITED STATES, | * | of Limitations. |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * | * | |

**Alexander J. Pires**, Pires Cooley, Washington, DC, for plaintiffs. Of counsel, **Gregory A. Brodek**, Duane Morris LLP, Bangor, ME.

**Phyllis Jo Baunach**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C. With her were **Steven J. Gillingham**, Assistant Director, Civil Division, **Robert E. Kirschman, Jr.** Director, Commercial Litigation Branch, and **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division. Of counsel, **Gerald A. Wesley**, Associate General Counsel, Defense Health Agency, Department of Defense, Washington, D.C.

## O P I N I O N

<u>**HORN, J.**</u>

Plaintiffs Ingham Regional Medical Center (Ingham), Bay Regional Medical Center (BRMC), McLaren Northern Michigan (McLaren), Gifford Medical Center, Inc. (Gifford), and Lakewood Health System (Lakewood) operate hospitals that participated in the TRICARE program, a federal program providing health care to uniformed service members, retirees, and certain others. Plaintiffs allege that from at least August 1, 2003 to May 1, 2009 (the Relevant Period), the defendant, United States of America, acting through the Secretary of the United States Department of Defense (DoD) in his official capacity as operator of TRICARE, underpaid them for certain services they provided as part of the TRICARE program, which plaintiffs allege resulted in the breach of two

contracts and violations of applicable statutory and regulatory provisions.[1] They seek to bring a class action[2] on behalf of every hospital in the United States that (1) provided outpatient services to individuals enrolled in the TRICARE program during the Relevant Period, and (2) participated in the defendant's Discretionary Payment Process, described below, announced April 25, 2011. Plaintiffs estimate their proposed class size to be approximately 5,200 hospitals.

## FINDINGS OF FACT

In 1956, Congress established a military health care system, now known as TRICARE, to "create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and for their dependents." See 10 U.S.C. § 1071 (2012).[3] Although the program initially covered only active duty members and their dependents, coverage was later expanded to include retirees, eligible dependents of retirees, and survivors, i.e., certain surviving dependents of deceased service members killed on active duty. See Military Medical Benefits Amendments of 1966, Pub. L. No. 89-

---

[1] Plaintiffs allege that all hospitals in their purported class were underpaid from August 1, 2003 to May 1, 2009, but that "small rural hospitals" continued to be underpaid through December 31, 2009, and that "children's hospitals, cancer hospitals, and critical access hospitals," continue to be underpaid through the present. Plaintiffs do not state whether the five named plaintiffs were small rural hospitals, children's hospitals, cancer hospitals, or critical access hospitals. Therefore, according to plaintiffs, to the extent that the named plaintiffs qualified as such hospitals, the Relevant Period could include the additional periods of alleged underpayment described above. The court also notes that, without explanation, the plaintiffs in their opposition to defendant's motion to dismiss define the Relevant Period as ending on April 30, 2009 rather than May 1, 2009. As discussed below, April 30, 2009 was the last day on which TRICARE used CHAMPUS Maximum Allowable Charge (CMAC) rates to reimburse health care providers such as plaintiffs.

[2] Plaintiffs have not yet filed a motion for class certification.

[3] From 1966 to 1995, after the passage of Military Medical Benefits Amendments of 1966, Pub. L. No. 89-614, §2(6), 80 Stat. 862, 863–65 (1966), the program was popularly known as the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). See Department of Defense, Under Secretary of Defense for Personnel and Readiness, Military Compensation Background Papers: Compensation Elements and Related Manpower Cost Items. Their Purposes and Legislative Backgrounds 715 (7th ed. 2011), http://www.loc.gov/rr/frd/pdf-files/Military_Comp-2011.pdf (last visited March 18, 2016). From 1995 to the present day, after a number of significant reforms were implemented by the Department of Defense, the program has operated under the name TRICARE. See id. at 719-20; see generally id. at 715-20 (describing the history of the Federal Government's attempts to provide medical care to members of the uniformed services and their dependents). The parties appear to use the terms CHAMPUS and TRICARE interchangeably in their filings.

614, 80 Stat. at 865; <u>see</u> <u>also</u> 10 U.S.C. § 1086(c) (2012). The law empowers the Secretary of Defense to administer TRICARE and the Secretary has used that power to promulgate regulations and manuals that, together with the underlying statutes, govern the TRICARE program. <u>See</u> 10 U.S.C. 1073(a)(2) (2012); <u>see</u> <u>generally</u> 32 C.F.R. § 199 (2015). Among other provisions, the law provides the Secretary of Defense with the authority to contract with outside providers, such as the plaintiff hospitals, for medical care for dependents of service members, retirees, dependents of retirees, and survivors. <u>See</u> 10 U.S.C. §§ 1079(a), 1086(a) (2012).[4]

TMA/DHA, as part of its management responsibilities, contracts with three managed care support contractors (MCSCs), which in turn are responsible for establishing networks of health care providers in their national region to provide health care services to TRICARE beneficiaries (there are three national regions: North, South, and West) and for receiving and processing individual claims. <u>See</u> 10 U.S.C. § 1072(7) (2012); DoD Directive 5136.13 (September 30, 2013). DHA/TMA does not typically enter into reimbursement contracts directly with medical care providers, including hospitals such as the plaintiffs, but rather with these MCSCs, which in turn receive and process the providers' claims for medical reimbursement. If an individual claim qualifies for payment under the TRICARE Program, then the claim is reimbursed in accordance with the guidelines set forth in 32 C.F.R. § 199.14.

The event which appears to have set in motion the events leading to this lawsuit was the alteration by Congress in 2001 of a single word in the portion of the TRICARE statute governing the reimbursements for outside providers of health care services. Prior to 2001, 10 U.S.C. § 1079(j)(2) stated:

> The amount to be paid to a provider of services for services provided under a plan covered by this section <u>may</u> be determined under joint regulations to be prescribed by the administering Secretaries which provide that the amount of such payments shall be determined to the extent practicable in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.) [i.e., Medicare].

10 U.S.C. § 1079(j)(2) (2000) (emphasis added). In 2001, Congress altered 10 U.S.C. § 1079(j)(2) by replacing "<u>may</u> be determined under joint regulations" with "<u>shall</u> be determined under joint regulations." National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, § 707, 115 Stat. 1012, 1163 (2001); <u>see</u> 10 U.S.C. 1079(j)(2)

---

[4] Prior to October 1, 2013, the TRICARE Management Activity (TMA) managed and administered the TRICARE program pursuant to DoD Directive 5136.12 (May 31, 2001). Effective October 1, 2013 and pursuant to DoD Directive 5136.13 (September 30, 2013), the Defense Health Agency (DHA) was established to manage and administer the TRICARE program, replacing TMA. In their submissions to this court, the parties refer to TMA and DHA interchangeably.

(2006) (emphasis added).[5] To implement this change, TRICARE issued an interim final rule on June 13, 2002, see 67 Fed. Reg. 40597–02 (June 13, 2002) (the Interim Final Rule), and then a final rule on October 24, 2005, see 70 Fed. Reg. 61368–79 (Oct. 24, 2005) (the Final Rule). The Interim Final Rule explained that, from 2000 to 2004, Medicare was phasing in a new Outpatient Prospective Payment System (OPPS) methodology for facility charges in hospital outpatient departments and emergency departments. See 67 Fed. Reg. 40597–02, 40601. The Interim Final Rule then stated that the DoD planned to follow the Medicare rule, but that "because of complexities of the Medicare transition process and the lack of TRICARE cost report data comparable to Medicare's, it is not practicable for the Department to adopt Medicare OPPS for hospital outpatient services at this time." Id. Instead, the Interim Final Rule, effective August 12, 2002, adopted new methods of payment for four categories of hospital-based outpatient services, with the anticipation of the "eventual adoption of the Medicare OPPS for most TRICARE hospital outpatient services covered by the Medicare OPPS." Id.; see id. at 40598 (stating effective date of rule). For clinical laboratory services, rehabilitation therapy services, and venipuncture, payments would be based on "the TRICARE-allowable cost method in effect for professional providers," while for outpatient radiology services, a fixed maximum allowable charge, the CHAMPUS Maximum Allowable Charge (CMAC), would be used. Id. at 40601; see id. at 40604-05 (describing additions to be codified at 32 C.F.R. § 199.14(a)(5)).

The 2005 Final Rule repeated the language in the Interim Final Rule regarding the impracticability of fully adopting Medicare OPPS for hospital outpatient services at that time. See 70 Fed. Reg. at 61371. The Final Rule then set forth reimbursement methods for hospital outpatient services that had "established allowable TRICARE charges," including: laboratory services, including clinical laboratory; rehabilitation therapy services; radiology services; diagnostic services; ambulance services; durable medical equipment (DME) and supplies; oxygen and related supplies; drugs administered other than oral method; all professional provider services that are provided in an emergency room, clinic, or hospital outpatient department, etc.; and routine venipuncture. Id.; see also id. at 61378–79 (describing amendments to 32 C.F.R. § 199.14(a)(5)(i)–(xii)). Plaintiffs refer to these categories as "All Outpatient Services." The 2005 Final Rule then explained: "For these services, payments are based on the TRICARE-allowable cost method in effect for professional providers or the CHAMPUS Maximum Allowable Charge (CMAC)." Id. at 61371. All other outpatient hospital services, except for ambulatory surgery services, which had their own payment methodology, were to paid as billed. Id. at 61371–72. The

---

[5] As defendant identifies: "The current citation is 10 U.S.C. § 1079(i)(2). The National Defense Authorization Act for Fiscal Year 2015 changed the citation 'by striking subsection (i) and . . . by redesignating subsections (j) through (q).'" (quoting Carl Levin and Howard "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291, § 703, 128 Stat. 3292, 3411 (2014)). To avoid confusion, however, the court will continue throughout this opinion to refer to the statutory section as 10 U.S.C. § 1079(j)(2).

2005 Final Rule made these changes retroactively effective to August 1, 2003. Id. at 61368.

In late 2008, TRICARE introduced a new payment system for hospital outpatient services that was similar to the OPPS rules used by Medicare. The effective date for the new payment system was May 1, 2009 for most hospitals, and January 1, 2010 for small rural hospitals. See 73 Fed. Reg. 74945–74966 (December 10, 2008) (publishing a final rule implementing the TRICARE Hospital OPPS with an effective date of February 9, 2009); see also 74 Fed. Reg. 6228 (February 6, 2009) (extending the effective date of TRICARE's OPPS until May 1, 2009).

Plaintiffs allege that the use of CMAC rates to reimburse hospitals did not approximate Medicare payment rates and resulted in significant underpayment to hospitals that treated TRICARE beneficiaries. According to plaintiffs, "CMAC was intended as a payment methodology used to reimburse '*individual* health care providers' (such as doctors) and *not* institutions, such as hospitals, which invariably have more overhead." (emphasis in original). Thus, plaintiffs allege, CMAC was never intended to be the exclusive reimbursement paid to hospitals for providing hospital outpatient services. Plaintiffs allege that TRICARE's use of CMAC rather than Medicare's hospital reimbursement methodology violated 10 U.S.C §§ 1079(a), (j)(2) and 1086(a), (g), which, according to plaintiffs, required the DoD to reimburse health care providers in accordance with Medicare payment rules to the extent practicable. Plaintiffs allege that from 2003 to 2008, the hospitals made "substantial efforts," both orally and in writing, to advise TRICARE of this alleged error, but TRICARE insisted CMAC was the appropriate reimbursement methodology for hospitals. Plaintiffs allege that, as a result, they and the proposed class members were "consistently and continually" underpaid during the sixty-nine months of the Relevant Period.

Plaintiffs also allege that, as a result of complaints from certain hospitals, at some undefined point in time, TRICARE directed that a study be undertaken of the accuracy of its payments to hospitals for all outpatient services rendered during the Relevant Period (the Kennel Study). This study was performed by Kennel and Associates, Inc. (Kennel), an independent consultant, which had previously been used by defendant as an outside subject matter expert. The Kennel Study allegedly compared CMAC payments to the payments that would have been made using Medicare payment principles. According to the plaintiffs, the Kennel Study determined that the defendant "(1) *underpaid* hospitals for outpatient radiology but, (2) correctly paid hospitals for all other outpatient services." (emphasis in original).

According to plaintiffs, several of the hospitals asked the defendant to acknowledge certain problems with the Kennel Study, to release the Kennel Study, and to calculate monies owed to proposed class members for all outpatient services, not just radiology, but the defendant refused. Instead, according to plaintiffs, the defendant, acting through the Deputy Director of TRICARE, Rear Admiral Christine S. Hunter, "unilaterally, and without notice to the hospitals," created and announced a "discretionary payment process," notice of which was sent to every hospital in the United States via a letter signed

by Deputy Director Hunter and dated April 25, 2011 (the April 25, 2011 Letter). A copy of this letter was attached as an exhibit to plaintiffs' amended complaint.

The April 25, 2011 Letter begins by stating that "[t]he Department of Defense (DoD) is currently analyzing whether your institution qualifies for any net adjustments to payments for hospital outpatient radiology services for the period August 1, 2003, until the TRICARE hospital Outpatient Prospective Payment System (OPPS) began on May 1, 2009." The April 25, 2011 Letter continued by stating that "[d]etailed instructions will be posted on the TRICARE Management Activity Web site, [sic] www.tricare.mil/RadiologyDiscretionaryAppealAdjustments explaining the manner in which a hospital may request that your institution's claims data be reviewed for appropriate discretionary adjusted payments." The April 25, 2011 Letter continued:

> For purposes of this process, DoD will treat your submission as an untimely but discretionary appeal under 32 Code of Federal Regulations 199.10(a)(5) and (c), provided it is received no later than 60 days from the date of this letter. Based on the request, your hospital may be paid an adjustment, subject to the availability of appropriations, in return for your acceptance of DoD's offer of additional payment based on criteria established by the agency. . . . In order to bring closure to any concerns regarding payment of hospital outpatient services under the TRICARE regulation prior to implementation of OPPS, payment of the discretionary adjustments will also be contingent on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries, and TRICARE MCSCs. We value your hospital as a partner in this effort and remain committed to working with you to complete the analysis of claims data and determine if any additional payments may be allowed.

In addition to the April 25, 2011 Letter, the agency made available on the TRICARE webpage mentioned in the Letter a document titled "NOTICE TO HOSPITALS OF POTENTIAL ADJUSTMENT TO PAST PAYMENTS FOR OUTPATIENT RADIOLOGY SERVICES" (the Notice) and answers to certain Frequently Asked Questions (the FAQs). (capitalization in original). Plaintiffs attached the Notice and an undated version of the FAQs as exhibits to their amended complaint.[6]

---

[6] Pursuant to this court's order and related to an identical attachment in the plaintiffs' original complaint, plaintiffs filed a document with the court identifying "when and where the undated frequently asked questions, included as an exhibit to the plaintiffs' complaint, was originally made available." Plaintiffs indicated:

> To the best of our knowledge and belief, the FAQs as originally published in or around April 2011, consisted of 12 questions and answers; the FAQs included as Exhibit D to Plaintiff's [sic] Complaint consisted of 17 questions

The Notice described the legislative and regulatory background for the "discretionary net adjusted payments" discussed in the April 25, 2011 Letter, the agency's rationale in providing the payments, and a nine-step methodology hospitals were to follow to request these payments. The background section described: how the National Defense Authorization Act for Fiscal Year 2002 changed the relevant law "to require use of Medicare rates for hospitals to the extent practicable"; how the 2002 Interim Final Rule partially implemented this statutory change, specifying payments for four categories of hospital outpatient services, including that the CMAC rate would be used to reimburse radiology services, while explaining that it was not practicable to adopt Medicare's OPPS payment system for hospital outpatient services at that time; how the 2005 Final Rule applied the CMAC to All Outpatient Services, retroactively effective August 1, 2003; and how TRICARE eventually adopted an OPPS payment methodology modeled after Medicare's, effective May 1, 2009.

In discussing the rationale behind the discretionary payments, the Notice began by stating that "[a] question has arisen about DoD's interpretation and implementation of the TRICARE regulation provision on reimbursement of hospital outpatient services as issued in the Final Rule on October 24, 2005." The Notice continues:

> The TRICARE regulation provisions on hospital outpatient services, in the absence of adoption of the Medicare OPPS methodology, adopted comparable Medicare payments for similar services provided in other sites (i.e., physician offices). That is, TRICARE looked to the similarity of services being provided, not the site of services, in adopting a reimbursement methodology for hospital outpatient services. By this approach, the technical component of the TRICARE allowable charge rates for similar services was used to reimburse the hospital for similar services furnished on an outpatient basis.

The Notice went on to state that:

> [I]n reviewing payments for hospital services, DoD has determined that, for radiology services specified in the regulation as being reimbursed under the allowable charge methodology, the technical component of the allowable charge did not approximate the Medicare fair payment for such hospital services as well as it could have. That is, in looking at the Medicare reimbursement methodologies in existence prior to adoption of Medicare OPPS in 2000, (methodologies resulting in fair payment for Federal health

---

and answers; and, the FAQs that were updated on August 2, 2011 consisted of 20 questions and answers.

Plaintiffs attached copies of the April 2011 and August 2011 versions of the FAQs to this filing and indicated they did not know exact dates the documents were published. Defendant states that the FAQs were posted to the TRICARE website and "[b]ecause the hospitals raised questions throughout the process, the agency periodically revised the FAQ."

care, which TRICARE allowable charges for hospital outpatient services were intended to be emulated), some radiology services were underpaid in comparison. Although a majority of the hospital outpatient services were paid based on fee schedules, etc., which were comparable with what Medicare would have paid, radiology services would need to have some TRICARE payments adjusted to reach a comparable payment level. Thus, although payments to hospitals for radiology services were consistent with the duly promulgated regulation, there is a basis for TRICARE to provide an opportunity to make some discretionary net payment adjustments to approximate more closely Medicare payment methods.

The Notice then discussed an analysis TRICARE had performed, which plaintiffs later learned was the Kennel Study, that "compared TRICARE hospital outpatient services reimbursement with the intended comparable Medicare fair payment." The Notice stated that this analysis concluded that "[i]n all cases, except radiology services, TRICARE payments for hospital outpatient services were either comparable to what Medicare would have paid or TRICARE paid more." According to the Notice, the potential net underpayment for all hospitals was "approximately $98 million." In view of these findings, the Notice stated that TRICARE was "offering hospitals an opportunity for discretionary adjusted payments for radiology services for which TRICARE allowable charges were not comparable to the pre-OPPS Medicare fair rates for the period August 1, 2003, to May 1, 2009 (or other appropriate end date for OPPS-exempt hospitals."

The Notice then went on to explain why TRICARE would make these "net adjustments to payments of hospital outpatient radiology services":

> For hospital outpatient services during [the period August 1, 2003 until the TRICARE OPPS began on May 1, 2009], payments by the TRICARE Managed Care Support Contractors (MSCSs) consistent with the applicable TRICARE regulation, policy and TRICARE directions were correct. As specifically concerns hospital outpatient radiology services, however, TRICARE may have directed payment of amounts which in some cases were less and in some cases were more than the comparable Medicare fair payment. General TRICARE policy is that payment methodologies follow to the extent practicable Medicare payments. Prior to adopting the Outpatient Prospective Payment System (OPPS), Medicare used a blended rate that factored in a percentage of hospital costs and a percentage of the global physician fee schedule to reimburse hospital outpatient radiology services. In contrast, TRICARE regulation limited reimbursement to hospitals for individual outpatient radiology services to the technical component of the CHAMPUS Maximum Allowable Charge (CMAC), which was one component of Medicare's physician fee schedule. Consistent with TRICARE policy under statute to pay similar to Medicare, we have determined that discretionary adjusted payments may better reflect the Medicare payment amounts for outpatient radiology claims.

The Notice stated, similar to the April 25, 2011 Letter, that any submission would be treated as "an untimely but discretionary appeal under 32 CFR 199.10(a)(5) and (c) provided it is received no later than June 23, 2011." The Notice also indicated that "[b]ased on the request and subject to the availability of funds, each hospital will receive adjusted payments in return for acceptance of DoD's offer of additional payment based on criteria established by the agency," and that "payment of the discretionary adjustments will also be conditioned on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries and the TRICARE MCSCs."

The Notice then laid out the nine-step process by which hospitals could "request an analysis of their claims data for possible discretionary adjustment" and to "govern the review of payments for hospital outpatient radiology services and payment of any discretionary net adjustments." Step 1 instructed hospitals to submit "a request for analysis of their claims data (process defined in Step 2) for hospital outpatient department radiology charges" during the period August 1, 2003 to April 30, 2009, the last day before TRICARE OPPS became effective. Step 1 also stated that "[s]mall rural hospitals," which were "not subject to TRICARE's OPPS until January 1, 2010," should submit requests for the period August 1, 2003 to December 31, 2009, that "Critical Access Hospitals," which "are not subject to TRICARE's OPPS," should submit requests for the period August 1, 2003 to November 30, 2009, and that other "[h]ospitals not subject to OPPS (such as Cancer and Children's hospitals)" should submit requests for the period August 1, 2003 to December 31, 2010. Step 2 described the procedure for submitting a request, instructing hospitals to submit their data, including name, address, zip code, Tax ID number, TRICARE sub ID number, the 6-digit Medicare OSCAR provider number, NPI number, and contact names and addresses for formal response and informal questions. Step 2 explained that "[a] separate Excel spreadsheet must be completed for each hospital in the TMA-specified format," following an example posted on the TRICARE website, and emailed to TMA. Plaintiffs attached a blank example of this spreadsheet to their amended complaint (the Spreadsheet).

Steps 3 through 7 described the review process. Step 3 detailed TMA's methodology to "extract the claims for each hospital for claims for outpatient radiology services during the relevant period," and indicated which types of radiology claims TMA would exclude and which types it would consider. Step 4 detailed the "'Medicare' method," the formula TMA would use to "calculate what would have been paid under the approach that Medicare used to pay hospital outpatient radiology claims prior to CMS's implementation of the Medicare OPPS in 2000." Step 5 explained how TMA would "adjust the 'Medicare' amount calculated in Step 4 on each claim using the ratio of the actual allowed amount on the claim to the TRICARE Standard allowed amount (the technical component of the CMAC)." Step 6 described how TMA would "then compare the adjusted 'Medicare' amount for each claim with the actual allowed amounts on that claim" and "will calculate the difference between the two amounts." Step 7 explained that, "[i]f the calculations in Step 6 indicate that an additional payment shall be made to the hospital, then a hospital-specific offset for cost sharing shall be calculated."

With regard to the particular claims that would be considered in this process, plaintiffs contend that the "[h]ospitals were advised that TRICARE had in its possession all of the data needed to make the proposed calculation and that they should not submit claims level data." Question 2 of the FAQs addressed claims-level data and, in response to the question, "[w]ill I need to provide further information such as claims-level data or identify the relevant claims or patients," the government answered, "[n]o, you will not. TRICARE will do this. You need to submit only the information in the Excel sheet. Do not submit patient-level data." Question 11 of the FAQs, in response to the question, "[w]ill the adjustment for a hospital be done in one bulk check or will it be done at the claim level," indicated that, "[t]he hospital will receive one check with a summary of the results of the calculations. Claims-level detail will not be provided due to the number of adjustments over this 7-year period." Moreover, in what plaintiffs allege was a later version of the FAQs, question 18 asked, "[c]an the government provide the individual claims records, including patient identifiers and CPT codes, for each of the radiology claims that were subject to adjustment" and the answer indicated, "[n]o, the government will not provide individual claims data to each hospital. The adjustment process described in the notice posted on this website indicates that if a hospital has questions about the data used, it should submit a detailed explanation of the alleged errors and proposed corrections with supporting documentation."

Step 8 in the Notice explained that "[a] written response to the hospital's request will be sent to the individual at the address provided by the hospital. The response will provide the calculated discretionary adjusted payment and the calculations from which the adjustment was derived." An alleged example of such a written response from TMA was attached as an exhibit to plaintiffs' amended complaint. The document is labelled "Hospital Radiology Payment Adjustment Worksheet," and, after listing the hospital's identifying information, contains a table listing, for various time periods during the Relevant Period, the "Number of Radiology Line Items," the "TRICARE Allowed Amounts," the "Allowed Amount Under Medicare Method," and the difference between the Medicare and the TRICARE amount for each period. The differences for all periods were then summed to get the "Adjusted Allowed Amount." Step 8 further specified that:

> While the methodology for calculating the adjustment is not subject to questions, any questions regarding the data used in the calculations should be received by TMA within 30 days of the date of TMA's response as specified in the response. Any questions should be accompanied by detailed explanation of the alleged errors and the proposed corrections with supporting documentation.

Finally, Step 9 explained that:

> TMA's written response will include a release and agreement to accept the discretionary adjusted payment by the hospital. The signed release and agreement should be returned to TMA within 30 days of the date of initial response or TMA response to any questions raised in step 8, whichever date is later. Following receipt of the signed release and agreement, payment will be made to the hospital.

A copy of the release and agreement mentioned in Step 9 of the Notice was attached to plaintiffs' amended complaint (the Release). Plaintiffs allege that, "Defendant drafted the Release without any input from the hospitals." The Release is titled "**Release**" (emphasis in original) and provides:

> By accepting the offer of the Department of Defense ("DoD") to provide a net adjustment to prior payments of hospital outpatient radiology services as described in the DoD's letter dated April, [sic] 25, 2011, and in consideration of any future net adjustments to prior payments of hospital outpatient radiology services made by the DoD or the TRICARE [MCSCs], Hospital:_____ Provider Number:_____ (including, but not limited to, its past and present officers, directors, employees, agents, stockholders, attorneys, servants, representatives, divisions, departments, acquisitions, offices, parents, subsidiaries, affiliates, and partners, and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing) (hereinafter collectively referred to as "Releasor") shall completely release, acquit, and forever discharge the Government, TRICARE beneficiaries, and any MCSCs (including, but not limited to, their and its past and present officers, directors, employees, agents, stockholders, attorneys, servants, representatives, divisions, departments, acquisitions, offices, parents, subsidiaries, affiliates, and partners, and the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing) (hereinafter collectively referred to as "Releasees") from any and all claims, demands, actions, suits, causes of action, appeals, whether asserted as a class, individually, or otherwise, damages whenever incurred, and liabilities of any nature whatsoever (including costs, penalties, and attorney's fees) that Releasor ever had, now has, or hereafter can, shall, or may have against Releasees, whether known or unknown, on account of or arising out of or resulting from or in any way relating to payments, reimbursements, adjustments, recoupments, or any other means of compensation by Releasees made at any time for outpatient services rendered to TRICARE beneficiaries by Releasor prior to the date Releasor became subject to the TRICARE Outpatient Prospective Payment System ("OPPS"), or December 31, 2010 if Releasor was never subject to the TRICARE OPPS.
>
> RELEASOR UNDERSTANDS THE SIGNIFICANCE OF THIS RELEASE OF UNKNOWN CLAIMS AND ITS WAIVER OF STATUTORY PROTECTION AGAINS A RELEASE OF UNKNOWN CLAIMS. ACCORDINGLY, RELEASOR EXPRESSLY WAIVES ANY AND ALL RIGHTS AND BENEFITS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE (WHICH STATES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUPSECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.") OR ANY OTHER

LAW, RULE, PROVISION OR STATUTE OF ANY OTHER JURISDICTION
THAT OPERATES TO BAR THE RELEASE OF UNKNOWN CLAIMS.

(capitalization in original). The bottom of the Release contains lines for a "Releasor Signature" and the date.

"On information and belief," plaintiffs allege that approximately 5,200 hospitals, including the named plaintiffs, submitted the Spreadsheet to TMA within 60 days of the April 15, 2011 Letter as required by Step 2 of the Notice. According to plaintiffs, defendant then assigned the 5,200 Spreadsheets and the responsibility to undertake the calculations called for in the Notice to Kennel, the same group that had performed the Study. All five of the named plaintiffs were subsequently provided with the written responses described in Step 8, which contained TMA's calculations and proposed payment amounts. Plaintiff Ingham signed the Release and received the proposed payment, but now alleges that, due to multiple errors in the Kennel Study and TMA's calculations, the payment it received for outpatient radiology services was less than the amount it was owed. Plaintiff BRMC received a response stating that it had in fact been overpaid for outpatient radiology services and was owed nothing. Plaintiffs McLaren, Gifford, and Lakewood refused to sign the Release after receiving proposed payment amounts that they believed, due to multiple errors in the Study and TMA's calculations, understated the amount they were owed for outpatient radiology services. All plaintiffs allege that they were underpaid not just for outpatient radiology services, but for All Outpatient Services.

According to plaintiffs, "[s]everal hundred hospitals" were represented by counsel during the Discretionary Payment Process (the Represented Hospitals). According to plaintiffs, when these hospitals received their proposed payment amounts they contacted TRICARE complaining of certain errors in the calculations, which they claimed understated the total amount they were owed by 129%. Eventually, TRICARE allegedly acknowledged to the Represented Hospitals that there were errors in the calculations for the amounts owed for outpatient radiology services and that it was not aware of these errors before sending out the calculations and proposed payment amounts to participating hospitals. Defendant then allegedly agreed, in recognition of these errors, to pay the Represented Hospitals 77% more than the amounts it originally had offered. According to plaintiffs, the other 5,200 hospitals that submitted Spreadsheets did not receive any such recalculated payment amounts. Plaintiffs do not specify if the named plaintiffs were among the Represented Hospitals. Plaintiffs allege in their amended complaint that, "[s]hortly after TRICARE paid the Represented Hospitals," plaintiffs contacted TRICARE requesting that all hospitals be paid correctly for radiology services and stating that other outpatient services had likewise been underpaid.

Plaintiffs allege that, in February and July 2013, in response to Freedom of Information Act requests, TRICARE provided them with redacted versions of the Kennel Study, which they have attached as exhibits to the amended complaint. Plaintiffs allege in their complaint that their analysis of the Kennel Study revealed two errors:

a) With respect to outpatient radiology services, the statement in the Notice that the underpayment was $98 million is mathematically incorrect. Using Defendant's own methodology and inaccurate data yields a figure significantly higher . . .

b) With respect to All Outpatient Services, the calculations and data showing the difference between monies paid under TRICARE versus what would have been paid under Medicare were incorrect. . . . [T]hese errors were due to multiple flaws in the Study, all of which insured that Defendant's representation to Plaintiffs and the Class that no outpatient services except radiology were unpaid was not true.

With respect to plaintiffs' second alleged error above, plaintiffs allege in their amended complaint that the errors underlying the Kennel Study's conclusions regarding All Outpatient Services included:

(1) the use of incorrect assumptions of fact; (2) intentional exclusion of claims that should have been included; (3) failure to properly capture claims data; (4) failure to accurately capture claims-related services rendered from a referring Military Treatment Facility; (5) failure to capture claims provided by a hospital providing services at multiple locations; (6) failure to accommodate changes in hospital locations; (7) failure of Managed Care Support Contractors to maintain claims data, preventing TRICARE from accessing this data; (8) use of erroneous formulae that resulted in incorrect calculations; (9) comparison of incomplete outpatient service categories; (10) comparison of "averages" that were not accurate; and (11) failure to address and account for unique hospital (as opposed to physician offices) costs.

Plaintiffs' amended complaint alleges five counts against the defendant. In Count I, plaintiffs allege the breach of two express contracts between themselves and the defendant, composed of the various documents which they have attached to their complaint. In Count II, plaintiffs allege, in the alternative, the breach of two implied-in-fact contracts identical to those alleged under Count I. In Count III, plaintiffs allege mutual mistake. In Count IV, plaintiffs allege the breach of the covenant of good faith and fair dealing. Finally, in Count V, plaintiffs allege violations of two allegedly money-mandating statutes, 10 U.S.C. §§ 1079 and 1086 (2000), as well as an allegedly money-mandating regulation, 32 C.F.R. § 199.7(h)(2) (2002).

As relief, plaintiffs seek the following judgments against the defendant: (1) for breach of an express or implied in fact contract, amounts "sufficient to reflect the correct amounts due each member of the [alleged] Class for All Outpatient Services during the [Relevant Period]"; (2) on the grounds of mutual mistake, to reform the alleged contracts "to reflect the correct amounts due each member of the [alleged] Class for All Outpatient Services during the Relevant Time"; (3) for the alleged breach of the covenant of good faith and fair dealing, amounts "sufficient to reflect the correct amounts due each member of the [alleged] Class for All Outpatient Services during the Relevant Time"; (4) for the alleged violation of the statutes and regulation, "the amount owed to them pursuant to the

money-mandates of 10 U.S.C. §§ 1079, 1086 and 32 C.F.R. § 199.7(h)(2)"; as well as, (5) fees, costs, and such other relief as the Court deems just and proper. Defendant has moved to dismiss plaintiffs' first amended complaint for failure to state a claim pursuant to Rule 12(b)(6) (2012) of the Rules of the United States Court of Federal Claims (RCFC).

## **DISCUSSION**

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990)); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); see also Avid

Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 5 U.S. 1169 (2011).

Under both RCFC 8(a)(2) and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2015); Fed. R. Civ. P. 8(a)(2) (2016); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–57, 570); Resource Investments, Inc. v. United States, 785 F.3d 660, 669 (Fed. Cir. 2015) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (quoting Bell Atl. Corp. v. Twombly, 550 U.S.at 555); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557));

Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354–55 (Fed. Cir.), cert. denied, 131 S. Ct. 92 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also Solaria Corp. v. United States, 123 Fed. Cl. 105, 113 (2015); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Housing Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012), aff'd, 562 F. App'x 964 (Fed. Cir. 2014), reh'g denied (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726–27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of New York v. United States, 92 Fed. Cl. 285, 292, 298, 298 n.14 (2010). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

In addition to the complaint, the court also may consider exhibits to the complaint. See RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). Moreover, "the court 'must . . . consider documents incorporated into the complaint by reference and matters of which a court may take judicial notice.'" Bell/Heery v. United States, 106 Fed. Cl. 300, 307 (2012), aff'd, 739 F.3d 1324 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)) (omission in Bell/Heery v. United States). The court may also consider a document when the complaint relies heavily upon its terms and effect, which render the document integral to the complaint. See id. at 307-08. Moreover, "[i]n deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record." Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999), cert. denied, 529 U.S. 1065 (2000); see also Bristol Bay Area Health Corp. v. United States, 110 Fed. Cl. 251 261–62 (2013); DeKalb Cnty., Ga. v. United States, 108 Fed. Cl. 681, 692 (2013).

**Count I: Breach of Express Contract**

Count I of plaintiffs' amended complaint alleges the creation, and breach, of two express contracts between the defendant and the hospitals in the purported class. Because plaintiffs have not yet moved to certify their purported class, the court will examine only whether the two alleged contracts existed between defendant and the five named plaintiffs. Plaintiffs' First Alleged Contract was allegedly formed through the exchange of four documents between defendant and plaintiffs: the April 25, 2011 Letter, the Notice, the FAQs, and the Spreadsheet. Plaintiffs allege that the terms of the offer for the First Alleged Contract were expressed in the April 25, 2011 Letter, the Notice, and the FAQs, and "included an obligation on the part of the Defendant to calculate the amount owed to each hospital" using the nine-step process described in the Notice. Plaintiffs allegedly accepted this offer by completing and returning the Spreadsheet to the Defendant. The alleged consideration for the First Alleged Contract was "Defendant undertaking the evaluation and Plaintiffs' agreement to be paid an amount to be determined through the nine-step process proposed by Defendant." According to plaintiffs, defendant breached the First Alleged Contract when it "failed to accurately calculate all the monies owed to each hospital for All Outpatient Services during the Relevant Time, as promised, in manner [sic] specified in Defendant's offer." In their opposition brief, plaintiffs clarify that the First Alleged Contract was allegedly entered into only between defendant and those "hospitals that did not sign and execute the Release and receive money." Three of the named plaintiffs, plaintiffs, McLaren, Gifford, and Lakewood, did not execute the Release, and plaintiff BRMC was notified it had been overpaid monies due. Therefore, the court will examine whether the First Alleged Contract was formed only between defendant and plaintiffs BRMC, McLaren, Gifford and Lakewood.

Plaintiffs' Second Alleged Contract allegedly consisted of six documents: the April 25, 2011 Letter; the Notice; the FAQs; the Spreadsheet; the Payment Adjustment Worksheet; and the Release. Plaintiffs allege that, "[u]nder this contract, Defendant agreed to make a proposed payment to the hospitals in return for a release of all their rights to reimbursement for All Outpatient Services for the Relevant Time." Plaintiffs contend that Second Alleged Contract "was breached when Defendant failed to abide by the terms of the Release, which required Defendant, *inter alia*, to calculate and pay the amount that was owed to each hospital for all outpatient services in the manner specified in 'DoD's letter dated April 25, 2011.'" In their opposition brief, plaintiffs clarify that the Second Alleged Contract was allegedly "entered into between Defendant and hospitals, like Plaintiff Ingham, that accepted Defendant's calculation and proposed payment, signed the Release, and received the payment." The only named plaintiff alleged to have signed the release and receive a payment from the defendant is plaintiff Ingham. Therefore, the court will examine only whether the Second Alleged Contract existed between defendant and plaintiff Ingham.

Defendant contends plaintiffs' claims for breach of express contracts should be dismissed for failure to state a claim because, for both of plaintiffs' Alleged Contracts,

plaintiffs have failed to allege facts demonstrating (1) the existence of a valid, binding contract with the government and (2) the breach of an identified contractual duty.

Contract claims against the United States are governed by the Tucker Act, which grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); United States v. Mitchell, 463 U.S. 206, 215 (1983); see also Kam-Almaz v. United States, 682 F.3d at 1368; Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999). To invoke the jurisdiction of the United States Court of Federal Claims for breach of contract claims, plaintiffs "must show that either an express or implied-in-fact contract underlies [their] claim." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). If plaintiffs' complaint "alleges that an express and, in the alternative, an implied-in-fact contract underlies its claim[s, t]his allegation suffices to confer subject matter jurisdiction in the Court of Federal Claims." Trauma Serv. Grp. v. United States, 104 F.3d at 1324–25 (citing Gould, Inc. v. United States, 67 F.3d 925, 929 (Fed. Cir. 1995); Do–Well Mach. Shop, Inc. v. United States, 870 F.2d 637, 639–40 (Fed. Cir. 1989)); Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1354 (Fed. Cir. 2011) (noting that, in Gould, the court found that "alleging a contract with the government suffices to trigger the Tucker Act's grant of jurisdiction 'upon any express or implied contract with the United States,' and that the proper basis for a dismissal, if warranted, was the failure to state a claim upon which relief can be granted" (quoting Gould, Inc. v. United States, 67 F.3d at 929–30)).

It is well settled that "[t]o recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir.), reh'g denied (Fed. Cir. 1989). See also Barlow & Haun, Inc. v. United States, 118 Fed. Cl. 597, 620 (2014); Cooley v. United States, 76 Fed. Cl. 549, 555–56 (2007) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959). A breach of contract claim requires: "(1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty." Bell/Heery v. United States, 739 F.3d at 1330 (citing Hercules Inc. v. United States, 24 F.3d 188, 198 (Fed. Cir.), reh'g denied, in banc suggestion declined (Fed. Cir. 1994),

aff'd, 516 U.S. 417 (1996); Trauma Serv. Grp. v. United States, 104 F.3d at 1325 ("To state a claim upon which relief can be granted, [plaintiff] must allege either an express or an implied-in-fact contract, and the breach of that contract."); San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959.

Defendant argues that plaintiffs' breach of contract claims based on the First Alleged Contract should be dismissed because plaintiffs fail to allege facts to demonstrate that the April 25 Letter, the Notice, the FAQs, and the Spreadsheet comprise a valid, binding contract with the government. In particular defendant argues that plaintiffs fail to allege: (1) facts to show mutuality of intent to contract; (2) an unambiguous offer and acceptance; (3) any indication of consideration; and (4) facts demonstrating that the Director of Deputy Director of TMA had authority to bind the government in contract.

A party alleging either an express or implied-in-fact contract with the government "must show a mutual intent to contract including an offer, an acceptance, and consideration." Furthermore, "[a] contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States."

Bank of Guam v. United States, 578 F.3d at 1326 (quoting Trauma Serv. Grp. v. United States, 104 F.3d at 1325) (alteration in Bank of Guam v. United States); see also Chattler v. United States, 632 F.3d 1324, 1330 (Fed. Cir.) (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1325), reh'g en banc denied (Fed. Cir. 2011); Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (citing City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998)); Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir.) ("The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract.") (citations omitted), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 522 U.S. 857 (1997); Huntington Promotional & Supply, LLC v. United States, 114 Fed. Cl. 760, 767 (2014); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 492 (2013); Council for Tribal Emp't Rights v. United States, 112 Fed. Cl. 231, 243 (2013), aff'd, 556 F. App'x 965. "'A well pleaded allegation of an express, or implied-in-fact, contract necessarily includes allegations going to each of the requisite elements of a contract.'" De Archibold v. United States, 57 Fed. Cl. 29, 32 (2003) (quoting McAfee v. United States, 46 Fed. Cl. 428, 432, appeal dismissed, 243 F.3d 565 (Fed. Cir. 2000)).  "For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established." Russell Corp. v. United States, 210 Ct. Cl. 596, at 606, 537 F.2d 474, at 481 (1976), cert. denied, 429 U.S. 1073 (1977).

Regarding the offer for the First Alleged Contract between the defendant and the four plaintiffs which did not sign the Release, plaintiffs BRMC, McLaren, Gifford, and Lakewood, plaintiffs argue that "[t]hrough the issuance of the April 25 Letter, the Notice, and the Frequently Asked Questions, the Government offered to analyze Plaintiffs' outpatient claims for possible additional payment and specified the terms on which the

analysis would take place." Plaintiffs also argue that Step 2 of the process outlined in the Notice specified how this offer was to be accepted: by the hospitals submitting a completed Spreadsheet to the defendant. Plaintiffs argue that the language of these documents shows that the government intended to contract with the plaintiffs, pointing to the statement in the April 25, 2011 Letter that "hospitals may be paid an adjustment . . . in return for your acceptance of DoD's offer of additional payment based on criteria established by the agency." Plaintiffs also argue that defendant showed an intent to enter into a contract by advising hospitals that payment was contingent upon the signing of the Release.

"To satisfy its burden to prove mutual intent to contract, a plaintiff must proffer objective evidence demonstrating the existence of an offer and a reciprocal acceptance." Am. Fed. Bank, FSB v. United States, 62 Fed. Cl. 185, 194 (2004) (citing Anderson v. United States, 344 F.3d at 1353 (citing Estate of Bogley v. United States, 206 Ct. Cl. 695, 704–05, 514 F.2d 1027, 1032 (1975); Restatement (Second) of Contracts § 22(1) (1981))). With regard to an implied-in-fact contract, "[a]lthough an express offer and acceptance are not necessary, the parties' conduct must indicate mutual assent" to the proposed bargain. AG Route Seven P'ship v. United States, 57 Fed. Cl. 521, 536–37 (2003) (citing City of Cincinnati v. United States, 153 F.3d at 1377), aff'd sub nom. AG Route Seven P'ship v F.D.I.C., 104 F. App'x 184 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004).

As plaintiffs recognize, "an offer is made by 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" Anderson v. United States, 344 F.3d at 1353 (quoting Restatement (Second) of Contracts § 24 (1981)); see also Am. Fed. Bank, FSB v. United States, 62 Fed. Cl. at 194. Yet, "[a]n offer does not exist unless the offeror manifests an intent to be bound." Neenan v. United States, 112 Fed. Cl. 325, 329 (2013), aff'd, 570 F. App'x 937 (Fed. Cir. 2014) (citing Linear Tech. Corp. v. Micrel, Inc., 275 F.3d 1040, 1050 (Fed. Cir. 2001), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 1052 (2003)); see also Estate of Bogley v. United States, 514 F.2d at 1032 ("An expression of intention is not an offer.").

As defendant notes in its reply to plaintiffs' opposition to the motion to dismiss, quoting Estate of Bogley v. United States, 514 F.2d at 1032, even despite detailed terms, "[s]ince an offer must be a promise, a mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer." Estate of Bogley v. United States, 514 F.2d at 1032; see also Neenan v. United States, 112 Fed. Cl. at 329 ("A document may show the 'willingness to enter a bargain' but it 'is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.'" (quoting Restatement (Second) of Contracts § 26 (1981))). Moreover, "[f]or a contract to be formed once an offer is made, there must be an acceptance, i.e., a 'manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" Anderson v. United States, 344 F.3d at 1355 (quoting Restatement (Second) of Contracts § 50(1)

(1981)). "[W]hether an offeree's conduct 'constitutes an acceptance will depend upon whether the offeror reasonably understands it to be an acceptance and whether it reasonably appears to conclude a contract or whether it leaves matters yet to be concluded.'" Am. Fed. Bank, FSB v. United States, 62 Fed. Cl. at 198 (quoting Williston on Contracts § 6.10, at 71 (4th ed. 1990)). "'This rule, espoused by the Restatement (Second), operates to protect the offeror who acts reasonably in relation to what he supposes is intended to operate as an acceptance, yet provides the offeror with significant flexibility as the master of his offer.'" Id. (quoting Williston on Contracts § 6.10, at 74). "The Court may read all the documents together in order to find the intention of the parties." Advanced Team Concepts, Inc. v. United States, 68 Fed. Cl. 147, 151 (2005) opinion clarified, 77 Fed. Cl. 111 (2007) (citing AG Route Seven P'ship v. United States, 57 Fed. Cl. at 536); see also Restatement (Second) of Contracts § 26, cmt. f (1981) ("*Preliminary manifestations as terms of later offer.* Even though a communication is not an offer, it may contain promises or representations which are incorporated in a subsequent offer and hence become part of the contract made when the offer is accepted." (emphasis in original)).

Plaintiffs' alleged offer for the First Alleged Contract, the April 25, 2011 Letter, the Notice, and the FAQs, may have shown a willingness on the part of the agency to enter into a bargain. The language of the documents, however, also established that the agency did not intend to conclude a bargain by virtue of the hospitals' submission of the Spreadsheet. Instead, the language of these documents demonstrates that defendant would not enter into a bargain until after analysis of the information submitted by the hospitals and the execution of the Release by the hospitals. The April 25, 2011 Letter provided that "[d]etailed instructions will be posted on the TRICARE Management Activity Web site . . . explaining the manner in which a hospital may request that your institution's claims data be reviewed for appropriate discretionary adjusted payments." (emphasis added). The April 25, 2011 Letter did not indicate that the request for review would conclude the bargain and result in payment. Instead, the April 25, 2011 Letter indicated that, even after the request for review, payment was uncertain and subject to availability of appropriations and the hospital's acceptance of DoD's offer of additional payment, stating: "Based on the request, your hospital may be paid an adjustment, subject to the availability of appropriations, in return for your acceptance of DoD's offer of additional payment based on criteria established by the agency." (emphasis added). The April 25, 2011 Letter further provided that payment was contingent on the hospital's execution of the Release, and concluded by indicating the agency "remain[s] committed to working with you to complete the analysis of claims data and determine if any additional payments may be allowed." (emphasis added).

Similarly, the Notice established that any alleged offer related to conditional payments, not simply calculations. The Notice stated that "TRICARE is now offering hospitals an opportunity for discretionary adjusted payments" and "TMA is offering hospitals an opportunity for any net adjustments to payments of hospital outpatient radiology services." (emphasis added). Moreover, the Notice provided that "[h]ospitals may request an analysis of their claims data for possible discretionary adjustment," (emphasis added), refers to such a request as a "submission," and does not use the

phrase, or invoke the concept of, acceptance. Similar to the April 25 Letter, the Notice provided that "[b]ased on the <u>request</u> and <u>subject to the availability of funds</u>, each hospital will receive adjusted payments in return for <u>acceptance of DoD's offer of additional payment based on criteria established by the agency</u>," (emphasis added), and included the same language regarding the contingency of payment upon the hospital's execution of the Release. Like the April 25, 2011 Letter, the Notice contemplated that a number of further steps were required to conclude a bargain, even after the hospitals' submission of the Spreadsheet.

The strongest indication that submission of the Spreadsheet did not result in a contract, and that the agency intended further actions before a contract was formed, is the description of the nine-step process in the Notice outlining "the review of payments for hospital outpatient radiology services and payment of any discretionary net adjustments." The methodology itself begins with Steps 1 and 2 describing the submission of the Spreadsheet and how a "[h]ospital submits a request for analysis of their claims data" and ends with Steps 8 and 9, explaining how the agency will send a "written response to the hospital's request" that will "include a <u>release and agreement to accept the discretionary adjusted payment by the hospital</u>." (emphasis added). Step 9 of methodology concludes by indicating that "[f]ollowing receipt of the signed release and agreement, payment will be made to the hospital." (emphasis added). The nine-step process demonstrates that the Spreadsheet was merely the beginning of a negotiating process between the agency and a requesting hospital. See <u>Am. Fed. Bank, FSB v. United States</u>, 62 Fed. Cl. at 198 ("[W]hether an offeree's conduct 'constitutes an acceptance will depend upon whether the offeror reasonably understands it to be an acceptance and whether it reasonably appears to conclude a contract or whether it leaves matters yet to be concluded.'" (quoting Williston on Contracts § 6.10, at 71)).

Plaintiffs' First Alleged Contract also fails to establish a contract between plaintiffs and defendant because plaintiffs have not sufficiently pled facts to establish valid consideration for the four named plaintiffs alleged to have accepted the contract, which did not sign the Release. It is "fundamental that a contract must be supported by sufficient and valuable consideration." <u>Estate of Bogley v. United States</u>, 514 F.2d at 1033. "Consideration is defined as a 'detriment incurred by the promisee, or a benefit received by the promisor at the request of the promisor.'" <u>Woll v. United States</u>, 45 Fed. Cl. at 477 (quoting <u>Estate of Bogley v. United States</u>, 514 F.2d at 1033 (quoting 1 Williston, Contracts § 102 (1957)); <u>see also</u> <u>Carter v. United States</u>, 102 Fed. Cl. at 66 ("Consideration is generally a bargained for exchange consisting of an act, forbearance, or return promise" (citing Restatement (Second) Contracts §§ 71, 72 (1981); <u>J. Cooper & Assocs., Inc. v. United States</u>, 53 Fed. Cl. 8, 18 (2002), <u>aff'd</u>, 65 F. App'x 731 (Fed. Cir. 2003)). Yet, "'[a] promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances.'" <u>Crewzers Fire Crew Transp., Inc. v. United States</u>, 741 F.3d 1380, 1382 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 77 (1979)); <u>Ridge Runner Forestry v. Veneman</u>, 287 F.3d at 1061 (quoting Restatement (Second of Contracts § 77). An illusory promise is "words in promissory form that promise nothing; they do not purport to put any limitation on the freedom of the alleged promisor, but leave his future action subject to his own

future will, just as it would have been had he said no words at all." <u>Ridge Runner Forestry v. Veneman</u>, 287 F.3d at 1061 (citing <u>Torncello v. United States</u>, 231 Ct. Cl. 20, 42, 681 F.2d 756, 769 (1982) (quoting 1 Corbin on Contracts § 145 (1963)). "'It is axiomatic that a valid contract cannot be based upon the illusory promise of one party, much less illusory promises of both parties.'" <u>Crewzers Fire Crew Transp., Inc. v. United States</u>, 741 F.3d at 1383 (quoting <u>Ridge Runner Forestry v. Veneman</u>, 287 F.3d at 1062 (citing Restatement (Second) of Contracts § 71(1))).

Plaintiffs argue that by submitting the Spreadsheet to defendant, "they were accepting Defendant's offer to contract and agreeing to be bound to the conditions and procedures set forth in the offering documents, which agreement is sufficient consideration for an enforceable contract." Tellingly, plaintiffs do not specify any "conditions and procedures" the submission of the Spreadsheet allegedly bound them to when submitted. In fact, submission of the Spreadsheet did not commit plaintiffs to take, or refrain from taking, any particular course of action, as demonstrated by the fact that three of the five plaintiffs submitted Spreadsheets, but did not ultimately sign the Release and accept the adjusted payments, and plaintiff BRMC was found not to be eligible. Nor have plaintiffs alleged that the defendant received any sort of benefit from the submission of their completed Spreadsheets. Thus, as defendant states in its motion to dismiss, "Plaintiffs confuse a binding 'agreement to be paid' with an inquiry as to how much they would be paid, if they signed a release." Such an "agreement" as alleged by plaintiffs lacks valid consideration.

Plaintiffs also allege an express contract between defendant and those hospitals that signed that Release, the Second Alleged Contract, which plaintiffs allege involved "an agreement by Defendant to make a proposed payment to the hospitals in return for their release of all their rights to reimbursement for All Outpatient Services for the Relevant Time." The only hospital among the named plaintiffs that signed the Release, and, thus, the only named plaintiff alleged to be a party to the Second Alleged Contract, is plaintiff Ingham. Plaintiffs allege the Second Alleged Contract was composed of six documents: the April 25, 2011 Letter, the Notice, the FAQs, the Spreadsheet, the Payment Adjustment Worksheet, and the Release.[7] Quoting the Release, plaintiffs allege that the terms of the Second Alleged Contract "required Defendant, *inter alia*, to calculate and pay the amount that was owed to each hospital for All Outpatient Services in the manner specified in 'DoD's letter dated April 25, 2011.'" According to plaintiffs, under the terms of the April 25, 2011 Letter, this payment was required "to be calculated pursuant to the nine-step process set forth in the Notice." Plaintiffs also argue that the defendant's labelling of the process involved in the Second Alleged Contract as a regulatory-based "discretionary payment process" is without legal support or effect because the regulation defendant claimed authorized the process, 32 C.F.R. § 199.10 (2010), was "inapplicable and did not provide the authority for TRICARE to do what it did."

---

[7] As noted above the, first five documents, the April 25, 2011 Letter, the Notice, the FAQs, the Spreadsheet, and the Payment Adjustment Worksheet were alleged to form the First Alleged Contract.

Defendant challenges the validity of the Second Alleged Contract on the grounds that plaintiffs have failed to adequately: (1) allege the existence of a mutual intent to contract; (2) identify a valid offer and acceptance; and (3) demonstrate that the contract was entered into by a person with actual authority to bind the United States. Defendant also argues that, even if the Second Alleged Contract were found to be valid, plaintiffs have failed to allege a breach of the contract. Finally, defendant argues that the court lacks jurisdiction to hear any claims arising out of the Second Alleged Contract because any hospitals alleged to be parties to the Second Alleged Contract signed the Release and, thus, waived their right to bring any claims for breach of the Second Alleged Contract.

Turning first to mutual intent to contract, defendant argues that the government did not intend to enter into any contracts as part of the Discretionary Payment Process, but instead "[t]he stated intent of the agency was to offer the hospitals an opportunity to apply for net adjustments in payments for outpatient radiology services, within the framework of the TRICARE regulatory scheme, not as part of a contractual relationship." In support of this argument, defendant points to language in both the April 25, 2011 Letter and the Notice stating that the defendant would treat the submission as an "untimely but discretionary appeal" under 32 C.F.R. § 199.10(a)(5) and (c). Defendant argues that the agency had the authority to create the Discretionary Payment Process under 32 C.F.R. § 199.1(n) (2010). The court notes, "[a]s a threshold condition for contract formation, there must be an objective manifestation of voluntary, mutual assent." Anderson v. United States, 344 F.3d at 1353 (citing Restatement (Second) of Contracts § 18). The United States Court of Appeals for the Federal Circuit recognized in D&N Bank v. United States, 331 F.3d 1374, 1378–79 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2003) that, "[a]n agency's performance of its regulatory or sovereign functions does not create contractual obligations. Something more is necessary." Id. (citing New Era Constr. v. United States, 890 F.2d 1152, 1155 (Fed. Cir. 1989), reh'g denied (Fed. Cir. 1990)) (internal citation omitted). In Anderson v. United States, the Federal Circuit elaborated on what constitutes "something more," indicating "[t]hat 'something more' must be, according to our precedent, a 'manifest assent to the same bargain proposed by the offer.'" Anderson v. United States, 344 F.3d at 1356. As the Federal Circuit recognized in Fifth Third Bank of Western Ohio v. United States, 402 F.3d 1221, 1234 (Fed. Cir.), reh'g denied (Fed. Cir. 2005), however, Anderson v. United States and D&N Bank v. United States "do not stand for the proposition that contractual terms cannot be found in agency regulatory documents." Fifth Third Bank of Western Ohio v. United States, 402 F.3d at 1234. The Federal Circuit stated in First Commerce Corp. v. United States:

> If the elements of contract formation are absent, then the government was acting solely in its regulatory capacity; if a contract was formed, then the government may be liable for its breach. To assert that the government was acting solely in its regulatory capacity is to assert a conclusion about contractual liability, not a premise that negates it. As we held in D & N Bank, the supervisory nature of the business transaction is not "probative of the government's intent to contract." D & N Bank, at 1380. Nor can the characterization of "regulatory" or "supervisory" absolve the government of

24

its contractual liability if it is shown that the government has indeed bound itself by contract.

First Commerce Corp. v. United States, 335 F.3d 1373, 1383 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

In the case currently before the court, the government was making an offer to issue discretionary payments to hospitals which had performed outpatient radiology services if the formula developed by defendant showed the hospitals were due payments and the hospitals signed the Release. The court finds that the regulations cited by defendant, 32 C.F.R. § 199.10(a)(5) and (c), are not a neat fit for the program defendant was trying to implement. In the versions of the regulations in effect at the time the April 25, 2011 Letter was issued, 32 C.F.R. § 199.10 provided for "[a]ppeal and hearing procedures" and 32 C.F.R. § 199.10(a) provided "General" information regarding "policies and procedures for appealing decisions made by OCHAMPUS [Office of the Civilian Health and Medical Program], OCHAMPUSEUR [Office of the Civilian Health and Medical Program Uniformed Services Europe], and CHAMPUS contractors adversely affecting the rights and liabilities of CHAMPUS beneficiaries, CHAMPUS participating providers, and providers denied the status of authorized provider under CHAMPUS." 32 C.F.R. § 199.10(a) (2010). 32 C.F.R. § 199.10(a)(5) provided:

> *Late filing.* If a request for reconsideration, formal review, or hearings is filed after the time permitted in this section, written notice shall be issued denying the request. Late filing may be permitted only if the appealing party reasonably can demonstrate to the satisfaction of the Director, OCHAMPUS, or a designee, that the timely filing of the request was not feasible due to extraordinary circumstances over which the appealing party had no practical control. Each request for an exception to the filing requirement will be considered on its own merits. The decision of the Director, OCHAMPUS, or a designee, on the request for an exception to the filing requirement shall be final.

32 C.F.R. § 199.10(a)(5) (2010). 32 C.F.R. § 199.10(c) provided the process for "Formal review." 32 C.F.R. § 199.10(c) (2010).

Defendant alleges that 32 C.F.R. § 199.10(a)(5) granted the Director of OCHAMPUS the discretion to grant "an exception to the timely filing of an appeal," and that the Director used this power to implement the Discretionary Payment Process as, in the words of the April 25, 2011 Letter, means by which hospitals could apply for an "untimely but discretionary appeal." As noted above, the Discretionary Payment Process is not a neat fit into the provisions of 32 C.F.R. § 199.10(a)(5). The language of 32 C.F.R. § 199.10(a)(5) provides that the appealing party must demonstrate "that the timely filing of the request was not feasible due to extraordinary circumstances over which the appealing party had no practical control" and "[e]ach request for an exception to the filing requirement will be considered on its own merits." 32 C.F.R. § 199.10(a)(5) (2010). The hospitals were not asked to make such a demonstration of extraordinary circumstances as part of the Discretionary Payment Process. However, the defendant did indicate in the

Notice that it was responding to an unusual set of circumstances regarding its own "interpretation and implementation of the TRICARE regulation provision on reimbursement of hospital outpatient services as issued in the Final Rule on October 24, 2005," which affected a potential large number of providers and was designed as a one-time fix for a defendant-identified problem. Moreover, this was defendant's initiative and much of the relevant data necessary to make any adjustments was held by the defendant.

Even if 32 C.F.R. § 199.10(a)(5) did provide the DHA Director with broad discretion, including the discretion to set up the Discretionary Payment Process, certain provisions of 32 C.F.R § 199.10(c) governing formal review were not strictly followed. The version of 32 C.F.R §199.10(c)(2) in place at the time of the Discretionary Payment Process states: "[t]he formal review determination shall be based on the information, upon which the initial determination and/or reconsideration determination was based, and any additional information the appealing party may submit or OCHAMPUS may obtain." 32 C.F.R. § 199.10(c)(2) (2010)). In the present case, the exhibits reflect that the hospitals were clearly instructed that the hospitals should not submit any additional information with their requests for analysis of claims data, other than to request an analysis based on the application of defendant's new payment formula to their original submissions. Thus, in answer to question 2 of the FAQs, "Will I need to provide further information such as claims-level data or identify the relevant claims or patients?," the defendant's response was, "No, you will not. TRICARE will do this. You need to submit only the information in the Excel sheet. Do not submit patient-level data."" Moreover, under 32 C.F.R. § 199.10(c)(4), the regulations required that "[t]he Chief, Office of Appeals and Hearings, OCHAMPUS, or a designee shall issue a written notice of the formal review determination to the appealing party at his or her last known address." 32 C.F.R. § 199.10(c)(4). Under this section, the regulations instructed that:

> The notice of the formal review determination must contain the following elements:
>
> (i) A statement of the issue or issues under appeal.
>
> (ii) The provisions of law, regulation, policies, and guidelines that apply to the issue or issues under appeal.
>
> (iii) A discussion of the original and additional information that is relevant to the issue or issues under appeal.
>
> (iv) Whether the formal review upholds the prior determination or determinations or reverses the prior determination or determinations in whole or in part and the rationale for the action.
>
> (v) A statement of the right to request a hearing in any case when the formal review determination is less than fully favorable, the issue is appealable, and the amount in dispute is $300 or more.

32 C.F.R. § 199.10(c)(4) (2010). Plaintiffs assert in their opposition to defendant's motion to dismiss that "[n]o such notice was provided to the Plaintiffs," in other words, the Notice to plaintiffs did not contain the elements of notification required under 32 C.F.R. § 199.10. Although the hospitals were notified of the dollar recalculations in the Payment Adjustment Worksheets, defendant has not argued that the Payment Adjustment Worksheet or any other document met any of the requirements of 32 C.F.R. § 199.10(c)(4).

Defendant also argues that the authority to devise the Discretionary Payment Process is found in 32 C.F.R. § 199.1(a) and (n). The applicable version of 32 C.F.R. § 199.1(a) states that the purpose of the section is to "prescribe[] guidelines and policies for the administration of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS)," while sub-section (n) states:

> (n) *Discretionary authority.* When it is determined to be in the best interest of CHAMPUS, the Director, OCHAMPUS, or a designee, is granted discretionary authority to waive any requirements of this part [32 C.F.R. part 199, the TRICARE/CHAMPUS regulations], except that any requirement specifically set forth in 10 U.S.C. chapter 55 [10 U.S.C. §§ 1071 – 1110b, the TRICARE/CHAMPUS statute], or otherwise imposed by law, may not be waived. It is the intent that such discretionary authority be used only under very unusual and limited circumstances and not to deny any individual any right, benefit, or privilege provided to him or her by statute or this part. Any such exception granted by the Director, OCHAMPUS, or a designee, shall apply only to the individual circumstance or case involved and will in no way be construed to be precedent-setting.

32 C.F.R. § 199.1(a), (n) (2010).

Defendant argues that because CMAC fixed maximum payment rates are not specifically set forth in 10 U.S.C., Chapter 55, the Director had authority "to 'waive' the CMAC requirement for radiology in an unusual and limited circumstance," despite the fact that the documents in the record do not reveal contemporaneous documentation that discusses the Director's authority to act as was done under 32 C.F.R. § 199.1. Although defendant has not offered an explanation as to why the Discretionary Payment Process, which plaintiffs allege could have affected a large number of hospitals, might qualify as a "very unusual and limited circumstance[]," 32 C.F.R. § 199.1(n) (2010), the defendant's actions were limited to a one-time adjustment related only to outpatient radiology services. However, even if 32 C.F.R § 199.1(n) did give defendant the power to "waive" the CMAC rate with respect to outpatient radiology payments, it did not grant defendant the affirmative power to, years after such payments had already been made, set up a process to provide hospitals with additional payments designed to approximate "pre-OPPS Medicare fair rates" and to actually make such payments, as was done during the Discretionary Payment Process. Such actions should not be characterized solely as a waiver of existing regulations, and, therefore, the authority to create the Discretionary Payment Process is not found in 32 C.F.R § 199.1, alone, as defendant claims.

27

Whereas the Discretionary Payment Process set up by defendant may not have strictly met the standard steps for processing appeals, the program's goals were consistent with the regulatory framework. The hospitals were offered a possible benefit, which is consistent with the purpose of the "discretionary authority" in 32 C.F.R § 199.1(a). The relevant documents before the court indicate that at least the TRICARE's goal was to resolve the ongoing concerns on the part of the hospitals regarding alleged past payments due for outpatient services in exchange for the hospitals' agreement to waive all claims regarding those payments once payments for outpatient radiology services were adjusted. Both the April 25, 2011 Letter and the Notice indicated, as stated in the April 25, 2011 Letter, that:

> In order to bring closure to any concerns regarding payment of hospital outpatient services under the TRICARE regulation prior to implementation of OPPS, payment of the discretionary adjustments will also be contingent [or, as stated in the Notice, "conditioned"] on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries, and TRICARE MCSCs.

Indeed, Step 9 of the Notice provided that plaintiffs would not receive the adjusted payment until they sent the agency a signed release. Finally, the Release itself explicitly stated these terms using the language of contract:

> By accepting the offer of the Department of Defense ("DoD") to provide a net adjustment to prior payments of hospital radiology services as described in the DoD's letter dated April, [sic] 25, 2011 . . . Hospital . . . shall completely release, acquit, and forever discharge the Government, TRICARE beneficiaries, and any MCSCs . . . .

(emphasis added).

Defendant also argues that plaintiffs' claims regarding the Second Alleged Contract should be dismissed because plaintiffs fail to identify which of the six documents allegedly comprising the Second Alleged Contract constitute the alleged offer and which the acceptance. Defendant argues that, of the six documents composing the Second Alleged Contract, only the Release actually commits or requires plaintiffs to do anything, and that the only action required of the defendant was to provide "a net adjustment," which, it argues, was done. Plaintiffs respond by stating that all six documents allegedly composing the Second Alleged Contract "read together set forth the terms of the contract." Plaintiffs further argue that, even standing alone, the Release, as a "settlement agreement," constituted a contract between the parties. As to what was required of defendant by the Release, plaintiffs point out that the Release stated that defendant would provide a "net adjustment to prior payments . . . *as set forth in DoD's letter of April 25, 2011.*" (emphasis added by plaintiffs). According to plaintiffs, this language incorporated by reference the terms of the April 25, 2011 Letter into the Release. Further, plaintiffs point to language in the April 25, 2011 Letter stating that hospitals "may be paid an adjustment . . . *in return for your acceptance of DoD's offer of additional payment based on criteria established by the agency*," and argue that the "criteria established by the

agency" was the nine-step process outlined in the Notice. (emphasis added by plaintiffs). Plaintiffs also argue that the statement in the April 25, 2011 Letter that "Detailed instructions will be posted on the TRICARE Management Activity Web site," incorporated by reference materials posted to the website, which it alleges included the Notice and the FAQs. Thus, plaintiffs argue, under the Second Alleged Contract, "[t]he government was not free to provide any net adjustment it saw fit to provide, it was bound to provide the net adjustment that proper application of the nine-step process would have yielded and its failure to do so was a breach."

Both parties appear to agree that, if an eligible hospital signed the Release after proceeding through each of the offer steps outlined by the defendant, the defendant agreed to bind itself to "provide a net adjustment to prior payments of hospital outpatient radiology services as described in the DoD's letter dated April, [sic] 25, 2011," in exchange for plaintiffs' agreement to waive all reimbursement related claims. The parties disagree, however, as to whether the language of the Release incorporates the other documents on which plaintiffs try to rely to allege the Second Alleged Contract came into existence.

"[T]o incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents [identified]." Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1344 (Fed. Cir. 2008) (quoting Cook Biotech Inc. v. Acell, Inc., 460 F.3d 1365, 1376 (Fed. Cir.) (quoting Advanced Display Sys. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000), cert. denied, 532 U.S. 904 (2001)), reh'g and reh'g en banc denied (Fed. Cir. 2006))  (second alteration in original). "In other words, the incorporating contract must use language that is express and clear, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract." Id.; see also Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 826 (Fed. Cir. 2010) ("To incorporate material by reference, a contract must use clear and express language of incorporation, which unambiguously communicates that the purpose is to incorporate the referenced material, rather than merely acknowledge that the referenced material is relevant to the contract.") (citing Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d at 1344-45); 11 Richard A. Lord, Williston on Contracts § 30.25 (4th ed. 1999) ("So long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document. . . ."). This requirement, however, "does not amount to a rule that contracting parties must use a rote phrase or a formalistic template to effect an incorporation by reference." Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d at 1345.

The language of the Release clearly and expressly incorporated the terms of the April 25, 2011 Letter. Defendant's argument that, "[h]ad the government intended to 'incorporate' the April 25, 2011 letter . . . in the release, it would have so stated," fails because incorporation by reference "does not require 'magic words' of reference or of incorporation." Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d at 1346.

The Release specifically referenced the April 25, 2011 Letter by stating: "By accepting the offer of the Department of Defense ('DoD') to provide a net adjustment to prior payments of hospital outpatient radiology services as described in the DoD's letter dated April, [sic] 25, 2011 . . . ." The April 25, 2011 Letter, in turn, stated that "[d]etailed instructions" would be posted on a specific page on TRICARE's website, www.tricare.mil/RadiologyDiscretionaryAppealAdjustment, "explaining the manner in which a hospital may request that your institution's claims data be reviewed for appropriate discretionary adjusted payments." Plaintiffs allege in their amended complaint that both the FAQ and the Notice were posted on this webpage. The April 25, 2011 Letter continued that, based on this request, a payment may be made "in return for your acceptance of DoD's offer of additional payment based on criteria established by the agency." Although the April 25, 2011 Letter did not mention the Notice and FAQs by name, it did identify a specific page on TRICARE's website where "[d]etailed instructions" could be found. That both the Notice and the FAQs contained what could reasonably be considered "[d]etailed instructions" regarding the Discretionary Payment Process and both were, allegedly, found on the specific webpage identified in the April 25, 2011 Letter, indicates that the plaintiffs have pled sufficient facts to show that the Letter provided the required "detailed particularity" to make clear it was referring to the Notice and the FAQ. Whether there is reasonable doubt as to whether these documents were incorporated into the terms of the Release is a closer question. When considered in the light most favorable to plaintiffs, the following facts suggest that there is sufficient evidence showing that they were being incorporated into the Release: the April 25, 2011 Letter refers to the referenced documents as "[d]etailed instructions . . . explaining the manner in which a hospital may request that [its] claims data be reviewed"; the Notice included "detailed instructions," in the form of the nine-step process, for both for hospitals to follow in submitting their claims and for the defendant to follow in computing payment offers, while the FAQs provide clarifications regarding these instructions; immediately after mentioning these instructions, the April 25, 2011 Letter stated that a hospital may be paid in return for DoD's "offer of additional payment"; and that the April 25, 2011 Letter stated that this offer will be "based on criteria established by the agency," although no other possible source for this criteria is mentioned. Thus, plaintiffs have pled sufficient facts to show that the Release incorporated by reference the April 25, 2011 Letter, which, in turn, incorporated the nine-step process included in the Notice, as clarified in the FAQs.

The terms of the offer by the defendant in the Release, thus, included a promise on the part of the defendant to "provide a net adjustment to prior payments of hospital outpatient radiology services," if the hospital and defendant complied with the nine-step process laid out in the Notice and if, after analysis, the hospital was eligible according to the determination of the defendant to receive the additional payment. Step 8 of the Notice's process stated that a "written response" including "the calculated adjusted payment and the calculations from which the adjustment was derived," that is the Payment Adjustment Worksheet, would be sent to those hospitals requesting additional payments, and step 9 stated that the Release would be included along with the Payment Adjustment Worksheet. Step 9 also stated that if, within 30 days, the Release was then returned to TMA, payment would be made to the hospital. Thus, the sending of the Payment Adjustment Worksheet and the Release to the plaintiffs constituted the

defendant's offer under the Second Alleged Contract. Both the Release, which stated that this offer was made in return for the hospital's agreement to waive all payment related claims against the DoD, and included a signature line at the bottom, and the Notice made clear that return of the signed Release, which plaintiff Ingham did, constituted acceptance of this offer. Plaintiffs, therefore, have sufficiently pled the existence of an unambiguous offer and acceptance of the Second Alleged Contract, as between defendant and plaintiff Ingham.

With respect to the existence of a government representative with the authority to bind the government to the apparent Second Alleged Contract, plaintiffs allege that TMA Deputy Director Hunter, who signed the April 25, 2011 Letter, had authority to contract with plaintiffs. Plaintiffs also contend, that "at all times relevant herein," Deputy Director Hunter was acting at the direction of, and with the approval of, the Director of TMA, who also had the authority to contract with plaintiffs. Defendant denies that either the deputy director or the director of TMA had such authority.

It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority. See Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); Trauma Serv. Grp. v. United States, 104 F.3d at 1325; Urban Data Sys., Inc. v. United States, 699 F.2d 1147, 1153 (Fed. Cir. 1983). Contractors dealing with the United States must inform themselves of a representative's authority and the limits of that authority. See Fed. Crop Ins. Corp. v. Merrill, 332 U.S. at 384 ("[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority."); Trauma Serv. Grp. v. United States, 104 F.3d at 1325 ("[T]his risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority."); see also Flexfab, LLC v. United States, 424 F.3d at 1260; Total Med. Mgmt., Inc. v. United States, 104 F.3d at 1321; Council for Tribal Emp't Rights v. United States, 112 Fed. Cl. at 243; Jumah v. United States, 90 Fed. Cl. 603, 612 (2009), aff'd, 385 F. App'x 987 (Fed. Cir. 2010); Aboo v. United States, 86 Fed. Cl. 618, 627, aff'd, 347 F. App'x 581 (Fed. Cir. 2009).

A government representative with the requisite authority generally is a required element of both express and implied-in-fact federal contracts. An officer of the United States who does not possess express contracting authority may bind the United States under limited circumstances, but only if he or she has "implied actual authority." See Winter v. Cath-dr/Balti Joint Venture, 497 F.3d 1339, 1344, 1346 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007); see also Salles v. United States, 156 F.3d 1383, 1384 (Fed. Cir. 1998); H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989) ("Authority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.") (quoting J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982)); Vargas v. United States, 114 Fed. Cl. 226, 235 (2014); Son Broad., Inc. v. United States, 52 Fed. Cl. 815, 820 (2002) ("Actual authority may be implied when such authority is 'an integral part of the duties assigned to a [g]overnment employee.'" (quoting Roy v. United States, 38 Fed. Cl. 184, 189, dismissed, 124 F.3d 224 (Fed. Cir. 1997))). Plaintiffs bear the

burden of proving that the Deputy Director of TMA, Rear Admiral Hunter, or the TMA Director had such authority. The fact that plaintiffs may have believed Deputy Director Hunter or the TMA Director held such authority is not sufficient. See Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1432 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998), cert. denied, 525 U.S. 1177 (1999); see also Trauma Serv. Grp. v. United States, 104 F.3d at 1327 (The plaintiff "must prove all of the requirements for a binding contract in order to prevail" and "must allege facts sufficient to show that the Government representative who entered into its alleged implied-in-fact contract was a contracting officer or had implied actual authority to bind the Government."). Although apparent authority will not suffice to hold the government bound by the acts of its agents, see Fed. Crop Ins. Corp. v. Merrill, 332 U.S. at 384, implied actual authority, like express actual authority, will suffice.

Plaintiffs do not allege that the Director or Deputy Director of TMA possessed express authority to enter into the alleged contracts. Instead, plaintiffs apparently argue that Deputy Director Hunter possessed implied authority to enter into the alleged contracts, focusing on their allegations on the extent of her duties. Plaintiffs allege in their amended complaint that, "[a]s the Deputy Director of TRICARE[,] Rear Admiral Hunter coordinated health care for 9.6 million military beneficiaries and managed TRICARE's multi-billion dollar portfolio." In their opposition to defendant's motion to dismiss, plaintiffs also offer excerpts from a DoD report, titled "A Report to Congress on the Organizational Structure of the Office of the Assistant Secretary of Defense for Health Affairs and the TRICARE Management Activity," in support of their argument. The excerpted portions of the report describe the position of the Deputy Director, TMA, stating that she "[s]erves as the principal advisor to, and acts at all times on behalf of, the TMA Director and Principal Deputy Director on all operational aspects of development and execution of TRICARE. Under the general supervision of TMA Director and Principal Deputy Director, the incumbent directs and manages TMA." The excerpts then go on to list the Deputy Director's "functions," stating that she "[m]anages health and medical resources of the TRICARE managed care benefit program" and "[d]evelops, maintains, and provides guidance for the integrated system for contracting and acquisition support for health care, dental pharmacy, and other health programs, claims processing services, and other administrative functions to support TRICARE."

In its motion to dismiss, defendant argues that Deputy Director Hunter's high level position does not necessarily mean that she had any authority, implied or actual, to enter into contracts with the plaintiffs. Defendant further argues that the authority of the Director and Deputy Director of TMA is derived from DoD Directive Number 5136.12, dated May 31, 2001, and, that, under that directive, neither the Director nor the Deputy Director of TMA would have the authority to enter into the contracts plaintiffs allege. Defendant first points to paragraph 6.2.9 of Directive 5136.12, which sets forth the following "responsibilities and functions" of the Director with respect to contracting: "Contract for managed care support, dental support, other health programs, claims processing services, studies and research support, supplies, equipment, and other services necessary to carry out the TRICARE and support the MHS [Military Health System]." DoD Directive 5136.12, ¶ 6.2.9 (May 31, 2001). Defendant argues that the establishment of

the Discretionary Payment Process was not among the "services necessary to carry out the TRICARE." Defendant next points to Directive 5136.12, paragraph 8.1.4, which grants the "specifically delegated authority" to the Director TMA to "[e]xercise the administrative authorities contained in enclosure 3." Defendant then quotes a portion of enclosure 3 to Directive 5136.12, which states that "the Director, TMA, or in the absence of the Director, the person acting for the Director, is delegated authority as required in the administration and operation of the TMA to":

> Enter into and administer contracts, through the TMA Directorate of Acquisition Management and Support or through a Military Department, a DoD contract administration services component, or other Federal Agency, as appropriate, for supplies, equipment, and services required to accomplish the mission of the TMA. The Director, AM&S [Acquisition Management and Support], shall be the head of the contracting activity.

DoD Directive 5136.12, Enclosure 3, ¶ E3.1.1.16. Defendant argues, similar to its argument regarding Directive 5136.12, paragraph 6.2.9, that the Discretionary Payment Process did not involve "supplies, equipment, and services required to accomplish the mission of the TMA." Additionally, defendant argues that this language shows that the Director has "no independent contracting authority" but must instead contract through the Director of Acquisition Management and Support. Defendant finally argues that the powers of the Deputy Director could not have been greater than those of the Director, pointing to the provision of enclosure 3 granting the Director the power to "redelegate these authorities [enumerated in enclosure 3] as appropriate, with the approval of the ASD(HA) and in writing, except as otherwise specifically indicated above or as otherwise provided by law or regulation." DoD Directive 5136.12, Enclosure 3, ¶ E3.1.2.

Upon review, the court, when drawing all reasonable inferences in favor of plaintiffs, does not read Directive 5136.12 to be as limiting as defendant argues. Initially, the grant of areas for which the Deputy Director has the power to contract contained in Directive 5136.12, includes not only "services required to accomplish the mission of the TMA," DoD Directive 5136.12, Enclosure 3, ¶ E3.1.1.16, but also includes "managed care support," "other health programs," and "claims processing services," DoD Directive 5136.12, paragraph 6.2.9, a broad range of categories related to the management of the TMA/DHA program, which might indeed encompass the type of contracts that were the predicate for the offer of the Discretionary Payment Process. The language of the April 25, 2011 Letter supports this finding, explaining that: "Because this issue affects all three TRICARE regions and multiple years of claimed services, DoD has decided to calculate the net adjustments itself, rather than through the MCSCs [Managed Care Support Contractors] . . . ." Moreover, plaintiffs' allegations and facts shown by the exhibits attached to the amended complaint, in particular, that Deputy Director Rear Admiral Hunter signed the April 25, 2011 Letter and the broad offer to a large number of hospitals to apply for additional payments, suggest that even more senior DoD officers, certain of whom no doubt had contract authority, could have been involved with the offer to provide the benefits if the proposed conditions were met by both sides. Further, Directive 5136.12, paragraph 8.0 and enclosure 3 do not suggest that the specifically delegated authorities

encompassed in enclosure 3 were intended to limit the responsibilities and functions of the Director or the Deputy Director of TMA. As such, and particularly when all reasonable inferences are drawn in favor of plaintiffs, the defendant's arguments related to Directive 5136.12 and enclosure 3 do not convince the court that the Director or the Deputy Director lacked management authority to take the actions to effect compensation to eligible hospitals, such as plaintiff Ingham.

Defendant also argues that, under 32 C.F.R. § 199.1(f), the services listed in Directive 5136.12, paragraph 6.2.9 required contracting pursuant to the Federal Acquisition Regulations (FAR). According to defendant, this means that contracts were required to be awarded by a warranted contracting officer, which Deputy Director Hunter was not because she lacked a contracting officer's warrant, pursuant to 48 C.F.R. § 1.602 (2010). The version of 32 C.F.R. § 199.1(f) in effect at the time of the alleged contracts, provided, in relevant part:

> (f) *Claims adjudication and processing.* The Director, OCHAMPUS, is responsible for making such arrangements as are necessary to adjudicate and process CHAMPUS claims worldwide.

> (1) *The United States*—(i) *Contracting out.* The primary method of processing CHAMPUS claims in the United States is through competitively procured, fixed-price contracts. The Director, OCHAMPUS, or a designee, is responsible for negotiating, under the provisions of the FAR, contracts for the purpose of adjudicating and processing CHAMPUS claims (and related supporting activities).

> (ii) *In-house.* The Director, OCHAMPUS, or a designee, is authorized to adjudicate and process certain CHAMPUS claims in-house at OCHAMPUS, when it is determined to be in the best interests of CHAMPUS subject to applicable considerations set forth in OMB Circular A–76. Such in-house claims processing may involve special or unique claims, or all claims for a specific geographic area.

32 C.F.R. § 199.1(f) (2010). At issue is whether the appropriate regulation to cover the Discretionary Payment Process fell under 32 C.F.R. § 199.1(f)(1)(i) of the regulations, which required negotiation of contracts under the FAR for contracting out, or under 32 C.F.R. § 199.1(f)(ii) for in-house processing, which is reserved for special or unique claims. Even if these circumstances were to fall under 32 C.F.R. § 199.1(f)(1)(i) for the contracting out of claims adjudication and processing, however, the FAR likely would still be inapplicable to the above captioned case. The applicable 2010 version of the FAR provides that "[t]he FAR applies to all acquisitions as defined in part 2 of the FAR." 48 C.F.R. § 1.104 (2010). As plaintiffs note, the FAR defines "*Acquisition,*" (emphasis in original) as "the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated." 48 C.F.R. § 2.101(b). The Discretionary Payment Process did not involve awarding a contract or task order. It was a broadly

34

applicable price adjustment to existing arrangements available to all hospitals which opted to go through the process and then met certain conditions, including signing a release. Payment adjustments to hospitals already doing business with the government engaging in the Discretionary Payment Process do not appear to fall within the purview of acquisitions.

The Discretionary Payment Process also was not a claim adjustment, analogous to a Request for an Equitable Adjustment (REA) or a claim, which generally are reviewed and approved by a contracting officer with warrant authority. 48 C.F.R. 552.243–71 (detailing the equitable adjustment process); 48 C.F.R. § 2.101(b) (defining a claim). Contracting officers have warrants to exercise discretionary authority to expend taxpayer money. By its very nature, the Discretionary Payment Process was effected by a broad based management policy directive. Applications by the hospitals for additional funds were offered to all by virtue of a public announcement based on a uniform process, and assuming hospitals submitted the proper documents and signed the Release, calculation of the sums owed was done mechanically according to formulas set up by the agency, and not subject to the contracting officer's discretion regarding individual claimants, as is the case with an REA or claim.

If the Second Alleged Contract can be considered a contract, assuming a plaintiff signed the Release, the next issue is whether plaintiffs have sufficiently pled that defendant breached the Second Alleged Contract. As noted above, "[t]o state a claim upon which relief can be granted, [plaintiff] must allege either an express or an implied-in-fact contract, and the breach of that contract." Trauma Serv. Grp. v. United States, 104 F.3d at 1325; see also Bell/Heery v. United States, 739 F.3d at 1330 ("A breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty."). "In making this assessment, the court must interpret the contract's provisions to ascertain whether the facts plaintiff alleges would, if true, establish a breach of contract." Bell/Heery v. United States, 739 at 1330 (citing S. Cal. Edison v. United States, 58 Fed. Cl. 313, 321 (2003)).

With regard to the Second Alleged Contract, plaintiffs, therefore, must show that Defendant breached a duty owed to plaintiff Ingham, the only plaintiff which signed the Release. Plaintiffs allege: "[t]he second contract was breached when Defendant failed to abide by the terms of the Release, which required Defendant, inter alia, to calculate and pay the amount that was owed to each hospital for all outpatient services in the manner specified in 'DoD's letter dated April 25, 2011.'" Plaintiffs allege defendant breached the Second Alleged Contract when defendant failed to correctly compute the amounts due "pursuant to the methodology as set forth in each Class Member's contract." Plaintiffs also, more broadly, allege certain specific miscalculations made in proposed payments to the Represented Hospitals during the Discretionary Payment Process. These alleged miscalculations, plaintiffs allege, were the result of defendant's use of incomplete claim information and inappropriate exclusion of certain categories of claims. Plaintiffs further argue that for all hospitals in their purported class, Kennel, which performed the calculations called for in the Discretionary payment process, "failed to correctly compute

the amount due Plaintiffs and the Class as set forth in the contracts between Class members and Defendant." As relates to plaintiff Ingham in particular, plaintiffs allege that the amount Ingham was ultimately paid was less than it was owed for radiology services by the defendant "[d]ue to multiple errors in the [Kennel] Study and in the calculation for additional radiology payments owed."

As discussed above, the Second Alleged Contract, provided that if all circumstances were met, including availability of funds, then eligible hospitals could receive a payment that was to be calculated pursuant to the nine-step process set forth in the Notice. Steps 3 through 7 of the Notice announced the methodology defendant proposed to calculate the radiology payments. Under this methodology, the defendant was to: "extract the claims for each hospital for claims for outpatient radiology services during the relevant period"; calculate what would have been paid under Medicare's pre-OPPS approach for each of these claims using the formula previously used by Medicare, ".42(BC [the billed charge for that line item] * CCR [the hospital-specific cost-to-charge ratio used for each period according to the Center of Medicare and Medicaid Services Pricier File]) + .58 (.62 global CMAC [amount for that line item])"; adjust this amount "using the ratio of the actual allowed amount on the claim to the TRICARE Standard allowed amount"; determine the difference if any, between this amount and the actual amount paid on the particular claim; sum these claim specific amounts for all of a hospitals claims; and then adjust this number using the "hospital-specific offset for cost sharing." When issued, this choice of method was created and chosen by agency personnel, even if the Kennel Study was used to inform agency choices. Thus, any errors in the Kennel Study would not be decisive on to the issue of whether defendant breached the Second Alleged Contract.

As stated above, plaintiffs also allege defendant failed to properly calculate payments due to hospitals according to the methodology set forth in the Notice. In particular, plaintiffs allege that there were "multiple errors" in the Defendant's calculation of the amount owed to plaintiff Ingham, resulting in an underpayment to Ingham. Plaintiffs allegation of the existence of such errors is bolstered by its additional allegations that defendant has acknowledged that it made miscalculations in computing the proposed payment amounts offered to the Represented Hospitals during the Discretionary Payment Process and, in recognition of these errors, agreed to pay the Represented Hospitals 77% more than was originally offered. Plaintiffs allege that these miscalculations were the result of defendant's use of incomplete claim information and the inappropriate exclusion of certain categories of claims. Defendant has failed, at this time, to offer any evidence that rebuts these allegations. Given that plaintiff Ingham signed the release, which entitled it to receive a payment calculated according to the process outlined in the Notice, plaintiffs' allegations that Ingham was not provided with such a payment are sufficient to plead a breach of the Second Alleged Contract by defendant, for the purposes of the present motion.

Regarding the Release, defendant offers a further argument to try to defeat plaintiffs' case and to argue that plaintiff Ingham and all other hospitals that signed the Release are barred from bringing any claims related to the Discretionary Payment

Process, because, by signing the Release, they "released the very cause they present." Plaintiffs respond, without citing support, that, "[w]hen, as here, the terms of a release are breached, the party damaged by the breach can bring suit; if this were not the case the consideration promised in exchange for the release of claims could be withheld with impunity."

To determine if a claim is barred by a release, it is necessary to consider the scope of the release. The United States Supreme Court has stated, "[t]o rightly understand the scope of this release we must consider the conditions of the contract, and especially the clause in it which calls for a release." United States v. William Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. 118, 126 (1907). Settlement agreements and releases are contractual in nature and are interpreted under the same rules as contracts, and their interpretation is a matter of law. See Mays v. United States Postal Service, 995 F.2d 1056, 1059 (Fed. Cir. 1993) (citing Greco v. Dep't of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988)); H.J. Lyness Constr., Inc. v. United States, —— Fed. Cl. ——, 2015 WL 10606989, at *4 (2015); K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. 571, 600 (2012); Raytheon Co. v. United States, 96 Fed. Cl. 548, 553 (2011); Kenbridge Constr. Co. v. United States, 328 Fed. Cl. at 765. Under those rules, courts determine the intent of the parties by considering the language of the contract. See Jowett, Inc. v. United States, 234 F.3d at 1368. To determine which claims a release is intended to bar, courts consider the entirety of the instrument of the release and the "facts and circumstances attending its execution." See Thorn Wire Hedge Co. v. Washburn & M. Mfg. Co., 159 U.S. 423, 441 (1895); Dureiko v. United States, 209 F.3d 1345, 1356 (Fed. Cir. 2000) ("In interpreting the release, we first ascertain whether its language clearly bars the asserted claim." (citing King v. Dep't of the Navy, 130 F.3d 1031, 1033 (Fed. Cir. 1997)). While "[t]he general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face." If a contract is found to be uncertain or ambiguous, then parties may assert extrinsic evidence and the interpretation becomes a matter of fact. Beta Sys., Inc. v. United States, 838 F.2d at 1183 (citing S.C.M. Corp. v. United States, 230 Ct. Cl. at 206, 675 F.2d at 284); see also H.L.C. & Assocs. Constr. Co. v. United States, 176 Ct. Cl. at 295, 367 F.2d 586 (1966); J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. 801, 807 (1963).

General language in a release may bar a party from asserting any claims arising out of the contract and intended by the parties. See United States v. William Cramp & Sons Ship & Engine Bldg. Co., 206 U.S. at 127–28; Johnson, Drake & Piper, Inc. v. United States, 209 Ct. Cl. 313, 330, 531 F.2d 1037, 1047 (1976) ("[A] general release bars claims based upon events occurring prior to the date of the release."); H.J. Lyness Constr., Inc. v. United States, —— Fed. Cl. ——, 2015 WL 10606989, at *4; Raytheon Co. v. United States, 96 Fed. Cl. at 553; K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. at 600; IMS Eng'rs-Architects, P.C. v. United States, 92 Fed. Cl. 52, 64 (2010), aff'd, 418 F. App'x 920 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2011) ("As a general rule, after executing a release, a contractor 'is thereafter barred from maintaining a suit for damages or for additional compensation under the contract based upon events that occurred prior to the execution of the release.'" (quoting B.D. Click Co. v. United States, 222 Ct. Cl. 290,

614 F.2d 748, 756 (1980))); <u>Dairyland Power Coop. v. United States</u>, 27 Fed. Cl. at 811; <u>A & A Insulation Contractors, Inc. v. United States</u>, 26 Cl. Ct. at 373.

Regarding general releases, the United States Court of Appeals for the Federal Circuit stated in <u>Augustine v. Progressive Dynamics, Inc.</u>:

> The rule for releases is that absent special vitiating circumstances, a general release bars claims based upon events occurring prior to the date of the release. *And no exception to this rule should be implied for a claim whose facts were well enough known for the maker of the release to frame a general description of it and request an explicit reservation.*

<u>Augustine Med., Inc. v. Progressive Dynamics, Inc.</u>, 194 F.3d 1367, 1373 (Fed. Cir. 1999) (quoting <u>Johnson, Drake & Piper, Inc. v. United States</u>, 209 Ct. Cl. at 330, 531 F.2d at 1047) (emphasis added in <u>Augustine Med., Inc. v. Progressive Dynamics, Inc.</u>).

Plaintiffs argue, however, that "[w]hen, as here, the terms of a release are breached, the party damaged by the breach can bring suit." The law provides that the execution of a general release without exceptions discharges the released party "from all claims and demands in law and equity arising out of the contract." <u>Hellander v. United States</u>, 147 Ct. Cl. 550, 561, 178 F. Supp. 932, 939 (1959) (citation omitted). "If a contractor wishes to preserve a right to assert a claim under that contract later, it bears the burden to modify the release, before signing it." <u>Dairyland Power Coop. v. United States</u>, 27 Fed. Cl. at 811 (citing <u>Mingus Constructors, Inc. v. United States</u>, 812 F.2d at 1393-94, 1396). In <u>Kenbridge</u>, the court stated:

> Where a contractor fails to exercise its right to reserve claims from the operation of a release, "it is neither improper nor unfair, absent some vitiating or aggravated circumstance, to preclude the contractor from maintaining a suit based on events which occurred prior to the execution of the release."

<u>Kenbridge Constr. Co. v. United States</u>, 28 Fed. Cl. at 765 (quoting <u>Clark Mech. Contractors, Inc. v. United States</u>, 5 Cl. Ct. at 86) (citing <u>H.L.C. & Assocs. Constr. Co. v. United States</u>, 176 Ct. Cl. at 293, 367 F.2d at 590)); <u>see also</u> <u>IMS Eng'rs-Architects, P.C. v. United States</u>, 92 Fed. Cl. at 64. The burden to identify and specify claims to be excepted from a general release lies with the parties before signing the release. <u>See Mingus Constructors, Inc. v. United States</u>, 812 F.2d at 1393–94 (citing <u>Inland Empire Builders, Inc. v. United States</u>, 424 F.2d at 1376). Generally, exceptions to releases are viewed narrowly and are strictly construed against the contractor. <u>Gresham, Smith & Partners v. United States</u>, 24 Cl. Ct. 796, 801 (1991) (citing <u>Mingus Constructors, Inc. v. United States</u>, 812 F.2d at 1394). "Vague, broad exceptions . . . are insufficient as a matter of law to constitute 'claims' sufficient to be excluded from the required release." <u>Mingus Constructors, Inc. v. United States</u>, 812 F.2d at 1394 (citing <u>Vann v. United States</u>, 190 Ct. Cl. 546, 555, 420 F.2d 968, 972 (1970) ("A claim not specifically delineated in an exception to a release is thereafter barred.")). "The rationale behind construing exceptions in releases narrowly is that the purpose of a release is to put an end to the matter in

controversy." Mingus Constructors, Inc. v. United States, 812 F.2d at 1394. If a party executing a general release has knowledge of facts sufficient to constitute a claim and wishes to except that claim from the release, the party must clearly manifest its intent to do so with an explicit reservation. See Augustine Med., Inc. v. Progressive Dynamics, Inc., 194 F.3d at 1373.

There are, however, circumstances when a party may bring a claim despite the execution of an otherwise applicable release. Such vitiating circumstances include economic duress, fraud, mutual mistake, lack of consideration, lack of performance and other special circumstances that would invalidate a contract or otherwise indicate that the parties intended to allow some claims to remain despite the release. See Mingus Constructors, Inc. v. United States, 812 F.2d at 1395; Axion Corp. v. United States, 68 Fed. Cl. 468, 475 (2005) (citing Jackson Constr. Co. v. United States, 62 Fed. Cl. 84, 93 (2004). "[W]here it is shown that, by reason of a mutual mistake, neither party intended that the release cover a certain claim, the court will reform the release." J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. at 806 (citations omitted); Harrison Eng'g & Constr. Co. v. United States, 107 Ct. Cl. 205, 208, 68 F. Supp. 350, 351 (1946). A unilateral mistake, however, does not allow for an exception to a general release unless the other party knew of the mistake. See Rocky River Co., Inc. v. United States, 169 Ct. Cl. 203, 207–08 (1965) (citations omitted). If a court finds a release does not express the intent of the parties, it may reform the release in accordance with the parties' intentions. See Nippon Hodo Co., Ltd. v. United States, 142 Ct. Cl. 1, 4, 160 F. Supp. 501, 502 (1958).

In the present case, the Release clearly provides for a broad release of claims, stating, in relevant part, that a hospital which signs the release:

shall completely release, acquit, and forever discharge the Government, TRICARE beneficiaries, and any MCSCs . . . (hereinafter collectively referred to as "Releasees") from any and all claims, demands, actions, suits, causes of action, appeals, whether asserted as a class, individually, or otherwise, damages whenever incurred, and liabilities of any nature whatsoever (including costs, penalties, and attorney's fees) that Releasor ever had, now has, or hereafter can, shall, or may have against Releasees, whether known or unknown, on account of or arising out of or resulting from or in any way relating to payments, reimbursements, adjustments, recoupments, or any other means of compensation by Releasees made at any time for outpatient services rendered to TRICARE beneficiaries by Releasor prior to the date Releasor became subject to the TRICARE Outpatient Prospective Payment System ("OPPS"), or December 31, 2010 if Releasor was never subject to the TRICARE OPPS.

A second paragraph below the portion just quoted and above the signature line also states:

RELEASOR UNDERSTANDS THE SIGNIFICANCE OF THIS RELEASE OF UNKNOWN CLAIMS AND ITS WAIVER OF STATUTORY PROTECTION AGAINS A RELEASE OF UNKNOWN CLAIMS.

ACCORDINGLY, RELEASOR EXPRESSLY WAIVES ANY AND ALL RIGHTS AND BENEFITS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE (WHICH STATES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUPSECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.") OR ANY OTHER LAW, RULE, PROVISION OR STATUTE OF ANY OTHER JURISDICTION THAT OPERATES TO BAR THE RELEASE OF UNKNOWN CLAIMS.

(capitalization in original).

The court finds that the Release is unambiguous on its face and sufficiently broad to bar all of plaintiffs' breach of contract claims alleged in their amended complaint, which "aris[e] out of" the government's reimbursements for outpatient services made prior to institution of the OPPS payment methodology. As stated, the burden to identify and specify claims to be excepted from a general release lies with the parties before signing the release. See Mingus Constructors, Inc. v. United States, 812 F.2d at 1393–94 (citing Inland Empire Builders, Inc. v. United States, 424 F.2d at 1376). Plaintiffs do not appear to allege in their amended complaint, or to have argued before the court in their opposition to defendant's motion to dismiss, that plaintiff Ingham, or any other similarly situated hospitals which signed the Release, requested an exception or reservation of specific claims from the general release before signing and becoming eligible to receive an adjusted payment.

Therefore, the court is left only with the question of whether plaintiffs have sufficiently pled facts alleging a vitiating circumstances to allow plaintiff Ingham to bring a claim, despite the execution of an otherwise applicable release. See J.G. Watts Constr. Co. v. United States, 161 Ct. Cl. at 807 ("[W]here the conduct of the parties in continuing to consider a claim after the execution of the release makes plain that they never construed the release as constituting an abandonment of the claim, or where it is obvious that the inclusion of a claim in a release was attributable to a mistake or oversight, or where fraud or duress is involved, the release will not be held to bar the prosecution of the claim." (internal citations omitted)); see also H.J. Lyness Constr., Inc. v. United States, —— Fed. Cl. ——, 2015 WL 10606989, at *4; Raytheon Co. v. United States, 96 Fed. Cl. at 553–54. The language of the Release is straightforward and clear and it would be a stretch for any hospital signor to argue they did not understand that it was relinquishing future claims after signing the Release and accepting payments. Nor have plaintiffs alleged that they signed Release was based on fraud or duress. Although plaintiffs do allege the existence of a mutual mistake, as discussed below, they have failed to adequately plead the elements of such a mistake. Thus, plaintiffs have failed to adequately plead the existence of a vitiating circumstance and plaintiff Ingham is barred by the Release from asserting any of the claims for an express breach of contract alleged in Count I of the amended complaint.  Therefore, all of plaintiffs' claims for breach of express contracts under Count I of the amended complaint are dismissed.

## Count II: Breach of Implied-In-Fact Contract

Alternative to their claims in Count I for breach of express contracts, plaintiffs allege the creation, and breach of, two implied-in-fact contracts between defendant and plaintiffs' purported class in Count II of their amended complaint. The alleged terms of these two alleged implied-in-fact contracts are identical to those of the two alleged express contracts, as are the supporting documents offered by plaintiffs. The only additional allegation made by plaintiffs with respect to the implied-in-fact contracts is that, "to the extent the documents exchanged by the parties . . . did not form an express contract, a contract between the parties can be implied-in-fact by reading all of the documents together in light of the surrounding circumstances." The alleged surrounding circumstances plaintiffs point to include: the defendant's hiring of Kennel in 2010 to produce the Kennel Study and the use of the Kennel Study to craft a global resolution of the dispute with the hospitals regarding outpatient services; defendant's statements in the FAQs that it had in its possession all of the data and all of the claims needed to determine what was owed to hospitals for outpatient services; defendant's establishment of the nine-step process requiring "affirmative participation by the hospitals" and that that they sign the Release before receiving payment; the repeated use of the language of offer and acceptance in the defendant's documents; and the Release "indisputably" setting forth the terms of the bargained for exchange.

The elements of a binding contract with the United States are identical for express and implied-in-fact contracts; only the nature of the evidence differs. See Night Vision Corp. v. United States, 469 F.3d 1369, 1375 (Fed. Cir. 2006) ("The elements of an implied-in-fact contract are the same as those of an oral express contract."), cert. denied, 550 U.S. 934 (2007); Hanlin v. United States, 316 F.3d at 1328 ("Thus, the requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs."); City of Cincinnati v. United States, 153 F.3d at 1377 ("Like an express contract, an implied-in-fact contract requires '(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance.' . . . When the United States is a party, a fourth requirement is added: The government representative whose conduct is relied upon must have actual authority to bind the government in contract." (quoting City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990), cert. denied, 501 U.S. 1230 (1991)); Trauma Serv. Grp. v. United States, 104 F.3d at 1325; Russell Corp. v. United States, 210 Ct. Cl. 596, 608–09, 537 F.2d 474, 481–82 (1976), cert. denied, 429 U.S. 1073 (1977)); Huntington Promotional & Supply, LLC v. United States, 114 Fed. Cl. at 767 ("The elements are the same for an express or implied-in-fact contract . . ."); Vargas v. United States, 114 Fed. Cl. at 233; Prairie Cnty., Mont. v. United States, 113 Fed. Cl. 194, 202 (2013), aff'd 782 F.3d 685 (Fed. Cir. 2015); Mastrolia v. United States, 91 Fed. Cl. 369, 384 (2010) (citing Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005)). Implied-in-fact contracts are agreements "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Trauma Serv. Grp. v. United States, 104 F.3d at 1325 (quoting Hercules, Inc. v. United States, 516 U.S. 417, 424 (1996) (quoting Balt. & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923))); see also Kam-Almaz v.

United States, 682 F.3d at 1368; Bank of Guam v. United States, 578 F.3d at 1329 (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1326); Bay View, Inc. v. United States, 278 F.3d 1259, 1265–66 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 285 F.3d 1035 (Fed. Cir.), cert. denied, 537 U.S. 826 (2002); Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 203 (2013); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. at 728 (citing Balt. & Ohio R.R. Co. v. United States, 261 U.S. at 597; Russell Corp. v. United States, 210 Ct. Cl. at 609, 537 F.2d at 482. Such an agreement will not be implied "unless the meeting of minds was indicated by some intelligible conduct, act or sign." Balt. & Ohio R.R. Co. v. United States, 261 U.S. at 598; see also City of Cincinnati v. United States, 153 F.3d at 1377 ("[A]n implied-in-fact contract arises when an express offer and acceptance are missing but the parties' conduct indicates mutual assent." (citing Chavez v. United States, 18 Cl. Ct. 540, 544 (1989)); Russell Corp. v. United States, 210 Ct. Cl. at 609, 537 F.2d at 482. "[A]n implied-in-fact contract cannot exist if an express contract already covers the same subject matter." Trauma Serv. Grp. v. United States, 104 F.3d at 1326.

Plaintiffs' failure to allege any valid consideration for the First Alleged Contract, discussed above, means that plaintiffs have failed to adequately plead the existence of an implied-in-fact version of the First Alleged Contract just as it did for their alleged express contract. With respect to the Second Alleged Contract, the terms of the implied-in-fact version of plaintiffs' Second Alleged Contract are identical to those of their alleged express version. As discussed above, the Second Alleged Contract was to be accepted by signing and executing the Release. Thus, as discussed above, only those hospitals which actually signed and executed the Release are alleged to be parties to the Second Alleged Contract. Also as noted above, the only such hospital among the named plaintiffs is plaintiff Ingham. Once Ingham singed the Release, however, the existence of an express version of the First Alleged Contract between defendant and plaintiff Ingham does not allow for the existence of any implied-in-fact version. See Trauma Serv. Grp. v. United States, 104 F.3d at 1326 ("[A]n implied-in-fact contract cannot exist if an express contract already covers the same subject matter."). Moreover, plaintiff Ingham is barred from asserting any claims for any alleged breach by the Release it signed for the same reasons it was barred from asserting its claims under the alleged express contract. Plaintiffs' claims for breach of implied-in-fact contracts under Count II of their amended complaint must be dismissed.

## Count III: Mutual Mistake

Plaintiffs also allege a claim for mutual mistake in Count III of their first amended complaint. Plaintiffs allege that, at the time the Payment Adjustment Worksheets were received by eligible hospitals, the parties held two mistaken beliefs:

(1) Defendant had correctly calculated the amounts due to each [alleged] Class member for radiology services pursuant to the methodology as set forth in each Class member's contract with Defendant and (2) Defendant had correctly determined that no additional amounts were due each Class member for the other categories of outpatient services.

With regard to the first alleged mistake, plaintiffs allege that defendant's calculations violated the calculation methodology. Defendant, however, argues that plaintiffs' claim must fail because, under the language of the Notice, plaintiffs assumed the risk of any errors in the government's calculations. With regard to the second alleged mistake, plaintiffs allege that defendant incorrectly determined non-radiology services had been correctly paid. Defendant, however, responds that plaintiffs have not alleged a mistake, but simply disagree with the methodology used in the Kennel Study. Defendant further argues that any alleged errors related to non-radiology categories of outpatient services are "irrelevant" because the Kennel Study was not part of defendant's payment program as announced in the Notice. The court notes that the only valid contract that plaintiffs have pled that could be reformed under the doctrine of mutual mistake is the Second Alleged Contract between defendant and plaintiff Ingham. Under this contract, defendant proposed to provide a payment to eligible hospitals calculated according to the nine-step process laid out in the Notice, in exchange for the hospitals' agreement to release all claims related to any additional payments received for outpatient services prior to the introduction of the TRICARE OPPS payment method at issue.

As stated by the Federal Circuit:

> In order to have a contract reformed, the party seeking reformation under the doctrine of mutual mistake must allege: "(1) the parties to the contract were mistaken in their belief regarding a fact; (2) that mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation."

Bank of Guam v. United States, 578 F.3d at 1329–30 (quoting Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir.), cert. denied, 498 U.S. 811 (1990)); see also Restatement (Second) of Contracts § 152 (1981). The purpose and function of the reformation of a contract is "to bring the parties' written contract in accord with their agreement." Atlas Corp. v. United States, 895 F.2d at 750. The Federal Circuit also has indicated that "[r]eformation of a written agreement on the ground of mutual mistake is an extraordinary remedy, and is available only upon presentation of satisfactory proof" of the four part test identified above. Nat'l Austl. Bank v. United States, 452 F.3d at 1329.

Defendant argues that plaintiff Ingham bore the risk of at least one of these alleged mistakes under the terms of the Release. "[A] contractor cannot prevail on a mutual mistake claim if it assumed the risk of the mistake." Short Bros., PLC v. United States, 65 Fed. Cl. at 797 (citing Flippin Materials Co. v. United States, 160 Ct. Cl. at 368–69, 312 F.2d at 415–16). "A party bears the risk of mistake when the risk is allocated to him by agreement of the parties . . . ." Burnside-Ott Aviation Training Ctr., Inc. v. United States, 985 F.2d 1574, 1581 (Fed. Cir. 1993) (quoting Restatement (Second) of Contracts § 154 (1981)) (omission in Burnside-Ott Aviation Training Ctr., Inc. v. United States). "The intent of the parties . . . is not irrelevant to the question of which party agreed to assume the risk of mistake and must be considered in making such a determination." Id. at 1582.

The court turns first to plaintiffs' first alleged mistake, that defendant failed to calculate the amounts due correctly under the methodology in their alleged contract with defendant in accordance with the nine-step process laid out in the Notice.   Plaintiffs allege, and defendant does not challenge, that, at the time the hospitals received their Payment Adjustment Worksheets, both parties believed that the defendant had "correctly calculated the amount due Plaintiffs and the class." According to plaintiffs, however, this was untrue because Kennel, working on behalf of the defendant, had failed to correctly compute these amounts. Plaintiffs also allege that this mistaken belief constituted a basic assumption underlying the contract and had a material effect on the bargain because the payment calculated according to the April 25, 2011 Letter, was, as expressly stated in the Release, to be the consideration the hospitals received for signing the Release.

While plaintiffs have successfully pled certain elements of mutual mistake, they have failed to plead or establish that the Second Alleged Contract did not put the risk of mistake on plaintiff Ingham. Step 8 of the nine-step methodology in the Notice, provided that "[a] written response to the hospital's request will be sent to the individual at the address provided by the hospital. The response will provide the calculated discretionary adjusted payment and the calculations from which the adjustment was derived." Step 8 also indicated that:

> While the methodology for calculating the adjustment is not subject to questions, any questions regarding the data used in the calculations should be received by TMA within 30 days of the date of TMA's response as specified in the response. Any questions should be accompanied by detailed explanation of the alleged errors and the proposed corrections with supporting documentation.

Step 8 of the Notice, which was a part of the defendant's offer for the Second Alleged Contract, thus, created a process by which the hospitals could challenge any perceived mistakes in the calculations received, putting the onus on the hospitals to do so. The opportunity to challenge was an important part of the Discretionary Payment Process, giving hospitals an opportunity to review the defendant's calculations and to provide feedback to defendant prior to signing the Release. Plaintiffs argue that if defendant wished to place the risk of mutual mistake on the hospitals, it should have provided them the Kennel Study and warned them that the "contract was conditional upon Plaintiff accepting the conclusions of the Study 'as is.'" The claims data was originally provided by the hospitals and then run through a methodology explicitly laid out in steps 3 through 7 of the Notice. The Kennel Study, although part of the background which led to the defendant's proposal to adjust hospital payment levels, was not a part of the methodology and did not affect the calculation of proposed payment amounts by the defendant during the Discretionary Payment Process. Plaintiffs admit in their amended complaint that plaintiff Ingham received the Payment Adjustment Worksheet containing the defendant's calculations and proposed payments for Ingham discussed in Step 8, and that it signed and returned the Release rather than challenging the figures it received. Plaintiffs, thus, have failed to sufficiently plead that plaintiff Ingham did not bear the risk of mistake related to defendant's alleged calculations for the adjustments provided for radiology services as

part of the Second Alleged Contract. Therefore, their claims under Count III of plaintiffs' amended complaint related to their first alleged mistake must be dismissed.

With respect to plaintiffs' second alleged mistake, that defendant had correctly determined no additional amounts were due plaintiffs for non-radiology outpatient services, plaintiffs allege that the Kennel Study incorrectly concluded that, for outpatient services other than radiology, plaintiffs had not been underpaid based on eleven allegedly "fundamental errors" listed in the amended complaint. These "fundamental errors" were:

> (1) [T]he use of incorrect assumptions of fact; (2) intentional exclusion of claims that should have been included; (3) failure to properly capture claims data; (4) failure to accurately capture claims-related services rendered from a referring Military Treatment Facility; (5) failure to capture claims provided by a hospital providing services at multiple locations; (6) failure to accommodate changes in hospital locations; (7) failure of Managed Care Support Contractors to maintain claims data, preventing TRICARE from accessing this data; (8) use of erroneous formulae that resulted in incorrect calculations; (9) comparison of incomplete outpatient service categories; (10) comparison of "averages" that were not accurate; and (11) failure to address and account for unique hospital (as opposed to physician offices) accounts.

Plaintiffs allege that the Kennel Study was the analysis defendant mentioned in the Notice as the basis for its conclusion that "[i]n all cases, except radiology services, TRICARE payments for hospital outpatient services were either comparable to what Medicare would have paid [prior to instituting its OPPS rate] or TRICARE paid more." Plaintiffs allege that plaintiffs mistakenly believed this conclusion was correct at the time they received the Payment Adjustment Worksheet. Plaintiffs also have pled that this mistaken belief constituted a basic assumption underlying the contract and had a material effect on the bargain, on the grounds that the waiver of additional possible causes of action related to non-radiology hospital services by the signing hospitals could have constituted the consideration received by the defendant to support the Second Alleged Contract. See C.H. Robinson Intern. v. United States, 64 Fed. Cl. 651, 661 (2005) (finding, in case involving an agreement by plaintiff to pay a mitigated penalty to government agency in exchange for waiving the right to judicial review of the agreement, that the parties' mistaken belief about plaintiff's potential maximum liability could have been a basic assumption underlying the contract and have had a material effect on the nature of the bargain).

Thus, the only remaining issue is whether plaintiffs have sufficiently pled that the Second Alleged Contract did not place the risk of the alleged mistake on plaintiff Ingham. The information needed to assess the size of what plaintiffs thought was the amount of consideration they offering defendant when signing the Release was in the hands of the hospitals. Moreover, in the Release, plaintiff Ingham agreed to release all claims:

> on account of or arising out of or resulting from or in any way relating to payments, reimbursements, adjustments, recoupments, or any other

> means of compensation by Releasees made at any time <u>for outpatient services</u> rendered to TRICARE beneficiaries by Releasor prior to the date Releasor became subject to the TRICARE Outpatient Prospective Payment System ("OPPS"), or December 31, 2010 if Releasor was never subject to the TRICARE OPPS.

(emphasis added). Thus, the Release was not limited to payments for radiology services but included all non-radiology outpatient services as well. Further, the release also explicitly waived any "UNKNOWN CLAIMS" that the hospitals may have had. (capitalization in original). Therefore, the language of the Release placed the burden of defining and raising any issues related to payments for non-radiology outpatient services during the Relevant Period, including those unknown prior to the time the Release was signed, on the hospitals which signed the Release. While plaintiffs allege that they never received a copy of the Kennel Study until after the Payment Adjustment Worksheets had been sent to them, the breadth of the release makes this immaterial. Because plaintiff Ingham admittedly signed the Release, plaintiffs have failed to sufficiently plead that Ingham did not bear the risk of mistake related to the amounts potentially owed by the defendant for non-radiology outpatient services. Therefore, plaintiffs' claims under Count III of their amended complaint related to plaintiffs' alleged mistakes must be dismissed.

## Count IV: Breach of the Covenant of Good Faith and Fair Dealing

In Count IV of plaintiffs' amended complaint, plaintiffs allege that defendant's actions violated the implied covenant of good faith and fair dealing. In particular, plaintiffs allege that, after the Represented Hospitals received notice of their proposed payments, the Represented Hospitals informed the defendant "of the errors in the Study and the underpayment of the [alleged] Class." Plaintiffs further allege that, despite this knowledge, "Defendant remained silent and took no steps to notify Plaintiffs and the Class or otherwise remedy the situation." According to plaintiffs, "[b]y failing to correct the errors in the calculation and proposed payments, Defendant breached its covenant of good faith and fair dealing."

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." <u>Alabama v. North Carolina</u>, 560 U.S. 330 (2010) (quoting Restatement (Second) of Contracts § 205 (1981). "Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty 'imposed by a promise stated in the agreement.'" <u>Metcalf Const. Co. v. United States</u>, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 235). "The covenant of good faith and fair dealing . . . imposes obligations on both contracting parties that include the duty not to interfere with the other party's *performance* and not to act so as to destroy the *reasonable expectations* of the other party regarding the *fruits of the contract.*" <u>Metcalf Const. Co. v. United States</u>, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting <u>Centex Corp. v. United States</u>, 395 F.3d 1283, 1304 (Fed.Cir.2005) (emphasis in <u>Metcalf Const. Co. v. United States</u>)). "Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." <u>Metcalf Const. Co. v. United States</u>, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting <u>Precision Pine [& Timber, Inc. v. United States</u>, 596 F.3d 817*,* 820 n. 1 (Fed Cir. 2010)).

However, as both parties recognize, "[i]t is well settled that the parties' duty of good faith and fair dealing must be rooted in promises set forth in the contract." Helix Elec., Inc. v. United States, 68 Fed. Cl. 571, 587 (2005). Thus, "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 831 (Fed. Cir. 2010) (citing Centex Corp. v. United States, 395 F.3d 1283, 1304–06 (Fed. Cir. 2005)); Jarvis v. United States, 43 Fed. Cl. 529, 534 (1999) ("The implied duty of good faith and fair dealing does not form the basis for wholly new contract terms, particularly terms which would be inconsistent with the express terms of the agreement.").

The only possible valid contract alleged by the plaintiffs, and the only source in which the duty of good faith and fair dealing could be "rooted," is the Second Alleged Contract between defendant and plaintiff Ingham. As discussed above, plaintiff Ingham signed the Release, and, thus, agreed to:

> completely release, acquit, and forever discharge the Government, TRICARE beneficiaries, and any MCSCs . . . (hereinafter collectively referred to as "Releasees") from any and all claims, demands, actions, suits, causes of action, appeals, whether asserted as a class, individually, or otherwise, damages whenever incurred, and liabilities of any nature whatsoever (including costs, penalties, and attorney's fees) that [Ingham] ever had, now has, or hereafter can, shall, or may have against Releasees, whether known or unknown, on account of or arising out of or resulting from or in any way relating to payments, reimbursements, adjustments, recoupments, or any other means of compensation by Releasees made at any time for outpatient services rendered to TRICARE beneficiaries by Releasor prior to the date [Ingham] became subject to the TRICARE Outpatient Prospective Payment System ("OPPS"), or December 31, 2010 if Releasor was never subject to the TRICARE OPPS.

Plaintiffs' allegations regarding the breach of the duty of good faith and fair dealing involve what plaintiffs allege were "errors in the Study and the underpayment of the Class" during the Discretionary Payment Process. As stated in the April 25, 2011 Letter, the Discretionary Payment Process made available to eligible hospitals "net adjustments to payments for hospital outpatient radiology services for the period August 1, 2003, until the TRICARE hospital Outpatient Prospective Payment System (OPPS) began on May 1, 2009." Under the TRICARE regulations implementing OPPS, no hospitals, including Ingham, became subject to OPPS until May 1, 2009, at the earliest. See 74 Fed. Reg. 6228 (extending the effective date of TRICARE's OPPS until May 1, 2009). Any errors in the calculation and proposed payments in the Discretionary Payment Process, therefore, "relat[e] to" payments made by the government prior to the date eligible hospitals became subject to TRICARE OPPS. Under the terms of the Release, hospitals that signed the release waived any claims related to payments made prior to the date the hospitals became subject to OPPS. Therefore, because plaintiff Ingham signed the Release, Ingham is barred from pursuing such claims under any form of cause of action, including

a breach of the duty of good faith and fair dealing. Therefore, plaintiffs' claims under Count IV of their amended complaint must be dismissed.

## Count V: Violations of Money-Mandating Statutes and Regulations

In Count V of their Complaint, which plaintiffs allege is made "[s]eparate and apart" from their breach of contract related claims in Counts I through IV, plaintiffs allege violations by the defendant of the allegedly money-mandating statutes 10 U.S.C §§ 1079 and 1086 and the allegedly money-mandating regulations 32 C.F.R §§ 199.4(a)(1)(i) and 199.7(h)(2). According to plaintiffs these statutes and regulations are part of a "framework" that required defendant to make civilian health care available to TRICARE beneficiaries and mandated that defendant pay Medicare rates, "to the extent practicable," for that provided health care. 10 U.S.C. § 1079. In particular, plaintiffs allege that this "framework" was composed as follows: under 10 U.S.C. §§ 1079(a) and 1086(a), the defendant was required to enter into contracts under which TRICARE beneficiaries could receive medical care from civilian health care providers; under 10 U.S.C. §§ 1079(j)(2) and 1086(g), the payments for medical care contracted by the defendant were required to be consistent with Medicare rates "to the extent practicable"; under 32 C.F.R. § 199.4(a)(1)(i) the defendant was required to "pay for medically necessary services and supplies required in the diagnosis and treatment of illness or injury," which includes outpatient services; and under C.F.R. § 199.7(h) when authorized providers participated in TRICARE by submitting claim forms, that provider was required to be paid for that claim. Plaintiffs allege that defendant violated these statutes and the regulations by failing to pay plaintiffs the money these statutes and the regulations mandated to be paid. Defendant argues plaintiffs' claims should be dismissed on the grounds that (1) the cited statutes and regulations are not money-mandating and, hence, the court lacks jurisdiction to hear plaintiffs' claims, and (2) even should jurisdiction to hear plaintiffs' claims exist, plaintiffs have failed to allege facts to demonstrate that defendant violated any of the cited statutes or regulations.

The court first addresses the issue of jurisdiction. As stated above, this court has jurisdiction over claims against the United States based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); United States v. Mitchell, 463 U.S. 206, 215 (1983); see also Kam-Almaz v. United States, 682 F.3d at 1368; Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "can fairly be interpreted as mandating compensation by the Federal Government." United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Roberts v. United States, 745 F.3d at 1162; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act

itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (*e.g.*, statutes or contracts).").  "If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction." Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565-66 (2009). "Further, the statute and regulations must be money-mandating as to the class of which plaintiff claims to be a member." Roberts v. United States, 745 F.3d at 1162 (citing Casa de Cambio Comdiv S.A. de C.V. v. United States, 291 F.3d 1356, 1361 (Fed. Cir. 2002)).

Plaintiffs allege that 10 U.S.C. §§ 1079 and 1086 are money-mandating because they required the DoD to obtain health care from civilian providers and pay Medicare rates for that health care. Plaintiff also argues, in the alternative, that the regulations implementing 10 U.S.C. §§ 1079 and 1086, 32 C.F.R. §§ 199.4(a)(1)(i) and 199.7(h)(2), are money-mandating because they require TRICARE to pay authorized civilian health care providers directly for all covered services when those providers signed and submitted TRICARE claims forms. Finally, citing Roberts v. United States, 745 F.3d at 1165-66, plaintiffs also argue that the court may find the combination of the cited statutes and regulations to be money-mandating. Defendant argues that 10 U.S.C. §§ 1079 and 1086 do not mandate payment to providers, but, rather, require the government to issue certain regulations regarding those payments. Defendant asserts that 32 C.F.R. § 199.7(h)(2) also is not money-mandating.

The version of 10 U.S.C. § 1079(a) applicable throughout the course of the Relevant Period states:

> To assure that medical care is available for dependents . . . of members of the uniformed services who are on active duty for a period of more than 30 days, the Secretary of Defense, after consulting with the other administering Secretaries, shall contract, under the authority of this section, for medical care for those persons under such insurance, medical service, or health plans as he considers appropriate.

10 U.S.C. § 1079(a) (2000) (emphasis added). The applicable version of 10 U.S.C. §1086(a) states:

> To assure that health benefits are available for the persons covered by subsection (c), the Secretary of Defense, after consulting with the other administering Secretaries, shall contract under the authority of this section for health benefits for those persons under the same insurance, medical service, or health plans he contracts for under section 1079(a) of this title.

10 U.S.C § 1086(a) (2000) (emphasis added). As referenced in 10 U.S.C. § 1086(a), persons covered by subsection (c) include: a "member or former member of a uniformed service who is entitled to retired or retainer pay, or equivalent pay" pursuant to 10 U.S.C. § 1074(b); certain dependents of retirees pursuant to 10 U.S.C. § 1076(b); and survivors of a deceased member of the uniformed service, pursuant to 10 U.S.C. § 1086(c)(2). See 10 U.S.C § 1086(c).

The statutes at 10 U.S.C. §§ 1079(j)(2) and 1086(g) set certain guidelines for the regulations implementing 10 U.S.C. §§ 1079(a) and 1086(a). As discussed above, 10 U.S.C. § 1079(j)(2) was modified by Congress in 2001. See National Defense Authorization Act for Fiscal Year 2002, Pub. L. No. 107-107, § 707, 115 Stat. 1012, 1163. The modified law, which was the version applicable throughout the relevant period, states:

> The amount to be paid to a provider of services for services provided under a plan covered by this section shall be determined under joint regulations to be prescribed by the administering Secretaries which provide that the amount of such payments shall be determined to the extent practicable in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.) [Medicare].

10 U.S.C. § 1079(j)(2) (2006) (emphasis added). 10 U.S.C. § 1086(g) applies 10 U.S.C. § 1079(j) to those beneficiaries described in 10 U.S.C. § 1086(a), stating:

> Section 1079(j) of this title shall apply to a plan contracted for under this section, except that no person not eligible for health benefits under this section may be denied benefits under this section with respect to care or treatment for any service-connected disability which is compensable under chapter 11 of title 38 solely on the basis that such person is entitled to care or treatment for such disability in facilities of the Department of Veterans Affairs.

10 U.S.C. § 1086(g) (2000) (emphasis added).

Thus, under 10 U.S.C. §§ 1079(a) and (j)(2), the Secretary "shall contract" for healthcare for military dependents, and the amount paid for these services "shall be determined" by regulations issued by the Secretary, which "shall be determined to the extent practicable" by Medicare's rates. Under 10 U.S.C. § 1086(a) and (g) the Secretary "shall" do the same for retirees, their dependents, and the dependents of uniformed service members killed while on active duty. Although "'the use of the word "shall" generally makes a statute money-mandating,'" Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 877 (Fed. Cir. 2007) (quoting Agwiak v. United States, 347 F.3d 1375, 1380 (Fed. Cir. 2003)), the statutes at 10 U.S.C. §§ 1079 and 1086 do not set out any specific steps defendant was required to take to provide health care to members of the military, retirees, or their families. Instead, these statutes required the defendant to issue regulations in order to provide such health care and set out certain guidelines that defendant was to follow when it issued these regulations and to contract for medical care for covered individuals. The program and benefits do not create a money-mandating

provision that flows to the plaintiff hospitals. The hospitals' eligibility for payment requires an extra step of authorization into the program. The portions of 10 U.S.C. §§ 1079 and 1086 cited by plaintiffs, therefore, are not money-mandating and, standing alone, cannot serve as a source of jurisdiction for plaintiffs.

Plaintiffs' also claim that jurisdiction exists under 32 C.F.R §§ 199.4(a)(1)(i) and 199.7(h)(2), either alone or in combination with 10 U.S.C. §§ 1079 and 1086. Throughout the Relevant Period 32 C.F.R. § 199.4(a)(1)(1) stated:

> Subject to all applicable definitions, conditions, limitations, or exclusions specified in this part, the CHAMPUS Basic Program will pay for medically necessary services and supplies required in the diagnosis and treatment of illness or injury, including maternity care and well-baby care. Benefits include specified medical services and supplies provided to eligible beneficiaries from authorized civilian sources such as hospitals, other authorized institutional providers, physicians, other authorized individual professional providers, and professional ambulance service, prescription drugs, authorized medical supplies, and rental or purchase of durable medical equipment.

32 C.F.R. § 199.4(a)(1)(i) (2002) (emphasis added)

During the Relevant Period, 32 C.F.R. § 199.7(h) stated:

> (h) *Benefit payments*. CHAMPUS benefit payments are made either directly to the beneficiary or sponsor or to the provider, depending on the manner in which the CHAMPUS claim is submitted.
>
> (1) *Benefit payments made to beneficiary or sponsor*. When the CHAMPUS beneficiary or sponsor sings and submits a specific claim form directly to the appropriate CHAMPUS fiscal intermediary (or OCHAMPUS, including OCHAMPUSEUR), any CHAMPUS benefit payments due as a result of that specific claim submission will be made in the name of, and mailed to, the beneficiary or sponsor. In such circumstances, the beneficiary or sponsor is responsible to the provider for any amounts billed.
>
> (2) *Benefit payments made to participating provider*. When the authorized provider elects to participate by signing a CHAMPUS claim form, indicating participation in the appropriate space on the claim form, and submitting a specific claim on behalf of the beneficiary to the appropriate CHAMPUS fiscal intermediary, any CHAMPUS benefit payments due as a result of that claim submission will be made in the name of and mailed to the participating provider. Thus, by signing the claim form, the authorized provider agrees to abide by the CHAMPUS-determined allowable charge or cost, whether or not lower than the amount billed. . . .

32 C.F.R. § 199.7(h) (2002) (emphasis added).

As plaintiffs point out in their opposition to defendant's motion to dismiss, in Britell v. United States, 372 F.3d at 1378, the Federal Circuit held that the combination of 32 C.F.R. §§ 199.4(a)(1)(i) and 32 C.F.R. § 199.7(h)(1) to was money-mandating, "mandating the payment of money directly to the beneficiaries as reimbursement for medical services received." Britell v. United States, 372 F.3d 1370, 1378 (Fed. Cir. 2004). In particular, the court highlighted the language from 32 C.F.R. § 199.4(a)(1)(i) stating that "the CHAMPUS Basic Program *will pay for* medically necessary services and supplies," from 32 C.F.R. § 199.7(h) stating that "CHAMPUS benefit *payments are made either directly to the beneficiary* or sponsor or to the provider," and from 32 C.F.R. § 199.7(h)(1) stating that, "[w]hen the CHAMPUS beneficiary or sponsor signs and submits a specific claim form . . . any CHAMPUS benefit payments due as a result of that specific claim submission will be made in the name of, and mailed to, the beneficiary or sponsor." Id. (emphasis, modification, and omission in Brittel v. United States). According to the Brittel court, "[the Federal Circuit] and other courts have repeatedly held that this type of mandatory language, e.g., 'will pay' or 'shall pay,' creates the necessary 'money-mandate' for Tucker Act purposes." Id.

Of the three regulatory provisions on which plaintiffs' claims are based, two, 32 C.F.R §§ 199.4(a)(1)(i) and 199.7(h), were involved in Brittel v. the United States, while the third, 32 C.F.R. § 199.7(h)(2), is the sister provision to the final provision cited in Brittel, 32 C.F.R. § 199.7(h)(1). Although defendant correctly points out that Brittel v. United States is factually distinguishable from the present case, in that it involved payments to beneficiaries under 32 C.F.R. § 199.7(h)(1), rather than to providers under 32 C.F.R. § 199.7(h)(2), the distinction does not affect plaintiffs' claims. The portion of 32 C.F.R. § 199.7(h)(1) quoted by the Brittel court is almost identical to, and contains the same money-mandating language, as the parallel portion of 32 C.F.R. § 199.7(h)(2) cited by the plaintiffs, which states that "[w]hen the authorized provider elects to participate by signing a CHAMPUS claim form . . .any CHAMPUS benefit payments due as a result of that claim submission will be made in the name of and mailed to the participating provider." Thus, following Brittel v. United States, the combination of 32 C.F.R. §§ 199.4(a)(1)(i) and 199.7(h)(2) is money-mandating with respect to TRICARE providers, "mandating the payment of money directly to the [providers] as reimbursement for medical services [provided]." Britell v. United States, 372 F.3d at 1378. The court further notes that, under 10 U.S.C. §§ 1079(j)(2) and 1086(g), the amount to be paid to providers providing services under TRICARE plans "shall be determined" by regulations providing which "to the extent practicable" match the rules used by Medicare. 10 U.S.C. § 1079(j)(2). Thus, the combination of 10 U.S.C. § 1079(j)(2) and 32 C.F.R. §§ 199.4(a)(1)(i) and 199.7(h)(2) mandates the payment of money to providers who have submitted claims, in amounts which have been "to the extent practicable" determined under rules which match those used by Medicare. In their complaint, plaintiffs allege both that they provided outpatient services to individuals enrolled in TRICARE and that they submitted claims for services provided to these individual on the forms required by 32 C.F.R § 199.7(h)(2). Thus, the combination of 10 U.S.C. § 1079(j)(2) and 32 C.F.R. §§ 199.4(a)(1)(i) and 199.7(h)(2) is money-mandating as to hospitals such as plaintiffs

and, therefore, jurisdiction exists to hear plaintiffs' claims brought under these statutes and regulations.[8]

Before moving on to defendant's additional grounds for dismissal, the court finds that plaintiff Ingham's claims under 10 U.S.C §§ 1079 and 1986 and 32 C.F.R. §§ 199.4 and 199.7 are barred by the Release. The Release states that by signing and accepting the plaintiffs offer of a payment as described in the April 25, 2011 Letter, the signor agrees to "completely release, acquit and forever discharge the Government . . . from any and all claims, demands, actions, suits, causes of action . . . arising out of or resulting in any way relating to payments . . . by [the Government] made at any time for outpatient services rendered to TRICARE beneficiaries by Releasor prior to the date Releasor became subject the TRICARE Outpatient Prospective Payment System ('OPPS'), or December 31, 2010 if Releasor was never subject to TRICARE OPPS." The Notice similarly states that "payment of the discretionary adjustments will also be conditioned on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries and the TRICARE MCSCs." In Count V, plaintiffs, including plaintiff Ingham, allege that they were underpaid for All Outpatient Services during the Relevant Period, in other words, plaintiffs allege a cause of action arising out of payments made by the government for outpatient services prior to the time they became subject to TRICARE OPPS. Such a cause of action is clearly covered by the Release and, therefore, for those hospitals which signed the Release and accepted its terms, namely plaintiff Ingham, Count V is dismissed.

Defendant also moves to dismiss plaintiffs' alleged money-mandating claims on the grounds that plaintiffs have failed to allege facts showing that defendant violated a specific payment rule under the statutes or regulations. Having found that jurisdiction exists, the court examines the merits of plaintiffs' claims under 10 U.S.C. §§ 1079 and 1086 and 32 C.F.R. §§ 199.4 and 199.7. In their amended complaint, plaintiffs argue that defendant violated 10 U.S.C. §§ 1079 and 1086 when it used the CMAC fixed maximum amounts to reimburse them for claims they submitted for All Outpatient Services. Plaintiffs allege this caused them to be paid less than they would have been paid if defendant had complied with the statutory mandate of 10 U.S.C. § 1079, which they allege "required the hospitals providing health care services to CHAMPUS beneficiaries to be paid consistent with Medicare." In their opposition to defendant's motion to dismiss, plaintiffs clarify that they do not allege that Defendant should have been paid using the Medicare OPPS rate during Relevant Period, which they concede was not feasible, but that defendant's use of CMAC rates failed to reflect Medicare rates "to the extent practicable" as required by 10 U.S.C. § 1079(j)(2). Plaintiffs argue that defendant's use of CMAC rates failed to meet this standard because CMAC "in no way emulated *any* prior Medicare reimbursement

---

[8] Plaintiffs additionally argue, in a notice of additional authority filed with the court, that defendant's argument that 32 C.F.R. § 199.7(h)(2) is not money-mandating contradicts a position it took in a 2007 filing in the case of Lakewood Health System v. Triwest Healthcare Alliance Corp., No. 07-cv-00069 (D. Del. 2007).

method for hospital outpatient services and was never intended to serve as the exclusive reimbursement paid to hospitals for outpatient services."

Defendant argues that Count V should be dismissed because plaintiffs have failed to allege facts to show that the reimbursement rates set forth in the Interim and Final Rules violated 10 U.S.C. § 1079. Initially, defendant argues that nothing in 10 U.S.C. § 1079 required it to pay hospitals using Medicare rates. Instead, defendant points to 10 U.S.C. § 1079's statement that the amounts paid to the provider should "to the extent practicable" reflect Medicare rates, and argues that what was "practicable" was "a quintessential discretionary judgment to be made by the Secretary." Defendant quotes GHS Health Maintenance Organization, Inc. v. United States, 76 Fed. Cl. 339, 363 (2007) for the proposition that an agency's "[j]udgment about the best regulatory tools to employ in a particular situation is . . . entitled to considerable deference from the generalist judiciary." (omission in GHS Health Maintenance Organization, Inc. v. United States). Defendant points out that the Interim Final and Final Rules, and later the Notice, all explained why it was not "practicable" to implement Medicare's OPPS rates at the time the Rules were issued. Defendant argues that the use of CMAC to reimburse hospitals was not improper because, as explained in the Notice, CMAC was "one component of Medicare's physician fee schedule" that Medicare used as part of a "blended rate" to reimburse outpatient radiology services prior to instituting OPPS. As to plaintiffs' claims regarding the existence of prior Medicare payment rates that should have been used, plaintiffs argue that there was nothing in 10 U.S.C. § 1079 that required the defendant to pay a specific prior Medicare rate or any specific rate and, thus, the existence of previous reimbursement rates is irrelevant. As to plaintiffs' argument that CMAC was not intended to reimburse hospitals, defendant argues that there was nothing in 10 U.S.C. § 1079 that required the defendant to pay all of plaintiffs' overhead fees.

The court notes that, in their briefs before this court, neither party conducts an analysis under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, reh'g denied, 468 U.S. 1227 (1984). As the arguments summarized above make clear, however, their dispute revolves around the issue of whether defendant improperly exercised its discretion under the statute 10 U.S.C. § 1079 when it issued the Interim Final and Final Rules establishing CMAC as the payment rate for certain outpatient services.[9]

Deference to the agency pursuant to Chevron requires that a court ask the following questions when reviewing an agency's construction of a statute that it

---

[9] As noted above, the relevant changes instituted by the Interim Final and Final Rules related to the use of CMAC were implemented at 32 C.F.R § 199.14(a)(5). Defendant seems to argue that this court would lack jurisdiction over the challenge of whether a regulation, such as 32 C.F.R § 199.14(a)(5), contravenes a statute, because the challenge must be brought under the Administrative Procedure Act in a United States District Court. Defendant offers no authority, however, to support its claim that such a challenge cannot also arise under a money-mandating claim, over which this court would have jurisdiction.

administers: first, the court must ask "whether Congress has directly spoken to the precise question at issue." <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. at 842–43. If the congressional intent is clear, then the court looks no further, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Id.</u> (footnote omitted); <u>see</u> also <u>City of Arlington v. FCC</u>, 133 S. Ct. 1863, 1868 (2013) ("'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" (quoting <u>Chevron U.S.A. v. Natural Res. Def. Council Inc.</u>, 467 U.S. 842–843)).

If the statute, however, is "ambiguous with respect to the specific issue," the court must ask the second question: "whether the agency's answer is based on a permissible construction of the statute." <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. at 843 (footnotes omitted); <u>see</u> also <u>Judulang v. Holder</u>, 132 S. Ct. 476, 484 n.7 (2011) ("[U]nder <u>Chevron</u> step two, we ask whether an agency interpretation is "'arbitrary or capricious in substance.'"" (quoting <u>Mayo Found. for Med. Ed. & Research v. United States</u>, 131 S. Ct. 704, 711 (2011) (quoting <u>Household Credit Servs., Inc. v. Pfennig</u>, 541 U.S. at 232, 242 (2004)))); <u>Thai Plastic Bags Indus. Co., Ltd. v. United States</u>, 746 F.3d 1358, 1364 (Fed. Cir. 2014) ("In other words, Commerce's 'interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.'" (quoting <u>United States v. Eurodif S.A.</u>, 555 U.S. 305, 316 (2009))); <u>Mason v. Shinseki</u>, 743 F.3d 1370, 1374 (Fed. Cir. 2014).

> [I]f Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because "[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones," and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated.

<u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 132 (2000) (quoting <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. at 866) (other citations omitted); <u>see</u> also <u>E.P.A. v. EME Homer City Generation, L.P.</u>, 134 S. Ct. 1584, 1603 (2014) ("Because '"a full understanding of the force of the statutory policy . . . depend[s] upon more than ordinary knowledge"' of the situation, the administering agency's construction is to be accorded 'controlling weight unless . . . arbitrary, capricious, or manifestly contrary to the statute.'" (quoting <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. at 844 (quoting <u>United States v. Shimer</u>, 367 U.S. 374, 382 (1961)))) (alterations in <u>E.P.A. v. EME Homer City Generation, L.P.</u>).

With respect to an agency's statutory construction: "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had arisen in a judicial proceeding." <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. at 843 n.11 (citations omitted); <u>see</u> also <u>APEX Exports v. United States</u>, 777 F.3d 1373, 1378–79 (Fed. Cir. 2015); <u>Cooper Techs. Co. v. Dudas</u>, 536 F.3d 1330, 1341 (Fed. Cir. 2008) ("'Our duty is not to weigh the wisdom of, or to resolve any struggle

between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute.'" (quoting Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir.), reh'g denied (Fed. Cir.), suggestion for reh'g en banc declined (Fed. Cir. 1992))); Hawkins v. United States, 469 F.3d 993, 1000 (Fed. Cir. 2006). However, "[d]eference does not mean acquiescence." Presley v. Etowah Cnty. Comm'n, 502 U.S. 491, 508 (1992). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Chevron U.S.A., Inc. v. Natural Resource Defense Council, Inc., 467 U.S. at 843 n.9 (citations omitted); Util. Air Regulatory Grp. v. E.P.A., 134 S. Ct. 2427, 2439 (2014) ("The question for a reviewing court is whether . . . the agency has acted reasonably and thus has 'stayed within the bounds of its statutory authority.'" (quoting City of Arlington v. FCC, 133 S. Ct. at 1868)); GHS Health Maint. Org., Inc. v. United States, 536 F.3d 1293, 1302 (Fed. Cir. 2008) ("If an agency promulgates a regulation without regard for what Congress has said on the matter, however, the purpose for deference evaporates."). Thus, this court should defer to an agency's construction of the statute if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' express intent." Rust v. Sullivan, 500 U.S. 173, 184 (1991) (citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. at 842–43); GHS Health Maint. Org., Inc. v. United States, 536 F.3d at 1302; Favreau v. United States, 317 F.3d 1346, 1358 (Fed. Cir. 2002), cert. denied, 540 U.S. 810 (2003); Miami Free Zone Corp. v. Foreign-Trade Zones Bd., 136 F.3d 1310, 1315 (Fed. Cir. 1998). The converse is likewise true; the court should only defer to the agency's interpretation if it is not in conflict with the congressional intent.

Regarding step one in the Chevron deference analysis, the court looks to the plain meaning of the language of 10 U.S.C. § 1079(j)(2) to determine "whether Congress has directly spoken to the precise question at issue" and whether congressional intent is clear. Again, 10 U.S.C. § 1079(j)(2) states:

> The amount to be paid to a provider of services for services provided under a plan covered by this section shall be determined under joint regulations to be prescribed by the administering Secretaries which provide that the amount of such payments shall be determined to the extent practicable in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under [Medicare].

10 U.S.C. § 1079(j)(2) (emphasis added). Two cases cited by the defendant, Biodiversity Legal Foundation v. Babbitt, 146 F.3d 1249 (10th Cir. 1998) and SMS Data Products Group, Inc. v. United States, 853 F.2d 1547 (Fed. Cir. 1988), although factually distinguishable, examined similar statutory language that combined the terms "shall" and "to the extent practicable."

SMS Data Products was a bid protest case involving a provision of the FAR governing the reprocurement of computer systems for the Department of Health and Human Services (HHS). See SMS Data Prods. Grp., Inc. v. United States, 853 F.2d at 1553. As quoted by the Federal Circuit, the relevant provision of the FAR required that

that the contracting officer "*shall obtain competition to the maximum extent practicable for the repurchase.*" Id. (quoting 48 C.F.R. § 49.402–6(b)) (emphasis in SMS Data Prods. Grp., Inc. v. United States). The Federal Circuit found there was no established interpretation of 48 C.F.R. § 49.402–6 and, thus, reviewed the plain meaning of the statute. Id. The Federal Circuit reasoned that:

> As one would expect, use of the word "shall" in the phrase "shall obtain competition to the maximum extent practicable" denotes the imperative. *See* 48 CFR § 2.101 (definition). As to the word "practicable," in common usage it means "possible to practice or perform," or "capable of being put into practice, done, or accomplished: feasible." Webster's Third New International Dictionary (1971). Thus, the contracting officer did not have unbridled discretion in conducting the reprocurement, but was required to conduct the reprocurement in the most competitive manner feasible.

SMS Data Prods. Grp., Inc. v. United States, 853 F.2d at 1553-54. The Federal Circuit noted, however, that even with this understanding, there was "obviously a large degree of ambiguity in a phrase such as 'shall obtain competition to the maximum extent practicable,' which can only be given concrete meaning through a process of case-by-case adjudication." Id. at 1554.

In Biodiversity Legal Foundation v. Babbitt, plaintiffs filed suit against the Fish and Wildlife Service, seeking injunctive and declaratory relief under the Endangered Species Act (ESA), 16 U.S.C. § 1533(b)(3)(A), and the Administrative Procedure Act, to enforce a 90-day deadline for finding a specific species endangered. Biodiversity Legal Foundation v. Babbitt, 146 F.3d at 1251. As quoted by the United States Court of Appeals for the Tenth Circuit, the relevant section of the ESA stated that the Secretary of the Interior "shall make a finding as to whether" the addition of a species to the endangered or threatened species list was warranted, "[t]o the maximum extent practicable, within 90 days after receiving the petition of an interested person." Id. at 1253 (quoting 16 U.S.C. § 1533(b)(3)(A)). The United States Court of Appeals for the Tenth Circuit rejected the notion that the provision imposed "a mandatory, nondiscretionary duty on the Service to act on new petitions to list within 90 days." Id. Instead, the Tenth Circuit, reasoned that:

> Since Congress did not define or otherwise explain the meaning of the facially ambiguous phrase "maximum extent practicable" within the statute, we assume Congress intended the words to be given their ordinary meaning, which we may discover through the use of dictionaries. *See United States v. LaBonte,* 520 U.S. 751, ——, 117 S.Ct. 1673, 1677, 137 L.Ed.2d 1001 (1997). "Practicable is . . . that which is performable, feasible, [or] possible . . . ." Black's Law Dictionary 1172 (6th ed. 1991); *see also* Webster's Ninth New Collegiate Dictionary 923 (defining "practicable" as that which is "possible to practice or perform: feasible"). "Maximum" is defined as "the highest or greatest amount, quality, value or degree." Black's Law Dictionary at 979; *see also* Webster's Ninth New Collegiate Dictionary at 735 (defining "maximum" as "the greatest quantity or value attainable"). Based on these definitions, the phrase "to the maximum extent

practicable" "imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 107 (D.D.C. 1995) (construing same language in another subsection of the ESA).

Though the ordinary language of the statute speaks in general terms of the greatest extent feasible or possible, the phrase remains ambiguous because neither the statutory language nor its ordinary meaning specifies the circumstances under which the Service may forego the 90–day deadline.

Biodiversity Legal Foundation v. Babbitt, 146 F.3d at 1253–54.

Although both SMS Data Products and Babbitt involved the phrase "to the maximum extent practicable" rather than the phrase "to the extent practicable" used in 10 U.S.C. § 1079, the distinction is not particularly significant in the present case. In SMS Data Products, it was the addition of "shall," which "denotes the imperative," to the phrase "to the maximum extent practicable," which meant that the government did not have "unbridled discretion." SMS Data Prods, Grp., Inc. v. United States, 853 F.2d at 1553-54. Further, although the phrase "to the maximum extent practicable" actually provides more emphatic guidance than "to the extent practicable," the Federal Circuit still found that there was a "large degree of ambiguity" in the phrase. Id. at 1554. Similarly, although the Babbitt court found that that the phrase "[t]o the maximum extent practicable" imposed a "clear duty" on the agency, it also found that the "phrase remain[ed] ambiguous" because, just as in the present case, the statute at issue did not specify the circumstances where action would not be "practicable." Biodiversity Legal Foundation v. Babbitt, 146 F.3d at 1254. Thus, while the word "shall" in 10 U.S.C. § 1079 makes clear that Congress intended to impose some direction on the defendant with respect to TRICARE's payment rates, the nature of the phrase "to the extent practicable" means that the exact requirements of that duty were ambiguous. Because Congress did not speak directly to the precise question of when TRICARE's reimbursement rates could be set different from Medicare's, the court moves on to step two of the Chevron deference analysis, whether the reimbursement methods set forth in the Interim Final and Final Rules represented a plausible construction of the guidelines set forth in 10 U.S.C. § 1079(j)(2).

Plaintiffs allege that that TRICARE's use of the CMAC rate in the Interim Final and Final Rules failed to provide payments which were "to the extent practicable in accordance with the same reimbursement rules as apply to payments to providers of services of the same type under [Medicare]," as required by 10 U.S.C. § 1079(j)(2), for two reasons: (1) CMAC allegedly did not emulate prior Medicare reimbursement methods; and (2) CMAC was allegedly intended to be used as a payment methodology for individual health care providers, such as doctors, rather than institutions  such as hospitals, which have higher overhead.

With respect to plaintiffs' first argument, 10 U.S.C. § 1079(j)(2) required defendant to attempt to emulate the reimbursement rules that then applied to providers under Medicare. Throughout the Relevant Period, Medicare was using the OPPS

reimbursement methodology. Thus, defendant's obligation was to attempt to emulate OPPS, rather than any prior Medicare reimbursement methods. Defendant's alleged failure to emulate these prior methods in promulgating the Interim Final and Final Rules is irrelevant to the issue of whether the Interim Final and Final Rules were acceptable interpretations of 10 U.S.C. § 1079(j)(2).[10]

With respect to plaintiffs' second argument, 10 U.S.C. § 1079(j)(2) required the defendant to attempt to ensure that the "amount of such payments" provided to service providers was in accordance with those that would have been received under Medicare's rules. The alleged purpose of CMAC is not, by itself, evidence that the actual payment amounts that providers would receive using CMAC would be less than those they would receive under Medicare OPPS rules.[11] This is particularly so because plaintiffs have failed to offer any evidence, or even allege, that the OPPS methodology at use during the relevant period would have remedied the alleged problem with CMAC by accounting for the allegedly higher overhead incurred by hospitals. Further, plaintiffs have failed to allege that it would have been practicable for defendant to apply the Medicare OPPS rate or

---

[10] Defendant's offer to use of a prior, pre-OPPS Medicare methodology to reimburse plaintiffs during the Discretionary Payment Process does not support plaintiffs' argument. In the Notice, defendant explained that the reason it was making such payments was because it had determined that the payment rates it had used for radiology services "were not comparable to the pre-OPPS Medicare fair rates for the period August 1, 2003, to May 1, 2009 (or other appropriate end date for OPPS-exempt hospitals)." (emphasis added). Although the defendant stated in the notice that its decision to use of such pre-OPPS methodologies for the Discretionary Payment Process "must be viewed in the context of the statute requiring TRICARE to adopt Medicare reimbursement methodologies for hospitals and DoD's policy that Medicare reimbursement should be emulated as fair payment for health care provided to TRICARE beneficiaries," defendant nowhere stated that it thought these pre-OPPS reimbursement methodologies actually better emulated Medicare OPPS rates than CMAC. The Kennel Study did not compare payments under CMAC and OPPS, but instead concluded that providers would have been paid more "[u]nder [the] method used by Medicare prior to OPPS." Defendant's apparent policy decision that the use of a pre-OPPS Medicare methodology would better provide hospitals with "fair payment" than CMAC during the Relevant Period does not show that it believed that such a methodology would have more effectively emulated OPPS payment rules, or that such a methodology actually did.

[11] In fact, there is evidence in the record that suggests that the use of CMAC during the relevant period actually resulted in greater payments to hospitals than the use of OPPS would have. As defendant notes in its motion to dismiss, the rule promulgated by defendant that ultimately did implement the OPPS methodology concluded that the use of OPPS would result in a reduction of approximately $460 million per year in payments to hospitals. See 73 Fed. Reg. 74945-01, 27 (Dec. 10, 2008) ("We estimate the total reduction . . . in hospital revenue under the OPPS for its first year of implementation . . . from revenue in the same period without the proposed OPPS changes to be approximately $460 million."). Plaintiffs do not challenge this conclusion.

some other rate that better approximated OPPS during the Relevant Period. Indeed, plaintiffs do not contest the two statements that defendant made in the documents issuing the Interim and Interim Final Rules that, at that time, it was impracticable to apply the OPPS payment methodology being used by Medicare. Such unchallenged statements, made contemporaneously with the issuance of the Interim Final and Final Rules, are strong evidence that it would not have been practicable for defendant to have applied the Medicare OPPS methodology during the Relevant Period. Because plaintiffs have failed to adequately plead any facts showing that the reimbursement rates instituted by the Interim Final and Final Rules represented an unreasonable interpretation of 10 U.S.C. § 1079(j)(2), plaintiffs' claims based on 10 U.S.C. §§ 1079 and 1086 and 32 C.F.R §§ 199.4 and 199.7 must fail at this time.

## CONCLUSION

On the grounds discussed above, defendant's motion to dismiss is **GRANTED** and plaintiffs' first amended complaint is **DISMISSED**. The Clerk is directed to enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**