# In the United States Court of Federal Claims

No. 13–821
(Filed Under Seal: 6 January 2020)
(Reissued for Publication: 14 January 2020)*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| INGHAM REGIONAL MEDICAL CENTER et al., | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | Work Product Doctrine; Motion to Compel; |
| | * | RCFC 26(b)(3). |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Alexander J. Pires*, Pires Cooley, Washington, DC, with whom was *Gregory A. Brodek*, of counsel, Duane Morris LLP, Bangor, ME, for plaintiffs.

*A. Bondurant Eley*, Senior Trial Counsel, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Steven J. Gillingham*, Assistant Director, and *Robert E. Kirshman, Jr.*, Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant.

---

* This Opinion and Order was originally filed under seal, to allow the parties the opportunity to propose redactions. No redactions were proposed. The order is reissued for publication with a few minor, non-substantive corrections.

## OPINION AND ORDER

**HOLTE**, **Judge**.

Plaintiffs Ingham Regional Medical Center ("Ingham"), Bay Regional Medical Center, McLaren Northern Michigan, Gifford Medical Center, Inc., and Lakewood Health System (collectively, "plaintiffs"), allege the United States, acting through the Secretary of the Department of Defense ("DoD") in his official capacity as operator of TRICARE, underpaid them for medical services they administered through the TRICARE program. Pending before the Court are five motions: (1) Plaintiffs' Motion for Determination that Certain Documents Produced in Discovery are not Privileged or Subject to the Work Product Doctrine, ECF No. 106 ("Pls.' Mot."); (2) Plaintiffs' Motion to Compel Deposition Testimony, ECF No. 109 ("Pls.' Mot. to Comp."); (3) Defendant's Motion to Seal Plaintiffs' Motion to Compel, ECF No. 111; (4) Defendant's Response to Pls.' Mot. to Compel and Defendant's Motion to Strike Portions of Plaintiffs' Expert Report that Rely Solely upon Privileged Material, ECF No. 113 ("Def.'s Resp. to Pls.' Mot. to Comp."); and (5) Defendant's Motion to Seal Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion to Compel and Plaintiffs' Opposition to Defendant's Motion to Strike, ECF No. 117. The Court held oral argument on these motions on 7 October 2019. For the following reasons, the Court **GRANTS** plaintiffs' motions and **DENIES** the government's motions.

## I.     Background

TRICARE is a "military health care system" that "provides medical and dental care for current and former members of the military and their dependents." *Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341, 1342 (Fed. Cir. 2017). TRICARE Management Activity ("TMA"), a "field office in the Defense Department," managed and oversaw TRICARE.[1] *N. Mich. Hosps., Inc. v. Health Net Fed. Servs., LLC*, 344 F. App'x 731, 734 (3d Cir. 2009). Hospitals providing TRICARE services are reimbursed according to DoD guidelines. *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1343 (citing 32 C.F.R. § 199.14). In 2001, the TRICARE statute was amended to require DoD to use Medicare reimbursement rules when reimbursing outside healthcare providers, which DoD was not previously required to do. *Id.* At the time, adopting Medicare reimbursement rules was impractical for TRICARE due to "the lack of TRICARE cost report data comparable to Medicare's." *Id.* (quoting TRICARE; Sub-Acute Care Program; Uniform Skilled Nursing Facility Benefit; Home Health Care Benefit; Adopting Medicare Payment Methods for Skilled Nursing Facilities and Home Health Care Providers, 67 Fed. Reg. 40,597–02, 40,601 (June 13, 2002)). In 2005, DoD issued a Final Rule, "which provided a more detailed explanation of the payment rules for hospital-based outpatient services." *Id.* That rule specified, "[f]or most outpatient services, hospitals would receive payments 'based on the TRICARE-allowable cost method in effect for professional providers or the [Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS")] Maximum Allowable Charge (CMAC).'" *Id.* (quoting TRICARE; Sub-Acute Care Program; Uniform Skilled Nursing Facility Benefit; Home Health Care Benefit; Adopting Medicare Payment Methods for Skilled Nursing Facilities and Home Health Care Providers, 70 Fed. Reg. 61,368–01, 61,371 (Oct. 24, 2005)

---

[1] TMA is now known as the Defense Health Agency ("DHA").

(codified at 33 C.F.R. pt. 199)).  These rules "applied until 2009, when TRICARE introduced a new payment system for hospital outpatient services that was similar to the Medicare [Outpatient Prospective Payment System] rules."  *Id.*

A group of hospitals (hereinafter referred to as "the 400 Hospitals") "complained that CMAC was only intended to be used for individual health care providers, not institutions with large overhead costs."[2]  *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1343.  The 400 Hospitals are a separate, but similarly situated group of hospitals as plaintiffs in this case, who seek to represent a group of approximately 1,610 hospitals.[3]  *See* Pls.' Mot. to Certify Class Action & Appoint Class Counsel, ECF No. 77 ("Pls.' Mot. to Certify").  In response to hospital complaints, TRICARE hired a consulting firm, Kennell and Associates, to "undertake a study of the accuracy of its payments to the hospitals."  *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1343–44.  Kennell and Associates performed a study (the "Kennell study") which "compared CMAC payments to the payments that would have been made using Medicare payment principles, and determined that DoD '(1) underpaid hospitals for outpatient radiology but, (2) correctly paid hospitals for all other outpatient services.'"  *Id.* at 1344 (emphasis omitted).

Due to the Kennell study findings, "DoD created a discretionary payment process," and on 25 April 2011, DoD notified TRICARE hospitals by letter of the process which allowed hospitals to "request a review of their TRICARE reimbursements."  *Id.*[4]  In addition to the letter,

---

[2] On 23 January 2007, the 400 Hospitals "filed their first amended complaint in the [United States District Court for the District of Delaware] asserting claims for breach of contract implied in fact and breach of quasi-contract/unjust enrichment" against one of TRICARE's managed care support contractors.  *N. Mich. Hosps., Inc.*, 344 F. App'x at 735.  On 30 May 2008, the District Court dismissed the complaint because the hospitals failed to exhaust their administrative remedies.  *Id.* at 736.  The Third Circuit affirmed the dismissal.  *Id.* at 740.  Thereafter, the parties to that suit exchanged email communications regarding further steps and potential readjustment with TRICARE.

[3] Plaintiffs in this case are represented by the same law firm as the 400 Hospitals but are a separate, albeit similarly situated group as the 400 Hospitals.  *See* Def.'s Resp. to Pls.' Mot. for Determination that Certain Docs. Produced in Disc. are not Priv. or Subject to the Work Product Doctrine ("Def.'s Resp. to Pls.' Mot.") at 6, ECF No. 108.  The 400 Hospitals initially included 2,500 hospitals, but over time, this number decreased to approximately 400 hospitals.  *Compare id.* at App12 (mentioning representation of "approximately 2,500 hospitals"), *with id.* at App59 (email mentioning representation of "approximately 400 hospitals").

[4] The letter states, in pertinent part:

> For purposes of this process, DoD will treat your submission as an untimely but discretionary appeal under 32 Code of Federal Regulations 199.10(a)(5) and (c), provided it is received no later than 60 days from the date of this letter. Based on the request, your hospital may be paid an adjustment, subject to the availability of appropriations, in return for your acceptance of DoD's offer of additional payment based on criteria established by the agency. . . . In order to bring closure to any concerns regarding payment of hospital outpatient services under the TRICARE regulation prior to implementation of OPPS, payment of the discretionary adjustments will also be contingent on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries, and TRICARE MCSCs. We value your hospital as a partner in this effort and remain committed to working with you to complete the analysis of claims data and determine if any additional payments may be allowed.

*Ingham Reg'l Med. Ctr. v United States*, 126 Fed. Cl. 1, 12 (2016), *aff'd in part, rev'd in part by Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341 (Fed. Cir. 2017).  Approximately 5,200 hospitals, including the named plaintiffs in this case and the 400 Hospitals, submitted a request.  *Id.* at 16.  Once TRICARE sent the 400 Hospitals recalculated amounts proposed for reimbursement, the hospitals identified errors in the recalculation.  *Id.* at 17.

"DoD published a document titled 'NOTICE TO HOSPITALS OF POTENTIAL ADJUSTMENT TO PAST PAYMENTS FOR OUTPATIENT RADIOLOGY SERVICES' (the "Notice")" on the TRICARE website. *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1344.[5] The Notice also described a "nine-step process by which hospitals could 'request an analysis of their claims data for possible discretionary adjustment' and to 'govern the review of payments for hospital outpatient radiology services and payment of any discretionary net adjustments.'"[6] *Ingham Reg'l Med. Ctr. v United States*, 126 Fed. Cl. 1, 14 (2016), *aff'd in part, rev'd in part by Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341 (Fed. Cir. 2017). If DoD determined a hospital was entitled to an adjustment, payment was conditioned upon availability of appropriations and

---

TRICARE allegedly acknowledged errors in the calculations but claimed it was not aware of the errors prior to sending the proposed payment adjustments. *Id.*

[5] The Notice explained, in pertinent part:

> The TRICARE regulation provisions on hospital outpatient services, in the absence of adoption of the Medicare OPPS methodology, adopted comparable Medicare payments for similar services provided in other sites (i.e., physician offices). That is, TRICARE looked to the similarity of services being provided, not the site of services, in adopting a reimbursement methodology for hospital outpatient services. . . .

> [I]n reviewing payments for hospital services, DoD has determined that, for radiology services . . . the technical component of the allowable charge did not approximate the Medicare fair payment for such hospital services as well as it could have. That is, looking at the Medicare reimbursement methodologies in existence prior to adoption of Medicare OPPS in 2000, . . . some radiology services were underpaid in comparison. . . . Thus, although payments to hospitals for radiology services were consistent with the duly promulgated regulation, there is a basis for TRICARE to provide an opportunity to make some discretionary net payment adjustments to approximate more closely Medicare payment methods. . . .

> General TRICARE policy is that payment methodologies follow to the extent practicable Medicare payments. Prior to adopting [OPPS], Medicare used a blended rate that factored in a percentage of hospital costs and a percentage of the global physician fee schedule to reimburse hospital outpatient radiology services. In contrast, TRICARE regulation limited reimbursement to hospitals for individual outpatient radiology services to the technical component portion of the CHAMPUS Maximum Allowable Charge (CMAC), which was one component of Medicare's physician fee schedule. Consistent with TRICARE policy under statute to pay similar to Medicare, we have determined that discretionary adjusted payments may better reflect the Medicare payment amounts for outpatient radiology claims.

*Ingham Reg'l Med. Ctr.*, 874 F.3d at 1344.

[6] "Step 1 instructed hospitals to submit a request for analysis of their claims data." *Ingham Reg'l Med. Ctr.*, 126 Fed. Cl. at 14 (internal quotation marks omitted). "Step 2 described the procedure for submitting a request," including "[a] separate Excel spreadsheet must be completed for each hospital" accompanying a request. *Id.* "Steps 3 through 7 described the review process." *Id.* Step 8 stated, "[a] written response to the hospital's request . . . will provide the calculated discretionary adjusted payment and the calculations from which the adjustment was derived." *Id.* at 15. Step 8 further explained:

> While the methodology for calculating the adjustment is not subject to questions, any questions regarding the data used in the calculations should be received by TMA within 30 days of the date of TMA's response as specified in the response. Any questions should be accompanied by detailed explanation of the alleged errors and the proposed corrections with supporting documentation.

*Id.* Lastly, Step 9 noted, "TRICARE's response would include a release and agreement to accept the discretionary payment." *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1345 (internal quotation marks omitted).

the hospital signing a release of claims against DoD. *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1344–45.

Plaintiffs submitted requests for discretionary payment, and TRICARE provided written responses. *Ingham Reg'l Med. Ctr.*, 126 Fed. Cl. at 16. "Plaintiff Ingham signed the Release and received the proposed payment," but alleged "the payment it received . . . was less than the amount it was owed." *Id.* DoD informed plaintiff Bay Regional Medical Center "it had been overpaid for radiology services and was owed nothing." *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1345. "Plaintiffs McLaren Northern Michigan, Gifford Medical Center, Inc., and Lakewood Health System refused to sign the Release after receiving proposed payment amounts that they believed, due to multiple errors in the [Kennell study] and TMA's calculations, understated the amount they were owed for outpatient radiology services." *Ingham Reg'l Med. Ctr.*, 126 Fed. Cl. at 17.

## A. Procedural History

Plaintiffs are a group of hospitals, separate from the 400 Hospitals, that provide medical services as part of the TRICARE program. On 21 October 2013, plaintiffs brought this action claiming the government underpaid them for medical services they provided between 1 August 2003 and 1 May 2009. *Ingham Reg'l Med. Ctr.*, 126 Fed. Cl. at 9. Plaintiffs allege this underpayment breached two contracts and violated various statutory and regulatory provisions.[7] *Id.* Plaintiffs seek to represent a class of approximately 1,610 similarly situated hospitals, separate from the 400 Hospitals. *See* Pls.' Mot. to Certify.[8]

On 13 January 2015, the government filed a motion to dismiss plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See* Def.'s Mot. to Dismiss Pls.' First Am. Compl., ECF No. 41. The government argued plaintiffs "fail[ed] to allege facts" sufficient to establish a binding contract with the government or that any contract was breached, and absent a valid contract, "there [could] be no mutual mistake or breach of the covenant of good faith and fair dealing." *Id.* at 1–2. On 22 March 2016, this Court dismissed plaintiffs' complaint for failure to state a claim. *Ingham Reg'l Med. Ctr.*, 126 Fed. Cl. at 55. Plaintiffs appealed, and on 3 November 2017, the Federal Circuit "reverse[d] the dismissal of [plaintiff] Ingham's breach of contract claim, affirm[ed] the dismissal of [plaintiffs'] money-mandating claim, and [did] not reach the claim for mutual mistake." *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1348.[9] The Federal Circuit remanded the case "for further proceedings on the breach of contract claim." *Id.* On remand, plaintiffs filed an amended complaint, the government filed its answer, and the parties engaged in ongoing

---

[7] Plaintiffs raise five counts in their first amended complaint: (1) breach of express contract; (2) breach of implied-in-fact contract; (3) mutual mistake; (4) breach of covenant of good faith and fair dealing; and (5) violations of 10. U.S.C. §§ 1079, 1086, and 32 C.F.R. § 1997.7(h)(2). Am. Compl., ECF No. 40.

[8] This Court stayed consideration of plaintiffs' motion for class certification on 30 April 2018. *See* Order, ECF No. 78.

[9] On appeal, plaintiffs appealed three claims: "(1) breach of express contract between Ingham and DoD based on the discretionary payment process; (2) revision of Ingham's contract based on mutual mistake, in light of the errors in the calculations of radiology outpatient services and the Kennel study; and (3) violations of money-mandating statutes and regulations, 10 U.S.C. §§ 1079 and 1086 and 32 C.F.R. § 199.7(h)(2)." *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1346.

discovery.[10]  This case was transferred to the undersigned Judge on 29 July 2019.  *See* Order, ECF No. 114.

### B.  Factual History Relevant to this Dispute[11]

On 26 July 2010, counsel for the 400 Hospitals, C. Mitchell Goldman, sent a letter to TMA's general counsel, Robert Seaman, inviting him to engage in recalculation negotiations to address the alleged underpayments.  Def.'s Resp. to Pls.' Mot. for Determination that Certain Docs. Produced in Disc. are not Priv. or Subject to the Work Product Doctrine at App2–3, ECF No. 108 ("Def.'s Resp. to Pls.' Mot.").  If TMA was unwilling to negotiate, Mr. Goldman requested Mr. Seaman provide more direction on how the 400 Hospitals "may resubmit [their] claims in question to comply with [TRICARE's] requirements," their contracts, and applicable law.  *Id.*[12]

On 19 November 2010, Gregory Brodek, also counsel for the 400 Hospitals, emailed Mr. Seaman explaining once the 400 Hospitals exhausted their administrative remedies, they would "be forced to resume the legal course of action, which will remove any ability to structure a resolution that addresses both your clients [sic] and ours [sic] needs and concerns."  *Id.* at App4.

On 19 January 2011, Mr. Brodek wrote Rear Admiral Christine Hunter, Deputy Director of TMA, about several items the parties must address to resolve the alleged underpayments, including "the proposed repayment process, the methodology used to determine the existence of underpayments, and our representation."  *Id.* at App13.[13]

---

[10] On 11 June 2019, the previous Judge assigned to this case scheduled expert discovery to close on 22 August 2019. Order, ECF No. 104.  On 21 August 2019, the parties filed a joint motion to stay expert discovery pending resolution of unresolved discovery motions at issue in this order and opinion. ECF No. 120.  On 29 August 2019, the undersigned Judge issued an order stating, "[t]he Court shall extend all deadlines contained within the 11 June 2019 scheduling order (ECF 104) at the time the pending discovery motions are ruled upon."  Order, ECF No. 122. All pending discovery disclosures and motions occurred after the 3 November 2017 Federal Circuit opinion.

[11] The facts relevant to this discovery dispute occurred during the 400 Hospitals' recalculation discussions with TRICARE, prior to the commencement of this suit.

[12] The letter stated in pertinent part:

> At the conclusion of our meeting, we made two specific requests [to] which you agreed . . . . First, we would like for your client to consider . . . entering into negotiations to settle this dispute. A settlement would avoid both sides incurring significant cost of claims processing and ultimately litigation. . . . Second, if your client is unwilling to enter into settlement discussions, please provide us with clear and concise directions on how our hospitals may resubmit the claims in question to comply with Tricare's requirements and not violate their existing payer contracts and existing law. . . . It is our belief that all parties are benefitted by avoiding protracted litigation which has been ongoing for more than 6 years.

Def.'s Resp. to Pls.' Mot. at App3.

[13] Mr. Brodek further stated:

> During the meeting, there appeared to be a misunderstanding of Duane Morris' representation of the Hospitals in this dispute and where this dispute is procedurally. Duane Morris was retained to file class action lawsuits on behalf of hospitals that had submitted claims for reimbursement of facility charges which were denied by two of TRICARE's three regional contractors. Those lawsuits were filed by representative hospitals on behalf of all similarly situated Hospitals in these two

On 2 February 2011, Mr. Brodek again emailed Mr. Seaman to express his understanding that "TRICARE is currently analyzing how to . . . address the payment error," but said, "if the currently pending appeals cannot be resolved in a manner that addresses our clients' concerns, they will be forced to proceed back to court." *Id.* at App17.  Mr. Brodek stated litigation was not "in either our clients', nor TRICARE's, best interest," and he offered a proposal he said "avoids these undesirable outcomes, and allows for a prompt, and final, resolution of this matter." *Id.*

After TRICARE sent its 25 April 2011 letter and issued the Notice establishing its discretionary payment review, the 400 Hospitals claimed there were deficiencies in the data TMA used to calculate proposed adjustments.  Def.'s Resp. to Pls.' Mot. at 7.  On 14 July 2011, Mr. Brodek emailed Paul Hutter, the new General Counsel of Defense Health Agency ("DHA"), confirming the 400 Hospitals and DHA would each run a calculation for a sample of data for ten TRICARE hospitals and compare their results.  Def.'s Resp. to Pls.' Mot. at App27.  Once they exchanged their findings, in a 27 July 2011 letter to Mr. Hutter, Mr. Brodek confirmed "it appears our data may not be as disparate as we originally believed," and he accepted Mr. Hutter's offer to "run . . . calculations on several additional hospitals." *Id.* at App41–42.

After exchanging additional calculations, on 16 September 2011, Mr. Brodek sent Mr. Hutter an email titled "Global Settlement," proposing a $92 million recalculated payment for all 400 Hospitals. *Id.* at App57.  Mr. Hutter responded to the proposal on 21 September 2011 by indicating TRICARE would agree to a $22 million payment. *Id.* at App59.  Mr. Brodek responded on 22 September 2011 requesting Mr. Hutter's "rationale for a 20% increase based upon data on which we have repeatedly disapproved the accuracy of," and requested to speak the following day "to either resolve, or agree this matter needs to be pushed into litigation." *Id.* at App61.

On 26 September 2011, in response to an email from Mr. Hutter titled "Settlement," Mr. Brodek wrote "it does not appear that there should be anything controversial left to discuss," and "there is enormous benefit to all parties to resolve the matter in its totality." *Id.* at App61.

Thereafter, the parties agreed to a final recalculated adjustment, and on 6 December 2011, Mr. Brodek sent Mr. Hutter an "invoice" for the agreed upon recalculated adjustment for "TRICARE hospital outpatient laboratory, radiology, and diagnostic services." *Id.* at App356.

## C.  Documents Under Review

---

regions. Those lawsuits were ultimately dismissed without prejudice to enable the parties to exhaust their administrative remedies. That dismissal without prejudice was affirmed by the United States Court of Appeals for the Third Circuit, in which the Third Circuit noted that the reason for the dismissal was to enable a factual record to be compiled in the administrative process concerning (1) whether expenses that qualify as facility charges were incurred; (2) whether such charges were properly billed; and (3) how much is owed. TRICARE has now shown through its own analysis that the expenses qualified as facility charges and were both incurred and billed by the Hospitals. The only remaining unanswered question is the amount owed to the Hospitals.

Def.'s Resp. to Pls.' Mot. at App14 (emphasis omitted).

On 21 October 2013, plaintiffs initiated this litigation. *See* Compl., ECF No. 1.  Between June and October 2018, plaintiffs served the government with various requests for production of documents. Pls.' Mot. to Comp. at Appx111–116, 146.  In response, the government produced around 380,000 pages of documents and compiled a privilege log with 2,500 entries. Def.'s Resp. to Pls.' Mot. at 9.  Plaintiffs now request the Court determine whether two documents and three emails the government produced during discovery are privileged. *See* Pls.' Mot. at 1; Pls.' Mot. to Comp. at 1–2.  The Court refers to each document individually as follows:  "Document One"; "Document Two"; "Email One"; "Email Two"; and "Email Three."

The government produced the documents in question through various discovery productions between 20 September 2018 and 9 April 2019. *See* Pls.' Mot. to Comp. at 9–10. Government counsel is unsure how Document One and Document Two were produced but explains the documents were likely "mis-coded . . . in [the government's] document management database as non-privileged." Def.'s Resp. to Pls.' Mot. at 11.  The government marked Document One in its privilege log at least sixteen times and Document Two at least twelve times, but both documents were inadvertently produced to plaintiffs. *Id.* at 8–9.  Document One and Document Two were contained in a group of documents attached to an email which was marked privileged, but the attachments were not secondarily marked. *Id.*  The government marked Email One twice in its privilege log, but Email One "did not receive consistent privilege treatment over the course of the [g]overnment's many productions," and it was produced twice to plaintiffs. Def.'s Resp. to Pls.' Mot. to Comp. at 6–7.  Email Two and Email Three were never marked privileged and were produced by the government. *Id.* at 5–6.

### a. Document One

On 30 September 2011, Dave Kennell, principal of Kennell and Associates, prepared Document One, Bates number ING0262545-53, and sent it to Mr. Hutter. Pls.' Mot. at A29–A37.  Document One, titled "Data Problems Related to Payment Adjustments for [the 400 Hospitals]," contained the stamp "Attorney-Client Protected Work Product Not To Be Disclosed" on the bottom of every page. *Id.*  In the document, Mr. Kennell identifies data problems encountered while calculating adjustments for the 400 Hospitals. *Id.*  Mr. Kennell estimates a total payment adjustment based on the issues identified in the document. *Id.*  The government produced Document One on 5 February 2019, but listed it at least sixteen times on its privilege log. Def.'s Resp. to Pls.' Mot. at 9, 11.

On 8 December 2011, "Melissa Walters, an individual providing staff support to DHA's Fall Church [sic] Office of General Counsel . . . forwarded a packet of six [of the 400 Hospitals'] settlement-related documents . . . at Mr. Hutter's request to Walt Ruggles, the then-Head of TMA's Financial Operations Division, to facilitate payment of the [400 Hospitals] Settlement." *Id.* at 9–10.  That packet included Document One. *See id.*

On 13 May 2019, plaintiffs' counsel notified government counsel the government produced two potentially privileged documents. Pls.' Mot. at A232.  On 2 June 2019, government counsel informed plaintiffs' counsel the documents were subject to work product privilege and clawback. *Id.* at A233.

### b. Document Two

Document Two, Bates number ING0262544, titled "Estimated TMA Liability in 3 Categories of Hospital Outpatient Services if Settlement does not Happen (2003-2009)," does not specify its author or date of creation. Pls.' Mot at A38. Document Two contains summarized calculations in boxed rows on an x and y axis. *Id.* On the y axis, Document Two lists four boxes: (1) "Additional TMA Liability for Radiology using 'costs'"; (2) "Additional TMA Liability for Radiology using 'billed charges'"; (3) "Additional TMA Liability for Radiology, Labs, and Diagnostic Tests using 'costs'"; and (4) "Additional TMA Liability for Radiology, Labs, and Diagnostic Tests using 'billed charges.'" *Id.* On the x axis, Document Two lists three boxes corresponding to the y axis: (1) "6 Months in 2008 for all Hospitals ~ 3,500"; (2) "6 Years for all Hospitals ~ 3,500"; and (3) "6 Years for Duane Morris Hospital ~ 400." *Id.* In the corresponding boxes for the x and y axes, Document Two provides estimated calculations for the listed hospital services and listed variables. *Id.* The government produced Document Two on 5 February 2019, but listed the document at least 12 times on its privilege log. Def.'s Resp. to Pls.' Mot. at 9, 11.

Document Two's creation is unclear. The government cannot ascertain its creator, but states after Document One's creation, "Mr. Hutter, or another individual employed in the Fall Church [sic] Office of DHA's Office of General Counsel, summarized [Document Two]." *Id.* at 8. In a footnote in its response to plaintiffs' privilege motion, the government explains:

> Based on the circumstantial evidence . . . we reasonably believe that Mr. Hutter is, in fact, the author of the substance of [Document Two]. We have been unable to confirm this with absolute certainty, however, because Mr. Hutter no longer works for the Government, and has not responded to our attempts to contact him with respect to this issue.

*Id.* at 8 n.2. The government states, however, "[t]he metadata identifies the original author of this liability projection as Melissa Walters." *Id.* at 9.

On 13 May 2019, plaintiffs' counsel notified government counsel the government produced two potentially privileged documents. Pls.' Mot. at A232. On 2 June 2019, government counsel informed plaintiffs' counsel the documents were subject to work product privilege and clawback. *Id.* at A233.

### c. Email One

On 26 August 2011, Christina Witsberger, a Senior Research Analyst at Kennell and Associates, sent Email One, Bates number ING0366488–89, to Mr. Kennell. Pls.' Mot. to Comp. at 9. Email One contained the subject line "HOPD Rad Adj - D. Morris - Childrens Hosp of the Kings Daughters, Norfolk VA TIN [redacted] zip 23507." *Id.* In Email One, Ms. Witsberger analyzes billing patterns by comparing TRICARE Encountered DATA ("TED") for the subject line hospitals to the data the 400 Hospitals sent.[14] *Id.* The government produced Email One on 4 March 2019 and 9 April 2019. *Id.* at 9–10.

---

[14] Ms. Witsberger wrote, in relevant part:

On 7 June 2019, plaintiffs deposed Ms. Witsberger, during which Email One was marked Exhibit 29. *Id.* at Appx88. Government counsel instructed Ms. Witsberger not to answer questions relating to Email One on the basis of work product doctrine and indicated the government would seek to clawback the document. *Id.*

### d. Email Two

On 2 September 2011, Ms. Witsberger sent Email Two, Bates numbers USA000129, USA000396, and ING0000961, to Mr. Kennell. Pls.' Mot. to Comp. at 8–9. Email Two contained the subject line "Duane Morris Latest Email." *Id.* In Email Two, Ms. Witsberger explained certain CPT codes were excluded from their analysis because "they did not have CMAC rates," not because they were "purely technical." *Id.* She further explained because the excluded codes were lab codes, not radiology codes, they did not have anything in the CMAC field. *Id.* The government produced Email Two on 20 September 2018 and on 15 November 2018. Pls.' Mot. to Comp. at 8–9.

On 11 October 2018, plaintiffs deposed Mr. Kennell. *Id.* at 10. Email Two was part of a group of documents marked as Exhibit 21 during the deposition. *Id.* at Appx40. Mr. Kennell testified, without objection of government counsel, he compiled Exhibit 21. *Id.* Email Two was also marked Exhibit 32 during the 5 June 2019 deposition of Ms. Witsberger. *Id.* at Appx90. Government counsel instructed Ms. Witsberger not to answer questions relating to Email Two on the basis of the work product doctrine and indicated the government would seek to clawback the document. *Id.* at Appx90–Appx91.

### e. Email Three

On 13 September 2011, Ms. Witsberger sent Email Three, Bates numbers USA000141 and ING0000969, to Mr. Kennell. Pls.' Mot. to Comp. at 8–9. Email Three contained the subject line "TC and 76499 analysis -- S and W." *Id.* Email Three analyzed cost data for certain coded procedures performed in hospitals in the southern and western United States.[15] *Id.* The government produced Email Three on 20 September 2018 and 15 November 2018. *Id.* at 8–9.

---

I have examined some billing patterns of the above hospital to compare line item info sent by Duane Morris versus our TED records, to try to figure out the discrepancy in number of line items for Period 2, which was off about 13% (Duane Morris had 13 pct more line items).

Although there are some claims they have which I cannot match (and a few we have they do not), examining some high volume CPT codes for these hospitals uncovered many cases where the CPT code on the TED record is just a general radiology "unlisted" (i.e. dump) code of 76499 whereas Duane Morris has a specific CPT code. The allowed amounts match what the CMAC for the TC was during the time period, so it does appear they were paid by CMAC for a specific CPT code rather than for dump code 76499.

Pls.' Mot. to Comp. at Appx137. Ms. Witsberger lists "examples of claims where the TED has CPT 76499 but Duane Morris has a specific CPT code on the hospital's claim record." *Id.* at Appx138.

[15] Ms. Witsberger wrote "[f]or the West, there is not a huge problem. All look normal except for the TINs beginning with 9305…. as we discussed (the ones in Oregon). Dump code 76499 is not an issue in the West." Pls.' Mot. To

On 11 October 2018, plaintiffs deposed Mr. Kennell, and he testified about Email Three's contents without objection from government counsel. *Id.* at Appx45–Appx47. On 30 April 2019, plaintiffs deposed Martha Maxey, a former TMA employee, and Email Three was marked Exhibit 41. *Id.* at 11. Ms. Maxey testified about Email Three's contents without objection from government counsel. Pls.' Mot. to Comp. at 11. Email Three was similarly marked Exhibit 34 during Ms. Witsberger's 7 June 2019 deposition. *Id.* at Appx92. Counsel for the government instructed Ms. Witsberger not to answer questions relating to Email Three on the basis of the work product doctrine and indicated the government would seek to clawback the document. *Id.* at Appx92–Appx93.

## II.   Discussion

### A.  Work Product Privilege

The work product doctrine is codified in Rule 26(b)(3) of the RCFC.[16] The doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal strategy

---

Comp. at Appx125. Further, "[f]or the South, two of the example [sic] I chose turned out to have huge numbers under another zip which does appear to be the same hospital in Peters file. We did not search these zips or report results." *Id.* Additionally, "[d]ump codes are a problem in period 2 for all of them to some degree, being around 10-15 pct of period 2 (20 pct for Jackson County and Kings Dtrs)." *Id.*

[16] RCFC 26(b)(3) provides:

> **(A) Documents and Tangible Things.** Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to RCFC 26(b)(4), those materials may be discovered if:
>
> > **(i)** they are otherwise discoverable under RCFC 26(b)(1); and
> >
> > **(ii)** the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> **(B) Protection Against Disclosure.** If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.
>
> **(C) Previous Statement.** Any party or other person may, on request and without the required showing, obtain the person's own previous statement about the action or its subject matter. If the request is refused, the person may move for a court order, and RCFC 37(a)(5) applies to the award of expenses. A previous statement is either:
>
> > **(i)** a written statement that the person has signed or otherwise adopted or approved; or
> >
> > **(ii)** a contemporaneous stenographic, mechanical, electrical, or other recording—or a transcription of it—that recites substantially verbatim the person's oral statement.

RCFC 26(b)(3) and Rule 26(b)(3) of the Federal Rules of Civil Procedure ("FRCP") are identical. *Compare* RCFC 26(b)(3), *with* Fed. R. Civ. P. 26(b)(3). The Court therefore uses other federal courts' interpretations of the FRCP as persuasive authority. *See Adams v. United States*, 391 F.3d 1212, 1218 n.3 (Fed. Cir. 2004) ("Rule 12 of the Court of Federal Claims mirrors Rule 12 of the Federal Rules of Civil Procedure"); *see also* 2002 Rules Committee Note,

'with an eye toward litigation,' free from unnecessary intrusion by adversaries." *Pac. Gas & Elec. Co. v. United States*, 69 Fed. Cl. 784, 789 (2006) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947) (observing that Rule 26(b)(3) codified the principles underlying the *Hickman* work product doctrine); *see also In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (citing *Hickman*, 329 U.S. at 511) ("[T]he work-product doctrine encourages attorneys to write down their thoughts and opinions with the knowledge that their opponents will not rob them of the fruits of their labor."). "At its core, the work-product doctrine shelters the mental processes of . . . attorney[s], providing a privileged area within which [they] can analyze and prepare [their] client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). RCFC 26(b)(3) prevents a party from discovering "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Although the rule protects documents prepared in anticipation of litigation, it does not address the scope of this immunity. *See, e.g.*, *Fed. Trade Comm'n v. Grolier Inc.*, 462 U.S. 19, 25 (1983) ("[Federal Rule of Civil Procedure] 26(b)(3) does not in so many words address the temporal scope of the work-product immunity.").

A primary treatise on the work product doctrine published by the American Bar Association titled, "The Attorney-Client Privilege and the Work-Product Doctrine" ("ABA Work Product Treatise") explains the work product privilege applies "not to all materials in an attorney's files, but only to those materials that were prepared in anticipation of litigation or for trial." 2 Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 1082 (6th ed. 2017). The privilege applies when: (1) there is "a threat of litigation"; and (2) the "document [was] prepared because of that threat." *Id.* at 1082–83. To constitute "in anticipation of litigation," the document "must also have been prepared for litigation and not for some other purpose." *Id.* at 1094 (emphasis omitted). A document may have been prepared "before or when litigation is imminent or pending without necessarily having been in the least prepared 'in anticipation' of litigation." *Id.* If a document would have been prepared regardless of the litigation, the document is generally not subject to work product protection. *Id.* at 1114.

The ABA Work Product Treatise outlines two approaches to determine the primary motivation for a document's preparation: the "because of" approach and the "primary purpose" approach. *Id.* Two questions guide this determination: (1) "[w]ere the documents prepared in the ordinary course of business"; and "(2) [w]as there an independent business purpose for which the document would have been prepared even if there had been no litigation anticipated?" Epstein, *supra*, at 1115. "If the answer to either question is yes, then there is no need to accord the document work-product protection." *Id.*[17] "The fact that litigation eventually does occur is

---

Rules of the United States Court of Federal Claims (as amended July 1, 2019) ("[I]nterpretation of the court's rules will be guided by case law and the Advisory Committee Notes that accompany the Federal Rules of Civil Procedure.").

[17] Wright & Miller's treatise, *Federal Practice and Procedure*, underscores this point: "even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2024 (3d ed.), Westlaw (database updated Aug. 2019). Additionally, the Advisory Committee Note to Rule 26(b)(3) states in part: "[m]aterials assembled in the ordinary course of business, or

not sufficient justification for making every document prepared before litigation work-product protected." *Id.* at 1122. The ABA Work Product Treatise provides, for example, "internal audits and accident investigations [are] not to be work-product protected unless litigation is clearly the *primary* motive." *Id.* at 1125 (emphasis in original). Additionally, "documents or other materials prepared looking toward, or in implementation of, a settlement often have been held not to be in anticipation of litigation." *Id.* at 1132. This is also true with investigative documents because "even though litigation may be foreseeable, courts have not hesitated to make investigative documents discoverable on the ground that there was a business purpose separate and distinct from the prospect of possible litigation that led to the investigation." *Id.* at 1156.

Three recent Court of Federal Claims cases address the work product doctrine. *See Pac. Gas & Elec. Co. v. United States*, 69 Fed. Cl. 784 (2006); *Weston/Bean Joint Venture v. United States*, 128 Fed. Cl. 1 (2014); *Northrop Grumman Corp. v. United States*, 80 Fed. Cl. 651 (2008).

In the first comparable Court of Federal Claims case, *Pacific Gas & Electric*, the Court discussed the work product doctrine in depth and explained, "'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation' are not protected." *Pac. Gas & Elec. Co.*, 69 Fed. Cl. at 798 (quoting *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)). In that case, an electric utility sued the United States for breach of contract. The government moved "to compel the production of documents and deposition testimony" withheld on the basis "of the attorney-client privilege and the work product doctrine." *Id.* at 786. The government argued plaintiff improperly asserted work product privilege over documents prepared for regulatory agencies overseeing plaintiff's company. *Id.* at 786–87. In response, plaintiff argued the work product privilege applies to "material prepared for administrative proceedings . . . as well as proceedings before the court of record" because administrative proceedings constitute litigation. *Id.* at 788. This Court discussed whether the proceedings, or some aspect thereof, constituted litigation for the documents to gain work product protection. *Id.* at 799. It explained, "'[t]he threshold determination in a case involving a claim of work product privilege is whether the material sought to be protected from discovery was prepared in anticipation of litigation' or was prepared in the ordinary course of business or for other purposes." *Id.* at 790 (quoting *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 86 (N.D. Ill. 1992)).

This Court outlined two approaches to determine if a document was prepared "in anticipation of litigation," because "there are 'a variety of approaches and conflicting decisions in the case law.'" *Id.* at 790 (quoting *Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 659 (S.D. Ind. 1991)). Under the first approach, a court considers "'the primary motivational purpose behind the creation of the document.'" *In re Raytheon Secs. Litig.*, 218 F.R.D. 354, 357 (D. Mass. 2003) (quoting *United States v. Gulf Oil Corp.*, 760 F.2d 292, 296 (Temp. Emer. Ct. App. 1985)). "Under this approach, 'if the primary motivating purpose behind the creation of the document is not to assist in pending or impending litigation, then a finding that the document

---

pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." 48 F.R.D. 487, 501.

enjoys work product immunity is not mandated.'" *Pac. Gas & Elec. Co.*, 69 Fed. Cl. at 791 (quoting *Gulf Oil Corp.*, 760 F.2d at 296). Under the second approach, known as the "because of" approach, "[w]here a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within [the work product doctrine.] *Id.* at 791 (quoting *Adlman*, 134 F.3d at 1195) (emphasis omitted). As the Second Circuit observed in *Adlman*, "[t]he formulation of the work-product rule used by the Wright & Miller treatise, and cited by the Third, Fourth, Seventh, Eighth and D.C. Circuits, is that documents should be deemed prepared 'in anticipation of litigation,' and thus within the scope of [Federal Rule of Civil Procedure 26(b)(3)], if 'in light of the nature of the document and the factual situation in the particular case the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *Adlman*, 134 F.3d at 1202 (quoting 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2024, at 343 (1994)) (emphasis omitted).

In *Pacific Gas & Electric*, this Court did not decide whether the "'primary motivating purpose' or the 'because of' approach is the correct application of RCFC 26(b)(3)," because its determination did not turn on which approach was used. *Pac. Gas. & Elec. Co.*, 69 Fed. Cl. at 798. This Court noted, however, "under either formulation, 'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation' are not protected." *Id.* (quoting *Adlman*, 134 F.3d at 1202)).

Additionally, in *Pacific Gas & Electric*, this Court discussed a line of cases describing the proper standard for identifying "dual-purpose" documents, which are prepared for concurrent purposes, not simply for litigation. *Id.* at 797–98. In the first case, the United States District Court for the District of Nevada held documents prepared as part of an aircraft manufacturer's investigation into a crash of one of its planes did not gain work product protection. *Soeder v. Gen. Dynamics Corp.*, 90 F.R.D. 253, 255 (D. Nev. 1980). In addition to preparing for litigation, the manufacturer had an "equally reasonable desire . . . to protect future pilots and passengers of its aircraft, to guard against adverse publicity in connection with such aircraft crashes, and to promote its own economic interests by improving its prospect for future contracts for the production of said aircraft." *Id.* Therefore, that court found because those documents were investigative, they were not subject to the work product doctrine. *See id.* In the second case, *Stout v. Illinois Farmers Ins. Co.*, 150 F.R.D. 594, 602 (S.D. Ind. 1993), *aff'd*, 852 F. Supp. 704 (S.D. Ind. 1994), the District Court for the Southern District of Indiana analyzed whether an insurer's documents "for concurrent litigation and non-litigation uses" related to a fire loss claim were protected under the work product doctrine. That court reasoned:

> If a document or thing would have been created for non-litigation uses regardless of its intended use in litigation preparation, it should not be accorded work product protection. Because the document would have been created for non-litigation reasons anyway . . . the document's release in discovery would not contravene the policies supporting the work product rule.

*Id.* at 604. Thus, the court "presume[d] that documents which were produced by an insurer for concurrent purposes before making a claims decision would have been produced regardless of litigation purposes and therefore do not constitute work product." *Id.* at 605.

This Court held in *Pacific Gas & Electric*, "[d]ocuments created by plaintiff 'in the ordinary course of business or that would have been created in essentially similar form irrespective of' the potential adversarial aspects" of the proceedings were not protected. 69 Fed. Cl. at 805 (citing *Adlman*, 134 F.3d at 1202). The court analyzed various documents listed in plaintiff's privilege log "for the purpose of permitting the parties to analogize these examples to disputed documents not mentioned . . . to resolve any further discovery disputes involving the work product doctrine." *Id.*

In the second comparable Court of Federal Claims case addressing the work product doctrine, *Weston/Bean Joint Venture v. United States*, the government filed a motion *in limine*, arguing various exhibits were prepared in anticipation of litigation and accordingly protected under the work product doctrine. 128 Fed. Cl. at 5. This Court applied the *Adlman* standards and held, "[t]he challenged documents addressed to the validity of the plaintiff's administrative claims would have been created whether or not the claims ultimately ended up in litigation and so were not prepared 'because of' anticipated litigation." *Id.*

In the third comparable Court of Federal Claims case, *Northrop Grumman*, plaintiff moved to "compel production of documents based on an alleged waiver of [work product] privilege." 80 Fed. Cl. at 651. In response, the government argued the relevant documents were not subject to work product protection because they were prepared for the contracting officer making a final decision on plaintiff's claim. *Id.* at 652. This Court discussed the two approaches to the work product determination and, agreeing with the *Pacific Gas & Electric* holding, found, "under either formulation, documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation are not protected." *Id.* at 654–55 (quoting *Pac. Gas & Elec. Co.*, 69 Fed. Cl. at 798) (internal quotation marks omitted). Although the documents were marked "produced in direct or indirect anticipation of litigation pursuant to the direction of the government attorney," this Court stated, "the court's responsibility is to look at the essence of the document itself, and not be driven to conclusions merely by a stamp affixed to the document." *Id.* at 653, 655. This Court held the documents were prepared in the ordinary course of business because the primary motivational purpose for their creation was the contracting officer's final decision. *Id.* at 656. This Court accordingly found the documents not subject to work product protection. *Id.*

Finally, the ABA Work Product Treatise cites several district and circuit court cases presenting similar fact patterns to the documents and emails at issue in this case. Epstein, *supra*, at 1133 (citing *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109 (7th Cir. 1983); *Willis v. Westin Hotel Co.*, No. 85 Civ. 2056, 1987 WL 6155, at *1 (S.D.N.Y. Jan. 30, 1987); *Scott Paper Co. v. Ceilcote Co.*, 103 F.R.D. 591, 595 (D. Me. 1984); *Grumman Aerospace Corp. v. Titanium Metals Corp. of Am.*, 91 F.R.D. 84, 86 (E.D.N.Y 1981); *Coastal Corp. v. Duncan*, 86 F.R.D. 514, 515 (D. De. 1980). In *Scott Paper Co.*, the District Court for the District of Maine distinguished "reports prepared in response to an unfortunate event, that might well lead to litigation" from "materials prepared as an *aid* to litigation." 103 F.R.D. at 595 (emphasis in original). In the documents at issue in that case, "the possibility of litigation is expressly mentioned," but "[i]n each instance, the document's author expressed the hope that litigation could be avoided." *Id.* The court analyzed the term "settlement," as used in the documents, and

reasoned, "'settlement' in this context refers to a negotiated business settlement and not to the settlement of a legal action." *Id.*; *see also Rupert v. United States*, 225 F.R.D. 154, 157 (M.D. Pa. 2004) (finding an appeals officer's memorandum prepared "to evaluate a settlement with the Plaintiffs . . . [was] not protected by the work-product privilege.").

In *Coastal Corp. v. Duncan*, plaintiffs challenged the validity of certain Department of Energy ("DOE") regulations. 86 F.R.D. at 515. The DOE asserted work product privilege to protect "pre-decisional, internal documents of a recommendatory or deliberative nature" from production. *Id.* at 516. The DOE argued the documents were prepared when litigation was "considered likely" and in "the context of DOE enforcement activities . . . the 'likelihood of litigation' is very strong." *Id.* at 522. The District Court for the District of Delaware held: because DOE did "not point[] with specificity to the litigation anticipated by DOE attorneys in preparing the documents," it "failed to properly assert the attorney work-product privilege." *Id.*

In *Grumman Aerospace Corp.*, plaintiffs sought discovery of an economic analysis report a "neutral fact-finder" prepared for the DoD to evaluate potential settlement of antitrust claims. 91 F.R.D. at 86. DoD asserted work product privilege, and the District Court for the Eastern District of New York found "the very fact of settlement ordinarily presupposes the existence, and assertion of identifiable claims that adversary parties prefer to settle rather than litigate." *Id.* at 89. Moreover, settlement negotiations do not "require[] . . . the 'adversary preparation' the doctrine protects." *Id.* The court further reasoned since the DoD was contractually bound to never use the report in litigation against the defendant, the report was not subject to protection. *Id.* at 89–90.

In *Willis*, the defendant sought "the production of an accident report prepared by an employee of its codefendant." 1987 WL 6155, at *1. The District Court for the Southern District of New York stated, "material prepared by non-attorneys in anticipation of litigation, such as accident reports and other investigative reports, is immune from discovery only where the material is prepared exclusively and in specific response to imminent litigation. The mere contingency that litigation may result does not give rise to the privilege." *Id.*; *see also Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 663 (S.D. Ind. 1991) ("It is presumed that a document or thing prepared before a final decision was reached on an insured's claim, and which constitutes part of the factual inquiry into or evaluation of that claim, was prepared in the ordinary and routine course of the insurer's business of claim determination and is not work product.").

Finally, in *Binks Manufacturing Co.*, the Seventh Circuit affirmed a district court order compelling production and admission of two internal memoranda defendant's in-house counsel prepared. 709 F.2d at 1121. The first memorandum, prepared for defendant's general counsel, detailed mechanical problems defendant's machinery experienced, which gave rise to the claim. *Id.* at 1113. The second memorandum, prepared for defendant's production manager, further detailed the mechanical problems and provided the counsel's opinion of the proper allocation of responsibility between the parties. *Id.* The court considered letters the parties exchanged when the memoranda were prepared, and while one letter's tone was threatening, the court determined it fell short of explicitly threatening litigation. *Id.* at 1120. The court reasoned, "while there may have been the remote prospect of litigation . . . the appellant has failed to meet its burden of proving that the memoranda were prepared . . . because of the prospect of litigation, or, that some

articulable claim, likely to lead to litigation, had arisen," even though litigation resulted.  *Id.* (emphasis and internal quotation marks omitted).

### a.  The Parties' Arguments – Document One and Document Two

Plaintiffs argue Document One and Document Two are not subject to work product protection[18] because "[t]he documents at issue here reflect Kennell's historic involvement in the Government's discretionary payment program."  Pls.' Mot. at 11.  Additionally, Document One and Document Two "were not created in anticipation of litigation with the [400 Hospitals] over the discrepancies that they had identified because, by the time the documents were created, the essential terms of a settlement had already been agreed to."  *Id* at 12.[19]

In response, the government argues Document One and Document Two are subject to work product privilege because "the fact that the documents are privileged is apparent on their face."  Def.'s Resp. to Pls.' Mot. at 13.  Further, the "major strategy" the 400 Hospitals used to "bring about both the discretionary payment process and the later [400 Hospitals] settlement was the repeated and explicit threat of litigation."  *Id.* at 14.  The government cites two letters and two emails written prior to the discretionary payment process and three emails written after the discretionary payment process, which it argues contain the "explicit threat of litigation" that lead to Document One's creation.[20]  *See id.* at 3–4, 7–8, 13–14; *see also supra* pgs. 6–7 (quoting all seven correspondences the government cites).  Additionally, the government argues the "threat of litigation had [not] been removed by September 22, 2011, before [Document One] and [Document Two] were created."  *Id.* at 14.[21]

---

[18] Plaintiffs also argue Document One and Document Two are not subject to attorney-client privilege.  Pls.' Mot. at 10–22.  During the 7 October 2019 oral argument, counsel for the government confirmed the government does not assert the attorney-client privilege for Document One or Document Two.  *See* Order, ECF No. 122.  The Court therefore does not address whether Document One or Document Two are subject to the attorney-client privilege.

[19] Plaintiffs raise four other arguments why Document One and Document Two are not privileged if the Court finds they are protected work product:  (1) "[t]he Government's voluntary production of documents, and its lack of objection to testimony by Kennell and Witsberger, relating to the Kennell Study and the discretionary payment program operates as a waiver of any possible work product protection"; (2) the government's production of the documents waived any protection because "the Government's process to screen for work product and privilege was insufficient" and "the Government did not take prompt steps to rectify the disclosure, instead waiting over two weeks to assert a claim of work product protection"; (3) "providing [a government employee] with a copy of [Document One] months after it was created, and providing him with both documents after the settlement agreement was signed, when litigation was not threatened, the Government waived any work-product protection that the documents may have had"; and (4) even if the documents are protected work product, "they are necessary to impeach the false testimony of Kennell and Witsberger" and "are necessary to aid Plaintiffs, and ultimately this Court, to quantify the underpayment resulting from the Government's exclusion of categories of outpatient services besides radiology."  *Id.* at 16–17, 21–22.

[20] The government cites five emails and two letters:  26 July 2010 letter from C. Mitchell Goldman to Mr. Seaman; 19 November 2010 email from Mr. Brodek to Mr. Seaman; 19 January 2011 letter from Mr. Brodek to Rear Admiral Christine Hunter; 2 February 2011 email from Mr. Brodek to Mr. Seaman; 16 September 2011 email from Mr. Brodek to Mr. Hutter; 21 September 2011 email from Mr. Brodek to Mr. Hutter; 26 September 2011 email from Mr. Brodek to Mr. Hutter.  *See* Def.'s Resp. to Pls.' Mot at 3–4, 7–8.

[21] In response to plaintiffs' four other arguments, the government argues:  (1) "[t]he fact that the Government has permitted plaintiffs broad discovery into the non-privileged aspects of this case does not operate as a privilege waiver"; (2) the government did not waive privilege because Document One was identified and withheld 16 times and Document Two 12 times, their disclosure was inadvertent, and two weeks is not "an inappropriately long period of time" to seek clawback; (3) the government did not waive privilege by disclosing the documents to one of its

### b. Analysis – Document One and Document Two

#### i. Document One

Although the government argues Document One's privilege is apparent on its face, "[t]he court's responsibility is to look at the essence of the document itself, and not . . . a stamp affixed to the document." *Northrop Grumman*, 80 Fed. Cl. at 655. Therefore, the Court must determine "whether the material sought to be protected from discovery was prepared in anticipation of litigation or was prepared in the ordinary course of business or for other purposes." *Pac. Gas & Elec. Co.*, 69 Fed. Cl. at 790 (quoting *Allendale Mut. Ins. Co.*, 145 F.R.D. at 86) (internal quotation marks omitted). "'[D]ocuments that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation' are not protected." *Id.* at 798 (citing *Adlman*, 134 F.3d at 1202).

The Court initially reviews the factual circumstances surrounding Document One's creation. First, the Court considers the nature of the government's hospital payment business during TRICARE's recalculation and discretionary payment process. Prior to the 25 April 2011 Notice, TRICARE's overarching goal was to avoid litigation by reconciling previous underpayments the 400 Hospitals identified. Consistent with this goal, the recalculation Notice stated TRICARE "review[ed] payments for hospital services . . . [and] has determined that, for radiology services . . . looking at the Medicare reimbursement methodologies in existence prior to adoption of Medicare OPPS in 2000, . . . some radiology services were underpaid in comparison," and "[c]onsistent with TRICARE policy under statute to pay similar to Medicare, we have determined that discretionary adjusted payments may better reflect the Medicare payment amounts." *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1344. Additionally, Step 8 of the Notice's nine-step review process detailed TRICARE would provide a written response to all hospitals who submitted a request for analysis of the claims, which "would provide the calculated discretionary adjusted payment and the calculations from which the adjustment was derived." *Id.* at 1345 (internal quotation marks omitted). Further, Step 8 provided, "[a]ny questions [about the response] should be accompanied by detailed explanation of the alleged errors and the proposed corrections with supporting documentation." *Ingham Reg'l Med. Ctr.*, 126 Fed. Cl. at 42. Through this internal review process, TRICARE sought to identify payment discrepancies and made the business decision to allow hospitals to submit their TRICARE payments for recalculation review.

TRICARE's invitation for participant hospitals to submit claims for review is comparable to business decisions insurance companies make during internal claims evaluation processes. When an insurer receives a claim, part of its internal business process is to undertake investigatory steps to evaluate the claim. This internal review process is conducted as a key component of its business to assure the correct payment is made to the claimant. Other federal

---

employees because "[i]t was necessary for [him] to have access to information regarding the proposed settlement"; and (4) "[n]o [e]xceptional [c]ircumstances [w]arrant [d]iscovery [o]f [Documents One and Two]" because "plaintiffs failed to collect and preserve all of their own data in order to prove their claims" and this "does not now mean that plaintiffs now have a substantial need justifying access to privileged information." Def.'s Resp. to Pls.' Mot. at 14, 16–20 (emphasis omitted).

courts have dealt with documents similarly created from internal review and have likewise held those internal documents were prepared as part of a business process.

As this Court discussed in *Pacific Gas & Electric*, in *Stout*, the District Court for the Southern District of Indiana stated, "[i]f an insurer anticipates litigation over a pending claims decision and undertakes extra-ordinary investigations for the purpose of ensuring a correct decision, the resulting documentation is not work product because the insurer generated the reports to use in evaluating the claim." *Stout*, 150 F.R.D. at 598. In the evaluation process, "[m]any documents are produced 'because of' anticipated litigation, in the sense that they would have not been created but for the prospect of litigation, but they were not created to prepare for that litigation." *Id.*; *see also Harper*, 138 F.R.D. at 663 ("It is presumed that a document or thing prepared before a final decision was reached on an insured's claim, and which constitutes part of the factual inquiry into or evaluation of that claim, was prepared in the ordinary and routine course of the insurer's business of claim determination and is not work product."). The ABA Work Product Treatise similarly notes, "the very nature of an insurer's business [is] to investigate and evaluate merits of claims . . . in the ordinary course of an insurer's business." Epstein, *supra*, at 1101. Here, just like an insurer's claim investigation, DoD investigated hospitals' underpayment claims further before making a payment determination. During the evaluation, both internal communications and communications with the parties are expected, and these communications are generated as part of the repayment evaluation process. While there may have been communication exchange between the parties regarding "settlement" after the Notice, the comments were related to calculation review regarding repayment. The ABA Work Product Treatise notes any time insurance coverage is considered, "factual inquiry into or evaluation of a claim . . . are produced in the ordinary course of an insurer's business." *Id.* Similarly in this case, when the Notice was posted, the government's business focus was to recalculate data to reconcile any past discrepancies in its payments to hospitals. Recalculating TRICARE payments therefore became the government's business during the discretionary payment period, and any additional steps were in furtherance of this business goal.

The Court next considers whether Document One was prepared in anticipation of litigation. The government argues three 2011 emails (16 September, 21 September, and 26 September) threatened litigation after the 400 Hospitals disputed the amount of proposed payment adjustment. Def.'s Resp. to Pls.'s Mot. at 7–8. The government argues it was this explicit threat of litigation which led to Document One's creation, and the threat of litigation was not removed prior to its creation. *Id.* at 14.[22]

The 2011 emails discuss the benefits of agreeing on calculation figures to avoid disputes. The ABA Work Product Treatise cites cases with comparable facts in the insurance context, including *Scott Paper Co.*, discussing whether documents prepared after an accident are subject to work product protection. Epstein, *supra*, at 1133. The *Scott Paper Co.* court distinguished

---

[22] "Paul Hutter, and [the 400 Hospitals] attempted to reconcile their competing calculations . . . and [the 400 Hospitals] repeatedly tied this separate settlement process to an explicit threat of litigation, including the following correspondence: [a] September 16 2011 email . . . [a] September 21, 2011 email . . . [a] September 26, 2011 email." Def.'s Resp. to Pls.'s Mot. at 8–9. "[I]n the face of threatened litigation by [the 400 Hospitals], on September 30, 2011, Mr. Kennell provided DHA General Counsel Paul Hutter with [Document One]." *Id.* at 8.

between "reports prepared in response to an unfortunate event that might well lead to litigation" and "materials prepared as an aid to litigation." *Scott Paper Co.*, 103 F.R.D. at 595 (citing *Binks Mfg. Co.*, 709 F.2d at 1120); *see also Soeder*, 90 F.R.D. at 255 (finding an "in-house" accident report prepared for a purpose other than for litigation was not protected). Although the "possibility of litigation [was] expressly mentioned . . . the document's author expressed the hope that litigation could be avoided," and the Court held the documents were not protected. *Id.* at 596. In this case, prior to the 2011 emails, between 14 July 2011 and 2 August 2011, the parties worked to clarify discrepancies identified in their respective recalculation analyses. At the time the 2011 emails were exchanged, there was no prospect of litigation because the letter and Notice initiating the discretionary payment process were sent to expressly avoid litigation. Although the 2011 emails mention "litigation" and "settlement," as discussed in *Scott Paper Co.*, the term "settlement" in this context refers to a negotiated business settlement, not the settlement of a legal action, because the government sought to correct payment errors and avoid litigation. When parties engage in a negotiated business settlement, "the very fact of settlement ordinarily presupposes the existence, and assertion of identifiable claims that adversary parties prefer to settle rather than litigate." *Grumman Aerospace Corp.*, 91 F.R.D. at 90. The 2011 emails demonstrate the authors hoped litigation could be avoided and refer to the term "settlement" as a negotiated business settlement to bring finality to payment adjustments.

Moreover, steps businesses take "to ensure that their current or future conduct conforms to the law or contractual obligations cannot be held to constitute steps in preparation for litigation merely because there is a substantial prospect of litigation if another party believes they have failed." *Stout*, 150 F.R.D. at 598. Here, the 2011 Notice stated, "[c]onsistent with TRICARE policy under statute to pay similar to Medicare, we have determined that discretionary adjusted payments may better reflect the Medicare payment amounts." *See Ingham Reg'l Med. Ctr.*, 874 F.3d at 1344. Consequently, the government's efforts to better comply with the statute, including analysis it procured in Document One, cannot constitute preparation for litigation.

As the ABA Work Product Treatise summarizes, multiple cases conclude where there may be a prospect of litigation, a party must meet its burden to demonstrate documents were prepared because of the prospect of litigation. Epstein, *supra*, at 1133; *see also Binks Mfg. Co.*, 709 F.2d at 1120. In *Binks*, the litigation concerned defective contract performance. *Binks Mfg. Co.*, 709 F.2d at 1111. An attorney for the purchaser, Presto, prepared two letters. The attorney sent the first letter to Presto's General Counsel, describing a conversation between three Presto corporate officers detailing the mechanical problems Presto experienced operating machinery. *Id.* at 1113. The attorney sent the second letter to Presto's Production Manager, containing a detailed list of the system's malfunctions, as well as the attorney's opinion concerning the allocation of responsibility between Presto and Binks regarding the machinery breakdowns. *Id.* Afterwards, "Binks and Presto made several unsuccessful attempts to reach a negotiated settlement" before "Binks filed a complaint seeking recovery under the contract for the balance of the purchase price." *Id.* The court analyzed the events leading to the preparation of the memoranda, including letters the companies sent to each other. The first letter, which Binks sent to Presto, "request[ed] full payment of the [s]ystem's purchase price" and if not paid, Binks would send a team to "dismantle and remove the equipment." *Id* at 1119. Presto responded by sending Binks a letter, which said in relevant part:

It should be specifically noted that your proposed avenues of resolving this matter are not available. We have already indicated that we shall withhold further payment to set off against our damages. . . . If you persist in your choice not to make the necessary corrections, we shall have to proceed on our own and continue to hold you fully responsible for any damages and expenses incurred.

*Id.* at 1120. The court observed although the letter's tone was threatening, it fell short of threatening litigation. *Binks Mfg. Co.*, 709 F.2d at 1120. The court held the letters were not privileged, reasoning "while there may have been the remote prospect of litigation . . . the appellant has failed to meet its burden of proving that the memoranda were prepared . . . because of the prospect of litigation, or, that some articulable claim, likely to lead to litigation, had arisen." *Id.* (emphasis and internal quotation marks omitted).

In this case, the 2011 emails mention "litigation," but they also discuss the benefits of a negotiated business settlement to avoid litigation. Def.'s Resp. to Pls.' Mot. at App17. The government argues it was the "explicit threat of litigation" in the 2011 emails which led to Document One's creation. *Id.* at 7–8. While there may have been a remote prospect of litigation at the time of Document One's creation, similar to *Binks*, the communications leading up to the creation of the document contained demands as to what each party wished to receive from the other, but the substance of the communications did not rise to the level of an articulable claim likely to lead to litigation. *Binks Mfg. Co.*, 709 F.2d at 1120. Here, in the communications prior to Document One's creation and the 2011 Notice, Mr. Brodek stated in his 2 February 2011 email to Mr. Seaman that litigation was not "in either our clients', nor TRICARE's, best interest," and he offered a proposal he thought "avoids these undesirable outcomes, and allows for a prompt, and final, resolution of this matter." Def.'s Resp. to Pls.' Mot. at App17. Mr. Brodek offered his proposal on how to avoid litigation, and while there may have been a future remote prospect of litigation, the government fails to identify an articulable claim likely to lead to litigation as Document One was created during the government's factual investigation into payment adjustments for the 400 Hospitals.

Additionally, the Court in *Binks* found the letter at issue in that case was not protected by the work product doctrine even though it contained attorney mental impressions. *Binks Mfg. Co.*, 709 F.2d at 1113. Conversely, in this case, Document One did not contain attorney mental impressions, but was nonetheless marked "Attorney-Client Protected Work Product Not To Be Disclosed." Pls.' Mot at A29–A37. Although marked privileged, the Court reviews the substance of the document; here, the communications exchanged prior to Document One's creation were merely a back-and-forth dialogue to identify payment discrepancies to reach a business settlement recalculation across all payees.

Finally, this Court's opinion in *Pacific Gas and Electric* discussed a line of cases describing the proper standard for "dual-purpose" documents, such as Document One, which are prepared for concurrent purposes, not simply for litigation. 69 Fed. Cl. at 797–98. First, in *Soeder*, an "in-house" report prepared in response to an airplane crash was not deemed protected work product despite the defendant anticipating litigation. 90 F.R.D. at 255. The Court held litigation does not automatically grant work product protection because defendant had an "equally reasonable desire . . . to improve its aircraft products, to protect future pilots and

passengers of its aircraft, to guard against adverse publicity in connection with such aircraft crashes, and to promote its own economic interests by improving its prospect for future contracts." *Id.* Second, in *Stout*, the insurance company had an equally reasonable desire to avoid litigation and provide a correct claims decision, but any extra investigation was to arrive at a calculation and not to form a litigation strategy. 150 F.R.D. at 598. Similar to these cases, here, Document One may have assisted if the case proceeded to litigation to provide evidence of miscalculations in the discretionary payment process, but the government had an equally reasonable desire to provide a correct adjustment to its TRICARE participants. When Document One was created, the government's primary focus was the calculation, and recalculation, of TRICARE payments which became the government's business during the discretionary payment process. The parties communicated to identify discrepancies in the recalculation process. Although emails mention the term "litigation," the emails' tone, language, and history demonstrate the authors' hope to avoid litigation. The emails refer to the term "settlement" as a negotiated business settlement to agree on a recalculation figure. Although Document One may have served a dual-purpose to provide evidence of miscalculations, Document One would have been produced regardless of any litigation to ensure the correct payment was made; any additional research the government conducted to make a correct payment determination is not protected work product.

### ii. Document Two

Document Two does not indicate its author or date of creation. *See* Pls.' Mot. at A38. The government argues circumstantial evidence establishes Mr. Hutter, the General Counsel of DHA, as Document Two's author, but also states metadata shows Ms. Walters is the original author. Def.'s Resp. to Pls.' Mot. at 8–9. The government did not submit an affidavit from Mr. Hutter establishing he is the author of Document Two. Regardless of authorship, documents prepared by non-attorneys do not immediately lose work product protection. *See* RCFC 26(b)(3)(A) (preventing a party from discovering "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent")).

The government argues Document Two was created because the 400 Hospitals threatened litigation. No date of creation is listed for Document Two, but its figures concern TRICARE recalculation, and Document Two comprises accounting numbers for the 3,500 hospitals who participated in the TRICARE program, so the date range is likely between 1 January 2011 and 30 September 2011 when Document One was produced. *See* Pls.' Mot. at A38. In this time period, the government's primary focus on payments was recalculating data to reconcile past discrepancies. For payment recalculation analysis, like the analysis during the discretionary payment process, the government required an extrapolated compilation of numbers previously calculated. Similar to an insurance company's internal claims evaluation process, documents prepared by an insurer in evaluating claim fulfillment "would have been produced regardless of litigation purposes and therefore do not constitute work product." *Pac. Gas & Elec. Co.*, 69 Fed. Cl. at 797 (quoting *Stout*, 150 F.R.D. at 598); *see also Harper*, 138 F.R.D. at 663 ("It is presumed that a document or thing prepared . . . which constitutes part of the factual inquiry into or evaluation of that claim, was prepared in the ordinary and routine course of the insurer's business . . . and is not work product."). Here, the government took extra investigatory steps to

compile calculations as part of a business decision, which arose from the discretionary payment process in mid-2011. This documentation, at a time when the government compiled calculations based on evaluation of recalculations, relates directly to the government's business of recalculating data to reconcile past discrepancies. Document Two is a user-friendly way of capturing estimated summary statistics based on estimated final values for listed factors on the x and y axes of the table. Although Document Two's title contains the word "settlement," the calculations in the document refer to a negotiated business recalculation settlement, not the settlement of a legal action, as the comments were related to repayment review. Further, Document Two only contains calculations compiled during the discretionary payment process and does not contain any attorney mental impressions or legal strategy.

### iii.  Document One and Document Two

Document One and Document Two's calculations relate to the government's business during the discretionary payment process and were part of a business decision prepared to provide extrapolated calculations regardless of litigation threat. Like the insurance context, if an insurer anticipates litigation and takes extra investigatory steps to ensure a correct decision, the documents are produced for use in evaluating claim fulfillment and not subject to work product protection. Therefore, both documents are not subject to work product protection. This is consistent with Supreme Court and Federal Circuit precedent as the documents were prepared as part of a business recalculation and no part concerned a lawyer's preparation with an "eye towards litigation." *Hickman*, 329 U.S. at 510–11 (Work product doctrine is intended to allow a lawyer to develop a legal strategy "with an eye towards litigation"); *Nobles*, 422 U.S. at 238 ("At its core, the work-product doctrine shelters the mental processes of . . . attorney[s], providing a privileged area within which [they] can analyze and prepare [their] client's case."); *In re EchoStar Commc'ns Corp.*, 448 F.3d at 1301 ("[T]he work-product doctrine encourages attorneys to write down their thoughts and opinions with the knowledge that their opponents will not rob them of the fruits of their labor."). RCFC 26(b)(3) prevents a party from discovering "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." The ABA Work Product Treatise explains the privilege applies "not to all materials in an attorney's files, but only to those materials that were prepared in anticipation of litigation or for trial." Epstein, *supra*, at 1082. Further, "documents or other materials prepared looking toward, or in implementation of, a settlement often have been held not to be in anticipation of litigation." *Id.* at 1132. In this context, "'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation' are not protected." *Pac. Gas & Elec. Co.*, 69 Fed. Cl. at 798 (quoting *Adlman*, 134 F.3d at 1202).

### c.  The Parties' Arguments – Email One; Email Two; and Email Three

Plaintiffs argue the three emails are not subject to work product protection because they were "from an employee of a government contractor to another employee of that contractor," and "[a]gency counsel is not listed as a recipient on any of the three emails, nor is there any

indication that agency counsel requested the information contained in them." Pls.' Mot. to Comp. at 14.[23]

The government argues the three emails are subject to work product protection because it was the explicit threat of litigation which led to Ms. Witsberger conducting the initial data analysis for Mr. Kennell, and this analysis led to the creation of the emails. Def.'s Resp. to Pls.' Mot. to Comp. at 11–12.[24]  Additionally, the government argues pursuant to RCFC 26(b)(5)(B), the Court should strike all reference to the challenged material plaintiffs' expert used as a basis for the opinions in his report. *Id.* at 18.

In reply, plaintiffs argue:  (1) the government failed to provide any affidavits to substantiate its argument that agency counsel directed Ms. Witsberger to perform tasks related to the three emails; (2) the motion to strike plaintiffs' expert report which relies upon disputed documents should be denied because "the documents in question are not privileged and, if they were, that privilege was unequivocally waived by [the government's] actions and inactions"; and (3) if the motion to strike is granted, it will prejudice plaintiffs as "[p]laintiffs have relied upon the contents of all of the Witsberger emails as well as the deposition testimony of Mr. Kennell and Ms. Maxey regarding some of those emails in framing their case against defendant."  Pls.' Reply to Def.'s Resp. to Pls.' Mot. to Comp. and Pls.' Opp'n to Def.'s Mot. to Strike, ECF No. 116 at 3, 10, 19–21.

### d.  Analysis – Email One; Email Two; and Email Three

#### i.  Email One

On 26 August 2011, Ms. Witsberger sent Email One to Mr. Kennell with the subject line "HOPD Rad Adj - D. Morris - Childrens Hosp of the Kings Daughters, Norfolk VA TIN [redacted] zip 23507."  Pls.' Mot. to Comp. at Appx137.  The government argues the analysis in this email was conducted due to the explicit threat of litigation and was then sent to Mr. Kennell, who created Document One.  *See* Def.'s Resp. to Pls.' Mot. to Comp. at 12.

Prior to Email One's creation, as detailed for Document One, the parties exchanged emails discussing recalculation to address alleged underpayments and the discretionary payment process.  At this time, after DoD sent the letter and Notice, the government's primary focus was

---

[23] Plaintiffs raise two other arguments why the three emails are not privileged if the Court finds they are protected work product:  (1) the government waived work product protection because it intentionally disclosed the emails, and even if their disclosure was inadvertent, "marking . . . two of the documents at depositions, without objection from government counsel, was a clear waiver as to those documents"; and (2) plaintiffs' substantial need for the three emails is sufficient to overcome work product protection because the emails are highly relevant to plaintiffs' allegations that "in calculating the amounts owed to hospitals during the discretionary payment process Kennell and Associates failed to capture all of the relevant outpatient radiology data," and plaintiffs do not have access to a substitute for the three emails.  Pls.' Mot. to Comp. at 21, 23.

[24] In response to plaintiffs' other arguments, the government argues:  (1) it did not waive privilege by inadvertently disclosing the three emails because they "contain absolutely no indications that they are work product, and because they overtly appear to be something they are not," it was not readily apparent that the documents were privileged prior to their disclosure; and (2) no exceptional circumstances justify their discovery because "[t]he fact that plaintiffs neglected to pursue discovery that they deem to be relevant to their claims is not a valid reason for them to now invade the work product privilege."  Def.'s Resp. to Pls.' Mot. to Comp. at 14, 16 (emphasis omitted).

recalculating TRICARE payments, which became the government's business during the discretionary payment process. The parties subsequently exchanged calculations to identify any differences in recalculating their data. At this point, the parties communicated as part of the repayment process, when there was no prospect of litigation because the process was intended to avoid litigation. To achieve a correct recalculation, the non-attorney research Ms. Witsberger provided to Mr. Kennell analyzed different calculations in the discretionary payment process—a process the government pursued for all payees. Here, Email One contains research into specific problems identified in the discretionary payment process. Email One contains no attorney mental impressions or legal strategy, and only contains analysis into the discretionary payment process. This documentation, produced in the ordinary course of business, does not automatically gain work product protection because "'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation' are not protected." *Pac. Gas & Elec. Co.*, 69 Fed. Cl. at 791 (quoting *Adlman*, 134 F.3d at 1202). While communications prior to Email One's creation contain back and forth argument regarding a negotiated business settlement, the comments only related to repayment. This non-attorney research contained in Email One generated solely for the purpose of claim investigation is not subject to work product protection. *See Harper*, 138 F.R.D. at 663 (finding an insurer's investigative records were not subject to work product protection because the records pertained to investigation before a claim decision was made).

### ii.  Email Two

On 2 September 2011, Ms. Witsberger sent Email Two to Mr. Kennell with the subject line "Duane Morris Latest Email." Pls.' Mot. to Comp. at Appx123. Ms. Witsberger "examined the issue in the email regarding deleting CPT codes billed on a global basis that are purely technical," and analyzes why codes were excluded from Kennell's analysis and why Duane Morris may not have realized why certain fields were not populated. *Id.* The government argues this analysis was conducted due to the explicit threat of litigation and sent to Mr. Kennell who produced Document One. Def.'s Resp. to Pls.' Mot. to Comp. at 12.

As discussed *supra* for Email One, the government's primary focus was recalculating TRICARE payments during the discretionary payment process. The parties exchanged calculations to identify any data discrepancies to achieve a correct recalculation. The non-attorney research Ms. Witsberger provided analyzed a specific issue relating to the government's business at the time of the discretionary payment process. Ms. Witsberger provided calculations and explained why information was excluded from the initial Kennell study. Pls.' Mot. to Comp. at Appx123. At the time of its creation, the parties exchanged emails regarding repayment calculations, and the non-attorney research relates directly to the recalculation analysis. Email Two contains no attorney mental impressions or legal strategy, and its information directly relates to the government's business of providing a correct recalculation to TRICARE program payees. This document therefore is not protected because "'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation' are not protected." *Pac. Gas & Elec. Co.*, 69 Fed. Cl. at 791 (quoting *Adlman*, 134 F.3d at 1202).

### iii.  Email Three

On 13 September 2011, Ms. Witsberger sent Email Three to Mr. Kennell with the subject line "TC and 76499 analysis – S and W." Pls.' Mot. to Comp. at Appx125. In Email Three, Ms. Witsberger analyzes data for hospitals located in the southern and western United States. *Id.*

As discussed for Email One and Email Two *supra*, the government's primary focus and business was recalculating TRICARE payments during the discretionary payment process. The parties discussed differences in their data prior to Email Three's creation, and the non-attorney research Ms. Witsberger provided to Mr. Kennell analyzed different calculations used in the discretionary payment process. At the time of its creation, the parties exchanged emails regarding repayment calculations, and the non-attorney research relates directly to the recalculation analysis. Email Three contains no attorney mental impressions or legal strategy, and its information directly relates to the government's business of providing a correct recalculated adjustment to TRICARE program payees. This document therefore is not protected by the work product doctrine because it was created in the government's ordinary course of business.[25]

### iv. Email One; Email Two; and Email Three

When Email One, Email Two, and Email Three were created, the government's primary focus was recalculating TRICARE payments, which became the government's business during the discretionary payment process. The parties exchanged emails to identify discrepancies in the recalculation process, and any additional research conducted in order to arrive at a correct decision was a "negotiated business settlement." *Scott Paper Co.*, 103 F.R.D. at 596 (finding use of the term "settlement . . . refers to a negotiated business settlement"); Epstein, *supra*, at 1125 ("[I]nternal audits and accident investigations [are] not to be work-product protected unless litigation is clearly the *primary* motive.") (emphasis in original). The three emails only contain discretionary payment analysis and no attorney mental impressions for "preparation [of] [the government's] case." *Nobles*, 422 U.S. at 238 ("At its core, the work-product doctrine shelters the mental processes of . . . attorney[s], providing a privileged area within which [they] can analyze and prepare [their] client's case."); *Hickman*, 329 U.S. at 510–11 (explaining work product doctrine is intended to allow a lawyer to develop a legal strategy "with an eye toward litigation"); *In re EchoStar Commc'ns Corp.*, 448 F.3d at 1301 ("[T]he work-product doctrine encourages attorneys to write down their thoughts and opinions with the knowledge that their opponents will not rob them of the fruits of their labor."). Therefore, the three emails are not subject to work product protection.

## III.   Conclusion

---

[25] The government's response brief to plaintiffs' motion for privilege determination notes original counsel for the government concluded Email Two and Email Three were business "responses to routine challenges brought pursuant to Step 8 of the [Discretionary Payment Process]." Def.'s Resp. to Pls.' Mot. to Comp. at 5. The government acknowledges the emails merely "reflect an analysis by Christina Witsberger . . . of the discrepancies between the data submitted by several hospitals and the data that TMA had used to calculate each hospital's proposed adjustment." *Id.* at 6.

The Court hereby **GRANTS**:  (1) Plaintiffs' Motion for Determination that Certain Documents Produced in Discovery are not Privileged or Subject to the Work Product Doctrine, ECF No. 106; and (2) Plaintiffs' Motion to Compel Deposition Testimony, ECF No. 109.  The Court hereby **DENIES**:  (1) Defendant's Motion to Seal Plaintiffs' Motion to Compel, ECF No. 111; (2) Defendant's Response to Plaintiffs' Motion to Compel and Defendant's Motion to Strike Portions of Plaintiffs' Expert Report that Rely Solely upon Privileged Material, ECF No. 113; and (3) Defendant's Motion to Seal Plaintiff's Reply to Defendant's Response to Plaintiffs' Motion to Compel and Plaintiffs' Opposition to Defendant's Motion to Strike, ECF No. 117.

The Court does not address plaintiffs' remaining arguments regarding waiver of the work product doctrine and exceptional circumstances regarding justification of their disclosure.  As this order is filed under seal pursuant to the protective order in this case and motions containing arguments of privilege and attorney work product, the parties shall meet and confer to discuss unsealing all motions and exhibits, or other reasons for related pleadings on these motions to remain sealed.  Additionally, the parties shall discuss the need for further discovery, including deposition of Christina Witsberger, and a proposed schedule for all discovery and motions extended by the Court's 29 August 2019 order, ECF No. 122.  On or before **27 January 2020**, the parties shall file a joint status report addressing:  (1) the unsealing of pleadings and exhibits related to the motions in this order; and (2) a proposed schedule for remaining discovery and motions extended by the Court's 29 August 2019 order, ECF No. 122.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge