# In the United States Court of Federal Claims

No. 13-821
(Filed:  13 December 2022)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| INGHAM REG. MED. CENTER, | \* | |
| n/k/a MCLAREN GREATER LANSING, | \* | |
| et al., | \* | |
| | \* | |
| Plaintiffs, | \* | Breach of Contract; Mutual Mistake of Fact; |
| | \* | Class Certification; Summary Judgment; |
| v. | \* | TRICARE Reimbursement; Medicare |
| | \* | Reimbursement; Duty; Breach; Damages; |
| THE UNITED STATES, | \* | Negative Implication Canon; Risk-shifting. |
| | \* | |
| Defendant. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Alexander J. Pires, Jr.*, Pires Cooley, of Washington, DC, with whom was *Gregory A. Brodek*, Duane Morris LLP, of Bangor, ME, for plaintiffs.

*A. Bondurant Eley*, Senior Trial Counsel, with whom were *Steven J. Gillingham*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiffs are six hospitals purporting to represent a class of approximately 1,610 hospitals across the United States in a suit requesting amongst other things the Court interpret what the Federal Circuit has deemed an "extremely strange" contract.  This contract arose when hospitals complained the government underpaid reimbursements for Department of Defense Military Health System, TRICARE, outpatient services rendered between 2003 and 2009.  After running a data analysis, in 2011, the government voluntarily entered a discretionary payment process contract with plaintiffs, offering net adjusted payments to reflect the Medicare blended rate for outpatient radiology claims.  On 9 June 2022, after nine years of litigation and one Federal Circuit appeal, this Court heard oral argument regarding the government's motion for summary judgment reviewing three issues:  (1) breach of contract; (2) mutual mistake of fact;

---

[*] This Opinion was initially filed under seal on 28 November 2022 pursuant to the protective order in this case.  The Court provided the parties the opportunity to submit proposed redactions on or before 12 December 2022.  On 12 and 13 December 2022, the parties confirmed by email they did not have any proposed redactions.  This Opinion is now reissued for publication in its original form.

and (3) class certification.  For the reasons detailed in this opinion, the Court:  (1) grants in part and denies in part the government's motion for summary judgment as to plaintiffs' breach of contract claim; (2) grants the government's motion for summary judgment as to plaintiffs' mutual mistake of fact claim; and (3) defers ruling on plaintiffs' motion for class certification.

As explained *infra*, the Court holds the government did not have a duty to obtain and adjust original native data from plaintiff hospitals, *see infra* Section IV.A, the government did have a duty to correctly adjust data from the government's TMA database, *see infra* Section IV.B, the government did have a duty to correctly consider zip codes for plaintiff hospital locations not provided by the hospitals in their discretionary payment submissions, *see infra* Section IV.C, the government breached its duty to correctly adjust data from TMA's database, *see infra* Section IV.D, plaintiffs were not obligated to pre-check TMA's data, *see infra* Section IV.E.1, the government did not prove the discretionary payment agreement shifted the risk of all data issues to plaintiff hospitals, *see infra* Section IV.E.2, and there was no mutual mistake of fact, *see infra* Section V.  The Court declines to rule on class certification at this time.  *See infra* Section VI.  As the only surviving breach of contract claim is the government's duty to extract, analyze, and adjust line items from its database, the parties shall next file a joint status report regarding scheduling for updated class certification briefing.

Finally, as the parties confirmed in the 11 May 2022 pre-oral argument status conference, several pending evidentiary motions were not consequential for summary judgment and the Court accordingly stays: the government's motion to exclude inadmissible evidence pursuant to Rule 408; plaintiffs' motion to exclude expert opinions of Jane Jerzak; plaintiffs' motion to exclude expert opinions of Anthony Fay; the government's motion to strike "Rule 408 Evidence Relied on by Plaintiffs in Summary Judgment Briefing"; the government's motion to strike "Paragraphs 3 - 10 of the Dale Thompson Declaration"; the government's motion to strike "Paragraphs 7 and 18 of the Declaration of Sere Allen, and Associated Briefing"; and plaintiffs' motion to exclude expert opinions of David Kennell.

## I.  Relevant Background

### A.  Factual History

TRICARE is a "military health care system" which "provides medical and dental care for current and former members of the military and their dependents."  *Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341, 1342 (Fed. Cir. 2017).  TRICARE Management Activity ("TMA"), a "field office in the Defense Department ['DoD']," managed the TRICARE system.[1] *N. Mich. Hosps., Inc. v. Health Net Fed. Servs., LLC*, 344 F. App'x 731, 734 (3d Cir. 2009). Hospitals providing TRICARE services are reimbursed according to DoD guidelines.  In 2001, Congress amended the TRICARE statute to require DoD to follow Medicare rules when reimbursing outside healthcare providers.  *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1343 (citing 32 C.F.R. § 199.14).  Due to "the lack of TRICARE cost report data comparable to Medicare's" figures, TMA, however, found it impracticable to immediately adopt Medicare reimbursement rules.  *Id.* (citation omitted).  To facilitate transition to Medicare rules, in 2005, DoD issued a Final Rule "which provided a more detailed explanation of the payment rules for hospital-based

---

[1] TMA is now known as the Defense Health Agency.

outpatient services." *Id.* The rule specified "[f]or most outpatient services, hospitals would receive payments 'based on the TRICARE-allowable cost method in effect for professional providers or the [Civilian Health and Medical Program of the Uniformed Services] ("CHAMPUS") Maximum Allowable Charge (CMAC).'" *Id.* (citation omitted). The TRICARE-allowable cost method "applied until 2009, when TRICARE introduced a new payment system for hospital outpatient services that was similar to the Medicare [Outpatient Prospective Payment System ('OPPS')] rules." *Id.*

On 23 January 2007, two hospitals "filed their first amended complaint in the [United States District Court for the District of Delaware] asserting claims for breach of contract implied in fact and breach of quasi-contract/unjust enrichment" against TRICARE's intermediary-managed care support contractors ("intermediaries"). *N. Mich. Hosps., Inc.*, 344 F. App'x at 735. "The Hospitals alleged [the intermediaries] refused to pay the Hospitals' facility charges for certain outpatient services rendered by the Hospitals to TRICARE beneficiaries, despite the fact that the Hospitals submitted claims to [the intermediaries] which included such charges." *Id.* (footnote omitted). The district court dismissed the complaint because the hospitals failed to first exhaust their administrative remedies, *id.* at 739, and the Third Circuit affirmed. *Id.* at 740. The Third Circuit determined, "Without question, the regulations state that certain services are reimbursed based on a maximum allowable charge calculation and that facility charges, which are not subject to a maximum allowable charge, are paid as billed." *Id.* at 737 (citing 32 C.F.R. § 199.14(a)(5)(i)–(xi)). The Third Circuit added "the regulations are equally clear that the Hospitals are not allowed to simply submit bills for any amount and then claim that they are entitled to reimbursement for the full amount charged because any amount above the CMAC represents their 'facilities' expenses." *Id.* In dicta, the court stated, "The dispute at issue is not a purely legal one, but rather requires factual determinations such as whether expenses that qualify as facility charges were incurred, whether such charges were properly billed, and how much is owed if they were incurred and properly billed." *N. Mich. Hosps., Inc.*, 344 F. App'x at 737. "Therefore, what is required by the underlying dispute in this case is an application of the TRICARE regulations to the Hospitals' specific claims for reimbursement." *Id.* After the Third Circuit affirmed, "the parties to that suit exchanged email communications regarding further steps and potential readjustment with TRICARE." Op. & Order ("14 Jan. 2020 Op. & Order") at 3 n.2, ECF No. 125.

In response to hospital complaints, TRICARE hired Kennell and Associates, a consulting firm, to "undertake a study [('Kennell study')] of the accuracy of its payments to the hospitals." *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1343–44. The Kennell study "compared CMAC payments to the payments that would have been made using Medicare payment principles, and determined that DoD '(1) underpaid hospitals for outpatient radiology but, (2) correctly paid hospitals for all other outpatient services.'" *Id.* at 1344 (emphasis removed).

From the Kennell study findings, "DoD created a discretionary payment process [('DPP')]," and, on 25 April 2011, DoD notified hospitals by letter of the process for them to "request a review of their TRICARE reimbursements (the 'Letter')."[2] *Id.* The DoD also

---

[2] The Letter states, in pertinent part:

"published a document titled 'NOTICE TO HOSPITALS OF POTENTIAL ADJUSTMENT TO PAST PAYMENTS FOR OUTPATIENT RADIOLOGY SERVICES' (the 'Notice')" on the TRICARE website.  Def.'s MSJ App. at A3–A9 [hereinafter *DPP Contract Notice*], ECF No. 203-1.[3]  Like the Letter, the Notice stated any submission would be treated as "an untimely but discretionary appeal under 32 CFR 199.10(a)(5) and (c) provided it is received no later than 23 June 2011." *Id.* at A7.  The Notice also indicated:  "Based on the request and subject to the availability of funds, each hospital will receive adjusted payments in return for acceptance of DoD's offer of additional payment based on criteria established by the agency," and "payment of the discretionary adjustments will also be conditioned on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries and the TRICARE [intermediaries]." *Id.*  The Notice described a nine-step methodology by which hospitals could "request an analysis of their claims data for possible discretionary

> For purposes of this process, DoD will treat your submission as an untimely but discretionary appeal under 32 Code of Federal Regulations 199.10(a)(5) and (c), provided it is received no later than 60 days from the date of this letter.  Based on the request, your hospital may be paid an adjustment, subject to the availability of appropriations, in return for your acceptance of DoD's offer of additional payment based on criteria established by the agency. . . .  In order to bring closure to any concerns regarding payment of hospital outpatient services under the TRICARE regulation prior to implementation of OPPS, payment of the discretionary adjustments will also be contingent on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries, and TRICARE [intermediaries].  We value your hospital as a partner in this effort and remain committed to working with you to complete the analysis of claims data and determine if any additional payments may be allowed.

Def.'s MSJ App. at A1–A2 (DPP Contract Letter), ECF No. 203-1.
[3] The Notice explained in relevant part:

> The TRICARE regulation provisions on hospital outpatient services, in the absence of adoption of the Medicare OPPS methodology, adopted comparable Medicare payments for similar services provided in other sites (i.e., physician offices).  That is, TRICARE looked to the similarity of services being provided, not the site of services, in adopting a reimbursement methodology for hospital outpatient services. . . .

> [I]n reviewing payments for hospital services, DoD has determined that, for radiology services . . . the technical component of the allowable charge did not approximate the Medicare fair payment for such hospital services as well as it could have.  That is, looking at the Medicare reimbursement methodologies in existence prior to adoption of Medicare OPPS in 2000, . . . some radiology services were underpaid in comparison. . . .  Thus, although payments to hospitals for radiology services were consistent with the duly promulgated regulation, there is a basis for TRICARE to provide an opportunity to make some discretionary net payment adjustments to approximate more closely Medicare payment methods. . . .

> General TRICARE policy is that payment methodologies follow to the extent practicable Medicare payments.  Prior to adopting [OPPS], Medicare used a blended rate that factored in a percentage of hospital costs and a percentage of the global physician fee schedule to reimburse hospital outpatient radiology services.  In contrast, TRICARE regulation limited reimbursement to hospitals for individual outpatient radiology services to the technical component portion of the [CMAC], which was one component of Medicare's physician fee schedule.  Consistent with TRICARE policy under statute to pay similar to Medicare, we have determined that discretionary adjusted payments may better reflect the Medicare payment amounts for outpatient radiology claims.

DPP Contract Notice at A5–A7.

adjustment" and to "govern the review of payments for hospital outpatient radiology services and payment of any discretionary net adjustments." *Id.*

Step 1 instructed hospitals to "submit[] a request for analysis of their claims data for hospital outpatient department radiology charges" for the period before TRICARE OPPS took effect. *Id.* Step 2 in relevant part expounded on submitting claims data, contact information, and questions. The second step described the process for determining necessary claims data: "[H]ospital[s] submit[] data with [their] name, address, zip code, Tax ID number, TRICARE sub ID number, the 6-digit Medicare OSCAR provider number [also known as the provider identification number], and [National Provider Identification ('NPI') number]." *Id.* Step 2 also directed hospitals to provide contact names and addresses "to be used by TMA for formal response to the request." DPP Contract Notice at A7. Each hospital compiled the required information in "[a] separate Excel spreadsheet . . . in the TMA-specified format." *Id.* Step 2 also specified the method to ask TMA questions noting, "Questions of general interest to all hospitals will be posted with answers on the TMA website." DPP Contract Notice at A7; *see* Def.'s MSJ App. at A10–A15 [hereinafter *DPP Contract FAQs*].

Steps 3–6 disclose how TMA would extract, exclude, and analyze claims data. DPP Contract Notice at A7–A9. Specifically, Step 3 explained "TMA w[ould] extract the claims for each hospital for claims for outpatient radiology services during the relevant period." *Id.* at A7. Step 3 also indicated which of the extracted claims TMA would exclude from consideration, such as "if the [Technical Component ('TC')] CMAC amount is less than the global CMAC and the claim does not have a TC modifier. *Id.* at A7–A8. Step 4 presented the "'Medicare' method" TMA used to "calculate what would have been paid under the approach that Medicare used to pay hospital outpatient radiology claims prior to [Centers for Medicare & Medicaid Services ('CMS')] implement[ing] . . . the Medicare OPPS in 2000." *Id.* at A8. Step 5 detailed how TMA "adjust[ed] the 'Medicare' amount calculated [through the Medicare Method] in Step 4 on each claim using the ratio of the actual allowed amount (the amount that a health plan has determined to be a fair price for a given medical treatment) on the claim to the TRICARE Standard allowed amount (the technical component of the CMAC)." *Id.* Step 6 explained how TMA "then compare[d] the adjusted 'Medicare' amount for each claim with the actual allowed amounts on that claim" and "calculate[d] the difference between the two amounts." *Id.* at A9. The difference between the Medicare method calculation and the payment from TMA "w[as] used in determining the level of additional payment to the hospital." DPP Contract Notice at A9. If the resulting difference was more or equal to TMA's payment, "no additional payment shall be made." *Id.* Step 7 clarified "[i]f the calculations in Step 6 [comparing the actual allowed amount and the Medicare method amount] indicate that an additional payment shall be made to the hospital, then a hospital-specific offset for cost sharing shall be calculated." *Id.*

Step 8 notified hospitals "[a] written response [at] the hospital's request w[ould] be sent to the individual at the address provided by the hospital [and] provide the calculated discretionary adjusted payment and the calculations from which the adjustment was derived." *Id.* Step 8 added "[w]hile the methodology for calculating the adjustment is not subject to questions, any questions regarding the data used in the calculations should be received by TMA within 30 days . . . of TMA's response . . . . Any questions should be accompanied by detailed

explanation of the alleged errors and the proposed corrections with supporting documentation." *Id.* at A9; *see* Def.'s MSJ App. at A16 (DPP Contract Sample Response).

Finally, Step 9 specified TMA's written response mentioned in Step 8 included "a release and agreement to accept the discretionary adjusted payment by the hospital." DPP Contract Notice at A9. Per Step 9, "[t]he signed release and agreement should be returned to TMA within 30 days of the date of initial response or TMA response to any questions raised in [S]tep 8, whichever date is later." *Id.* After TMA received "the signed release and agreement, payment w[ould] be made to the hospital." *Id.*

Plaintiffs estimate several thousand hospitals submitted requests for discretionary payment, including the six named plaintiffs in this case ("plaintiffs"): McLaren Greater Lansing (Ingham Regional Medical Center), INTEGRIS Baptist Regional Health Center (Miami), INTEGRIS Bass Baptist Health Center, INTEGRIS Grove Hospital, INTEGRIS Baptist Medical Center (Integris Baptist), and INTEGRIS Canadian Valley Hospital. *See Ingham Reg'l Med. Ctr. v United States*, 126 Fed. Cl. 1, 16 (2016), *aff'd in part, rev'd in part*, 874 F.3d at 1348. The Court previously "determined that plaintiffs in this lawsuit have appropriately pled that a contract was formed between TMA and plaintiffs through: (1) the April 25, 2011 letter, (2) the Notice, (3) the FAQs, (4) the spreadsheets that hospitals submitted to TMA to provide their identifying information and indicate their interest in receiving the adjustment, (5) the payment adjustment worksheets that TMA provided to hospitals to show the amount of TMA's proposed adjustment, and (6) the release of claims that hospitals executed to receive their adjustment payments ('the Release')." Def.'s MSJ at 17 (citing *Ingham Reg'l Med. Ctr.,* 126 Fed. Cl. at 31–32).

## B.    Regulatory Scheme

The relevant provisions of the regulatory scheme of 32 C.F.R. § 199.14(a)(5) provide:

(5) Hospital outpatient services. This paragraph (a)(5) identifies and clarifies payment methods for certain outpatient services, including emergency services, provided by hospitals . . . .

(iv) *Radiology services.* TRICARE payments for hospital outpatient radiology services are based on the allowable charge method under paragraph (j)(1) of the section. In the case of radiology services for which the CMAC rates are established under that paragraph, a payment rate for the technical component of the radiology services is provided. Hospital charges for an outpatient radiology service are reimbursed using the CMAC technical component rate. . . .

(xi) *Facility charges.* TRICARE payments for hospital outpatient facility charges that would include the overhead costs of providing the outpatient service would be paid as billed. For the definition of facility charge, *see* § 199.2(b).

## C.    Procedural History

On 21 October 2013, plaintiffs brought this action claiming the government underpaid them for certain outpatient medical services they provided between 1 August 2003 and 1 May 2009. *See Ingham Reg'l Med. Ctr.*, 126 Fed. Cl. at 9. Plaintiffs allege the approximately six years of underpayment breached two contracts and violated various statutory and regulatory provisions. *Id.* Plaintiffs seek to represent a class of approximately 1,610 similarly situated hospitals. *See* Pls.' Mot. to Certify, ECF No. 76.

On 13 January 2015, the government filed a motion to dismiss plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), Def.'s Mot. to Dismiss, ECF No. 41. The government argued plaintiffs "fail[ed] to allege facts" sufficient to establish a binding contract with the government or that any contract was breached, and absent a valid contract, "there [could] be no mutual mistake or breach of the covenant of good faith and fair dealing." *Id.* at 1. On 22 March 2016, this Court dismissed plaintiffs' complaint for failure to state a claim. *See Ingham Reg'l Med. Ctr.*, 874 F.3d at 1346. Plaintiffs appealed three claims: the "(1) breach of express contract between Ingham and DoD based on the [DPP]; (2) revision of Ingham's contract based on mutual mistake, in light of the errors in the calculations of radiology outpatient services and the Kennell study; and (3) violations of money-mandating statutes and regulations." *Id.* On 3 November 2017, the Federal Circuit "reverse[d] the dismissal of [plaintiff] Ingham's breach of contract claim, affirm[ed] the dismissal of [plaintiffs'] money-mandating claim, and [did] not reach the claim for mutual mistake." *Id.* at 1348. Although the Federal Circuit found the Release does not bar Ingham from bringing a breach of contract claim, it did not further interpret the contract. *See id.* at 1346. The Federal Circuit remanded the case "for further proceedings on the breach of contract claim." *Id.* at 1348. On remand, plaintiffs filed an amended complaint, the government filed its answer, and the parties engaged in discovery, ECF Nos. 74, 79. This case was transferred to the undersigned Judge on 29 July 2019. *See* Order, ECF No. 114.

On 14 January 2020, the Court issued an order ruling on five motions regarding the government's effort to "claw back" purportedly privileged documents it inadvertently sent plaintiffs. 14 Jan. 2020 Op. & Order. The Court held these communications were not privileged by analogizing the DPP to "an insurer's claim investigation" as "DoD investigated hospitals' underpayment claims further before making a payment determination." *Id.* at 18. The Court stated, "When [one of the allegedly privileged documents] was created, the government's primary focus was the calculation, and recalculation, of TRICARE payments which became the government's business during the [DPP]." *Id.* at 22. "While there may have been communication exchange between the parties regarding 'settlement' after the Notice, the comments were related to calculation review regarding repayment" and the parties aimed to "avoid litigation." *Id.* at 19, 21. The Court found "the term 'settlement' in this context refers to a negotiated business settlement, not the settlement of a legal action, because the government sought to correct payment errors and avoid litigation." *Id.* at 20. The Court thus held the documents in question could not "constitute preparation for litigation," and the DPP Contract was a "negotiated business settlement to agree on a recalculation figure." *Id.* at 20, 22.

On 5 June 2020, plaintiffs filed a renewed motion to certify class and appoint class counsel ("Pls.' Class Cert."), ECF No. 146. The government filed a response to plaintiffs' renewed motion for class certification on 26 August 2021 ("Def.'s Class Cert. Resp."), ECF

207, and on 4 February 2022, plaintiffs filed a reply in support of their renewed motion to certify class action and appoint counsel, ("Pls.' Class Cert. Reply"), ECF No. 226.  On 26 August 2021, the government filed a motion for summary judgment ("Def.'s MSJ"), ECF No. 203.  Plaintiffs filed an opposition to government's motion for summary judgment on 4 February 2022 ("Pls.' MSJ Resp."), ECF No. 225, and on 11 March 2022, the government filed a reply in support of its motion for summary judgment ("Def.'s MSJ Reply"), ECF No. 234.

The parties then filed seven evidentiary motions and one motion for leave to file amended briefs.  On 26 August 2021, the government filed a motion to exclude inadmissible evidence relied upon in plaintiffs' motion for class certification, ECF No. 204, under Rule 408 of the Federal Rules of Evidence ("FRE").  The same day, the government filed a motion to exclude the expert opinion of Jane Jerzak, ECF No. 205, and a motion to exclude the expert opinion of Anthony Fay, EFC No. 206.  On 11 March 2022, the government filed a motion to strike inadmissible evidence under FRE 408 relied upon in plaintiffs' response to the government's motion for summary judgment and plaintiffs' response to the government's motion to exclude the expert opinion of Jane Jerzak, ECF No. 238.  The next day, the government moved to strike paragraphs 7 and 18 of the declaration of Sere Allen, ECF No. 239.  On 14 March 2022, the government moved to strike paragraphs 3 through 10 of Dale Thompson's declaration, ECF No. 240.  The next day, plaintiffs filed a motion for leave to file amended briefs and appendices, ECF No. 242.  On 5 April 2022, plaintiffs filed a motion to exclude the expert opinion and continued participation of David L. Kennell and Kennell and Associates, ECF No. 251.[4]  The Court considers plaintiffs' amended briefs and appendices, ECF No. 242, to the extent they are relevant to this Opinion and Order.

### D.    Scope of Questions Presently at Issue

The Court held a status conference on 11 May 2022 to discuss at length all ten motions pending before the Court, ECF No. 241.  The Court discussed whether there were material disputes of fact to preclude summary judgment and whether the Court should resolve the government's summary judgment motion with plaintiffs' motion for class certification.  11 May 2022 Status Conference Tr. ("SC Tr.") at 6:23–7:2, ECF No. 257.  All parties agreed "the interpretation of the contract . . . and [the] interpretation of 32 C.F.R. § 199.14 [are] question[s] of law," and decisions in conjunction with class certification would be "a great benefit to clarity in the case and a preservation of resources" if adverse to plaintiffs.  SC Tr. at 116:12–19.  At the parties' request, the Court also considered whether mediation might be appropriate.  SC Tr. at 7:3–4.  Plaintiffs preferred mediation, but the government opposed mediation at the time.  *See* SC Tr. at 112:17–114:23.  The parties discussed their various evidentiary motions and motion for leave to file—specifically the materiality of each motion to the government's motion for summary judgment and plaintiffs' motion for class certification.  SC Tr. at 7:5–8.

During oral argument on 9 June 2022, both parties confirmed there are no disputes of material fact on the issues of:  (1) TMA's duties under the contract; and (2) whether there was a mutual mistake of fact.  9 June 2022 Oral Argument Tr. ("Tr.") at 78:11–19, ECF No. 259.  The parties also agreed their various pending evidentiary motions are not necessary to resolve the two

---

[4] The parties also filed response and reply briefs in opposition to these motions and in support of these motions, respectively.  *See* ECF Nos. 212, 220, 223, 243, 244, 245, 247, 248, 250, 252, and 253.

summary judgment issues:  (1) contract interpretation; and (2) class certification.  Tr. at 78:20–79:4.  Thus, the 9 June 2022 oral argument and this opinion and order do not contemplate the parties' evidentiary motions, as the motions to exclude expert opinions, ECF. Nos. 205, 206, and 251, and strike certain portions from certain filings, ECF Nos. 238, 239, and 240, are contingent upon the Court determining the appropriate interpretation of the DPP Contract.  SC Tr. at 122:13–16 (THE COURT: "[W]e proceed to summary judgment on the two items generally described as . . . CFR 32-199 and the clarification of what's released as part of the DPP, as well as class certification[.]").  In turn, the Court assesses:  (1) the extent of TMA's contractual duties under the DPP; and (2) the availability of the defense of mistake regarding 32 CFR 199.14(a)(5)'s CHAMPUS discount rates.  *See* Tr. 77:6–14 (THE COURT:  "Issue 1, if the Court finds that the government only had a duty to use the data that it had, that plaintiffs did not know about, in order to plug into the DPP, and that they did that, and then on Issue 2, the Court finds that there was no mistake with respect to 32 CFR 199.14(a)(5), what issues still remain in the case?  [PLAINTIFFS]:  I don't think there would be issues remaining[.]").

## II.    Parties' Arguments on the Government's Motion for Summary Judgment

The government argues plaintiffs' breach of contract claim fails as a matter of law "because the parties' contract assigned the ultimate responsibility for identifying any errors in the adjustment calculation *to the plaintiffs*, and provided them a hard and fast 30-day deadline for doing so."  Def.'s MSJ at 31.  For plaintiffs' mutual mistake of fact claim, the government argues "there is no mistake to begin with."  *Id.* at 32.  The government adds "plaintiffs bear the risk of the mistakes that they now allege, and . . . the reformation that they seek is legally unavailable because TMA specifically explained in the parties' contract that it was *not* offering any such adjustment."  *Id.*

Plaintiffs argue the "Government is liable to Plaintiffs on the following two bases:  (1) the Government breached the DPP by failing to properly extract and adjust all of Plaintiffs' radiology claims[;] and (2) the Parties committed a mutual mistake of fact upon entering the DPP by believing that the Government had properly reimbursed Plaintiffs for all categories of outpatient services (except for radiology), including by appropriately paying for facility charges."  Pls.' MSJ Resp. at 17.  "First, as to the Plaintiffs' breach of contract claim, the plain language of the DPP shows that the Government breached what was a clear contractual duty to extract and adjust all of the Plaintiffs' radiology claims."  *Id.* at 18.  "Second, as to the Plaintiffs' claim for mutual mistake, the plain language of § 199.14(a)(5) shows that the Government must reimburse hospitals for the overhead costs of providing outpatient services, as billed, including for all facility charges."  *Id.*

## III.    Summary Judgment Standard

Summary judgment is proper when the evidence fails to reveal a "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "Genuine" issues exist if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Facts are "material" if they "might affect the outcome of the suit" and do not include "irrelevant or unnecessary" factual disputes.  *Id.*  Inferences "must be viewed in the light most favorable" to

the nonmoving party when considering summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party "always bears the initial responsibility" of presenting evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## IV. Analysis of Plaintiffs' Breach of Contract Claim

The government argues: (1) TMA had no contractual duty to extract, analyze, and adjust radiology claims data from the hospitals[5] under the contract; and (2) plaintiffs bore the risk of any data discrepancy. *See generally* Def.'s MSJ. The government asserts plaintiffs' breach of contract claim "fails as a matter of law . . . because the parties' contract assigned the ultimate responsibility for identifying any errors in the adjustment calculation *to the plaintiffs*, and provided them a hard and fast 30-day deadline for doing so." *Id.* at 31. The government states, "[t]he contract provided that TMA would first extract data with certain contractually-specified identifiers from its own records, and use the methodology specified in the parties' contract to generate a proposed adjustment amount[.]" *Id.* (citing DPP Contract Notice at A7–A8). Then, "once TMA presented this proposed adjustment amount to the hospitals, the hospitals were required to raise 'any questions regarding the data used in the calculations' and provide a 'detailed explanation of the alleged errors and the proposed corrections with supporting documentation' within 30 days." *Id.* (citing DPP Contract Notice at A8). The government adds plaintiffs "received years ago exactly what they bargained for, *i.e.*, a quick payment of a definite adjustment amount that they accepted with full knowledge that they had not examined the provenance of that number using their own data, and, accordingly, with full acceptance of any associated risk." *Id.*

Plaintiffs argue: (1) TMA had a contractual duty to extract, analyze, and adjust plaintiffs' radiology claims data under the contract; (2) TMA had a duty to extract line items from its database; and (3) TMA bore the risk of any data discrepancy, not plaintiffs. *See generally* Pls.' MSJ Resp. Plaintiffs add "[t]he Government's attempt to shirk its contractual duty fails as (a) the evidence proves that the Government breached the DPP, (b) the Government was responsible for ensuring the accuracy of its data, not Plaintiffs, and (c) the Government cannot prove any affirmative defense, as is required, to avoid liability." *Id.* at 23.

---

[5] The Court refers to the data not in TMA's records as "hospital" data because plaintiffs' mention of "*all* of the radiology line items," Pls.' MSJ Resp. at 27, relates to their argument TMA's databases were missing certain records which the hospitals submitted. *See id.* at 30 ("The Government does not explain why some of the data did not exist in its systems . . . ."); *see also* Tr. at 101:7–102:3 ("THE COURT: . . . Plaintiffs read [Step 3 as stating] TMA will extract the claims for each hospital's *submitted* claims for outpatient radiology services? [PLAINTIFFS]: I think that's the only way to fairly interpret that language . . ." (emphasis added)). As a factual matter, the government admits records were missing from TMA's database, but the government contends it was not required under the contract to find additional data as a legal matter. Tr. at 13:14–22 ("[THE GOVERNMENT:] . . . [W]e discovered that there were 139 line items in the INTEGRIS data set that TMA could not find in its records. So, . . . the INTEGRIS data set does contain records that are missing from ours. I don't think that changes our legal position on the motion for summary judgment . . . because . . . there is no contract requirement for us to adjust records that we don't own because the contract's cast in terms of extraction.").

There are four elements to a breach of contract claim:  "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989) (citations omitted).  For the first element, the court previously found "a valid contract between the parties," and the parties do not dispute this finding.  *Ingham Reg. Med. Ctr.,* 126 Fed. Cl. at 22, 31–32 (2016), *aff'd in part, rev'd in part on other grounds*, 874 F.3d 1341 (Fed. Cir. 2017); Def.'s MSJ at 17; Pls.' MSJ Resp. at 13; *see San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959; Def.'s MSJ App. at A1–A2 [hereinafter *DPP Contract Letter*]; DPP Contract Notice at A3–A9; DPP Contract FAQs at A10–A15; Def.'s MSJ App. at A17 [hereinafter *DPP Contract Release*].  The Court accordingly considers:  (1) whether the contract obligates TMA as plaintiffs allege; (2) if TMA had contractual duties, whether it breached those duties; (3) if TMA breached, whether any breach caused plaintiffs' damage; and (4) whether the government proves any viable defenses to plaintiffs' breach of contract claim.  *See San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959.

### A.   Whether TMA Had a Contractual Duty to Extract, Analyze, and Adjust Hospital Radiology Data

The government concedes the DPP required TMA to fulfill certain contractual obligations it owed to plaintiffs.  Def.'s MSJ at 34 (noting "TMA's duties toward the plaintiffs").  To determine the extent of the obligations, the Court looks to the DPP's plain language and gives the words their plain and ordinary meaning, unless the language is ambiguous.  *See United Cmtys., LLC v. United States*, 154 Fed. Cl. 676, 681 (2021).  The Court first narrows the contract provisions to plaintiffs' radiology data before then determining its ambiguity (or lack thereof) and analyzing the plain meaning of the DPP language.

Missing data is the central problem to the issue of what data the government had a duty to correctly adjust.  Between hospitals submitting their claims data to intermediaries, intermediaries processing the data and submitting it to TMA, and TMA storing the data in its database, some claims data was miscategorized or lost.  For example, eighty-two line items from plaintiff-Ingham were all together missing from TMA's database.  Some of the data loss was due to programming errors and records conversion issues with intermediaries between 2003 and 2009 after original submission, but the extent, timing, and exact causes of the loss are unknown.  Plaintiffs' expert report did not opine regarding how much data was missing.[6]  The question the Court addresses now is whether the government had a duty to find and correct this missing data

---

[6] This explanation is based on the parties' statements at oral argument.  *See* Tr. at 12:7–11 ("[THE GOVERNMENT]:  . . . Plaintiffs, because of the way they structured their expert report, did not actually address that issue specifically, trying to quantify or identify why line items may have been missing or anything to that effect."), 50:12–15 ("THE COURT:  . . . [W]hen we were just talking about Ingham as an example, there were 82 that were missing?  [THE GOVERNMENT]: Yes."), 50:23–51:4 ("[THE GOVERNMENT]:  . . . [H]ow this particular error manifested itself was the hospital would appropriately code it.  It would be a CPT code for an x-ray of your arm.  It would forward that information to the fiscal intermediary.  There's some crazy data cross-walking problem on the part of Healthnet that—a programming error which caused those CPT codes to be rerecorded as generic codes."), 74:9–16 ("[PLAINTIFFS]:  . . . [I]t's not part of our interpretation that there has to be a reevaluation of the hospital's claims, just that the thing that is being extracted is the hospital's claim and not something that the government or its fiscal intermediaries . . . have changed in some way that's unknown to plaintiff[s]."), 257:19–24 ("[THE GOVERNMENT]:  . . . [T]he issue is that the fiscal intermediary doesn't have those claims.  Right?  There was a records conversion issue, and so . . . . I don't know that we still have them.").

under the DPP, or whether the government could re-calculate the payments under the DPP utilizing the data as it existed in 2011 in the government's possession.

The government argues, "Plaintiffs fail to cite *any provision of their contracts* that contain" an explicit duty for the government to extract and adjust the hospitals' radiology data. Def.'s MSJ Reply at 6.  The government adds, "TMA had no obligation to adjust line items that were not in its physical possession." Tr. at 12:3–5.  In response, plaintiffs argue "the plain language of the DPP shows that the Government breached what was a clear contractual duty to extract and adjust all of the Plaintiffs' radiology claims." Pls.' MSJ Resp. at 18.  Plaintiffs assert "the Government itself concedes that it did not follow the methodology in the DPP under which the Government expressly promised that it would extract and adjust *all* of the radiology line items." *Id.* at 27.  To support the contention the DPP required TMA "to extract, analyze, and adjust all of Plaintiffs' radiology claims data," plaintiffs cite several contractual provisions, including:  the Letter; Step 1; Step 3; Step 4; Step 5; Step 6; Step 7; FAQ 2; and FAQ 14.  *Id.* at 24–28.  Plaintiffs assert "[i]t would be unreasonable to expect a hospital reading the plain language of the DPP to infer that only *some* of the required claims would be included." *Id.* at 28.  The original hospital submissions comprise "all" of plaintiffs' radiology claims.  *See* Tr. at 74:9–16 ("[PLAINTIFFS]:  . . . [I]t's not part of our interpretation that there has to be a reevaluation of the hospital's claims, just that the thing that is being extracted is the hospital's claim and not something that the government or its fiscal intermediaries . . . have changed in some way that's unknown to plaintiff[s].")

Contract interpretation is a question of law.[7]  *See Jowett, Inc. v. United States*, 234 F.3d 1365, 1367–68 (Fed. Cir. 2000).  The court "must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."  *Id.* at 1368 (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).  Beginning with the "plain language," the court must "give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning."  *Id.* (first quoting *McAbee Constr., Inc.*, 97 F.3d at 1435, and then quoting *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998)).  The court must also determine "the intent of the parties at the time they contracted, as evidenced by the contract itself."  *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988).  If multiple interpretations of contract provisions exist, they "should be construed most strongly against the drafter."  *United States v. Seckinger*, 397 U.S. 203, 210 (1970).

As a threshold matter, both parties agree the relevant contract language is unambiguous, though they disagree as to the interpretation.  *See* Tr. at 72:24–25 ("[PLAINTIFFS]:  . . . We don't think there's an ambiguity."); 103:13–14 ("[PLAINTIFFS]:  . . . I don't necessarily allege that Step 3 is ambiguous."); Def.'s MSJ Reply at 1 ("In our opening brief, we demonstrated that the contracts . . . are simple, straightforward, and fundamentally unambiguous instruments.").  As the parties agree the contract is unambiguous, the Court now considers the various terms as they relate to TMA's duties under the contract.  First, the Court assesses the role of intermediaries who were "made aware of th[e] DoD initiative [to calculate the net adjustments

---

[7] As the nonmovant, plaintiffs agree "interpreting [TMA's] contractual duties is purely an issue of law." Tr. at 72:21–23.  The Court accordingly need not determine whether the evidence reveals a "genuine issue as to any material fact" and must only consider whether the government "is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

itself], but [would] not otherwise be involved in the calculation of net adjustments." DPP Contract Letter at A1. The Court then analyzes TMA's obligations in Step 1 instructing hospitals to "submit a request for analysis of their claims data" and in Step 2 directing hospitals to enter basic identifying information in a provided Excel spreadsheet as part of the Step-1 request. DPP Contract Notice at A7. In Step 3, the Court reviews whether "TMA extract[ing] the claims for each hospital for claims for outpatient radiology services" provided in the Excel spreadsheet requires TMA to consider data not included in the spreadsheet. *Id.* at A7–A8. Next, the Court must determine if "each" qualifying "hospital" or "claim" throughout the CHAMPUS methodology—as well as FAQ 14, which clarifies the DPP analysis was performed on a service line basis—requires TMA to examine all plaintiffs' radiology data in the aggregate or just claims-level data individually. *Id.* at A5–A7; DPP Contract FAQs at A12. If the Court determines the DPP Contract obligates TMA to inspect the hospitals' data as opposed to just claims data in TMA's database, the Court must determine whether TMA had a contractual duty to verify its data.

The government first argues regardless of how the steps are calculated in the methodology, the government only has the data previously provided by intermediaries. *See* Def.'s MSJ at 38 ("It was important that individual hospitals provide complete identifying information that TMA did not have in order to establish the unique, agreed-upon parameters of TMA's records search for that hospital."). The Letter provides: "Because this issue affects all three TRICARE regions and multiple years of claimed services, DoD has decided to calculate the net adjustments itself, rather than through the [intermediaries], which have been made aware of this DoD initiative, but will not otherwise be involved in the calculation of net adjustments . . . ." DPP Contract Letter at A1. Plaintiffs contend the plain language of the DPP explicitly required TMA to extract *all* the radiology claim data, including data from the hospitals not in the database, and to examine its data for errors. Pls.' MSJ Resp. at 23. To argue the government was obligated to analyze the hospitals' radiology data, plaintiffs emphasize "DoD has decided to calculate the net adjustments itself." *Id.* at 25 (emphasis removed) (quoting DPP Contract Letter at A1). Plaintiffs argue in TMA claiming it would calculate the net adjustments itself, "[t]he government impliedly warrant[ed] the accuracy of matters set forth in contract documents." *Id.* at 23–24 (citing *D.F.K. Enters., Inc. v. United States*, 45 Fed. Cl. 280, 285 (1999)).

To illustrate the differences in language and meaning between the Letter and plaintiffs' interpretation, the Court first reads the Letter through the lens of plaintiffs' interpretation. Plaintiffs' interpretation of the Letter to input "the hospitals' data" within the calculations essentially requires adding the words "with the hospitals' data" to read "DoD has decided to calculate the net adjustments itself with the hospitals' data." *See* DPP Contract Letter at A1. As can be seen from considering the additional limitation, the inclusion of the additional words expands the scope of the obligation on the government. The plain meaning of the original sentence from the Letter—"DoD has decided to calculate the net adjustments itself, rather than through the [intermediaries]"—is TMA would *not* involve intermediaries in the DPP calculation process *or use the hospitals' data from the intermediaries. Id.*; *see also* Tr. at 106:3–11 ("[THE GOVERNMENT]: If the [intermediarie]s are not going to be involved with this process, they are the repository of the plaintiffs' submitted hospital data. So . . . we are clearly signaling that we are not going back to the clearinghouse, we are not going back to the hospital data. That

leaves the only thing to be extracted would be the records in the government's official record of payment in Step 3."). This original sentence from the Letter does not provide TMA would analyze plaintiffs' data by performing the analysis itself—in fact, the provision lacks any mention of data, plaintiffs' or otherwise. DPP Contract Letter at A1. The Court cannot change the plain meaning of the Letter by adding language. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("[I]t is no more the court's function to revise by subtraction than by addition."). The Court finds plaintiffs' interpretation inapplicable because the interpretation requires the addition of words to support plaintiffs' preferred meaning. *See id.*

As part of the DPP, DoD further clarified the decision not to use intermediaries in the DPP was made for administrative efficiency. *See* DPP Contract Letter at A1. Intermediaries were not involved "[b]ecause this issue affects all three TRICARE regions and multiple years of claimed services[.]" *Id.* This explanation further put plaintiffs on notice TMA planned to process its data itself to perform the adjustments rather than expending time and resources involving numerous outside parties or finding the hospitals' data to process. The plain meaning of the Letter undermines plaintiffs' argument the government had to analyze the hospitals' data. *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); DPP Contract Letter at A1.

It is also important to understand the calculation outcome is dependent on which data is processed. While the government describes a DPP calculation, plaintiffs confuse the described calculation with a calculation *outcome* which requires utilizing the hospitals' data. The Letter clarifies TMA is only extracting, analyzing, and adjusting the data *previously* furnished by intermediaries—and the Letter clarifies only TMA is doing so. *See* DPP Contract Letter at A1 ("DoD has decided to calculate the net adjustments itself, rather than through the [intermediaries] . . . ."). Plaintiffs seemingly infer from the government's responsibility to perform calculations a promise the calculations will be perfectly accurate and use the hospitals' data to achieve that perfection: "DoD has decided to calculate the net adjustments itself, rather than through the [intermediaries]," DPP Contract Letter at A1, according to plaintiffs is "unambiguous, and make[s] clear that *the duty to extract, analyze, and adjust all of Plaintiffs' radiology claims data* were [sic] not discretionary tasks, and rested solely with the Government." Pls.' MSJ Resp. at 26 (emphasis added). The cited sentence of the Letter references *who* is involved in the payment process—DoD, not intermediaries—rather than *what* is involved in the payment process. *See* DPP Contract Letter at A1. Plaintiffs read in a nonexistent warranty regarding the process by asserting the government, as sole arbiter of the calculations, must utilize the hospitals' data. *See id.* The plain language does no more than exclude intermediaries from the process. *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); DPP Contract Letter at A1.

In summary, the Court does not read the government's statement intermediaries would not be involved in DPP calculations as making a promise to adjust specific data. The language of the Letter refers only to the involvement of intermediaries—or lack thereof—in the DPP process and does not imply a guarantee of perfect calculations using the hospitals' data. The plain meaning of the Letter does not bind the government to analyze the hospitals' data but rather

clarifies intermediaries would not be involved for efficiency's sake. *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); DPP Contract Letter at A1.

1.      **Whether Step 1 and 2's Plain Meaning Instructing Hospitals to "submit[] a request for analysis of their claims data" Obligates TMA to Any Performance**

As part of the DPP, the 2-page Letter made hospitals aware more detailed procedures would follow.  The Letter stated "[d]etailed instructions will be posted on the [TMA] Web Site" and noted these instructions would "explain[] the manner in which a hospital may request th[eir] claims data be reviewed for appropriate discretionary adjusted payments."  DPP Contract Letter at A1.  These instructions were the Notice and "answers to certain Frequently Asked Questions (DPP Contract FAQs)."  Def.'s MSJ at 11 (citing DPP Contract Notice & FAQs at A3–A15).  Rather than detailing the methodology or defining the extent of data TMA would use, the Letter directs the hospitals to the 7-page Notice and 20-question FAQs.  Extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in context.  Restatement (Second) Contracts cmt. b (Am. L. Inst. 1981).  Contextualizing the Letter with the Notice and FAQs "gives meaning to all . . . provisions and makes sense[,]" allowing the Letter to be read as a whole.  *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435).  The Court accordingly next addresses the Notice and FAQs.

Steps 1 and 2 of the Notice outlined the process for requesting analysis of claims data:

Step 1:  Hospital submits a request for analysis of their claims data (process defined in Step 2) for hospital outpatient department radiology charges during the period from August 1, 2003, to April 30, 2009, which is the last day before TRICARE's OPPS became effective on May 1, 2009.  Small rural hospitals not subject to TRICARE's OPPS until January 1, 2010, shall submit a request for the August 1, 2003-December 31, 2009 period.  Critical Access Hospitals (CAHs) are not subject to TRICARE's OPPS and shall submit a request for the August 1, 2003-November 30, 2009 period. As of December 1, 2010, CAHs are reimbursed 101 percent of reasonable costs.  Hospitals not subject to OPPS (such as Cancer and Children's hospitals) shall submit a request for the August 1, 2003-December 31, 2010 period.

Step 2:  As part of the request, hospital submits data with its name, address, zip code, Tax ID number, TRICARE sub ID number, the 6-digit Medicare OSCAR provider number, and NPI number.  If multiple Tax ID or Medicare provider numbers were used during this period, hospitals will submit these data.  The request shall also include the name and address to be used by TMA for formal response to the request.  A separate Excel spreadsheet must be completed for each hospital in the TMA-specified format. An example is posted on the TMA website . . . . Hospitals will also submit the name of a contact and a phone number to resolve any questions.  The request will be submitted to the following address: [omitted].  Any questions should be submitted to the following email address: [omitted].  Questions of general interest to all hospitals will be posted with answers on the TMA website.

DPP Notice at A7.  Plaintiffs argue Step 1 of the Notice "provides the hospital submit[] a request for analysis of their claims data," and plaintiffs noted Step 1 "is at the very beginning of the hierarchy."  Tr. at 127:16–24.  Step 1 required hospitals to submit a request to begin the DPP and provided the relevant time period of adjustable claims depending on the type of hospital.  The plain meaning of Step 1 provided hospitals initiate the "analysis" by "submit[ting] a request"; hospitals are the subject of Step 1, and the provision does not obligate TMA to any performance.  DPP Contract Notice at A7.  The FAQs expressly foreclose plaintiffs' argument TMA should have provided its granular data to the hospitals.  *See* DPP Contract FAQs at A11 ("Claims-level detail will not be provided due to the number of adjustments over this 7-year period.").  TMA is simply the passive recipient of the information per Step 1.  FAQ 18 also explained three reasons why "the government will not provide individual claims data to each hospital:"  (1) providing 10 million claims of data is impractical; (2) including patient-level data is inadvisable due to privacy concerns; and (3) giving hospitals the summary worksheet is sufficient for hospitals to determine whether the historical claims counts and amounts are reasonable.  DPP Contract FAQs at A14.  Plaintiffs, therefore, knew before they entered the contract through parallel provisions (Step 1, FAQ 11, and FAQ 18) TMA was not providing its claim-level data.  DPP Contract Notice at A7; DPP Contract FAQs at A11, A14.  Although the provision noted, the "hospital submits a request for analysis of their claims data[,]" where "their" referred to hospitals, the provision directed hospitals to Step 2 for how to "submit[] a request for analysis of their claims data."  DPP Contract Notice at A7.  As Step 1 directed the parties to Step 2, the Court next considers whether the "process defined in Step 2" obligated TMA to extract, analyze, and adjust the hospitals' radiology data.  *See id.*

Plaintiffs state Step 2 "requested Plaintiffs to provide . . . basic [identifying] information in an Excel spreadsheet."  Pls.' MSJ Resp. at 33.  Step 2 provided "[a]s part of the [Step 1] request, hospital submits data with its name, address, zip code, Tax ID number, TRICARE sub ID number, the 6-digit Medicare OSCAR provider number, and NPI number."  DPP Contract Notice at A7.  Hospitals "shall also include" a contact name and address for correspondence related to the Step 9 "formal response."  *Id.*  The requested information qualifies as "basic [identifying]" data, not claims-level data—billing codes that healthcare entities submit to insurance companies—or patient-level data—patients' personal information, such as medical history and demographic characteristics.  *See id.*  The government argues, "[a]t most, plaintiffs seek to infer a promise or warranty that the data that [TMA] was using was perfect from the fact that [TMA] did not invite hospitals to submit patient-level data as part of Step 2."  Def.'s MSJ at 39; *see also* Tr. at 68:16–21 ("THE COURT:  . . . [T]he DPP does not warranty proper data going into it and does not warranty that the data going into it, for the purposes of DPP analysis, is the same as the data that the hospitals had originally submitted to the intermediary.  [THE GOVERNMENT]:  That's correct.").  The contextual evidence of Step 1, which only calls hospitals to action, renders similar conclusions.  Step 2 is an extension of Step 1, as Step 1 mentioned a "[h]ospital submits a request for analysis of their claims data (process defined in Step 2)[.]"  DPP Contract Notice at A7.  Like Step 1, the plain language of Step 2 only described information for plaintiffs—it does not obligate TMA in any way.  *See id.*  Step 2 also limited the information plaintiffs would submit "[a]s part of the request."  *Id.*  Notably, under Step 2, hospitals were not invited or required to submit claims data—only basic identifying information.  *See id.*  FAQs 1 and 2 from the TMA website together state the limited information needed from hospitals more expressly.  FAQ 1 clarified hospitals are not required to submit sub-ID numbers.

DPP Contract FAQs at A10.  FAQ 2 then built on FAQ 1 by answering the question, "Will I need to provide further information such as claims-level data or identify the relevant claims or patients?"  *Id.*  TMA answered:  "No, you will not.  TRICARE will do this.  You need to submit only the information in the Excel sheet [according to Step 2].  Do not submit patient-level data." *Id.*  The instructions of Step 2 limited who could submit data and further limited submitted data to a hospital's "name, address, zip code, Tax ID number, TRICARE sub ID number, the 6-digit Medicare OSCAR provider number, and NPI number."  DPP Contract Notice at A7.  Step 2 does not obligate TMA to any action—let alone to analyze data not submitted.  Step 1, Step 2, FAQ 1, and FAQ 2 accordingly specify what the hospitals needed to submit with a request and what they did not, but the plain meaning of these provisions does not bind the government to analyze the hospitals' radiology data.  *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); DPP Contract Notice at A7; DPP Contract FAQs at A10.

### 2.        Whether Step 3 Requires TMA to Reference External Data Sources

Step 3 of the Notice included the first mention of an action by TMA:

> Step 3:   *TMA will extract* the claims for each hospital for claims for outpatient radiology services during the relevant period (either the August 2003-April 2009, August 2003-December 2009, or August 2003-November 2010 period).   All hospital outpatient department claims for radiology paid as billed, with OHI, or with a professional modifier (-26) will be excluded.   Radiology claims will include codes within the CPT range of 70000-79999 and which were codes with a non-zero rate in the Technical Component (TC) field of the CMAC rate file.   Within this group of claims, if the TC CMAC amount is less than the global CMAC and the claim does not have a TC modifier, it will be excluded.

DP Contract Notice at A7–A8 (emphasis added).  As to Step 3, the government argues "plaintiffs posit that essentially any difference between TMA's data and the hospital's data constitutes a contract breach.  However, this proposition cannot be derived from Step 3, and is not in the parties' contract at all."  Def.'s MSJ at 42.  The government asserts the following actions did not violate its obligations under Step 3 because "[t]he issue was not with the extraction itself, but with the contents of the underlying records, whose examination and correction was in no way required by the contract":  excluding (1) "some miscoded line items"; (2) "dump coded records"; and (3) "line items without TC modifiers."  *Id.* at 42–43 (citing DPP Contract Notice A7–A8).

Plaintiffs respond TMA's extraction of data "from its own records . . . does not explain why some of the data did not exist in [TMA's] systems or how this somehow justifies failing to perform its contractual obligations."  Pls.' MSJ Resp. at 30.  Plaintiffs also contend "[t]he Government cannot reasonably argue that it was not required to conduct due diligence *on its own data*, while at the same time refusing Plaintiffs access to the data."  *Id.*  Plaintiffs argue TMA should have corrected errors with the data "(*e.g.*, the records conversion issue for 2003-2004 in the South regarding to which the Government stipulated, and a fiscal intermediary advising of erratic TC modifier practices in May 2011)."  *Id.* at 30–31 (citing Def.'s MSJ at 43–44). Plaintiffs add "if you look at Step 3, the government's basic obligation was to extract the claims

from each hospital for claims for outpatient radiology services during the relevant period. Claims from each hospital has to mean the claims that the hospital submitted." Tr. at 70:8–14.

Building on the information hospitals supplied in Step 2, Step 3 provided "TMA will extract the claims for each hospital for claims for outpatient radiology services during the relevant period." DPP Contract Notice at A7. From *Merriam-Webster Dictionary*'s definition of "extract," only two definitions are relevant: (1) "to draw forth (as by research)" e.g., "extract data"; and (2) "to select (excerpts) and copy out or cite." *Extract*, Merriam Webster Dictionary, (11th ed. 2022); *see Af–Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 (9th Cir. 2007) ("When determining the plain meaning of language, we may consult dictionary definitions."). Using either definition, the word "extract" contemplates removing or copying something from somewhere. Although plaintiffs argued under Step 3, "somewhere" must "mean the claims that the hospital submitted," Tr. at 70:13–14, plaintiffs admitted TMA extracted line items from TMA's own database as a practical matter. Tr. at 111:23–112:4 ("[COURT]: . . . . [Step 3] begins, 'TMA will extract the claims.' Where is TMA to extract the claims from? [PLAINTIFFS]: Well, from the database that the government maintains. . . . [COURT]: From TMA's database? [PLAINTIFFS]: Yeah, from TMA's database"), 113:23–24 ("[PLAINTIFFS]: . . . . [A]s a practical matter, TMA was looking to its database."). Further, in arguing FAQ 4 does not support the government's position, plaintiffs admitted TMA was "just going to look at the records that are in the database and use those as a basis for the adjustment." Tr. at 20:11–13. Plaintiffs were aware at numerous stages of the process—from extracting line items, Tr. at 111:23–112:4, to determining adjustment bases, Tr. 113:23–24—TMA was utilizing its database. "The process of interpretation . . . turns in good part on what the court regards as normal habits in the use of language, habits that would be expected of reasonable persons in the circumstances of the parties." E. Allan Farnsworth, Contracts 456 (4th ed. 2004). The parties were aware TMA extracted line items from TMA's own database, contextualizing the interpretation of from where "TMA will extract the claims for each hospital." DPP Contract Notice at A7; s*ee, e.g., George Backer Mgt. Corp. v. Acme Quilting Co.*, 385 N.E.2d 1062, 1065 (N.Y. 1978) (If particularized meaning is intended, "surely no problem of draftsmanship would have stood in the way of its being spelled out.").

TMA extracted data from its database, so at oral argument the Court questioned "where also in Step 3 then is TMA obligated to collect data from outside its database to make it match something that the hospitals had submitted to the intermediaries?" to which plaintiffs responded, "I think that's built into what we believe is the only reasonable interpretation of what it means to extract claims for each hospital." Tr. at 113:8–15. The notion TMA's duties are assumed, however, only points back to the Court's interpretation of "extract." When the Court asked whether Step 3 obligated TMA to seek data outside its database, plaintiffs initially said, "No," but plaintiffs later said, "'[Y]es,' . . . because Step 3 obligate[d] the government to adjust the claims that the hospitals submitted." Tr. at 112:11–19. Plaintiffs admitted for TMA to collect data it lacked, TMA would "have [had] to go to the fiscal intermediaries[,]" Tr. at 177:15–16; however, the contract expressly stated TMA would not go to the intermediaries. *See* DPP Contract Letter at A1 ("DoD has decided to calculate the net adjustments itself, rather than through the [intermediaries].");*supra* Section IV.A. Further, FAQ 2 clarified hospitals did not need to provide claims-level data, rather "TRICARE will do this." DPP Contract FAQs at A10 (answering "[y]ou need to submit only the information in the Excel sheet" to the question "Will I

need to provide further information?").  Plaintiffs attempted to contextualize the notion TMA would adjust the claims with an action TMA explicitly rejected:  using intermediaries.  *See* DPP Contract Letter at A1; *supra* Section IV.A.  Plaintiffs' arguments Step 3 obligated TMA to extract the hospitals' radiology data accordingly impermissibly reach beyond the plain meaning of the text.  *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); DPP Contract Notice at A7; DPP Contract FAQs at A10.

After TMA "extract[ed] the claims for each hospital" meeting certain criteria, Step 3 further provided certain claims "will be excluded" from what "TMA will extract."  DPP Contract Notice at A7–A8.  For example:

> All hospital outpatient department claims for radiology paid as billed, with [other hospital insurance ('OHI')], or with a professional modifier (-26) [the professional component used when a physician interprets but does not perform the test] will be excluded. . . .  Within this group of [radiology] claims, if the Technical Component (TC) CMAC amount is less than the global CMAC and the claim does not have a TC modifier, it will be excluded.

*Id.* at A7.  In addition to defining "extract" as "to select (excerpts) and copy out or cite," *Merriam Webster Dictionary* also defines "exclude" as "to expel . . . especially from a place or position previously occupied." *See Extract, Exclude,* Merriam Webster Dictionary.  Reading the definitions together, TMA must extract data before it can then exclude portions of its extractions because TMA must "select" excerpts of data from hospitals request before it is able to "expel" certain data points.  As the ordinary meaning of the Step 3 exclusions merely narrow the universe of considered data from what "TMA will extract," the claims data "TMA will extract" is the largest universe of data TMA was obligated to consider.  Excluding existing database data is the plain meaning of excluding data TMA extracts in Step 3.  *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); DPP Contract Notice at A7–A8.

One of the excluded claims relates to "dump codes."  The government explained a dump code is a non-CMAC-associated generic code from a fiscal intermediary resulting from the inability of the coder to input the proper CPT code.  *See* Tr. at 46:16–21.[8]  Regarding "dump codes," Step 3 provided "[r]adiology claims will include codes within the CPT range of 70000-79999 and which were codes with a *non-zero rate* in the TC field of the CMAC rate file." DPP Contract Notice at A7 (emphasis added).  Dump codes have a zero rate in the TC field, so dump codes were not included in the data TMA extracted according to Step 3.  *Id.*  Plaintiffs argue TMA erred by excluding dump codes.  See Pls.' MSJ Resp. at 21.  TMA's obligations stem from the contract, and the contract expressly provided TMA would exclude dump codes. *See* DPP Contract Notice at A7.  Plaintiffs admitted under Step 3 "the DPP provided that claims with certain CPT codes would be adjusted" and "[a] dump code falls outside that."  Tr. at 63:6–9. Therefore, TMA did not err in excluding dump codes per Step 3.  Under a plain meaning rule, there is a two-stage process.  In the first stage, the court makes a preliminary determination of whether the language in dispute lacks the required degree of clarity before going on to the second

---

[8] The government noted during oral argument, "there were 82 line items [out of 4,006 total] for Ingham that were not adjusted because of the dump code issue."  Tr. at 46:9–11; *see* Tr. at 44:18–19 ("[THE GOVERNMENT:]  . . . [W]e adjusted 4,006 line items for Ingham.").

stage, that of interpretation.  E. Allan Farnsworth, Contracts 464 (4th ed. 2004) (quoting Arthur L. Corbin, *The Parol Evidence Rule*, 53 YALE L.J. 603, 622 (1944)).  The direction of Step 3 that dump codes fall outside of TMA's adjustment purview does not "lack the required degree of clarity," so the Court does not need to proceed with interpretation.  *See id.*

> **i.      Whether the Word "Each" Qualifies "Claim" and "Hospital" in Steps 1 through 6 Individually or Collectively**

Plaintiffs contend the government was obligated to analyze the hospitals' radiology data.  Pls.' MSJ Resp. at 27.  Plaintiffs emphasize the word "each" in Steps 3 through 6 supports their hospital-data interpretation.[9]  *Id.*  After admitting at oral argument TMA extracted claims from

---

[9] The Notice provides in full Steps 3–6:

> Step 3:  TMA will extract the claims for *each* hospital for claims for outpatient radiology services during the relevant period (either the August 2003-April 2009, August 2003-December 2009, or August 2003-November 2010 period).  All hospital outpatient department claims for radiology paid as billed, with OHI, or with a professional modifier (-26) will be excluded.  Radiology claims will include codes within the CPT range of 70000-79999 and which were codes with a non-zero rate in the Technical Component (TC) field of the CMAC rate file.  Within this group of claims, if the TC CMAC amount is less than the global CMAC and the claim does not have a TC modifier, it will be excluded.
>
> Step 4:  TMA will calculate what would have been paid under the approach that Medicare used to pay hospital outpatient radiology claims prior to CMS's implementation of the Medicare OPPS in 2000.  Medicare used a weighted blending of two factors with 42 percent for the first factor and 58 percent for the second factor.  We refer to this as the "Medicare" method.  Specifically, TMA would use the following formula to calculate the "Medicare" allowed amount for *each* hospital radiology claim:
>
> > .42 (BC*CCR) + .58 (.62 global CMAC)
>
> where: BC = billed charge for that line item
> > CCR= the hospital-specific outpatient cost-to-charge ratio
> > Global CMAC = the global CMAC for that CPT code (line item)
>
> TMA will perform separate calculations of the "Medicare" amount for the following periods.  Each period corresponds to a change in the TRICARE CMAC amounts:
> > August 11, 2003-February 29, 2004
> > March 1, 2004-March 31, 2005
> > April 1, 2005-February 28, 2006
> > March 1, 2006-January 31, 2007
> > February 1, 2007-February 29, 2008
> > March 1, 2008-February 28, 2009
> > March 1, 2009-March 31, 2010
> > April 1, 2010-June 30, 2010
> > July 1, 2010-July 31, 2010
> > August 1, 2010-December 31, 2010
>
> The outpatient cost-to-charge ratio (CCR) used for each period shall be the hospital-specific outpatient CCR in effect on the first day of each period as provided on the Outpatient Provider Specific File (OPSF) available from CMS's OPPS Pricer file.
>
> Step 5:  To reflect the value of discounts at network hospitals, TMA will adjust the "Medicare" amount calculated in Step 4 on *each* claim using the ratio of the actual allowed amount on the claim to the TRICARE Standard allowed amount (the technical component of the CMAC).  For example, if the TRICARE Standard technical portion of the CMAC for a radiology claim was equal to $100

its database, plaintiffs agreed the phrase "each hospital" in Step 3 is the same as "each hospital" in Step 2:

> A separate Excel spreadsheet must be completed for *each* hospital in the TMA-specified format.

DPP Contract Notice at A7 (emphasis added); Tr. at 112:5–7. The word "each" immediately precedes—and modifies—the word "hospital," so the plain meaning of the word "each" instructed TMA to extract data based on the individual hospitals that submitted their identifying information per Steps 1 and 2. *See* DPP Contract Notice at A7 ("TMA will extract the claims for each hospital . . . ."). The plain meaning of "each hospital" accordingly does not change the scope of TMA's duty to "extract [from its database] the claims for each hospital" which submitted identifying information according to Step 2. *Id.*

Regarding Steps 4 through 6, the word "each" modifies "hospital radiology claim" in Step 4, and "claim" in Steps 5 and 6. *Id.* at A8–A9. As Steps 4, 5, and 6 sequentially follow Steps 1, 2, and 3, the "each hospital radiology claim" and "each claim" language in Steps 4, 5, and 6 referred only to each individual claim extracted and not excluded under Step 3. Steps 4 through 6 described the calculations TMA was to perform, so the word "each" in this context denoted TMA was to analyze claims on an individual basis as opposed to collectively. The DPP specifically included "each" as the modifier as opposed to an indefinite article like "a." "Each" is a word of limitation as opposed to the generalizing force of "a." *See Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000). The only interpretation that "makes sense," therefore, is if the plain meaning of the word "each" does not broaden TMA's duty to extract data from its database and then use this data for TMA's analysis of individual claims for each hospital. Put differently, TMA is only responsible for analyzing the data of each claim of each hospital. *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435 and giving "the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning"); DPP Contract Notice at A7–A9.

---

and the actual allowed amount on the claim was equal to $95, the ratio is 0.95. This difference could occur because of a hospital discount. In this example, the adjusted "Medicare" amount would be equal to 0.95 multiplied by the "Medicare" amount prior to adjustment. If both the actual and the TRICARE Standard amounts were equal (for example, because there were no discounts), the ratio would be equal to 1.0 (the ratio could not exceed a value of 1.0). For purposes of this discretionary adjustment, this process will level discounts over the period even if the hospital may not have had a network agreement in effect at the time of any individual service claim.

Step 6: TMA will then compare the adjusted "Medicare" amount for *each* claim with the actual allowed amounts on that claim. TMA will calculate the difference between the two amounts. The positive and negative differences will be summed over the entire 2003-2009 period (or the 2003-2010 period for hospitals not subject to OPPS). If the sum of the differences is positive (because the adjusted "Medicare" allowed amounts exceed the actual allowed amounts) then this information will be used in determining the level of the additional payment to the hospital. If the actual allowed amounts are equal to or exceed the "adjusted Medicare" amounts, then no additional payment shall be made.

DPP Contract Notice at A7–A9 (emphasis added).

3.  **Whether FAQ 14's Clarification of "The Notice to Hospitals of Potential Adjustment to Past Payment for Outpatient Radiology Services" Applies to the Kennell Study or the DPP Calculations**

The government argues FAQ 14, which clarifies the DPP "analysis was performed on a service line basis, rather than on a hospital specific basis," does not impose a duty on TMA to extract and analyze the hospitals' radiology data.  Def.'s MSJ Reply at 14–15 (quoting FAQ 14). The government asserts FAQ 14 is irrelevant to TMA's duty as "it is describing the methodology that was used in the Kennell studies that were conducted *prior to* the [DPP] to determine whether TRICARE's payment methodology was comparable to Medicare's across different types of outpatient services generally."  *Id.* at 14.  Plaintiffs argue FAQ 14 does require the government to extract all hospital radiology claims, emphasizing "[t]he [data] analysis was performed on a service line basis."  *Id.*

The FAQ, published in 2013, mentions the data analysis of hospital outpatient services generally, not just radiology claims, so the FAQ—by its plain meaning—refers to the Kennell study.  *See* DPP Contract FAQs at A12.  The 2013 FAQ also refers to the data analysis in past tense which further signals it refers to the Kennell study, which accounted for 2003–2009 data: FAQ 14 specifies "[t]he analysis *was performed* on a service line basis, rather than on a hospital specific basis," confirming the provision must refer to the Kennell study and not the yet-to-be-performed DPP calculations according to the contract.  *See id.* (emphasis added).  The Kennell study does not apply to individual hospital claims, and the DPP obligated TMA to perform—but not to the extent of extracting and analyzing radiology data not in the database. FAQ 14's clarification of "The Notice to Hospitals of Potential Adjustment to Past Payment for Outpatient Radiology Services" applies to the Kennell study, which occurred before the publication of the Notice and thus does not provide context to TMA's contractual duty regarding plaintiffs' data.  *See J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 642 N.E.2d 1215, 1218 (Ill. 1994) (interpreting existence of ambiguity by looking solely at what appears within the written contract itself).

4.  **Whether *Spearin* Applies**

Citing *D.F.K. Enterprises, Inc.*, a 1999 Court of Federal Claims case in which a contractor sued alleging the Army Corps of Engineers breached a contract to paint a water storage tank by misrepresenting the amount of adverse weather experienced at the site, plaintiffs argue TMA "had a contractual duty to verify its data because it implicitly warranted that its representations about the data were accurate."  Pls.' MSJ Resp. at 26 (citing *D.F.K. Enters., Inc.*, 45 Fed. Cl. at 285); *see infra* Section IV.B (holding TMA's data and its performance according to the DPP methodology were both within TMA's control).  In a related 1918 case, the Supreme Court considered a government contract to construct a dry dock at the Brooklyn Navy Yard.  *United States v. Spearin*, 248 U.S. 132, 133 (1918).  The Court found "the insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that if the specifications were complied with, the sewer would be adequate.  This implied warranty is not overcome by the general clauses requiring the contractor to examine the site . . . ."  *Id.* at 137. Further, in *Spearin*, the government specified steps for the contractor to follow, which implied these steps would lead to a certain result.  *Id.* at 133; *see also Lakeshore Eng'g Servs., Inc. v.*

*United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014) ("[T]he Supreme Court in *Spearin* recognized that an implied warranty arises in a particular circumstance:  when a contractual requirement binds the builder to follow design specifications stated in the contract.").  The basis for the "*Spearin* Doctrine" is when contractors are bound to build according to the plans and specifications provided by the owner, the contractor should not be responsible for damages that, through no fault of his own, occur when the plans and specifications are defective.  In response to plaintiffs' citation of *D.F.K. Enterprises, Inc.*, the government characterizes *D.F.K. Enterprises, Inc.* as "a *Spearin* warranty case" and clarifies "*Spearin* does not apply in a 'case [that] does not involve a design specification that bound [the contractor] but turned out to produce a defective or unsafe construction.'"  Def.'s MSJ Reply at 13 (first citing *D.F.K. Enters., Inc.*, 45 Fed. Cl. at 285, and then citing *Lakeshore*, 748 F.3d at 1349).  The Court agrees *Spearin* implied warranties apply in design specification cases, and plaintiffs fail to cite any non-design specification cases for their argument.  In this case, moreover, the contract specified how TMA should perform under the DPP Contract, not how the contractor—plaintiffs in this case—should perform.  For example, Step 3 of the contract states, "TMA will extract the claims for each hospital for claims for outpatient radiology services during the relevant period."  *See* Def.'s MSJ Reply at 10–11 (citing DPP Contract Notice at A7–A8).  TMA created a duty for itself, if anything, not an implied warranty.

The government argues further on the issue of implied warranties, "if the government was promising to do something as elaborate as going and checking records . . . there would be an explicit express obligation in the contract to do that."  Tr. at 125:6–9.  The government explained "that would be a very complicated prospect and it's in no way contemplated in the language of this instrument."  Tr. at 125:9–11.  Plaintiffs responded "[i]f the government was going to do anything less than its promise, which was to extract all the hospitals' claims, it should have provided a disclaimer of that fact and it didn't."  Tr. at 125:21–24.  Plaintiffs' argument on this point requires the Court first accept their argument TMA had an express obligation to analyze the hospitals' data, which the Court rejects.  *See infra* Section IV.A.5.  Further, the Court agrees with the government if TMA had promised to analyze the hospitals' data, which would have required requesting data from intermediaries or plaintiffs themselves and would have been a complicated process, the DPP Contract would have provided so expressly.  *See* DPP Contract Notice at A7 (requesting "claims" data—not "all" or "new" data).  TMA thus lacked a contractual duty to extract, analyze, and adjust the hospitals' radiology data.  *See Moore v. Shawmut Woodworking & Supply, Inc.*, 788 F.Supp.2d 821, 825, 829 (S.D. Ind. 2011) (finding a breach of contract can be predicated upon a contractual duty only when the contract affirmatively evinces an intent to charge one party with a duty).

### 5.   Conclusion

The Court finds TMA did not have a contractual duty to "locate, identify, and adjust each and every line item for radiology ever paid," or put another way, "the Parties' contracts contained no requirement that the Government extract and adjust all of Plaintiffs' radiology data."  Def.'s MSJ at 34; Def.'s MSJ Reply at 6 (cleaned up); *see Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997); *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959; DPP Contract Letter at A1–A2; DPP Contract Notice at A3–A9; DPP Contract FAQs at A10–A15;

DPP Contract Release at A17.  As the government has shown TMA lacked this specific contractual duty, the government has proven it is "entitled to a judgment as a matter of law"; the Court accordingly grants the government's motion for summary judgment as to plaintiffs' breach of contract claim regarding TMA's lack of contractual duty to extract, analyze, and adjust the hospitals' radiology data.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

**B.      Whether TMA Had a Contractual Duty to Extract, Analyze, and Adjust Radiology Data from its Database**

Regarding TMA's duty to extract, analyze, and adjust radiology data, plaintiffs argue even if the Court found TMA was not obligated "to extract and analyze all of plaintiffs' radiology data," "there would still be a breach."  Tr. at 131:8–16.  Plaintiffs note "[t]he government has . . . stipulated to the fact that there were line items in their database that met the criteria for extraction that were not adjusted.  That's still a breach."  Tr. at 131:18–21; *see also* Tr. at 85:4–7 ("[PLAINTIFFS:]  . . . [T]he government has stipulated that there are certain claims that did meet the criteria for extraction that were not adjusted, even though they were in their database.").

As discussed *supra* Section IV.A.2, Step 3 provided "TMA will extract the claims" and then exclude certain claims using specified criteria.  *See* DPP Contract Notice at A7.  The government admits "[t]he contract provided that TMA first would extract data with certain contractually-specified identifiers from its own records, and use the methodology specified in the parties' contract to generate a proposed adjustment amount."  Def.'s MSJ at 31 (citing DPP Contract Notice at A7–A8).  The government also concedes it "failed to include [several] line items . . . that met the criteria for extraction set forth in Step 3."  Def.'s MSJ Reply at 5 (citing DPP Contract Notice at A9; DPP Contract FAQs at A15).  The government also conceded at oral argument TMA's exclusion of several line items "although they met the criteria for extraction" "would not be compliant with Step 3."  *See* Tr. at 80:1–9.  The government then stated:  "[D]id our algorithm fail in some way on Step 3 for these 13 line items?  Sure."  Tr. at 81:19–21.  The government finally said "[it] agreed to extract the records in our possession."  Tr. at 97:20–21.  The government admitting it had a duty according to Step 3 is consistent with the contract language; to assert otherwise would lead to the absurd result where TMA could have performed calculations based on plainly incorrect data that did not match the data in TMA's system.  At oral argument, the government admitted if TMA provided bogus data, it technically would have breached the contract.  Tr. at 97:3–10 ("THE COURT:  But if [TMA] provided bogus data, that wouldn't be following the process as detailed in the DPP, that would be a breach.  [THE GOVERNMENT]:  . . . yes."); *see also* Tr. at 224:2–7 ("[PLAINTIFFS:]  . . . [I]f the government were not obligated to use accurate data in doing its adjustments, on some level it would be an illusory promise, right, because the government could use whatever data and come up with whatever result and it wouldn't be a breach.").[10]  The Court accordingly finds TMA did have a

---

[10] The algorithm's failure does not amount to an illusory promise, a promise that is unenforceable due to indefiniteness or lack of mutuality.  1 Corbin on Contracts § 1.17 (2022).  A promise conditioned upon an event within the promisor's control is not illusory if the promisor also "impliedly promises to make reasonable effort to bring the event about or to use good faith and honest judgment in determining whether or not it has in fact occurred."  *Id.*  In this case, TMA had a duty to extract data in its records, but the failure to utilize "perfect data" is not illusory.

duty under the plain language of Step 3 to extract, analyze, and adjust radiology data from its database.  *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); *Trauma Serv. Grp.*, 104 F.3d at 1325; *San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 959; DPP Contract Letter at A1–A2; DPP Contract Notice at A3–A9; DPP Contract FAQs at A10–A15; DPP Contract Release at A17.

### C.     Whether TMA Had a Contractual Duty to Consider Zip Codes Not Provided by Hospitals

Regarding plaintiff Integris Baptist, who the government stipulates had five unadjusted line items during the DPP because of an alternate zip code, the government states "there is no dispute that Integris Baptist did not advise TMA that it provided radiology services in zip code 73116" under Step 2.  Def.'s MSJ Reply at 4 (citing DPP Contract Notice at A7).  Step 2 provided "[a]s part of the request, hospital submits data with its . . . zip code[.]"  DPP Contract Notice at A7.  FAQ 8 answered "[p]lease provide the address and zip code of the physical location of the hospital" to the question "[s]hould I provide the address of the physical location of the hospital or a billing address?"  DPP Contract FAQs at A11.

The government argues "it does not appear that plaintiffs could meet their burden of proving [TMA's failure to adjust five line items associated with an alternative zip code for Integris Baptist Medical Center] constituted an error of extraction.  Step 2 of the Notice required *hospitals* to provide zip code information to TMA to facilitate the extraction process."  Def.'s MSJ at 43 n.9 (citations omitted).  Plaintiffs, however, contend "the DPP doesn't make any provision that if a hospital has multiple locations, that all of the zip codes must be separately identified in the DPP."  Tr. at 9:18–20.

Plaintiffs admit there is no "evidence that [Integris Baptist] did" provide TMA with its 73116 zip code so this issue is not factually disputed.  Tr. at 8:14–21.  Plaintiffs, however, argue Integris Baptist was not obligated to do so because the contract only provided hospitals must submit their "zip code" not "zip codes."  Tr. at 8:19–9:2.  The government counters it is "a reasonable reading of the provision to assume that if a hospital has more than one physical location, it's going to advise the government to that effect."  Tr. at 10:6–9.  The government argues "under FAQ 8, the physical location zip code had to be provided and [Integris Baptist] didn't."  Tr. at 10:17–18.

Interpreting the zip code requirement of Step 2 requires examining its context.  Step 2 provides:  "As part of the request, hospital submits data with its name, address, zip code, Tax ID number, TRICARE sub ID number, the 6-digit Medicare OSCAR provider number, and NPI number.  [("Sentence 1").]  *If multiple Tax ID or Medicare provider numbers were used during this period*, hospitals will submit these data.  [("Sentence 2").]"  DPP Contract Notice at A7 (emphasis added).  The plain meaning of Sentence 1 in context requires submission of only one zip code.  Reading the two sentences together raises the negative implication canon, a tool of contract interpretation this court has employed many times.  *See, e.g.*, *United Pac. Ins. v. United States*, 497 F.2d 1402, 1405 (Ct. Cl. 1974) (applying the rule of *expressio unius est exclusio alterius* to find when language specifically provided where flashings were to be installed, there was manifested an intention the flashings are not required to be installed elsewhere); *Pub. Util.*

*Dist. No. 1 v. United States*, 20 Cl. Ct. 696, 700 (1990) (interpreting a contract using the doctrine of *expressio unius est exclusion alterius*); *Nicholson v. United States*, 29 Fed. Cl. 180, 196 (1993) (explaining where particular things are specified in a contract, others of the same general character are impliedly excluded); *Sam Rayburn Mun. Power Agency v. United States*, No. 20-1535, 2021 WL 4888872, at *12 (Fed. Cl. Oct. 19, 2021) (Holte, J.) (finding damages were generally available under a contract, as an issue of subject matter jurisdiction, when the contract enumerated three exceptions to damages); *see also* Scalia & Garner, *supra*, at 107–11 (describing the negative implication canon as "[t]he expression of one thing implies the exclusion of others"). By listing two specific identifying criteria from Sentence 1 for which hospitals should submit multiple values, "Tax ID" and "Medicare provider numbers[,]" DPP Contract Notice at A7, Sentence 2 of the Notice implied hospitals did not have to submit multiple values for the non-listed identifying criteria, including zip codes. *See, e.g.*, *United States v. Giordano*, 416 U.S. 505, 514 (1974) (finding an individual government employee was not authorized to perform an action under a statute authorizing only two types of officials). The plain meaning of Step 2 did not, therefore, require hospitals to submit multiple zip codes, and the Court thus finds TMA did have a duty to consider zip codes for hospital locations not provided by the hospitals.[11] *See Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435); *Pub. Util. Dist. No. 1*, 20 Cl. Ct. at 700; *United Pac. Ins. v.*, 497 F.2d at 1405; DPP Contract Notice at A7.

>    **D.    Whether TMA Breached its Contractual Duty to Extract, Analyze, and Adjust Radiology Data from its Database and Damages**

Regarding TMA's breach, plaintiffs argue, "the Government itself concedes that it did not follow the methodology in the DPP[.]" Pls.' MSJ Resp. at 27. Plaintiffs also argue the errors with the data were not trivial, "[r]ather, the Excluded Hospitals Memo and the Settlement Agreement prove that the Government failed to follow the DPP methodology on a substantially large scale, rather than just in a few insignificant instances." *Id.* at 29. Plaintiffs further argue the government's failure to extract line items "for unknown reasons" supports plaintiffs' argument "the Government does not understand its own data and failed to satisfy its contractual obligations." *Id.* at 29–30.

To prove breach of contract, plaintiffs must show the government "fail[ed] to perform a contractual duty when it [was] due." *Trauma Serv. Grp.*, 104 F.3d at 1325. The Court finds *supra* Section IV.B the DPP Contract obligated TMA to extract, analyze, and adjust plaintiffs' radiology data TMA had in its system, and this is the duty plaintiffs allege TMA failed to perform. *See* Pls.' MSJ Resp. at 27. "The Government stipulates that there are nine line items for Integris Baptist Medical Center, and four line items for Integris Bass Baptist Medical Center that were not extracted from TMA's databases in 2011, although *they met the criteria for extraction*." Def.'s MSJ at 30 (emphasis added) (citations omitted). The government concedes

---

[11] The Court holds under the plain meaning of Step 2 of the Notice but notes the parties did not discuss the language of Sentence 2, "multiple Tax ID or Medicare provider numbers[,]" or the negative implication canon at oral argument or in their briefing. *See generally* Tr.; Def.'s MSJ; Pls.' MSJ Resp.; Def.'s MSJ Reply. Additionally, the record does not reflect whether the multiple zip codes of Integris Baptist also had multiple associated Tax ID or Medicare provider numbers or, if so, whether Integris Baptist submitted those numbers as required by Step 2. The Court denies the government's motion for summary judgment as to the line items covered by the alternative zip code, *see infra* Section IV.F, but notes additional discovery may be required to determine liability.

its "algorithm fail[ed] in some way on Step 3 for these 13 line items[.]" Tr. at 81:19–21. The government also states, "We believe that the contract express provisions provided what would and would not be included in the adjustment set." Tr. at 48:18–20. The government accordingly admits TMA failed to follow the extraction criteria, at least in part.

Although the government admits it technically breached the DPP Contract regarding extraction, it argues "where government records are in the tens of millions, I think it would be unreasonable to expect perfection . . . on something of this scale." Tr. at 59:6–10. As support, the government cites to FAQ 18 which contextualizes Step 8, directing questions about the content—not the calculation—of claims data to TMA within thirty days of request response receipt. Tr. at 82:13–18 ("[THE GOVERNMENT]: . . . [T]he purpose of the claims counts, it's from FAQ 18 and I think that the final sentence of that FAQ . . . the intention is that hospitals can review these amounts to determine whether the historical claims counts and amounts are reasonable."). FAQ 18 stated, "Hospitals can review [the summary worksheet] amounts to determine whether the historical claims counts and amounts are reasonable." DPP Contract FAQs at A14. The government emphasizes the language "are reasonable" to argue the government did not "promis[e] exactitude." Tr. at 82:18–21. The government adds FAQ 18 "doesn't say exact; it says reasonable." Tr. at 82:18. Plaintiffs respond, "[j]ust because Question 18 says 'reasonable' . . . the very best hospitals could do is some sort of reasonableness check." Tr. at 86: 8–11. Plaintiffs also argue "the hospitals [did not] ha[ve a] way of easily figuring this out or doing some calculation as part of the DPP." Tr. at 62:1–5.

The government argues "historical claims counts and allowed amounts would be used to assess reasonableness, not exactitude[,]" and thus, "even though it's not, strictly speaking, a complete compliance with Step 3, given the contract obligations as a whole, we don't believe that would be a breach either, particularly given Step 8." Tr. at 80:13–19. The government also argues infinitesimal variance is not "within the contemplation of the contract" under *Southwest Welding*. Tr. at 83:23–25. In *Southwest Welding*, a contractor could not recover extra compensation for additional work entitled by a 0.16 percent deviation from a base number of 90 degrees because it was within the variation contemplated by use of the figure "90 degrees plus or minus." *Sw. Welding & Mfg. Co. v. United States*, 373 F.2d 982, 985 (Ct. Cl. 1967). The government asserts it did not "know that the technical noncompliance . . . with respect to this negligible number of line items . . . is as grievous as it would appear on the face." Tr. at 84:9–17. Plaintiffs note in the *Southwest Welding* case, "there were plus and minus symbols" following the parameter at issue indicating there was an acceptable margin of error. Tr. at 85:17–20. Plaintiffs argue unlike *Southwest Welding*, "[t]here weren't any plus or minus symbols in the DPP or anything like plus or minus symbols[.]" Tr. at 85:21–22.

"When performance of a duty under a contract is due any non-performance is a breach." Restatement (Second) of Contracts § 235(2) (Am. L. Inst. 1981). The Restatement further explains: "[A] duty is discharged when it is fully performed. Nothing less than full performance, however, has this effect and any defect in performance, even an insubstantial one, prevents discharge on this ground." § 235, cmt. a. "[A] 'reasonable' breach of contract is nonetheless a breach." *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1365 (Fed. Cir. 2009). The government admits its "performance of a duty under [the DPP] contract"—extracting plaintiffs' radiology data which was in TMA's database—was due. *See* § 235(2). Contrary to

the Restatement, the government argues something less than full performance discharged its obligation under the DPP.  *See* § 235, cmt. A; Tr. at 80:13–19.  In unambiguous terms, however, the DPP Contract provided TMA's duty was to "extract the claims for each hospital" and then exclude certain claims.  DPP Contract Notice at A7–A8.  The government admitted it failed to do just that.  *See e.g.*, Tr. at 81:19–21.  Following the Restatement's guidance, the Court finds "[n]othing less than full performance" can satisfy TMA's obligation to perform under the DPP Contract, and "a 'reasonable' breach of contract is nonetheless a breach."  § 235, cmt. a; *Stockton E. Water Dist.*, 583 F.3d at 1365.  As a matter of law regarding contract interpretation and the government's admission, the government's failure to extract all thirteen line items for Integris Baptist and Integris Bass Baptist constitutes a breach of TMA's duty according to Step 3.  *See Stockton E. Water Dist.*, 583 F.3d at 1365; DPP Contract Notice at A7; *supra* Section IV.B.

### 1. Damages

To prevail on their breach of contract claim, plaintiffs must also prove damages.  *See San Carlos Irrigation & Drainage Dist.*, 877 F.2d at 960 (citing *Com. Int'l Co. v. United States*, 338 F.2d 81, 86 (1964)).  "Damages for a breach of contract are recoverable where:  (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty."  *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citation omitted).  The government admitted if the Court finds TMA was obligated to extract and analyze plaintiffs' radiology data from its system, and if the Court finds the government failed to sufficiently prove a defense, the Court "would find that [the government] owed one [named plaintiff] hospital $486"—plaintiffs would be entitled to *some* damages.  Tr. at 133:7–15.  The parties, however, did not agree to any specific amount of damages, and plaintiffs argued damages would be calculated after class certification.  *See* Tr. at 134:2–7 ("a class would be certified . . . and determining which hospitals were entitled to damages would be something that would be resolved at that stage.").  The Court accordingly finds the government did not carry its burden as the moving party of establishing plaintiffs cannot prove damages, and thus the government did not show it is "entitled to a judgment as a matter of law" in this respect.  *Anderson*, 477 U.S. at 247; *see* Tr. at 133:7–15.

### E. The Government's Defenses to Breach of Contract

In a breach of contract case, "[o]nce the facts of breach are established, the defendant has the burden of pleading and proving any affirmative defense that legally excuses performance." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1297 (Fed. Cir. 2014) (quoting *Stockton E. Water Dist.*, 583 F.3d at 1360).  The defendant also has the burden of proving any risk-shifting defense against a breach of contract claim by a preponderance of the evidence.  *See Cardiosom, L.L.C. v. United States*, 117 Fed. Cl. 526, 532 (2014) (denying the government's motion for summary judgment in a breach of contract case, in part, because the contract did not shift the relevant risk to plaintiff).  The Court accordingly considers first whether plaintiffs were obligated to check the data under the DPP and second whether the DPP shifted the risk of any data errors to plaintiffs.

### 1. Whether Plaintiffs Had a Contractual Obligation to Check Discretionary Adjusted Payment Data

In relevant part, Step 8 regarding written requests to TMA provided:

> While the methodology for calculating the adjustment is not subject to questions, any questions regarding the data used in the calculations should be received by TMA within 30 days of the date of TMA's response as specified in the response. Any questions should be accompanied by detailed explanation of the alleged errors and the proposed corrections with supporting documentation.

DPP Contract Notice at A9. The government contends Step 8 "unequivocally placed the ultimate responsibility for identifying any errors in the adjustment calculation *squarely on the plaintiffs*, and not the Government." Def.'s MSJ at 34. The government elaborates "*the hospitals* shouldered the obligation under the contract to raise '*any* questions regarding the data used in the calculations' and provide a '*detailed explanation* of the alleged errors and the *proposed corrections with supporting documentation*' within 30 days." *Id.* at 35–36. Step 8 "created a process by which the hospitals could challenge any perceived mistakes in the calculations received, putting the onus on the hospitals to do so." *Id.* at 43.

Plaintiffs respond by noting the government's "deliberate choice to use permissive language in Step 8," notably "should," shows "Step 8 in no way *required* Plaintiffs to confirm that the Government's data was accurate." Pls.' MSJ Resp. at 34–35 (citing DPP Contract Notice at A9). Plaintiffs further argue "[t]he Government could have similarly stated in Step 8 that 'the hospitals are *required to* verify the Government's calculations' or that 'the hospitals *must* verify the Government's data. However, the Government chose not to incorporate such language." *Id.* at 34. Plaintiffs argued Step 8 "is not what the Government asserts it is. It was not ever intended to place an obligation on hospitals to undertake some elaborate investigation and identify all possible errors. It was intended to set a time frame when they could ask questions." Tr. at 243:19–25.

While the government at times argued at oral argument Step 8 obligated the hospitals to verify the data TMA presented, Tr. at 93:11–12 ("[THE GOVERNMENT:] . . . it is a contract obligation to bring any questions within a 30-day window"), the government admitted plaintiffs were not obligated under the contract to check data, rather the contract merely permits plaintiffs to verify.[12] *See* Tr. at 229:11–17 ("I agree that . . . Step 8 doesn't say must—the language is not as strong [as *Lakeshore*], but it's still structurally putting the contractor on notice."), 57:15–18 (government counsel characterizing Step 8 as plaintiffs' "opportunity" to check radiology data), 93:8–11 ("[THE GOVERNMENT:] . . . the language in Step 8 is precatory only insofar as the choice to undertake . . . a challenge rests with the Plaintiff"); *see also* Tr. at 91:21–24 ("[PLAINTIFFS:] . . . there's nothing in the language of Step 8 that imposes an obligation on

---

[12] As relevant to the Court's finding of no mutual mistake of fact *infra* Section V, the government admitted at oral argument Step 8 only applies to radiology data questions. *See* Tr. at 229:24–230:4 ("THE COURT: . . . [Y]ou argue that Step 8 applies to radiology claims. Are you also arguing that Step 8 applies to non-radiology claims? [THE GOVERNMENT]: No. THE COURT: Not at all? [THE GOVERNMENT]: No."). The government argued non-radiology risk shifting only occurs by operation of law, citing *ConocoPhillips v. United States*, 501 F.3d 1374 (Fed. Cir. 2007), because plaintiffs chose to enter a business settlement expressly limited to radiology claims, necessarily foreclosing adjustment for non-radiology claims. Tr. at 230:4–6 ("[THE GOVERNMENT]: . . . [T]he risk shifting that occurs with respect to the non-radiology claims is by operation of law, not by contract [pro]vision.").

the hospitals to [investigate data]").  Plaintiffs therefore *could* verify the data but did not *have* to.  *See e.g.*, *Telzrow v. United States*, 127 Fed. Cl. 115, 123–24 (2016) (holding the contract allowed but did not require the government to collaborate with landowners on restoration project).

Further, Step 8 provided "any questions regarding the data used in the calculations *should* be received by TMA within 30 days of the date of TMA's response as specified in the response."  DPP Contract Notice at A9 (emphasis added).  The Step 8 language is permissive, allowing plaintiffs to submit questions if they so choose.  *See id.*; Tr. at 91:24–92:1 ("[PLAINTIFFS]:  . . . I mean, really what [Step 8] does is put a time limit on how long [hospitals] are allowed to ask questions if they so choose.").  If plaintiffs did not challenge TMA's data under Step 8, plaintiffs signed the Release, and TMA then paid the hospitals.  *See* DPP Contract Notice at A9.  The government did not claim plaintiffs breached the DPP Contract by not checking the data, as the government might claim if plaintiffs were *obligated* to verify the data.  As TMA was required to perform according to the DPP Contract even if plaintiffs failed to question the radiology data, and as the government does not now claim plaintiffs breached the contract by failing to question the data, the Court finds the plain meaning of Step 8 provided plaintiffs the *option* to challenge TMA's data—but not the obligation.[13]  *Jowett, Inc.*, 234 F.3d at 1368 (quoting *McAbee Constr., Inc.*, 97 F.3d at 1435) (holding courts "must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.");  DPP Contract Notice at A9.

## 2.    Whether Plaintiffs Bore the Risk of Any Data Issues

The government argued even if Step 8 is only optional and does not obligate plaintiffs to check TMA's data, it structurally places risk on plaintiffs, making them "the insurers of this calculation."  Tr. at 212:11–13.  As the Court finds TMA did not have a duty to analyze the hospitals' radiology data, the Court need not analyze whether plaintiffs bore the risk of this alleged breach of contract.  *See supra* Section IV.A.  By contrast, as the Court finds TMA did have a duty to extract, analyze, and adjust radiology data from TMA's database, the Court must consider whether plaintiffs bore the risk of this alleged breach of contract.  *See supra* Section IV.B.

The government argues TMA was not required to disclaim data accuracy because "[t]he entire contract structure provided plaintiffs with more than adequate notice that they, not the Government, were to be the ultimate insurers of the proposed adjustment calculations, and that they should act accordingly."  Def.'s MSJ Reply at 8.  Considering Step 8 and FAQ 18, the government argues this case is like *Lakeshore* wherein the Federal Circuit recognized a contract's structure may "'reinforce[] the allocation of risk by affirmatively pointing [a] potential contractor to the mechanism it should use . . . to account for potential . . . error[,]' and put that potential contractor on notice to protect its interests."  *Id.* at 9–10 (quoting *Lakeshore*, 748 F.3d at 1347).  The government also distinguishes *Metcalf Construction Co.*, 742 F.3d at 995–96, by

---

[13] Plaintiffs argue even if the Court finds the DPP Contract did require hospitals submit questions per Step 8, "the Government made it impossible for Plaintiffs to do so within thirty days."  Pls.' MSJ Resp. at 35.  As the government notes, impracticability is "'intended for use as a defense to a breach-of-contract claim for nonperformance, not as a theory to be used in pursuit of an affirmative remedy[.]'"  Def.'s MSJ at 44 n.10 (quoting *CanPro Invs., Ltd. v. United States*, 130 Fed. Cl. 320, 345 (2017))).  Additionally, some hospitals submitted questions within the thirty-day period.  *Id.*; Tr. at 247:14–249:3.  The Court finds *supra* plaintiffs were not obligated to verify TMA's data, so the Court need not consider plaintiffs' impracticability argument.

arguing "here, (1) there were no affirmative representations, and (2) consistent with *Lakeshore*, the contract *implicitly* warned plaintiffs . . . were to take into account a risk or [sic] error." Def.'s MSJ Reply at 10. The government adds "[t]here would be no need for Step 8 . . . if TMA was guaranteeing that the data that it extracted from its own databases, or the extraction process itself, would be perfect." Def.'s MSJ at 41. The government contends "hospitals were free to check against their *own records for the same services*[.]" Def.'s MSJ Reply at 5 (citing DPP Contract Notice at A9; DPP Contract FAQs at A15).

Plaintiffs respond "the DPP . . . did not allocate the risk to Plaintiffs." Pls.' MSJ Resp. at 37 (citing *Metcalf Constr. Co.*, 742 F.3d at 996). Plaintiffs also note "[i]f the Federal Circuit considered Step 8 to be a basis upon which to defeat Plaintiffs' claim, the Federal Circuit would have presumably done so, rather than remanding the claim." *Id.* at 38–39 (citing *Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1371 (Fed. Cir. 1998) ("[A]n appellate court may affirm a judgment of a district court on any ground the law and the record will support . . . .")).

Regarding its argument the contract expressly shifted the risk of data errors to plaintiffs, the government argued "although . . . *Lakeshore* is maybe 75 percent on all fours, it's the closest case." Tr. at 227:17–19. In *Lakeshore*, the Federal Circuit affirmed the Court of Federal Claims' grant of summary judgment in favor of the government. 748 F.3d at 1343. To solicit "bids for a contract for [future, indefinite] repair, maintenance, and construction services at Fort Rucker, Alabama[,]" the United States Army Contracting Agency instructed prospective contractors to submit bids using prices found in the Universal Unit Price Book ("UUPB") and then multiply these costs by coefficients to account for costs not considered in the UUPB. *Id.* The Federal Circuit noted "[a] fundamental aspect of contracts for future performance is how they allocate risks related to the performance." *Id.* at 1350. The Federal Circuit concluded that "the language of the contract does not promise that the prices [provided] in the UUPB were accurate or place on the government the risk that they will turn out to be inaccurate" and instead "the only reasonable conclusion on the evidence here is that any risk that the prices in the UUPB were inaccurate at the time of contracting was borne by [the plaintiff]." *Id.* at 1347. The Federal Circuit supported its conclusion with three reasons: (1) the contract lacked a promise the prices would be accurate, and the firm fixed-price nature of the agreement in dispute shifted the risk to the contractor; (2) the contract "affirmatively point[ed] the potential contractor to the mechanism it should use in its bid to account for potential error in the 2006 UUPB prices"; and (3) the plaintiff's "own actions ma[d]e clear that it understood that it was responsible for checking the 2006 UUPB unit prices and setting its coefficients accordingly." *Id.* The essence of the Federal Circuit's conclusion was rooted in its finding the plaintiff could not "rewrite the clauses to provide it protections the government did not agree to." *Id.* at 1348 (citing *ConocoPhillips v. United States*, 501 F.3d 1374, 1379 (Fed. Cir. 2007)).

First, unlike *Lakeshore*, the contract in this case did not involve future government procurement but rather the calculation of discretionary adjustment payments for past services performed by plaintiffs. The DPP Contract involved an adjustment paid shortly after the contract was executed, unlike *Lakeshore* involving payment for services "indefinite as to delivery and quantity" rendered at some undetermined future date with potential interim market fluctuations in material or labor prices. The risk borne by the contractor in *Lakeshore* was risk of future market price fluctuations, outside the government's control, whereas in this case the government

asks the Court to find plaintiffs bore the risk of the government's failure to perform according to the contract. *See* DPP Contract Notice at A7–A9.

Second, the government admits Step 8 "is not as strong" as the risk-shifting language in *Lakeshore*. Tr. at 229:1–13. In *Lakeshore*, the Federal Circuit noted the procurement contract stated the plaintiff must use a coefficient to "take into account 'all costs other than the prepriced unit prices,' and it provide[d] a nonexclusive list of the factors that the coefficient must include, one of which [wa]s '[o]ther risks of doing business.'" 748 F.3d at 1347. The *Lakeshore* solicitation also provided "the coefficients must 'contain all costs other than the prepriced unit prices, as no allowance [would] be made after award.'" *Id.* at 1343. In this case, however, the DPP Contract obligated the government to "extract the claims[,]" "calculate what would have been paid under the [Medicare method,]" and send a written response to hospitals detailing "the calculated discretionary adjusted payment and the calculations from which the adjustment was derived." DPP Contract Notice at A7–A9. The contract then provided plaintiffs the opportunity to check the data and calculations according to Step 8. Step 8 noted "any questions regarding the data used in the calculations should be received by TMA within 30 days of the date of TMA's response[.]" *Id.* at A9. Given the contract obligated TMA to "extract" radiology line items from its database, the plain meaning and purpose of Step 8 was to give hospitals a chance to cross-reference their data with a summary of TMA's extracted data. *See* Tr. at 212:16–24 ("[PLAINTIFFS:] . . . [T]he purpose of Step 8 is to limit the amount of time in which the government will entertain questions from the plaintiffs. It says if you have any questions about the calculations . . . you have to get those to us within 30 days, otherwise we're not going to listen to them."). Though the government argues TMA "made no statements or promises that its own work is accurate[,]" Tr. at 229:20–21, TMA did expressly promise it would extract from its database and include or exclude radiology line items according to specific criteria. *See* DPP Contract Notice at A7; Tr. at 239:11–15 ("[PLAINTIFFS:] . . . [T]he government promised that it would extract the hospitals' claims. The government has to perform that promise even if it turns out that it's difficult for the government to do so.").

Not only is Step 8 weaker than the contractual language the Federal Circuit held shifted risk to the contractor in *Lakeshore*, but also the DPP Contract *did* affirmatively obligate TMA to perform in a particular manner which it admits it failed to do—e.g., "TMA will extract the claims for each hospital for claims for outpatient radiology services during the relevant period[.]" DPP Contract Notice at A7. In *Lakeshore*, the Federal Circuit held the plaintiff "has advanced no evidence that could support a finding that the government represented that the UUPB prices were accurate and could be relied on by [the plaintiff], with the government assuming the risk of error in those prices." 748 F.3d at 1348. A key distinction between this case and *Lakeshore* is the government here did not do what the contract specified it must.[14] By asking the Court to enforce the contract according to TMA's express obligations to consider its own data, plaintiffs

---

[14] Though the government's argument using *Lakeshore* is distinguishable when it comes to plaintiffs' TMA-data duty claim—alleging the government had a duty to adjust line items in its database—the government's argument using *Lakeshore* is more closely analogous against plaintiffs' "hospital-data duty" claim—alleging the government had a duty to adjust all hospital data, including data from intermediaries or plaintiffs not in TMA's database. Like the contract in *Lakeshore*, the DPP Contract does not expressly provide for this hospital-data obligation. The Court finds the government prevails as a matter of law on plaintiffs' hospital-data duty claim because the government was not obligated to analyze all hospital's radiology data, *supra* Section IV.A. There is therefore no reason to analyze further whether plaintiffs bore the risk of their hospital-data duty claim.

in this case are accordingly not seeking to "rewrite the clauses to provide it protections the government did not agree to[,]" but rather plaintiffs request TMA perform as it was contractually obligated. *Lakeshore*, 748 F.3d at 1348 (citing *ConocoPhillips*, 501 F.3d at 1379). Further, TMA's data and its performance according to the DPP methodology were both within TMA's control, unlike the materials and labor pricing in *Lakeshore*.

Plaintiffs add, unlike *Lakeshore*, "there's nothing in Step 8 that says you have to do this, otherwise the government is off the hook and they don't have to perform their obligations under the agreement." Tr. at 216:23–25. Although the government states it does not argue the Release applies, Step 8 aside, the government's argument would require the Court to enforce the Release against plaintiffs' remaining breach of contract claim. The government also mentioned the Release as barring plaintiffs' claim at oral argument. *See* Tr. at 227:2–3 ("[THE GOVERNMENT:] . . . They know that the deadline cannot be extended. That's in the FAQs. They execute[d] a release."). This argument, however, improperly contradicts the Federal Circuit's guidance: the Release cannot bar a suit for breach of the underlying contract. *See Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341, 1347 (Fed. Cir. 2017) ("[T]he Release cannot be enforced against a claim for breach of the underlying contract."). In short, the government cannot argue the Step 8 option allows TMA to avoid performing a proper calculation.

In addition to express risk allocation, the government argues the DPP Contract structurally or impliedly allocated risk of radiology data discrepancies to plaintiffs. *See* Def.'s MSJ at 37. Even if risk is not expressly allocated to one party, risk may still be attributed to a party for "conscious ignorance" when "he was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness[.]" Restatement (Second) of Contracts, § 154 cmt. c (Am. L. Inst. 1981). In *Metcalf Construction Co.*, the Federal Circuit ruled a contractor failed to establish liability in its suit alleging the Navy breached its duty of good faith and fair dealing under a contract to design and build military housing. 742 F.3d at 997. The contractor did not "bear the risk of significant errors in the pre-contract assertions by the government about the subsurface site conditions" even when the contract required the contractor to conduct an independent investigation upon award. *Id.* at 995–96. Conversely, to the extent plaintiffs rely on assumptions when contracting with the government, it is "incumbent upon the plaintiffs to investigate those issues before entering into the contract." *ConocoPhillips*, 501 F.3d at 1380. In *ConocoPhillips*, the plaintiffs entered multiple contracts "contain[ing] an economic price adjustment clause that caused the contract price to be adjusted each month based on a publication known as the Petroleum Marketing Monthly ('PMM')." *Id.* at 1376. The plaintiffs argued reformation of the contracts was necessary because "they did not appreciate the way in which the price changes reported by the PMM could differ from price changes reported by other sources of market information." *Id.* at 1379–80. The Federal Circuit held "[t]o the extent the plaintiffs thought that the PMM tracked other market publications more closely than it did," they should have gathered more information before entering the contracts. *Id.* at 1380. *ConocoPhillips* is distinguishable from this case as plaintiffs are not asserting they relied on their own assumptions but rather plaintiffs relied on TMA's express contractual duty to extract, analyze, and adjust TMA's data according to the DPP Contract. *See ConocoPhillips*, 501 F.3d at 1380; *supra* Section IV.B. The government also admits the Federal Circuit in *ConocoPhillips* did not discuss risk-shifting in the breach of contract analysis section. Tr. at 87:7–9 ("THE

- 33 -

COURT: . . . [D]oes *Conoco* discuss risk in the breach of contract section?  [THE GOVERNMENT]:  No[.]").  In this case, as TMA expressly promised to use its data for the adjustments, plaintiffs cannot impliedly bear the risk of the government's "pre-contract assertions" even though Step 8 gives plaintiffs a thirty-day option window to question the government's written response, akin to offering a contractor an opportunity to perform a site visit.  *See Metcalf Constr. Co.*, 742 F.3d at 995–96.

As TMA had an express duty it admittedly failed to perform, this case is distinguishable from *Lakeshore* regarding express allocation of risk and from *Conoco* regarding implied allocation of risk.  The Court accordingly finds the government has not met its burden of showing it is "entitled to judgment as a matter of law" for whether plaintiffs bore the risk as to the government's breach of its contractual duty to extract, analyze, and adjust radiology data from TMA's database.  *Anderson*, 477 U.S. at 247; *see Lakeshore*, 748 F.3d at 1348; *Metcalf Constr. Co.*, 742 F.3d at 990–91; *ConocoPhillips*, 501 F.3d at 1380.

### F.    Conclusion

As the Court finds TMA was not obligated to perform what plaintiffs argue was TMA's contractual duty to extract and adjust *the hospitals' data*, the Court accordingly grants in part the government's motion for summary judgment as to plaintiffs' breach of contract claim regarding TMA's contractual duty to extract and adjust the hospitals' data.  *See supra* Section IV.A.  As the government, however, admits TMA failed to meet what plaintiffs assert was TMA's contractual duty to extract, analyze, and adjust radiology claims *data from TMA's database*, and as the government has not met its burden of proving any breach of contract defenses, the Court accordingly denies in part the government's motion for summary judgment as to plaintiffs' breach of contract claim regarding TMA's contractual duty to extract, analyze, and adjust radiology claims data from TMA's database.  *See supra* Sections IV.B, D.  As the government admits TMA failed to meet what plaintiffs assert was TMA's contractual duty to extract, analyze, and adjust radiology claims *data for an alternative zip code* for plaintiff Integris Baptist, the Court accordingly denies in part the government's motion for summary judgment as to plaintiffs' breach of contract claim regarding TMA's contractual duty to extract, analyze, and adjust radiology claims data for the five line items under Integris Baptist's alternative zip code. [15]  *See supra* Section IV.C.

## V.    Analysis of Plaintiffs' Mutual Mistake of Fact Claim

The Restatement (Second) of Contracts Section 152, titled "When Mistake of Both Parties Makes a Contract Voidable" (the "mutual mistake" doctrine), provides:

(1)   Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

---

[15] Plaintiffs did not cross-move for summary judgment, so the Court only decides the government's motion for summary judgment.

> (2) In determining whether the mistake has a material effect on the agreed exchange of performances, account is taken of any relief by way of reformation, restitution, or otherwise.

(Am. L. Inst. 1981). The classic illustration of a mutual mistake is: "A contracts to sell and B to buy a tract of land, the value of which has depended mainly on the timber on it. Both A and B believe that the timber is still there, but in fact it has been destroyed by fire. The contract is voidable by B." § 152, illus. 1. The Federal Circuit in *Atlas Corp. v. United States* provided the standard for a mutual mistake of fact claim:

> A party seeking to state a claim for reformation of a contract under the doctrine of mutual mistake must allege four elements:
>
> (1) the parties to the contract were mistaken in their belief regarding a fact;
> (2) that mistaken belief constituted a basic assumption underlying the contract;
> (3) the mistake had a material effect on the bargain; and
> (4) the contract did not put the risk of the mistake on the party seeking reformation.

895 F.2d 745, 750 (Fed. Cir. 1990).

Plaintiffs aver the mutual mistake issue is whether specific categories, including facility charges, were correctly paid before the DPP. *See* Tr. at 166:4–8. To frame the mutual mistake issue, the Court notes plaintiffs clarified at oral argument their only allegation of mutual mistake is whether 32 C.F.R. § 199.14(a)(5)(xi) requires TMA to reimburse plaintiffs for outpatient service "facility charges." Tr. at 137:3–7 ("THE COURT: . . . [T]he parties' disagreement is whether the agency's mandate was to provide facility charges over the 199.14 enumerated outpatient services, correct? [PLAINTIFFS]: Correct."), 147:18–24 ("[PLAINTIFFS]: . . . [T]he DPP represents that prior payments had been made in accordance with Medicare principles. . . . The mistake was that the hospitals believed that proper facility charge payments had already been made."). Plaintiffs further clarified regarding radiology data and calculations per the DPP Contract—plaintiffs' breach of contract claim—they "do not allege (and do not need to allege) 'mistakes' in the calculations, and do not seek reformation of the DPP on that basis." Pls. MSJ Resp. at 38. Plaintiffs do not allege a mutual mistake of fact regarding dump codes, either. *See* Tr. at 63:14–20 ("[PLAINTIFFS]: Well, I think that the government was aware the dump codes were a problem. I think the government had knowledge of that and failed to disclose that knowledge as part of the DPP. THE COURT: So there was no mistake of fact; the government knew about it? [PLAINTIFFS]: Correct[.]"). Notably, other than facility charges under § 199.14(a)(5)(xi), plaintiffs do not claim a mutual mistake of fact regarding general underpayment in relation to Medicare principles. Tr. at 138:6–9 ("THE COURT: . . . [O]ther than the 199.14 payment of facilities charges . . . is there any other mutual mistake of fact? [PLAINTIFFS]: No[.]"), 207:9–16 ("THE COURT: If zero dollars are due under (xi), is there still underpayment? [PLAINTIFFS]: "I don't believe that there would be underpayment, at least in the way we formulated our claims for those other categories of outpatient services."). The Court accordingly need only analyze whether the parties were mutually mistaken as to the interpretation of § 199.14(a)(5)(xi).

A.      **Whether the Parties Were Mistaken in Their Belief Regarding a Fact**

The first element of the mutual mistake standard requires "the parties to the contract [to be] mistaken in their belief regarding a fact[.]" *Atlas Corp.*, 895 F.2d at 750. "An erroneous mutual belief about the contents of a written agreement is sufficient to constitute a 'mistake' for this purpose: reformation is available when the parties, having reached an agreement and having attempted to reduce it to writing, fail to express it correctly in the writing." *Nat'l Australia Bank v. United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006) (cleaned up). "Reformation is not a proper remedy for the enforcement of terms to which the defendant never assented; it is a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed." *Atlas Corp.*, 895 F.2d at 750 (quoting 3 Corbin on Contracts § 614 at 723 (1960)).

The government contends reformation of a contract based on mutual mistake is "extraordinary relief" which "is not legally available under the circumstances of this case, because TMA considered, and disclaimed at the time of contract formation, any intention to provide hospitals with a markup for hospital overhead through the [DPP] in the first place." Def.'s MSJ at 45–46. The government argues the DPP Contract "stat[ed] unequivocally that '[a]ny interpretation [of] the regulation provision that facility charges were to be paid on all hospital outpatient services in addition to the allowable charge authorized for specified outpatient services is unsupportable.'" *Id.* at 53 (quoting DPP Contract Notice at A5). In other words, the government argues the contract "cannot now be 'reformed' to create a contract obligation that DoD explicitly refused to offer." *Id.* The government concludes "[t]here is no aspect of plaintiffs' 'mutual mistake' that is legally viable, and, as such, the Government is entitled to summary judgment in its favor." *Id.* at 71.

Plaintiffs argue courts "frequently use the power of a court of equity to reform contracts so that they conform to the intention of the parties." Pls.' MSJ Resp. at 45 (quoting *Nippon Hodo Co. v. United States*, 160 F. Supp. 501, 502 (Ct. Cl. 1958)) (cleaned up). Plaintiffs assert "the Parties made a mutual mistake by believing that the Government had reimbursed Plaintiffs for facility charges for all categories of outpatient reimbursement services." *Id.* Plaintiffs argue "[t]he Government offered to pay hospitals the amounts it owed them, but *only* for outpatient radiology services, and *only* as quantified by the Kennell Study." *Id.* at 46 (citing DPP Contract Letter at A1–A2; DPP Contract Notice at A3–A9). TMA, plaintiffs argue, "affirmatively and unambiguously represented in the DPP that radiology was the only underpaid outpatient service." *Id.* (citing DPP Contract Notice at A6; DPP Contract FAQs at A12–A13). Further, plaintiffs claim "the DPP failed to reflect anywhere that facility charges were not factored into payments," and "[t]hus, radiology was not the only underpaid outpatient service[.]" *Id.*

The 1990 Federal Circuit case *Atlas Corp.* concerned contracts with the government to produce uranium and offers an analytical framework for determining proper reformation of a contract. 895 F.2d at 750. Although the Federal Circuit found no mutual mistake in *Atlas Corp.*, the court recognized reformation would be appropriate where "the parties recognize the existence of a fact about which they could negotiate" and "they mutually form a belief concerning that fact, but their belief is erroneous." *Id.* (finding no mutual mistake and so no contract reformation because "[t]he parties could not have formed a mutually mistaken belief concerning a fact whose

- 36 -

existence they could not recognize"). In *Atlas Corp.*, the Federal Circuit listed several cases where courts did permit reformation of contracts. *See id.* at 751 (citing *Sw. Welding & Mfg. Co. v. United States*, 373 F.2d 982, 990 (Ct. Cl. 1967) (the parties mistakenly believed the price of steel was lower than it actually was); *Walsh v. United States*, 102 F. Supp. 589 (Ct. Cl. 1952) (the parties erroneously believed the minimum wage rate was a certain amount, even though it had increased earlier); *Aluminum Co. of Am. v. Essex Grp., Inc.*, 499 F. Supp. 53 (W.D. Pa. 1980) (the parties erroneously believed the Wholesale Price Index would accurately represent nonlabor production costs for the purpose of a contractual escalation clause)); *see also Bowen–McLaughlin–York Co. v. United States*, 813 F.2d 1221 (Fed. Cir. 1987) (reformation permitted where the parties erroneously omitted certain price items which existed and could have been included in the contract). The Court of Claims also reformed a contract in *National Presto Industries, Inc. v. United States* where plaintiff contractor entered a contract with the government, but neither party knew at the time of negotiations the step they had cut to save costs would end up being necessary. 338 F.2d 99 (Ct. Cl. 1964). The Federal Circuit in *Atlas Corp.* discussed *National Presto Industries*, stating, "Although the parties did not know of the need for the additional equipment, they clearly recognized that the equipment *might* be needed. . . . Therefore, there was a mutual mistake[.]" *Atlas Corp.*, 895 F.2d at 751 (citation omitted) (citing *Nat'l Presto Indus.*, 338 F.2d at 107).

At oral argument, the parties admitted they are unsure whether the *Atlas Corp.* mutual-mistake-of-fact standard requires the parties share the *same* mistaken belief, although the government added it has not "seen a case where the actual mistaken belief was not the same." Tr. at 135:23–136:21. The government stated, "[A]t a minimum, the parties have to share the same intention." Tr. at 136:7–8. Indeed, the first element of a mutual mistake claim requires "the parties recognize the existence of a fact about which they could negotiate," and "they mutually form a belief concerning that fact, but their belief is erroneous." *Atlas Corp.*, 895 F.2d at 750. The exemplary mutual mistake cases cited by the Federal Circuit in *Atlas Corp.* involved parties sharing the *same* belief. *See e.g.*, *Sw. Welding & Mfg. Co.*, 373 F.2d at 991; *Walsh*, 102 F. Supp. at 591; *Aluminum Co. of Am.*, 499 F. Supp. at 69–70. The parties further would have assented to the deal had they been aware of the truth regarding the fact, and thus, reformation was a viable option. *See Atlas Corp.*, 895 F.2d at 751 ("Other cases in which courts have permitted reformation of contracts similarly show that the parties held an erroneous belief concerning a fact whose existence the parties recognized and about which they could reach agreement.").

The Court accordingly must determine whether the parties shared a mistaken belief. Plaintiffs argue the regulation mandates TMA reimburse facility charges under 32 C.F.R. § 199(a)(5)(xi) for all outpatient services, whereas TMA expressly stated in the DPP Contract "[a]ny interpretation [of] the regulation provision that facility charges were to be paid on all hospital outpatient services in addition to the allowable charge authorized for specific outpatient services is unsupportable." DPP Contract Notice at A5. As the parties' beliefs on the interpretation of the regulation are diametrically opposed, the Court does not find the parties "mutually form[ed] a belief concerning [a] fact[.]" *Atlas Corp.*, 895 F.2d at 750–51; *see Nat'l Australia Bank*, 452 F.3d at 1329. Further, as the parties entirely disagreed on the interpretation of the regulation when they entered the DPP Contract, plaintiffs in this case cannot contend the parties "reached an agreement[,] . . . attempted to reduce it to writing, [and] fail[ed] to express it

correctly in the writing." *Nat'l Australia Bank*, 452 F.3d at 1329 (internal quotations omitted); *see also Am. President Lines, Ltd. v. United States*, 821 F.2d 1571, 1582 (Fed. Cir. 1987) ("The purpose and function of the reformation of a contract is to make it reflect the true agreement of the parties on which there was a meeting of the minds.").

"Reformation is not a proper remedy for the enforcement of terms to which the defendant never assented; it is a remedy the purpose of which is to make a mistaken writing conform to antecedent expressions on which the parties agreed." *Atlas Corp.*, 895 F.2d at 750. The government, however, never assented to making facility charge payments atop other payments for outpatient services; the government in fact argues the opposite. Tr. at 143:21–23 ("[THE GOVERNMENT]: . . . [Plaintiffs] contend, and we disagree, . . . there's a facility charge payment due on top of the CMAC."). The government states, "TMA expressly rejected the option of offering hospitals an overhead markup on top of the reimbursement amounts[.]" Def.'s MSJ Reply at 43 (citing DPP Contract Notice at A5). This express rejection in the DPP states, "[A]ll categories of hospital outpatient services paid in accordance with the specific terms of 199.14(a)(5)(i) through (x) received the correct payment under the TRICARE regulation and are not entitled to an additional 'facility charge' under paragraph (xi)." DPP Contract Notice at A5. This DPP language expresses TMA's intention of not paying additional facility charges atop payments for various outpatient services. *Id.* Further, when asked at oral argument how the DPP Contract dealt with facility charges, plaintiffs responded, "[F]acility charge payments were not offered as part of the DPP." Tr. at 147:8–11, 147:20–22 ("[PLAINTIFFS]: . . . [T]he DPP represents that no additional facility charge payment is necessary."). The government added "[t]here [are] no documents or government witness testimony to suggest that the government was mistaken factually about the way that these matters are reimbursed." Tr. at 165:16–19.

The parties disagree on the interpretation of the statute relative to facility charges such that the Court cannot hold they had a meeting of the minds on this issue. *Compare* Pls.' MSJ Resp. at 41 ("Section 199.14(a)(5) provides that the Government must reimburse Plaintiffs for twelve categories of outpatient hospital services, including facility charges."), *with* Def.'s MSJ Reply at 51 (quoting Pls.' MSJ Resp. at 5, 54–55) (the government rejects plaintiffs' claim "TMA admitted . . . the 'facility charge' provision of 32 C.F.R. § 199.14(a)(5) was intended to provide for a markup for hospital overhead on top of reimbursements otherwise paid as described in the regulation, and is now taking a supposedly contrary 'convenient litigating position[.]'"). Without a meeting of the minds, the parties cannot have mutually come to a mistaken belief.

Against the government's argument TMA "considered and disclaimed . . . any intention to provide hospitals with a markup for hospital overhead[,]" plaintiffs argue, "the DPP's central purpose was to reimburse hospitals for any outpatient category where the hospitals were paid less than they should have been paid when applying Medicare fair payment principles." Pls.' MSJ Resp. at 49. Plaintiffs emphasize "the Notice states that all categories of hospital outpatient services paid pursuant to 1991.4(a)(5)(i) [sic] through (x) 'are not entitled to an *additional* "facility charge" under paragraph (xi).'" *Id.* (quoting DPP Contract Notice at A5). Plaintiffs argue this "explanation thus suggests that [the government incorrectly believed] facility charges were already appropriately included in the payments pursuant to the regulation." *Id.*

At oral argument, the government stated the general purpose of the contract was to "bring closure to any concerns regarding payment of hospital outpatient services under the TRICARE regulation, prior to the implementation of OPPS." Tr. at 145:10–14 (quoting DPP Contract Letter at A1–A2). Plaintiffs contended "the purpose of the DPP was to provide payment to the hospitals that was consistent with . . . the requirements of the regulation and the statute." Tr. at 234:10–12. In response to plaintiffs' appeal to "equity" and the "spirit and purpose" of the DPP as grounds for reformation, the government argues "plaintiffs misapprehend the spirit and central purpose of the [DPP,]" which "was to *settle definitively* outstanding disputes between the parties that had arisen in connection with the interpretation of 32 C.F.R. § 199.14(a)(5) and a supposed difference between levels of reimbursement for outpatient services between Medicare and TRICARE." Def.'s MSJ Reply at 43. To determine the parties' intent, the Court looks to the plain language of "the contract itself." *Greco v. Dep't of the Army*, 852 F.2d 558, 560 (Fed. Cir. 1988); *see CITGO Asphalt Refin. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081, 1088 (2020) ("[T]he parties' intent 'can be determined from the face of the agreement' and 'the language that they used to memorialize [that] agreement.'"). Plaintiffs' characterization of the general purpose of the DPP Contract to argue TMA would have consented to paying facility charges conflicts with the plain terms of the DPP Contract: "The intent and effect of the regulation provision for reimbursement of facility charges was to pay all *other* hospital outpatient services *not specifically listed* in the regulation provision with a stated allowable charge methodology based on billed charges." DPP Contract Notice at A5. The government was not mistaken in the DPP regarding whether facility charges needed adjustment because they expressly excluded facility charges from the scope of consideration. *See id.*

The remedy for mutual mistake of fact is to reform the contract—in this case, the DPP Contract. The Court is, however, unable to reform the DPP Contract in a way which does not "reflect the true agreement of the parties on which there was a meeting of the minds." *Am. President Lines, Ltd.*, 821 F.2d at 1582. As the parties did not "mutually form a belief concerning [a] fact," and as TMA did not assent to reimbursing plaintiffs' facility charges as plaintiffs request, the Court finds plaintiffs' claim fails the first element of a mutual mistake of fact claim.[16] *Atlas Corp.*, 895 F.2d at 750; *see Nat'l Australia Bank*, 452 F.3d at 1329; *Am. President Lines, Ltd.*, 821 F.2d at 1582.[17] As plaintiffs failed to satisfy the first element of a mutual mistake claim, the Court accordingly grants the government's motion for summary judgment as to plaintiffs' mutual mistake of fact claim. *See Atlas Corp.*, 895 F.2d at 750 ("A party seeking to state a claim for reformation of a contract under the doctrine of mutual mistake *must allege four elements*[.]"). Although the Court finds plaintiffs failed to satisfy a necessary

---

[16] In dicta in *Northern Michigan Hospitals, Inc. v. Health Net Federal Services, LLC*, a related case preceding the present action discussed *supra* Section I.A, the Third Circuit provided if "the dispute at issue is not a purely legal one, but rather requires factual determinations[,]" such as applying the TRICARE regulations to the Hospitals' specific claims for reimbursement, "what is required by the underlying dispute . . . is an application of the TRICARE regulations to the Hospitals' specific claims for reimbursement." 344 F. App'x 731, 737 (3d Cir. 2009). After the Third Circuit affirmed the dismissal of Northern Michigan Hospitals' claim, the parties in this case entered the DPP Contracts instead of pursuing their "implied in fact and breach of quasi-contract/unjust enrichment" claims in the Third Circuit case. *Id.* at 735. Further, during oral argument on 9 June 2022, both parties confirmed there are no disputes of material fact on the issues of TMA's duties under the contract and whether there was a mutual mistake of fact. Tr. at 78:11–19.

[17] As the Court finds plaintiffs' claim fails the first element of a mutual mistake of fact claim, the Court need not consider the parties' arguments regarding whether TMA's interpretation of 32 C.F.R. § 199.14(a)(5)(xi) was correct, including evaluation of the *Kisor* deference factors.

element of their mutual mistake of fact claim, the Court nonetheless analyzes the other three elements in the alternative.

**B.      Whether the Mistaken Belief Constituted a Basic Assumption Underlying the Contract**

For a mutual mistake of fact claim to succeed, the mistaken belief must have "constituted a basic assumption underlying the contract[.]" *Id.* This element presupposes proving a mistake under element one of the *Atlas Corp.* analysis. Because the Court finds there was no mistake, no mistake could have constituted a basic assumption underlying the contract. Plaintiffs' claim accordingly fails element two of the *Atlas Corp.* analysis. *Id.*; *see supra* Section V.A.

**C.      Whether the Mistake had a Material Effect on the Bargain**

A party asserting a mutual mistake of fact must show the mistaken belief "had a material effect on the bargain[.]" *Atlas Corp.*, 895 F.2d at 750. This element is contingent on finding a mistaken fact per element one of the *Atlas Corp.* analysis. Because the Court finds there was no mistake, no mistake could have had a material effect on the bargain. Plaintiffs' claim accordingly fails element three of the *Atlas Corp.* analysis. *Id.*; *see supra* Section V.A.

**D.      Whether Plaintiffs Bore the Risk of Mistake**

Element four of the *Atlas Corp.* analysis requires plaintiffs show "the contract did not put the risk of the mistake on [them]." *Atlas Corp.*, 895 F.2d at 750. The Court finds there was no mistake sufficient to satisfy element one of the *Atlas Corp.* analysis, and thus the Court need not address *Atlas Corp.* element four. *See id.* Assuming in the alternative plaintiffs' claim "DoD and Class Members had been parties to a mutual mistake because, contrary to DoD's representations in the contract documents, radiology was *not* the only outpatient service that TRICARE underpaid" was true, and there was a mutual mistake of fact as to the underpayment of non-radiology outpatient services, the Court analyzes whether plaintiffs bore the risk of the mistake. Pls.' Class Cert. at 15; *see Atlas Corp.*, 895 F.2d at 750.

Restatement (Second) of Contracts Section 154 provides:

A party bears the risk of a mistake when

> (a)  the risk is allocated to him by agreement of the parties, or
> (b)  he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
> (c)  the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

In *Harbor Insurance Co. v. Stokes*, the DC Circuit stated "[i]n the comments to § 154(b), the Restatement reformulates treating 'limited knowledge as sufficient' as 'conscious ignorance[.]'"

45 F.3d 499, 502 (D.C. Cir. 1995) (citing Restatement (Second) of Contracts § 154 cmt. c. (Am. L. Inst. 1981)).  The Restatement reads:

> *c. Conscious ignorance.*  Even though the mistaken party did not agree to bear the risk, he may have been aware when he made the contract that his knowledge with respect to the facts to which the mistake relates was limited.  If he was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of the mistake.  It is sometimes said in such a situation that, in a sense, there was not mistake but "conscious ignorance."

§ 154 cmt. c.  Commenting on the scope of "conscious ignorance," the court stated, "The Restatement has quite logically set 'conscious ignorance' in a section explicitly addressing risk allocation."  *Harbor Ins. Co.*, 45 F.3d at 502.

The government argues "a party bears the risk of a mistake when [it] is aware, at the time the contract is made, that it has only limited knowledge with respect to the facts which the mistake relates but treats that limited knowledge as sufficient."  Def.'s MSJ at 47 (citing *ConocoPhillips v. United States*, 501 F.3d 1374, 1380 (Fed. Cir. 2007)).[18]  The government argues "'[e]very time parties enter into a contract, they act with incomplete information[,]'" and "[t]herefore, '[w]here [the parties] have been explicitly concerned about an issue, but decide to press forward without further inquiry or explicit provision, it is reasonable to suppose that they intend the contract to dispose of the risk in question, *i.e.,* to bar any reopening at the behest of the party who, it turns out, would have done better without the contract."  *Id.* at 48 (quoting *Harbor Ins. Co.*, 45 F.3d at 502).  As an initial matter for the government's risk-bearing argument, the government admits Step 8 of the DPP, which in pertinent part reads, "[t]he response will provide the calculated discretionary adjusted payment and the calculations from which the adjustment was derived[,]" applies to "radiology only[,]" so the government argues its "position is that the imposition of the risk of mistake occurs . . . by operation of law, as a result of [plaintiffs'] conscious choice to proceed and go forward on the basis of limited knowledge."  DPP Contract Notice at A9; Tr. at 211:4–23.  The government argues because the contract was "consciously considered," the resulting contractual relationship is not a mistake, but rather "awareness of . . . uncertainty[.]"  Def.'s MSJ at 48 (quoting *Loral Corp. v. United States*, 434 F.2d 1328, 1331 (Ct. Cl. 1970)).

To support their contention that they did not bear the risk of errors, plaintiffs cite *Metcalf Construction Co.*, stating:  "In *Metcalf Construction Co.*, the Government made representations to the plaintiff in its pre-contract requests and questions-and-answers, and the plaintiff later sued the Government for breach of contract."  Pls.' MSJ Resp. at 37 (quoting *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 996 (Fed. Cir. 2014)).

---

[18] The plaintiffs in *ConocoPhillips*, discussed *supra* Section IV.E.2, argued their contracts should be reformed based on mutual mistake because "when they entered into the contracts they believed that the [Petroleum Marketing Monthly ('PMM')] accurately reflected market prices, and they did not appreciate the way in which the price changes reported by the PMM could differ from price changes reported by other sources of market information." 501 F.3d at 1379–80.  The contracts were, however "very clear about the price that [would] be paid to the contractor and how that price [would] be adjusted." *Id.* at 1380.  The Federal Circuit held "[t]o the extent the plaintiffs thought that the PMM tracked other market publications more closely than it did . . . it was incumbent upon the plaintiffs to investigate those issues before entering into the contract." *Id.* (citing Restatement (Second) of Contracts § 154(b)).

The court held that nothing in the contract "expressly or implicitly warned Metcalf that it could not rely on, and that instead it bore the risk of error in, the government's affirmative representations . . . .    The natural meaning of the representations was that, while Metcalf would investigate conditions once the work began, it did not bear the risk of significant errors in the pre-contract assertions by the government[.]"

*Id.* (quoting *Metcalf Constr. Co.*, 742 F.3d at 995–96).

The government asserts plaintiffs incorrectly view "the fact that TMA provided them with limited information, particularly as to the [Kennell] studies, during the settlement process, [as] effectively mak[ing] TMA their insurer[.]"    Def.'s MSJ at 50.    Plaintiffs had other options, according to the government, but chose to proceed with "conscious ignorance" instead.    *Id.* at 50–51.    For example, the government contends plaintiffs could have "avail[ed] themselves of the FAQ process to obtain additional information[,]" "attempt[ed] to negotiate contract terms that were more protective of their interests in light of the limited information TMA had provided[,]" "walk[ed] away from the proposed arrangement entirely," or resolved to litigate.    *Id.* at 51 (emphasis removed).    Instead, the government emphasizes, "*in the face of their limited knowledge*, [plaintiffs] made the conscious choice to press forward with the deal without alteration, and they chose to compromise their unadjudicated legal claims, electing the certainty of settlement over the uncertainty of litigation."    *Id.*

The government further notes a "party who has made inquiries that have gone unanswered fails to exercise due diligence and assumes the risk of mistake if it executes a contract notwithstanding its lack of knowledge."    *Id.* at 51–52 (citing *CanPro Invs. Ltd. v. United States*, 130 Fed. Cl. 320, 342 (2017) (finding "[plaintiff]'s execution of the lease in light of its admitted lack of knowledge concerning what it deems a 'basic assumption' regarding the lease constitutes a failure to exercise due diligence and thus places the risk of a mistake resulting from such lack of knowledge squarely on [plaintiff]." (citation omitted))).    Plaintiffs "did not even make *inquiries* before executing the contract[,]" according to the government.    *Id.* at 52.    The government summarizes:  "The fact that plaintiffs were contacted years later by a law firm, and now regret the decision that they made on limited knowledge in 2011 to accept the terms of TMA's settlement offer, is not a circumstance that now enables them to reform their contract."    *Id.* (footnote omitted).    In response to plaintiffs' contention there was no express allocation of risk to plaintiffs, the government argues "the risk of mistake may shift in ways other than through express contract provisions."    Def.'s MSJ Reply at 39.

Plaintiffs assert "[t]o allocate the risk of a mutual mistake to a particular party, there must be 'an agreement explicitly reached or implied from customary practice, as to who should bear the risk of mistake.'"    Pls.' MSJ Resp. at 50 (quoting *Burnside-Ott Aviation Training Ctr., Inc. v. United States*, 985 F.2d 1574, 1582 (Fed. Cir. 1993)).    Plaintiffs state:  "In *Burnside-Ott Aviation Training Ctr., Inc.*, for example, the court denied the Government summary judgment's [sic] motion against the Plaintiffs' mutual mistake claim[,]" determining because "the contract does not say 'anything about which party to a government contract bears the risk of misclassification of service employees . . .further [sic] examination is needed to determine whether the parties had

an agreement, explicitly reached or implied from customary practice, as to who should bear the risk of mistake.'" *Id.* (quoting *Burnside-Ott Aviation Training Ctr., Inc.*, 985 F.2d at 1582). Similarly, plaintiffs cite *S.A. Healy Co. v. United States*, noting in that case "the Government argued that the following contract provision allocated the risk of insufficient appropriations (the relevant risk in this case) to the plaintiff: 'The contractor is also cautioned that the prosecution of the work at a rate that will exhaust the funds reserved before the end of the fiscal year will be at his own risk.'" *Id.* at 50–51 (quoting 576 F.2d 299, 304–05 (Ct. Cl. 1978)). In *S.A. Healy Co.*, plaintiffs argue, "[t]he court determined that the 'clause as a whole is not sufficient to shift this burden to the contractor when the administrative agency is at least partly to blame for the funds shortage.'" *Id.* at 51 (quoting 576 F.2d at 304–05). Plaintiffs contrast *S.A. Healy Co.* with this case, asserting "the Parties did not enter into any agreement regarding who would bear the risks of the mistake[,]" and the government's arguments fail because "there was not a single provision or disclaimer in the DPP that expressly or implicitly warned Plaintiffs that [they] could not rely on [the] Government's affirmative representations, and that Plaintiffs bore the risk of error." *Id.* Plaintiffs also cite *National Presto Industries* as instructive. *Id.* at 52. In *National Presto Industries, Inc. v. United States*, the plaintiff entered a contract containing "no disclaimers of Government liability or warranties by the plaintiff" with the Ordnance Department of the Army "for the commercial production of 105-millimeter artillery shells." 338 F.2d 99, 101, 109 (Ct. Cl. 1964). The 1964 Court of Claims found although the plaintiff was an "active partner" in the process, "this was not a performance contract; plaintiff was not an expert, promising to perform and taking the whole risk and anxiety of the project off the Government's shoulders." *Id.* at 109. Plaintiffs contend even if they were "active partners" in the DPP, the government was the reason for plaintiffs' limited knowledge, so the risk remains with the government. Pls.' MSJ Resp. at 52–53. Plaintiffs note like the *National Presto Industries* contract, the DPP Contract "did not contain any disclaimers of Government liability or any warranties by the Plaintiffs." *Id.* at 53.

The government notes "in the *Burnside-Ott* case cited by the plaintiffs, the Federal Circuit reversed a grant of summary judgment because . . . 'further examination is needed to determine whether the parties had an agreement, explicitly reached *or implied from customary practice*, as to who should bear the risk of mistake.'" Def.'s MSJ Reply at 39–40 (quoting *Burnside-Ott Aviation Training Ctr., Inc.*, 985 F.2d at 1582). In response to plaintiffs' use of *S.A. Healy Co.*, the government argues "[t]he court in that case had no occasion to consider whether, and under what conditions, risk shifting occurs by operation of law outside of circumstances where there is an express contract provision, because the only task before the court was to interpret the provision in question." *Id.* at 40 (citing *S.A. Healy Co.*, 576 F.2d at 304–05). The government also distinguishes *National Presto Industries*, stating it "does not stand for the proposition that the risk of mistake cannot shift in the absence of an express contract provision." *Id.* Although the court acknowledged the absence of disclaimers and warranties in the particular contract at issue as part of its analysis, the government asserts "the Claims Court's determination that the risk of mistake did not shift to the contractor was based upon the fact that the *overall dealings* between the parties—not just the contract provisions—established that the contractual relationship at issue was that of a 'joint enterprise' pioneering a new technology." *Id.* at 40–41 (citing *Nat'l Presto Indus., Inc.*, 338 F.2d at 109).

This court has found "a party 'cannot rely upon a mutual mistake of fact to avoid enforcement of a contract where . . . the "mistake" is a result of that party's failure to exercise due diligence.'" *CanPro Invs. Ltd.*, 130 Fed. Cl. at 342 (quoting *Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 175 (2014)).  In *CanPro*, the plaintiff alleged it reasonably relied on the government to provide all material information relating to the lease, and it "never received the information it requested and that it knew was needed to develop an informed belief concerning the [issue], but that it nonetheless executed the lease." *Id.*  This court found "[plaintiff]'s execution of the lease in light of its admitted lack of knowledge . . . constitutes a failure to exercise due diligence and thus places the risk of a mistake resulting from such lack of knowledge squarely on [plaintiff]." *Id.*  This court held "'[i]gnorance is never sufficient to constitute a ground of relief if it appears that the requisite knowledge might have been obtained by reasonable diligence.'" *Id.* (quoting *Griffin & Griffin Expl., LLC*, 116 Fed. Cl. at 175).

In this case, plaintiffs signed the DPP knowing "facility charge payments were not offered as part of the DPP." Tr. at 147:8–11, 147:20–22 ("[PLAINTIFFS:] . . . [T]he DPP represents that no additional facility charge payment is necessary.").  Plaintiffs asserted at oral argument "they were reasonably . . . relying upon what the DPP said." Tr. at 178:6–7.  When the Court asked, "Did the plaintiffs inquire as to the government's stating that it [did] correctly reimburse for non-radiology claims?" plaintiffs responded, "I'm not sure whether any . . . potential plaintiffs did.  I'm not aware of the named plaintiffs having done that.  No." Tr. at 178:4–13.  Although plaintiffs admit they did not exercise due diligence to determine whether they were correctly reimbursed for non-radiology outpatient services, plaintiffs nonetheless signed the DPP.  *See* Def.'s MSJ App. at A19 (Ingham Regional Medical Center), A21 (Integris Baptist Regional), A23 (Integris Bass Baptist), A25 (Integris Grove Hospital), A27 (Integris Baptist Medical), A29 (Integris Canadian Valley).  Plaintiffs also admit when they signed the DPP they had not seen the Kennell Study underlying TMA's analysis of outpatient service reimbursements.  Pls.' MSJ Resp. at 52 ("[T]he Government refused to provide Plaintiffs with a copy of the Kennell Study until years later, in 2013, after Plaintiffs had made multiple attempts and FOIA requests to obtain it.").  Plaintiffs accordingly concede they signed the DPP Contract despite their "limited knowledge." *Id.*; *see ConocoPhillips*, 501 F.3d at 1380 (determining "it cannot be said that either party could have been mistaken" as to the calculation method imagined by the contract).  By agreeing to the DPP's terms despite admitting they "ha[d] only limited knowledge with respect to the facts to which the mistake relates[,]" plaintiffs "b[ore] the risk of [the] mistake" they now allege.  Restatement (Second) of Contracts § 154(b); *see ConocoPhillips*, 501 F.3d at 1380 (holding contractors bore risk of investigating the calculation method before entering contract).

Plaintiffs signed the DPP knowing they had limited knowledge regarding the facts underlying the alleged mistake, thus plaintiffs failed to "exercise due diligence[,]" and so the risk of any mistake "resulting from such lack of knowledge [is placed] squarely on" plaintiffs. *CanPro Invs. Ltd.*, 130 Fed. Cl. at 342.  As the DPP Contract expressly disclaims paying plaintiffs for the mistake they now allege, "it was incumbent upon the plaintiffs to investigate those issues before entering into the contract." *ConocoPhillips*, 501 F.3d at 1380.  By acting on limited knowledge with "conscious ignorance" and agreeing to the DPP without investigation, plaintiffs bore the risk of mistake.  Even if, counterfactually, their claim satisfied elements one, two, and three of the *Atlas Corp.* analysis, plaintiffs' mutual mistake of fact claim would fail

element four.  As stated *supra* Section V.A, the government has shown plaintiffs failed to prove all four elements of their mutual mistake of fact claim, and the alternative analysis does not change the Court's finding the government has shown it is "entitled to judgment as a matter of law" regarding plaintiffs' mutual mistake of fact claim.[19]  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Atlas Corp.*, 895 F.2d at 750; *ConocoPhillips*, 501 F.3d at 1380.

## VI.   Class Certification

Plaintiffs seek class certification arguing "[t]he Class Members are hospitals that provided outpatient healthcare services to current and former military members and their families covered under the U.S. Government's TRICARE program."  Pls.' Class Cert. at 1.  Plaintiffs assert "approximately 1,600 similarly situated hospitals across the United States . . . , entered into the exact same reimbursement contract with the U.S. Government, which contract was the subject of the exact same mutual mistake, and were as a result all systematically underpaid by the U.S. Government in the same way under that common contract."  *Id.*  According to plaintiffs,

---

[19] In the alternative, the government asserts "the parties' contracts are *settlement agreements*" which "definitively settled the question of whether TRICARE underpaid hospitals relative to the Medicare rates . . . , as well as 'any and all claims . . . arising out of or resulting from or in in anyway relating to payments . . . or any other means of compensation' . . . prior to the institution of the TRICARE [OPPS]."  Def.'s MSJ Reply at 32–33.  "These features[,]" the government argues, "foreclose the applicability of the mutual mistake doctrine in this case as a matter of law."  *Id.* at 33.  According to the government, plaintiffs' allegation about "erroneous factual assumptions" is not relevant because "[a] settlement agreement that resolves known factually disputed issues in the face of uncertainty is equally immune from reformation on the grounds of mutual mistake."  *Id.* (citing *Tarrant v. Monson*, 96 Nev. 844, 845–46 (1980)).  The government notes "[a]t the time of contracting, the parties were aware . . . there was an unresolved dispute between TMA and hospitals over the proper interpretation of 32 C.F.R. § 199.14(a)(5)."  *Id.* at 36–37 (citing DPP Contract Notice at A5).

Though the Court previously found "the [L]etter and Notice initiating the [DPP] were sent to expressly avoid litigation" and so "cannot constitute preparation for litigation[,]" the Court found the DPP Contract was a "negotiated business settlement" resolving payment discrepancy between by "recalculating TRICARE payments, which became the government's business during the [DPP]."  14 Jan. 2020 Op. & Order at 20, 25.  While the DPP Contract was not prepared in anticipation of litigation, the parties used "the term 'settlement' as a negotiated business settlement to bring finality to payment adjustments."  *Id.* at 20.  A Nevada Supreme Court case cited by the government, *Tarrant v. Monson*, involved an agreement between a jeweler and customer after the jeweler misplaced the customer's ring and offered instead a replacement ring before later finding the original ring.  96 Nev. at 845; *see* Def.'s MSJ Reply at 33.  In *Tarrant*, the Nevada Supreme Court held: "One who acts, knowing that he does not know certain matters of fact, makes no mistake as to those matters.  If a person is in fact aware of certain uncertainties a mistake does not exist at all."  *Id.*  Further, "[o]ne who is uncertain assumes the risk that the facts will turn out unfavorably to his interests."  *Id.*  "Since [the jeweler] at time of agreement knew that the ring might later be found, [the jeweler] bargained with conscious uncertainty and not under a mistaken belief.  [The jeweler] assumed the risk that the facts would turn out unfavorably to his interests."  *Id.* at 846.  Although the roles of the parties in this case are reversed compared to *Tarrant*, with plaintiffs seeking contract reformation and the government defending, the government argues in this case, like *Tarrant*, "[t]he parties d[id] know what they d[id]n't know."  Tr. at 148:14–15.  Plaintiffs entered the DPP Contract knowing they did not know whether they were correctly paid facility charges, even with the express provision providing for the opposite of their current mutual mistake argument—"[hospitals] are not entitled to an additional 'facility charge' under paragraph (xi)."  DPP Contract Notice at A5; *see* Def.'s MSJ App. at A19 (Ingham Regional Medical Center), A21 (Integris Baptist Regional), A23 (Integris Bass Baptist), A25 (Integris Grove Hospital), A27 (Integris Baptist Medical), A29 (Integris Canadian Valley).  To the extent the contract qualified as a settlement agreement, the Court would alternatively find plaintiffs bore the risk under the DPP negotiated business settlement.  *See Tarrant*, 96 Nev. 844; 14 Jan. 2020 Op. & Order at 22.

"[c]ommon issues thus predominate" as "the financial injury suffered by each of the Class Members is easily ascertained through a uniform damages methodology" and "[t]he only difference among Class Members is the *amount* of damages." *Id.* The parties briefed their argument for class certification pertaining to the potential class of approximately 1,600 hospitals. *See* Def.'s Class Cert. Resp.; Pls.' Class Cert. Reply.

Plaintiffs argue at least two facts are common to all Class members: (1) "the Government failed to calculate properly payments owed to Class Members for outpatient radiology services in accordance with the contract because it omitted hospital claims data, which are the specific line item requests for reimbursement submitted by hospitals to TRICARE"; and (2) "the Government's representation in the contract that categories of outpatient services other than radiology services were not underpaid was incorrect" because it "improperly failed to account for facility charges when it made representations in the [DPP] that all other outpatient services had been paid at amounts equal to or more than that which would have been paid under Medicare principles." Pls.' Class Cert. at 2–3. Plaintiffs "seek certification pursuant to RCFC 23 of the following Class: [a]ll hospitals in the United States that participated in the [DPP] described in the . . . [L]etter . . . , and the Notice . . . referred to therein, and that signed a release and received a payment through the [DPP]." *Id.* at 4.

Plaintiffs argue their breach of contract claim raises at least two common issues of law and fact: (1) "[w]hether, in calculating the amounts owed to Class Members, the Government captured and used all of the claims data that it was required to use under the terms of the contract;" and (2) "[w]hether the Government paid each Class Member the amount it was entitled to under the [DPP]." *Id.* at 24. Plaintiffs argue the breach of contract claim affects all class members. *Id.* The relevant potential class, however, is only the class of plaintiffs affected by the government's breach of contract for failure to follow the DPP in limited circumstances because the Court finds the DPP Contract only obligated TMA to use its data, not the hospitals' data. *See supra* Sections IV.A, B, D; Tr. at 132:4–13.

Plaintiffs argue the proposed class of approximately 1,600 hospitals satisfies RCFC class certification requirements, which have been "'succinctly described as comprising inquiry into the elements of numerosity, commonality, typicality, adequacy, and superiority.'" Pls.' Class Cert. at 19 (quoting *Singleton v. United States*, 92 Fed. Cl. 78, 82 (2010)). Plaintiffs' class certification briefing does not address the "numerosity, commonality, typicality, adequacy, and superiority" of the narrow class of plaintiffs affected by the government's breach of contract for failure to follow the DPP in limited circumstances. *See supra* Section IV.F. In oral argument on 9 June 2022 on the government's motion for summary judgment, plaintiffs admitted if the Court finds the DPP Contract only obligated TMA to use its data, the class would be "smaller than the whole class" argued in briefing. Tr. at 132:4–13. Plaintiffs focused their briefing on arguing commonality under the breach of contract claim for the large class of approximately 1,600 hospitals and did not address the commonality of what plaintiffs admit is a smaller class. *See* Pls.' Class Cert. at 22–25.

Based on the summary judgment holding in this order, the Court therefore needs further information regarding how plaintiffs in this post-summary judgment smaller class would meet the requirements for class certification. *See* Tr. at 260:21–261:9 ("THE COURT: Is that not a

fair, clear, ascertainable grouping of hospitals that is smaller than the full class alleged by plaintiffs now, but a class capable of being defined and a class that would have each individual hospital making its own individual calculation of damages?  [THE GOVERNMENT]: . . . [T]o make a prima facie case, even on those points, you're still left with the problem of taking their data and doing a comparison to the government's data.").  The Court accordingly declines to rule on plaintiffs' class certification motion at this time.  As the only surviving claims are breach of contract for failure to follow the DPP in a few limited circumstances, the parties did not adequately brief the narrower proposed class of plaintiffs arising under the remaining claims. The parties shall file a joint status report providing the parties' views on class certification for the smaller class of plaintiffs affected by the government's breach of contract for failure to follow the DPP in limited circumstances and on whether further briefing is necessary.

## VII.  Conclusion

For the foregoing reasons, the Court **GRANTS** plaintiffs' motion for leave to file amended briefs and appendices to the extent considered in this Opinion and Order, ECF No. 242, and **GRANTS IN PART** and **DENIES IN PART** the government's motion for summary judgment, ECF No. 203.  The Court **GRANTS** the government's motion for summary judgment as to plaintiffs' hospital-data duty and mutual mistake of fact claims but **DENIES** the government's motion as to plaintiffs' TMA-data duty and alternate zip code claims.  The Court **STAYS** the evidentiary motions as the Court established in the status conference held on 11 May 2022[20] plaintiffs' motions to exclude expert opinions—ECF Nos. 205, 206—and the continued participation of Kennell, ECF No. 251, are not consequential for the government's summary judgment motion.  For the same reason, the Court **STAYS** the government's motions to strike "Paragraphs 3 - 10 of the Dale Thompson Declaration," ECF No. 239, and "Paragraphs 7 and 18 of the Declaration of Sere Allen, and Associated Briefing," ECF No. 240.  The Court **STAYS** the government's motion to exclude inadmissible evidence pursuant to Rule 408, ECF No. 204, and, thus, the Court **STAYS** the government's motion to strike "Rule 408 Evidence Relied on by Plaintiffs in Summary Judgment Briefing," ECF No. 238.  On or before **28 December 2022**, the parties **SHALL FILE** a joint status report updating the Court on plaintiffs' motion for leave to file amended briefs and appendices and providing their views on further briefing related to plaintiffs' motion to certify class.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[20] *See supra* Section I.D (noting government's motions to exclude expert opinions of Jane Jerzack, ECF No. 205, Anthony Fay, ECF No. 206, and David Kennell, ECF No. 251; motions to strike "Rule 408 Evidence Relied on by Plaintiffs in Summary Judgment Briefing," ECF No. 238, "Paragraphs 7 and 18 of the Declaration of Sere Allen, and Associated Briefing," ECF No. 239, and "Paragraphs 3 - 10 of the Dale Thompson Declaration," ECF No. 240; and motion to exclude inadmissible evidence pursuant to Rule 408, ECF No. 204, are not consequential for summary judgment).