# In the United States Court of Federal Claims

No. 13-821

(Filed:  17 June 2026)[*]

```
**************************************
INGHAM REG'L MEDICAL CENTER,          *
n/k/a MCLAREN GREATER LANSING,        *
et al.,                               *
                                      *
                Plaintiffs,           *
                                      *
v.                                    *
                                      *
THE UNITED STATES,                    *
                                      *
                Defendant.            *
                                      *
**************************************
```

*Alexander J. Pires, Jr.*, Pires Cooley, of Washington, DC, with whom was *Gregory A. Brodek*, Duane Morris LLP, of Bangor, ME, for plaintiffs.

*A. Bondurant Eley*, Senior Litigation Counsel, with whom were *Steven J. Gillingham*, Assistant Director, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, and *Brett A. Shumate*, Assistant Attorney General, Civil Division, U.S. Department of Justice, all of Washington, DC, for the government.

## OPINION AND ORDER

**HOLTE, Judge.**

This case concerns a dispute between six hospitals and the Department of Defense Military Health System about the interpretation of what the Federal Circuit has deemed an "extremely strange" contract for reimbursements of outpatient radiology services rendered between 2003 and 2009.[1]  In 2011, after a study revealed TRICARE underpaid hospitals compared to Medicare for outpatient radiology services, the government entered contracts offering discretionary payments to reimburse plaintiffs.  On 21 January 2026, after twelve years of litigation and one Federal Circuit appeal, the Court heard oral argument regarding the parties'

---

[*] This Opinion was originally filed under seal on 11 June 2026 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this Opinion for proprietary, confidential, or other protected information and submit proposed redactions by 18 June 2026 at 5:00 p.m.  On 16 June 2026, the parties confirmed they do not seek redaction of the Opinion.  The Opinion is now reissued for publication.

[1] *See* 9 June 2022 Oral Arg. Tr. at 161:7–13, ECF No. 259 ("THE COURT:  So the Federal Circuit panel, when the case was argued, characterized this agreement as extremely strange.  [THE GOVERNMENT]:  That is accurate.  It is extremely strange.  THE COURT:  It is extremely strange?  [THE GOVERNMENT]:  It is.").

cross motions for summary judgment on plaintiffs' only surviving breach of contract claim—the government's duty to extract, analyze, and adjust line items from its database. For the reasons detailed in this opinion, the Court grants-in-part and denies-in-part the government's Motion for Summary Judgment and grants-in-part and denies-in-part plaintiffs' Motion for Partial Summary Judgment.

## I.        Relevant Background

The Court previously reviewed the relevant factual and procedural history in its 2022 Opinion and Order on Summary Judgment, as follows:

### A.        Factual History

TRICARE is a "military health care system" which "provides medical and dental care for current and former members of the military and their dependents." *Ingham Reg'l Med. Ctr. v. United States*, 874 F.3d 1341, 1342 (Fed. Cir. 2017). TRICARE Management Activity ("TMA"), a "field office in the Defense Department ['DoD']," managed the TRICARE system.[2] *N. Mich. Hosps., Inc. v. Health Net Fed. Servs., LLC*, 344 F. App'x 731, 734 (3d Cir. 2009). Hospitals providing TRICARE services are reimbursed according to DoD guidelines. In 2001, Congress amended the TRICARE statute to require DoD to follow Medicare rules when reimbursing outside healthcare providers. *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1343 (citing 32 C.F.R. § 199.14). Due to "the lack of TRICARE cost report data comparable to Medicare's" figures, TMA, however, found it impracticable to immediately adopt Medicare reimbursement rules. *Id.* (citation omitted). To facilitate transition to Medicare rules, in 2005, DoD issued a Final Rule "which provided a more detailed explanation of the payment rules for hospital-based outpatient services." *Id.* The rule specified "[f]or most outpatient services, hospitals would receive payments 'based on the TRICARE-allowable cost method in effect for professional providers or the [Civilian Health and Medical Program of the Uniformed Services] ("CHAMPUS") Maximum Allowable Charge (CMAC).'" *Id.* (citation omitted). The TRICARE-allowable cost method "applied until 2009, when TRICARE introduced a new payment system for hospital outpatient services that was similar to the Medicare [Outpatient Prospective Payment System ('OPPS')] rules." *Id.*

On 23 January 2007, two hospitals "filed their first amended complaint in the [United States District Court for the District of Delaware] asserting claims for breach of contract implied in fact and breach of quasi-contract/unjust enrichment" against TRICARE's intermediary-managed care support contractors ("intermediaries" [or "MCSCs"]). *N. Mich. Hosps., Inc.*, 344 F. App'x at 735. "The Hospitals alleged [the intermediaries] refused to pay the Hospitals' facility charges for certain outpatient services rendered by the Hospitals to TRICARE beneficiaries, despite the fact that the Hospitals submitted claims to [the intermediaries] which included such charges." *Id.* (footnote omitted). The district

---

[2] TMA is now known as the Defense Health Agency.

court dismissed the complaint because the hospitals failed to first exhaust their administrative remedies, *id.* at 739, and the Third Circuit affirmed. *Id.* at 740. The Third Circuit determined, "Without question, the regulations state that certain services are reimbursed based on a maximum allowable charge calculation and that facility charges, which are not subject to a maximum allowable charge, are paid as billed." *Id.* at 737 (citing 32 C.F.R. § 199.14(a)(5)(i)–(xi)). The Third Circuit added "the regulations are equally clear that the Hospitals are not allowed to simply submit bills for any amount and then claim that they are entitled to reimbursement for the full amount charged because any amount above the CMAC represents their 'facilities' expenses." *Id.* In dicta, the court stated, "The dispute at issue is not a purely legal one, but rather requires factual determinations such as whether expenses that qualify as facility charges were incurred, whether such charges were properly billed, and how much is owed if they were incurred and properly billed." *N. Mich. Hosps., Inc.*, 344 F. App'x at 737. "Therefore, what is required by the underlying dispute in this case is an application of the TRICARE regulations to the Hospitals' specific claims for reimbursement." *Id.* After the Third Circuit affirmed, "the parties to that suit exchanged email communications regarding further steps and potential readjustment with TRICARE." [14 Jan. 2020 Op. & Order] at 3 n.2, ECF No. 125.

In response to hospital complaints, TRICARE hired Kennell and Associates, a consulting firm, to "undertake a study [('Kennell study')] of the accuracy of its payments to the hospitals." *Ingham Reg'l Med. Ctr.*, 874 F.3d at 1343–44. The Kennell study "compared CMAC payments to the payments that would have been made using Medicare payment principles, and determined that DoD '(1) underpaid hospitals for outpatient radiology but, (2) correctly paid hospitals for all other outpatient services.'" *Id.* at 1344 (emphasis removed).

From the Kennell study findings, "DoD created a discretionary payment process [('DPP')]," and, on 25 April 2011, DoD notified hospitals by letter of the process for them to "request a review of their TRICARE reimbursements (the 'Letter')."[3] *Id.* The DoD also "published a document titled 'NOTICE TO

---

[3] The Letter states, in pertinent part:

> For purposes of this process, DoD will treat your submission as an untimely but discretionary appeal under 32 Code of Federal Regulations 199.10(a)(5) and (c), provided it is received no later than 60 days from the date of this letter. Based on the request, your hospital may be paid an adjustment, subject to the availability of appropriations, in return for your acceptance of DoD's offer of additional payment based on criteria established by the agency. . . . In order to bring closure to any concerns regarding payment of hospital outpatient services under the TRICARE regulation prior to implementation of OPPS, payment of the discretionary adjustments will also be contingent on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries, and TRICARE [intermediaries]. We value your hospital as a partner in this effort and remain committed to working with you to complete the analysis of claims data and determine if any additional payments may be allowed.

Gov't's 26 August 2021 MSJ ("Gov't's First MSJ"), App'x at A1–A2 (DPP Contract Letter), ECF No. 203-1.

HOSPITALS OF POTENTIAL ADJUSTMENT TO PAST PAYMENTS FOR OUTPATIENT RADIOLOGY SERVICES' (the 'Notice')" on the TRICARE website.  Def.'s MSJ App. at A3–A9 [hereinafter *DPP Contract Notice*], ECF No. 203-1.[4]  Like the Letter, the Notice stated any submission would be treated as "an untimely but discretionary appeal under 32 CFR 199.10(a)(5) and (c) provided it is received no later than 23 June 2011."  *Id.* at A7.  The Notice also indicated: "Based on the request and subject to the availability of funds, each hospital will receive adjusted payments in return for acceptance of DoD's offer of additional payment based on criteria established by the agency," and "payment of the discretionary adjustments will also be conditioned on the execution of a release by the hospital of any hospital outpatient service claims against the agency, TRICARE beneficiaries and the TRICARE [intermediaries]."  *Id.*  The Notice described a nine-step methodology by which hospitals could "request an analysis of their claims data for possible discretionary adjustment" and to "govern the review of payments for hospital outpatient radiology services and payment of any discretionary net adjustments."  *Id.*

Step 1 instructed hospitals to "submit[] a request for analysis of their claims data for hospital outpatient department radiology charges" for the period before TRICARE OPPS took effect.  *Id.*  Step 2 in relevant part expounded on submitting claims data, contact information, and questions.  The second step described the process for determining necessary claims data:  "[H]ospital[s] submit[] data with [their] name, address, zip code, Tax ID number, TRICARE sub ID number, the

---

[4] The Notice explained in relevant part:

> The TRICARE regulation provisions on hospital outpatient services, in the absence of adoption of the Medicare OPPS methodology, adopted comparable Medicare payments for similar services provided in other sites (i.e., physician offices).  That is, TRICARE looked to the similarity of services being provided, not the site of services, in adopting a reimbursement methodology for hospital outpatient services. . . .

> [I]n reviewing payments for hospital services, DoD has determined that, for radiology services . . . the technical component of the allowable charge did not approximate the Medicare fair payment for such hospital services as well as it could have.  That is, looking at the Medicare reimbursement methodologies in existence prior to adoption of Medicare OPPS in 2000, . . . some radiology services were underpaid in comparison. . . .  Thus, although payments to hospitals for radiology services were consistent with the duly promulgated regulation, there is a basis for TRICARE to provide an opportunity to make some discretionary net payment adjustments to approximate more closely Medicare payment methods. . . .

> General TRICARE policy is that payment methodologies follow to the extent practicable Medicare payments.  Prior to adopting [OPPS], Medicare used a blended rate that factored in a percentage of hospital costs and a percentage of the global physician fee schedule to reimburse hospital outpatient radiology services.  In contrast, TRICARE regulation limited reimbursement to hospitals for individual outpatient radiology services to the technical component portion of the [CMAC], which was one component of Medicare's physician fee schedule.  Consistent with TRICARE policy under statute to pay similar to Medicare, we have determined that discretionary adjusted payments may better reflect the Medicare payment amounts for outpatient radiology claims.

DPP Contract Notice at A5–A7.

6-digit Medicare OSCAR provider number [also known as the provider identification number], and [National Provider Identification ('NPI') number]." *Id.* Step 2 also directed hospitals to provide contact names and addresses "to be used by TMA for formal response to the request." DPP Contract Notice at A7. Each hospital compiled the required information in "[a] separate Excel spreadsheet . . . in the TMA-specified format." *Id.* Step 2 also specified the method to ask TMA questions noting, "Questions of general interest to all hospitals will be posted with answers on the TMA website." DPP Contract Notice at A7; *see* Gov't's First MSJ, App'x at A10–A15 [hereinafter *DPP Contract FAQs*].

Steps 3–6 disclose how TMA would extract, exclude, and analyze claims data. DPP Contract Notice at A7–A9. Specifically, Step 3 explained "TMA w[ould] extract the claims for each hospital for claims for outpatient radiology services during the relevant period." *Id.* at A7. Step 3 also indicated which of the extracted claims TMA would exclude from consideration, such as "if the [Technical Component ('TC')] CMAC amount is less than the global CMAC and the claim does not have a TC modifier. *Id.* at A7–A8. Step 4 presented the "'Medicare' method" TMA used to "calculate what would have been paid under the approach that Medicare used to pay hospital outpatient radiology claims prior to [Centers for Medicare & Medicaid Services ('CMS')] implement[ing] . . . the Medicare OPPS in 2000." *Id.* at A8. Step 5 detailed how TMA "adjust[ed] the 'Medicare' amount calculated [through the Medicare Method] in Step 4 on each claim using the ratio of the actual allowed amount (the amount that a health plan has determined to be a fair price for a given medical treatment) on the claim to the TRICARE Standard allowed amount (the technical component of the CMAC)." *Id.* Step 6 explained how TMA "then compare[d] the adjusted 'Medicare' amount for each claim with the actual allowed amounts on that claim" and "calculate[d] the difference between the two amounts." *Id.* at A9. The difference between the Medicare method calculation and the payment from TMA "w[as] used in determining the level of additional payment to the hospital." DPP Contract Notice at A9. If the resulting difference was more or equal to TMA's payment, "no additional payment shall be made." *Id.* Step 7 clarified "[i]f the calculations in Step 6 [comparing the actual allowed amount and the Medicare method amount] indicate that an additional payment shall be made to the hospital, then a hospital-specific offset for cost sharing shall be calculated." *Id.*

Step 8 notified hospitals "[a] written response [at] the hospital's request w[ould] be sent to the individual at the address provided by the hospital [and] provide the calculated discretionary adjusted payment and the calculations from which the adjustment was derived." *Id.* Step 8 added "[w]hile the methodology for calculating the adjustment is not subject to questions, any questions regarding the data used in the calculations should be received by TMA within 30 days . . . of TMA's response . . . . Any questions should be accompanied by detailed explanation of the alleged errors and the proposed corrections with supporting documentation." *Id.* at A9; *see* Gov't's First MSJ, App'x at A16 (DPP Contract Sample Response).

Finally, Step 9 specified TMA's written response mentioned in Step 8 included "a release and agreement to accept the discretionary adjusted payment by the hospital." DPP Contract Notice at A9. Per Step 9, "[t]he signed release and agreement should be returned to TMA within 30 days of the date of initial response or TMA response to any questions raised in [S]tep 8, whichever date is later." *Id.* After TMA received "the signed release and agreement, payment w[ould] be made to the hospital." *Id.*

Plaintiffs estimate several thousand hospitals submitted requests for discretionary payment, including the six named plaintiffs in this case ("plaintiffs"): McLaren Greater Lansing (Ingham Regional Medical Center), INTEGRIS Baptist Regional Health Center (Miami), INTEGRIS Bass Baptist Health Center, INTEGRIS Grove Hospital, INTEGRIS Baptist Medical Center (Integris Baptist), and INTEGRIS Canadian Valley Hospital. *See Ingham Reg'l Med. Ctr. v United States*, 126 Fed. Cl. 1, 16 (2016), *aff'd in part, rev'd in part*, 874 F.3d at 1348. The Court previously "determined that plaintiffs in this lawsuit have appropriately pled that a contract was formed between TMA and plaintiffs through: (1) the April 25, 2011 letter, (2) the Notice, (3) the FAQs, (4) the spreadsheets that hospitals submitted to TMA to provide their identifying information and indicate their interest in receiving the adjustment, (5) the payment adjustment worksheets that TMA provided to hospitals to show the amount of TMA's proposed adjustment, and (6) the release of claims that hospitals executed to receive their adjustment payments ('the Release')." Gov't's First MSJ at 17 (citing *Ingham Reg'l Med. Ctr.,* 126 Fed. Cl. at 31–32).

### B.    Regulatory Scheme

The relevant provisions of the regulatory scheme of 32 C.F.R. § 199.14(a)(5) provide:

(5) *Hospital outpatient services*. This paragraph (a)(5) identifies and clarifies payment methods for certain outpatient services, including emergency services, provided by hospitals . . . .

(iv) *Radiology services.* TRICARE payments for hospital outpatient radiology services are based on the allowable charge method under paragraph (j)(1) of the section. In the case of radiology services for which the CMAC rates are established under that paragraph, a payment rate for the technical component of the radiology services is provided. Hospital charges for an outpatient radiology service are reimbursed using the CMAC technical component rate. . . .

(xi) *Facility charges.* TRICARE payments for hospital outpatient facility charges that would include the overhead costs of providing the outpatient service would be paid as billed. For the definition of facility charge, *see* § 199.2(b).

### C.    Procedural History

On 21 October 2013, plaintiffs brought this action claiming the government underpaid them for certain outpatient medical services they provided between 1 August 2003 and 1 May 2009. *See Ingham Reg'l Med. Ctr.*, 126 Fed. Cl. at 9. Plaintiffs allege the approximately six years of underpayment breached two contracts and violated various statutory and regulatory provisions. *Id.* Plaintiffs seek to represent a class of approximately 1,610 similarly situated hospitals. *See* Pls.' Mot. to Certify, ECF No. 76.

On 13 January 2015, the government filed a motion to dismiss plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), Gov't's Mot. to Dismiss, ECF No. 41.  The government argued plaintiffs "fail[ed] to allege facts" sufficient to establish a binding contract with the government or that any contract was breached, and absent a valid contract, "there [could] be no mutual mistake or breach of the covenant of good faith and fair dealing." *Id.* at 1.  On 22 March 2016, this Court dismissed plaintiffs' complaint for failure to state a claim. *See Ingham Reg'l Med. Ctr.*, 874 F.3d at 1346.  Plaintiffs appealed three claims:  the "(1) breach of express contract between Ingham and DoD based on the [DPP]; (2) revision of Ingham's contract based on mutual mistake, in light of the errors in the calculations of radiology outpatient services and the Kennell study; and (3) violations of money-mandating statutes and regulations." *Id.*  On 3 November 2017, the Federal Circuit "reverse[d] the dismissal of [plaintiff] Ingham's breach of contract claim, affirm[ed] the dismissal of [plaintiffs'] money-mandating claim, and [did] not reach the claim for mutual mistake." *Id.* at 1348.  Although the Federal Circuit found the Release does not bar Ingham from bringing a breach of contract claim, it did not further interpret the contract. *See id.* at 1346.  The Federal Circuit remanded the case "for further proceedings on the breach of contract claim." *Id.* at 1348.  On remand, plaintiffs filed an amended complaint,[5] the government filed its answer, and the parties engaged in discovery, ECF Nos. 74, 79.  This case was transferred to the undersigned Judge on 29 July 2019. *See* Order, ECF No. 114.

On 14 January 2020, the Court issued an order ruling on five motions regarding the government's effort to "claw back" purportedly privileged documents it inadvertently sent plaintiffs.  14 Jan. 2020 Op. & Order.  The Court held these communications were not privileged by analogizing the DPP to "an insurer's claim investigation" as "DoD investigated hospitals' underpayment claims further before

---

[5] The Federal Circuit's Opinion left several holdings in the court's 22 March 2016 decision undisturbed. *See generally Ingham*, 874 F.3d 1341; *Ingham*, 126 Fed. Cl. 1, *aff'd in part, rev'd in part*, 874 F.3d 1341.  Accordingly, several plaintiffs who did not sign Releases to obtain payment under the DPP were dismissed from the suit. *See id.* Originally, the named plaintiffs on the suit were:  Ingham Regional Medical Center, Bay Regional Medical Center, McLaren Northern Michigan, Gifford Medical Center, Inc., and Lakewood Health System. *See* Compl. at 1, ECF No. 1.  Upon filing an amended complaint, the named plaintiffs are now:  McLaren Greater Lansing (f/k/a Ingham Regional Medical Center), Integris Baptist Medical Center, Inc., Integris Bass Baptist Health Center, Integris Canadian Valley Hospital, Integris Miami Hospital, and Integris Grove Hospital. *See* Second Am. Compl. at 1, ECF No. 74.

making a payment determination." *Id.* at 18. The Court stated, "When [one of the allegedly privileged documents] was created, the government's primary focus was the calculation, and recalculation, of TRICARE payments which became the government's business during the [DPP]." *Id.* at 22. "While there may have been communication exchange between the parties regarding 'settlement' after the Notice, the comments were related to calculation review regarding repayment" and the parties aimed to "avoid litigation." *Id.* at 19, 21. The Court found "the term 'settlement' in this context refers to a negotiated business settlement, not the settlement of a legal action, because the government sought to correct payment errors and avoid litigation." *Id.* at 20. The Court thus held the documents in question could not "constitute preparation for litigation," and the DPP Contract was a "negotiated business settlement to agree on a recalculation figure." *Id.* at 20, 22.

On 5 June 2020, plaintiffs filed a renewed motion to certify class and appoint class counsel ("Pls.' Class Cert."), ECF No. 146. On 26 August 2021, the government filed a motion for summary judgment ("Gov't's First MSJ"), ECF No. 203. The parties then filed seven evidentiary motions and one motion for leave to file amended briefs. On 26 August 2021, the government filed a motion to exclude inadmissible evidence relied upon in plaintiffs' motion for class certification, ECF No. 204, under Rule 408 of the Federal Rules of Evidence ("FRE"). The same day, the government filed a motion to exclude the expert opinion of Jane Jerzak, ECF No. 205, and a motion to exclude the expert opinion of Anthony Fay, EFC No. 206. On 11 March 2022, the government filed a motion to strike inadmissible evidence under FRE 408 relied upon in plaintiffs' response to the government's motion for summary judgment and plaintiffs' response to the government's motion to exclude the expert opinion of Jane Jerzak, ECF No. 238. The next day, the government moved to strike paragraphs 7 and 18 of the declaration of Sere Allen, ECF No. 239. On 14 March 2022, the government moved to strike paragraphs 3 through 10 of Dale Thompson's declaration, ECF No. 240. On 5 April 2022, plaintiffs filed a motion to exclude the expert opinion and continued participation of David L. Kennell and Kennell and Associates, ECF No. 251.

*See Ingham Reg. Med. Ctr. v. United States*, 163 Fed. Cl. 384, 390–95 (2022) (citations modified for clarity). Following a status conference and oral argument, on 28 November 2022, the Court issued an opinion and order, staying class certification and the parties' evidentiary motions but granting-in-part and denying-in-part the government's Summary Judgment Motion. *See id.* at 390. The Court concluded:

(1) the government did not have a duty to obtain and adjust original native data from plaintiff hospitals;

(2) the government did have a duty to correctly adjust data from the government's TMA database;

(3) the government did have a duty to correctly consider zip codes for plaintiff hospital locations not provided by the hospitals in their discretionary payment submissions;

(4) the government breached its duty to correctly adjust data from TMA's database;

(5) plaintiffs were not obligated to pre-check TMA's data;

(6) the government did not prove the discretionary payment agreement shifted the risk of all data issues to plaintiff hospitals; and

(7) there was no mutual mistake of fact.

*Id.* (cleaned up).  Thus, the Court's 28 November 2022 Opinion and Order found plaintiffs' "only surviving breach of contract claim is the government's duty to extract, analyze, and adjust line items from its database."  *Id.*  The Court then directed the parties to proceed with briefing for class certification.  *Id.*

On 21 March 2023, plaintiffs filed a Motion for Leave to Conduct Certain Limited Additional Discovery and to Submit Supplemental Expert Report.  *See* Pls.' 21 Mar. 2023 Mot. for Disc., ECF No. 269.  Plaintiffs noted, after the Court's 28 November 2022 Order finding the government breached its duty to correctly adjust data from TMA's database, "[w]hat remains is to identify the hospitals impacted, and to quantify the underpayments."  *See id.* at 1.  Plaintiffs sought leave to:  "(1) depose a Government corporate designee, (2) serve document requests, and (3) thereafter serve a supplemental expert report on the relevant class issues," noting, "[a]fter completion of this discovery, [p]laintiffs would then file an amended motion for class certification."  *Id.* at 2.

On 2 January 2024, the Court granted-in-part and denied-in-part plaintiff's Motion for Discovery and ordered a future JSR to update the Court on the progress of discovery.  *See Ingham Reg'l Med. Ctr. v. United States*, 169 Fed. Cl. 12, 32 (2024).  In that Order, the Court denied plaintiffs' request for an expert report to estimate class-wide damages without prejudice, noting "plaintiffs' next step should be to analyze the government's data for the six named plaintiffs already in plaintiffs' possession to assist plaintiffs in tailoring their document requests."  *See Ingham*, 169 Fed. Cl. at 32.

On 1 April 2024, in a second JSR following the Court's 2 January 2024 Order, the parties disclosed plaintiffs' preliminary estimate of damages for the six named plaintiffs based on a data file the government produced following summary judgment.  *See* 1 April 2024 JSR at 7, ECF No. 292.  The government disputed plaintiffs' damages estimate, arguing they implemented the DPP incorrectly—the government then disclosed its plans to file a motion for summary judgment following the close of discovery.  *See id.* at 8–10.

On 18 December 2024, plaintiffs filed a Renewed Motion to Certify Class Action and Appoint Class Counsel, ECF No. 313.  The Court stayed further briefing on the motion until the close of expert discovery on 28 February 2025.  *See* 23 December 2024 Order, ECF No. 314.  On 12 February 2025, the government filed a sealed motion for leave to file a motion to strike plaintiffs' expert reports and motion for class certification for failure to comply with the Court's previous orders.  *See* Gov't's Mot. for Leave to File Mot. to Strike, ECF No. 315.  On 7 March 2025, the parties filed a JSR in which they confirmed completion of fact and expert discovery and proposed competing proposals for resolution of issues moving forward.  *See* 7 Mar. 2025 JSR, ECF No. 318.

On 26 March 2025, the Court held a status conference to discuss the 7 March 2025 JSR. *See* 17 Mar. 2025 Scheduling Order, ECF No. 319.  After the status conference, the Court issued an Order further staying plaintiffs' Motion to Certify Class and finding as moot the government's Motion for Leave to File Motion to Strike.  *See* 27 Mar. 2025 Order Staying Mot. to Certify Class, ECF No. 320.  Citing its 23 December 2024 Order, and as agreed by the parties, the Court instead ordered a briefing schedule for filing expert reports and Cross-Motions for Summary Judgment.  *See id.* at 2.  The Court noted the "goal of the Cross-Motions . . . is to substantively discuss the government's disagreements regarding liability in the expert reports and narrow the issues as concretely as possible before addressing class certification."  *See id.*

On 31 March 2025, plaintiffs filed the Opening Expert Report of Isaiah Berg ("Berg Report") and its supplement ("Berg Supp. Report"), ECF No. 321, and the government filed the Opening Expert Report of Mark Gustafson ("Gustafson Report") and its supplement ("Gustafson Supp. Report"), ECF No. 322.  On 28 April 2025, the government filed a Sealed Motion for Summary Judgment ("Gov't's Second MSJ"), ECF No. 325.  The same day, plaintiffs filed a Sealed Motion for Partial Summary Judgment ("Pls.' MPSJ"), ECF No. 326, which plaintiffs amended on 30 April 2025, ECF No. 328.  The parties filed responses on 28 May 2025, followed by replies in mid-June.  *See* Pls.' Resp., ECF No. 332; Gov't's Resp., ECF No. 333; Pls.' Reply, ECF No. 334; Gov't's Reply, ECF No. 335.  On 21 January 2026, the Court held oral argument on the parties' Cross-Motions.  *See* 24 Oct. 2025 Order Setting Oral Argument, ECF No. 337.  Currently pending before the Court are the parties' Cross-Motions for Summary Judgment.  *See* Gov't's Second MSJ; Pls.' MPSJ; *see generally Ingham*, 163 Fed. Cl. at 290; 27 Mar. 2025 Order.

## II.    Parties' Arguments

"The Court previously determined that plaintiffs in this lawsuit have appropriately pled that a contract was formed between TMA and plaintiffs through:  (1) the April 25, 2011 letter, (2) the Notice, (3) the FAQs, (4) the spreadsheets that hospitals submitted to TMA to provide their identifying information and indicate their interest in receiving the adjustment, (5) the payment adjustment worksheets that TMA provided to hospitals to show the amount of TMA's proposed adjustment [("Adjustment Worksheets")], and (6) the release of claims that hospitals executed to receive their adjustment payments ('the Release')."  *Ingham*, 163 Fed. Cl. at 393 (citations and internal quotations omitted).  Neither party disputes the existence of the contract as pleaded—rather, both parties accept a contract was formed through these six categories of documents but dispute how to properly implement the nine-step DPP as outlined in the Notice. *See* Gov't's Second MSJ at 1, 5; Pls.' MPSJ at 8, 16.

The government argues summary judgment is proper for three reasons.  First, the government asserts plaintiffs have put forward new arguments not previously included in briefing for the Court's first summary judgment ruling, constituting "an obvious case of waiver." Gov't's Second MSJ at 28.  Second, the government contends plaintiffs seek to include line items expressly excluded by the contract by misinterpreting contractual text in DPP Steps 3, 5, 6, and 7.  *See id.* at 28–29.  Third, according to the government, plaintiffs cannot establish damages with any reasonable certainty because plaintiffs' expert report re-writes DPP Steps 3, 5, 6, and 7

in a manner irreconcilable "with the plain language of the contracts." *See id.* at 29. Thus, the government argues plaintiffs have not presented any proof of breach or damages related to the claims the Court allowed to move forward in its last summary judgment order (that is, the government's TMA-data duty and plaintiffs' alternate zip code claims). *See id.* On the basis of its own expert report running the DPP, the government asks the Court enter judgment against the named plaintiffs on all their claims, except for $13,914[6] for Integris Baptist Medical Center. *See id*.

Plaintiffs argue they did not waive their current claims because they are not responding to the government's first Motion for Summary Judgment, but instead seeking judgment on claims the Court allowed to move forward in the last summary judgment order. *See* Pls.' Resp. at 6–7. Plaintiffs argue the Court's order on the government's first Motion for Summary Judgment establishes the government breached the contract, and plaintiffs further contest the government's interpretation of the contract. *See* Pls.' MPSJ at 20–22. Specifically, plaintiffs assert: (1) the government already conceded breach of contract with INTEGRIS Baptist Medical Center through underpayments of nearly $14,000; (2) the government breached the contract by incorrectly interpreting DPP steps 3, 5, 6, and 7 to underpay plaintiffs; and (3) a memo authored by David Kennell corroborates these underpayments. *See id.* at 22, 23–35. Finally, plaintiffs argue, because the government excluded line items eligible for payment in breach of the contract, plaintiffs were not paid the full amounts owed under the contract, and damages are present as a matter of law. *See id.* at 36–37.

## III.    Legal Standard

### A.    Summary Judgment

Summary judgment is proper when the evidence fails to reveal a "genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "Genuine" issues exist if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Facts are "material" if they "might affect the outcome of the suit" and do not include "irrelevant or unnecessary" factual disputes. *Id.* Inferences "must be viewed in the light most favorable" to the nonmoving party when considering summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party "always bears the initial responsibility" of presenting evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### B.    Contract Interpretation

"Contract interpretation is a matter of law and thus is amenable to decision on summary judgment." *Gov't Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 812 n.1 (Fed. Cir. 1988)

---

[6] The government also stipulated to an additional $486 in damages based on a prior expert's quantification of damages and an additional $79 from its expert's supplemental report—for a total of $14,479 in damages for Integris Baptist Medical Center. *See* Section V.F, *infra*.

(citations omitted).  "When deciding an issue governed by the text of a legal instrument, the careful lawyer or judge trusts neither memory nor paraphrase but examines the very words of the instrument."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012).  This is because "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."  *Id.*  As such, "[c]ontract interpretation begins with the plain language of the agreement."  *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).  "A contract is ambiguous only when it is susceptible to two reasonable interpretations."  *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (quoting *A-Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1584 (Fed. Cir. 1994)).  "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term.  Rather, both interpretations must fall within a 'zone of reasonableness.'"  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citation omitted).

When interpreting a contract, one must consider it as a whole and interpret it to harmonize and give reasonable meaning to all its parts.  *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996); *Gould*, 935 F.2d at 1274 ("[P]rovisions of a contract must be so construed as to effectuate its spirit and purpose . . . an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.").  If a contract's provisions are "clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them."  *McAbee*, 97 F.3d at 1435 (cleaned up).  "To permit otherwise would cast a long shadow of uncertainty over all transactions and contracts."  *Id.* (cleaned up).  "The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face."  *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988).

## IV.    Whether Plaintiffs Waived Contract Interpretation Arguments by Failing to Raise Them in Response to the Government's First Motion for Summary Judgment

Preliminary to the parties' contract interpretation disputes, the government argues plaintiffs waived their current contract interpretation claims in two ways:  (1) plaintiffs failed to raise their current theories in briefing for the summary judgment decision in 2022; and (2) discovery rules required plaintiffs' first expert reports to disclose all opinions to be expressed at trial.  *See* Gov't's Second MSJ at 31.  First, according to the government, plaintiffs were required to "put all of their legal cards on the table" in response to the government's first Motion for Summary Judgment, but plaintiffs did not raise their current contract interpretation theories in their 2022 response brief, so these claims are waived.  *See id.* at 31–32.  A non-movant's argument is "waived when it was not raised in response to the motion for summary judgment."  *See Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003).  The core concern regarding waiver is unfair procedure—*i.e.*, whether the Court can reach a fully-informed decision on issues fully briefed by the parties.  *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (noting "parties must give a trial court a fair opportunity to rule on an issue other than by raising that issue for the first time in a reply brief").  "[Waiver] is, of course, not governed by a rigid rule but may as a matter of discretion not be adhered to where

circumstances indicate that it would result in basically unfair procedure." *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990) (citations omitted).

To assess whether allowing plaintiffs' new contract interpretation would be procedurally unfair, some history on the evolution of plaintiffs' current claims is helpful. In the Court's 2022 summary judgment decision, the Court found plaintiffs' "only surviving breach of contract claim is the government's duty to extract, analyze, and adjust line items from its database." *Ingham*, 163 Fed. Cl. at 390. The breach of contract disputes in 2022, however, focused on whether TRICARE had a duty to apply the DPP to hospital claims data, as opposed to TRICARE data. *See id.* at 397–408. The Court ultimately ruled TRICARE had no contractual duty to analyze hospital data, but it did have a duty to correctly apply the DPP to its own data. *See id.* at 390. Considering the government stipulated thirteen line items "were not extracted from TMA's databases in 2011, although they met the criteria for extraction," Gov't's First MSJ at 30, the Court found the government failed to correctly apply the DPP to its own data and therefore breached the contract, *see Ingham*, 163 Fed. Cl. at 412. After this finding of liability at summary judgment, plaintiffs' primary task for building out this claim was to establish the scope of the government's breach. *See Ingham*, 169 Fed. Cl. at 32. At the time, however, plaintiffs' discovery to date only compared the government's original DPP analysis using TRICARE data to plaintiffs' own DPP analysis using hospital data. *See id.* at 29. After plaintiffs raised this issue to the Court, the Court allowed both parties to conduct additional expert discovery to apply the DPP to TRICARE data. *See* 2 Apr. 2024 Order, ECF No. 293. The additional expert discovery allowed plaintiffs to specify the contract provisions the government allegedly breached in failing to extract eligible line items from TRICARE data. *See* 21 Jan. 2026 Oral Argument Transcript ("Tr.") at 20:3–12, ECF No 350; *Ingham*, 169 Fed. Cl. at 29.

In view of this context, the Court must determine whether plaintiffs' failure to raise their current contract interpretation claims in response to the government's first Motion for Summary Judgment was so procedurally unfair plaintiffs should be deemed to have waived these claims. *See Becton*, 922 F.2d at 800. While the failure to raise an argument in a response brief would typically deprive the Court of a "fair opportunity to rule on an issue," *see Novosteel*, 284 F.3d 1274 (Fed. Cir. 2002), here both parties submitted expert reports, expert rebuttal reports, and fully-briefed cross-motions for summary judgment on the very contract interpretation theories the government argues plaintiffs waived. *See* Gustafson Report; Berg Report; Gustafson Supp. Report; Berg Supp. Report; Gov't's Second MSJ; Pls.' MPSJ. While plaintiffs concede the specific contract terms at issue do not appear in their complaint or response brief, the government was at no procedural disadvantage to present its counterarguments to the Court considering over three years of litigation ensued on these issues since the government's first Motion. *See* Gov't's First MSJ (filed Aug. 2021); Gov't's Second MSJ (filed Apr. 2025). The government does not dispute this procedural reality, but instead argues prejudice and unfairness stem from plaintiffs' "complete do-over" in raising new breach theories after the Court's first summary judgment order. *See* Tr. at 26:13–24. The government's reasoning is flawed, however, considering all plaintiffs' current contract interpretation claims were allowed to proceed as part of what the Court determined were plaintiffs' "only surviving breach of contract claim:" "the government's duty to extract, analyze, and adjust line items from its database." *See Ingham*, 163 Fed. Cl. at 390. At the time of the 2022 decision, this breach only related to thirteen line items then deemed to be improperly excluded from the DPP for "unknown reasons"—but as plaintiffs

noted at oral argument, "like those 13 line items, [contract interpretation disputes regarding Steps 3, 5, 6, and 7 all relate to TRICARE's] failure to extract and adjust claims as they're required to do so under the DPP." *See* Tr. at 31:7–13. While the government argues plaintiffs' current claims must "remain within the scope of this court's findings of liability in November 2022," *see* Tr. at 30:23–25, plaintiffs' current contract interpretation claims do remain within scope—each alleges the government misapplied the DPP, and in doing so failed to "extract, analyze, and adjust line items from its database," *see Ingham*, 163 Fed. Cl. at 390. Considering both parties had robust opportunity to brief plaintiffs' current contract interpretation theories and considering plaintiffs' current theories are within the scope of the breach of contract claim the Court allowed to move forward in 2022, plaintiffs did not waive their current breach of contract claims. *See* Pls.' Resp. at 6–7; Pls.' MPSJ at 19–20; *Ingham*, 163 Fed. Cl. at 390; *Becton*, 922 F.2d at 800.

Second, the government argues plaintiff's new expert report violates RCFC 26(a)(2)(B)(i), which requires an expert report provide "a complete statement of all opinions the witness will express." *See* Gov't's Second MSJ at 31. According to the government, plaintiffs violated RCFC 26(a)(2)(B)(i) because their expert report after the 2022 summary judgment decision included theories not disclosed in expert reports prior to the decision. *See id*. The government reads RCFC 26 too narrowly—the rule requires an expert disclose in a report a complete statement of all opinions he or she will express outside of that report, but it does not restrict a later expert report from disclosing opinions different from an earlier report, especially where the Court has expressly allowed the parties to engage in additional expert discovery. *See* RCFC 26(a)(2)(B)(i). Indeed, the preamble of RCFC 26(a)(2)(B) clarifies its requirements apply "unless otherwise stipulated or *ordered by the court*." Given the Court ordered the parties to conduct additional fact and expert discovery, the government's invocation of RCFC 26(a)(2)(B)(i) is inapposite. *See* 2 Apr. 2024 Order, ECF No. 293. Moreover, as the government conceded at oral argument, the main issue Rule 26(a)(2)(B)(i) guards against is prejudice. *See* Tr. at 23:25–24:5 ("[THE COURT:] [L]et's assume that there is some violation, isn't the issue prejudice, then? [THE GOVERNMENT]: Right. And there is an incurable substantive prejudice to the government."). The language of the rule reflects it is a procedural safeguard against surprise: "The report must contain: (i) a complete statement of all opinions the witness *will express* and the basis and reasons for them." *See* RCFC 26(a)(2)(B)(i) (emphasis added). As noted, *supra*, the government was afforded a full opportunity to present its own supplemental expert report subsequent to the 2022 decision, meaning it suffered no undue surprise or prejudice. *See also* Tr. at 26:25–27:3 ("THE COURT: You agree that the government's expert, Gustafson, explicitly responds to plaintiffs' expert? [THE GOVERNMENT]: Yeah."). Considering RCFC 26(a)(2)(B)(i) only limits the opinions an expert may express to those explained in a report and the government was not prejudiced because it was allowed its own supplemental expert report, RCFC 26(a)(2)(B)(i) does not preclude plaintiffs' expert reports and plaintiffs have not waived their current claims by failing to raise them in expert reports prior to the 2022 summary judgment decision. *See id.*; RCFC 26(a)(2)(B)(i); *Becton*, 922 F.2d at 800.

## V.    Whether TRICARE Breached Contracts with Named Plaintiffs

Having determined plaintiffs' current contract interpretation arguments were not waived, the Court next turns to the substance of the parties' cross-motions for summary judgment. The bulk of the parties' cross-motions comprise contract interpretation disputes. *See generally*

Gov't's Second MSJ; Pls.' MPSJ.  As noted *supra*, the parties' "extremely strange" contract is formed through six separate documents:  (1) the Letter; (2) the Notice; (3) the FAQs; (4) the spreadsheets hospitals submitted to TMA to provide their identifying information and indicate their interest in receiving the adjustment; (5) the Adjustment Worksheets; and (6) the Releases. *Ingham*, 163 Fed. Cl. at 393; *see also* Gov't's Second MSJ at 1, 5; Pls.' MPSJ at 8, 16.  Plaintiffs and the government submitted competing expert reports interpreting the parties' contract and implementing the steps of the DPP for the six named plaintiffs, using TRICARE data.  *See* Berg Report; Gustafson Report.  Differences between how the experts implemented DPP Steps 3, 5, 6, and 7 precipitated the parties' disputes as to how the text of each step should be interpreted.  *See generally* Gov't's Second MSJ; Pls.' MPSJ.  Both parties agree contractual interpretation is a question of law, and there is no genuine dispute of material fact inhibiting contract interpretation. *See* Pls.' MPSJ at 17, 22; Gov't's Resp. at 42–43, 48.  Accordingly, the Court considers each of the parties' proposed interpretations in deciding the Cross-Motions.

### A.    Whether TRICARE Properly Implemented DPP Step 3

The parties dispute five key phrases in DPP Step 3, which describes how to determine which radiology line items are eligible for payment.  In full, Step 3 states:

> TMA will extract the claims for each hospital for claims for outpatient radiology services during the relevant period (either the August 2003 – April 2009, August 2003 – December 2009, or August 2003 – November 2010 period).  All hospital outpatient department claims for radiology paid as billed, with OHI, or with a professional modifier (-26) will be excluded.  Radiology claims will include codes within the CPT range of 70000-79999 and which were codes with a non-zero rate in the Technical Component (TC) field of the CMAC rate file.  Within this group of claims, if the TC CMAC amount is less than the global CMAC and the claim does not have a TC modifier, it will be excluded.

Gov't's App'x to Gov't's Second MSJ ("Gov't's App'x") at A7 (DPP Step 3), ECF Nos. 325-1, 325-2, 325-3.  First, the parties dispute how many exclusion categories appear in Step 3's statement "[a]ll hospital outpatient department claims for radiology paid as billed, with OHI, or with a professional modifier (-26) will be excluded."  Second, the parties dispute how the contract defines "paid as billed."  Third, the parties dispute which line items are "with OHI," *i.e.*, with other health insurance.  Fourth, the parties dispute what it means for a claim to "not have a TC modifier."  Fifth, the parties dispute how to implement the contract's exclusion of TRICARE OPPS claims in view of the "relevant period" time ranges listed in Step 3.  Accordingly, the Court next decides the proper contract interpretation for each of the five phrases in question in Step 3.  The Court concludes the Step 3 analysis by addressing a dispute over a typo in the government's expert report referenced in the briefs.

### 1.    Whether Step 3 Language, "[a]ll hospital outpatient department claims for radiology paid as billed, with OHI, or with a professional modifier (-26) will be excluded," Creates Two or Three Exclusionary Categories

The parties dispute whether the language in Step 3 stating, "All hospital outpatient department claims for radiology paid as billed, with OHI, or with a professional modifier (-26) will be excluded," creates three exclusions or just two.  Gov't's App'x at A7 (DPP Step 3); Pls.' MPSJ at 24; Gov't's Resp. at 36.  The Court addresses the parties' textual arguments first, the parties' results-based arguments next, and the parties' purpose-based arguments last.

Regarding the text, the government argues the text of Step 3 creates a simple list of three exclusions of radiology claims:  (1) "paid as billed," (2) "with OHI," and (3) "with a professional modifier (-26)."  *See* Gov't's Resp. at 36.  In contrast, because the word "or" does not appear between "paid as billed," and "with OHI," plaintiffs argue there are only two categories:  (1) radiology claims "paid as billed, with OHI;" and (2) radiology claims "with a professional modifier (-26)."  *See* Pls.' MPSJ at 24.  A list of three items separated by commas and a conjunction prior to the final item is one of the most basic constructions in the English language.  *See, e.g.*, *Gershenson v. Sec'y of Health & Hum. Servs.*, No. 90-4005V, 1997 WL 79874, at *8 (Fed. Cl. Feb. 10, 1997) (noting "disability, pain, or illness" is a list "of three nouns that are linked by the distributive conjunction 'or.'").  For plaintiffs to overcome the plain reading of "paid as billed, with OHI, or with a professional modifier" as a list of three, they must demonstrate how the plain language of the contract leaves this construction ambiguous.  *See NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citation omitted) ("To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term.").

Other terms in the contract confirm "paid as billed" and "with OHI" are indeed two separate categories.  *See* Gov't's App'x at A18, A20, A22, A24, A26, A28 (Adjustment Worksheets).  The Adjustment Worksheets—which are part of the contract and which plaintiffs reviewed before executing their respective Releases to enter the contract—clarify the full list of exclusions for radiology claims.  *See id.*; Gov't's App'x at A14 (FAQ 17 ("The signed release should be submitted after the government has provided the results of the adjustment calculations.")).  The Adjustment Worksheets rephrase the list of exclusions with OHI and paid as billed listed separately:  "Line items after exclusions for TFL, OHI, claims paid as billed, claims paid by APC (OPPS), and line items with a professional modifier (-26)."  Gov't's App'x at A18, A20, A22, A24, A26, A28.  When the Court asked plaintiffs how their interpretation can be squared with the Adjustment Worksheets, plaintiffs responded "this is just reflecting that the amount of OHI is taken into account in step 3. . . . [W]hat is being described here [is not] prescriptive."  *See* Tr. at 43:12–16.  While plaintiffs maintain Step 3 and the Adjustment Worksheets "can be read in harmony," they also clarified their "position is that 'paid as billed, with OHI' is one category, *notwithstanding* the language" in the Adjustment Worksheets.  *See* Tr. at 45:21–23; 46:9–10 (emphasis added).  When the Court noted the adjustment worksheets list the OHI exclusion category prior to and separate from "paid as billed," plaintiffs responded, "to the extent there were a conflict, you would follow Step 3."  *See* Tr. at 46:24–25.  The Federal Circuit, however, requires a contract be interpreted to give meaning to all its parts.  *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996).  Moreover, both Step 3 and the Adjustment Worksheets separate "paid as billed" and "OHI" with commas in lists of exclusions.  *See* Gov't's App'x at A7 (DPP Step 3); *id.* at A18, A20, A22, A24, A26, A28 (Adjustment Worksheets).  As contractual language in the Adjustment Worksheet confirms the plain language of Step 3 lists "paid as billed" and "with OHI" as two separate exclusions for

radiology claims, plaintiffs' argument an "or" is needed between the two phrases in Step 3 to remove ambiguity fails. *See McAbee*, 97 F.3d at 1434–35.

As a further textual argument, plaintiffs contend contract language from FAQ 5 and Step 7 demonstrate DPP calls for only one exclusion of claims "paid as billed, with OHI." *See* Pls.' Resp. at 9. Plaintiffs argue, because FAQ 5 defines paid as billed with reference to the "TRICARE allowed amount (before reductions for copayments, OHI, etc.)" and because Step 7 "considers copayments," these provisions "make clear that OHI and reductions for copayments should be considered in the DPP." *See id.* That is, plaintiffs assert categorically excluding claims with OHI would render FAQ 5's reference to OHI and Step 7's reference to copayments meaningless because these references suggest OHI is still relevant to the contract after Step 3 exclusions. *See id.* Therefore, according to plaintiffs, excluding only claims "paid as billed" after factoring in OHI payments is more logical than categorically excluding all "with OHI" claims. *See id.* FAQ 5 and Step 7, however, do not establish OHI is still relevant to the DPP after the Step 3 exclusions. Reference to "reductions for copayments, OHI, etc." in FAQ 5 merely clarifies the proper amount to use when determining which claims in Step 3 are "paid as billed,"—FAQ 5 directs the DPP to use the "TRICARE allowed amount []before reductions for copayments, OHI, etc." to determine "paid as billed" claims in Step 3, but does not say anything about whether OHI factors into the DPP later in the process. *See* Gov't's App'x at A10 (FAQ 5). Thus, FAQ 5 does not contradict the plain language of the contract categorically excluding "with OHI" claims: it merely clarifies the correct point of comparison for determining claims "paid as billed." *See id.* As to Step 7, the language of Step 7 mentions "cost sharing" but does not, as plaintiffs assert, mention "copayments." *See* Gov't's App'x at A9 (DPP Step 7). Moreover, plaintiffs do not explain how references to either cost sharing or copayments conclusively establish the contract still contemplates OHI claims even after the exclusion in Step 3. *See* Pls.' Resp. at 9 (simply stating "Copayments are considered in Step 7"). In short, neither FAQ 5 nor Step 7 establish OHI amounts are used in the DPP after Step 3 to suggest not all "OHI" claims should be excluded in Step 3. Furthermore, as discussed *supra*, to the extent plaintiffs argue the lack of the word "or" between "paid as billed," and "with OHI," renders the language ambiguous, the Adjustment Worksheets clarify the exclusions are separate by listing the two categories separately. *See* Gov't's App'x at A18, A20, A22, A24, A26, A28 (Adjustment Worksheets).

To bolster their textual arguments, plaintiffs argue treating "paid as billed" and "with OHI" as separate categories is incorrect because such an interpretation causes "absurd results." *See* Pls.' Resp. at 9. Plaintiffs assert, because only twenty-eight line items of 47,640 radiology line items are "paid as billed," and because the government has acknowledged "paid as billed" claims are rare, excluding such a small number of line items through a standalone "paid as billed" exclusion category is an absurd result. *See id.*; Pls.' MPSJ at 25. Plaintiffs also argue treating "with OHI" as a separate exclusionary category causes absurd results because it excludes claims even if OHI only contributed $0.50. *See* Pls.' MPSJ at 26; Pls.' Resp. at 9. While the "[c]onstruction of the terms of a contract . . . should avoid absurd and whimsical results[, this prudential rule entails] an interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous. *See Northwest Marine Iron Works v. United States*, 493 F.2d 652, 657 (Ct. Cl. 1974) (cleaned up). Plaintiffs' appeal to allegedly absurd

results fails for two reasons.  First, combining "paid as billed" and "with OHI" into one exclusionary category would render meaningless the language in the Adjustment Worksheet treating the two exclusions as separate.  *See, e.g.*, Gov't's App'x at A18 (Ingham Adjustment Worksheet).  Second, plaintiffs only entered the contracts after receiving Adjustment Worksheet estimates of such exclusions, with language clarifying the two exclusions are separate.  *See* Gov't's App'x at A2 (Letter ("payment of the discretionary adjustment will also be contingent on the execution of a release by the hospital")), A14 (FAQ 17 ("The signed release should be submitted after the government has provided the results of the adjustment calculations.")); *see also* Gov't's App'x at A18, A20, A22, A24, A26, A28 (Adjustment Worksheets).  The Adjustment Worksheets list the results of DPP exclusions in terms of line items and dollar amounts and clarify such results reflect "[l]ine items after exclusions for TFL, OHI, claims paid as billed, . . . ."  *See* Gov't's App'x at A18, A20, A22, A24, A26, A28 (Adjustment Worksheets).  Plaintiffs could only accept the contract after reviewing adjustment worksheets and sending back a release.  *See* Gov't's App'x at A2 (Letter ("payment of the discretionary adjustment will also be contingent on the execution of a release by the hospital")), A14 (FAQ 17 ("The signed release should be submitted after the government has provided the results of the adjustment calculations.")).  Plaintiffs' "absurd results" argument is unpersuasive where the separate exclusions and their results were disclosed in the plain language of the contract and plaintiffs knowingly accepted these results.  *See LAI Servs., Inc. v. Gates*, 573 F.3d 1306, 1317 (Fed. Cir. 2009) (adopting the government's interpretation of a contract even in the presence of ambiguity because plaintiff "was on notice as to the government's interpretation of the contract"); *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930) ("[T]o justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense.").

Lastly, the parties dispute the proper interpretation of Step 3 based on the broader purpose of the contract.  Plaintiffs argue the purpose of the DPP is "to make the hospitals whole," by aligning what TRICARE paid with the full amounts Medicare rates allowed.  *See* Pls.' MPSJ at 24–25.  The government disagrees, arguing the purpose of the DPP was to ensure the TRICARE "allowed amount" aligned with the Medicare rate, and because multiple non-TRICARE entities also contributed to the allowed amount, it is wrong to base exclusions on whether TRICARE paid the full Medicare rate.  *See* Gov't's Resp. at 38–39.  Thus, while plaintiffs argue one exclusionary category for "paid as billed, with OHI" is correct because it would only exclude "line items [where TRICARE] already paid [plaintiffs] the greatest amount possible," *see* Pls.' MPSJ at 24–25, the government asserts plaintiffs' argument improperly re-imagines the terms of the contract based on a misunderstanding of the purpose of the DPP, *see* Gov't's Resp. at 38–39.  "The general rule is that extrinsic evidence will not be received to change the terms of a contract that is clear on its face."  *Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) (citing *SCM Corp. v. United States*, 675 F.2d 280, 284 (1982)).  To the extent plaintiffs seek to interpret the terms of the contract based on their understanding of its purpose, plaintiffs' argument fails insofar as it contradicts the plain terms of the contract.  *See id.*  Here, even if the terms were ambiguous and an analysis of the purpose of the contract were warranted to clarify ambiguity, the contract itself states the purpose of the DPP:  "[c]onsistent with TRICARE policy under statute to pay *similar* to Medicare, we have determined that discretionary adjusted payments may better *reflect* the Medicare payment amounts for outpatient radiology claims," given "Medicare used a blended rate" while "TRICARE regulation *limited reimbursement . . . to the technical component portion of the CHAMPUS Maximum Allowable*

*Charge* (CMAC)." *See* Gov't's App'x at A6 (Notice) (emphasis added). Step 7 of the DPP explicitly adjusts the difference between the allowed amount and Medicare rates downward to account for cost sharing with entities other than TRICARE. *See* Gov't's App'x at A9 (DPP Step 7). Thus, plaintiffs are incorrect the purpose of the DPP was to ensure TRICARE itself paid the *full* Medicare fair rates—instead, the issue the DPP addressed was variance between TRICARE allowed amounts and Medicare rates, not variance between what TRICARE paid and Medicare rates. *See* Gov't's App'x at A5–A6 (Notice) ("the technical component of the allowable charge did not approximate the Medicare fair payment for such hospital services as well as it could have . . . TRICARE is now offering hospitals an opportunity for discretionary adjusted payments for radiology services *for which TRICARE allowable charges were not comparable to the pre-OPPS Medicare fair rates*") (emphasis added). Even if the contractual terms were ambiguous, plaintiffs' interpretation arguments based on the purpose of the contract fail because plaintiffs misstate the purpose of the contract.[7] Accordingly, because construing DPP step 3 to include three separate exclusions for radiology claims: (1) preserves the meaning of language in the Adjustment Worksheets, (2) does not otherwise contradict terms of the contract, (3) does not cause absurd results, and (4) accords with the contractually-stated purpose of the DPP, plaintiffs' argument "paid as billed" and "with OHI" are part of one exclusionary category fails. *See Gould*, 935 F.2d at 1274 (Fed. Cir. 1991) ("Contract interpretation begins with the plain language of the agreement.") ("provisions of a contract must be so construed as to effectuate its spirit and purpose . . . an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.").

### 2.    Which Line Items Are "paid as billed"

In the second dispute relating to Step 3 exclusions, the parties differ as to the correct interpretation of the definition of "paid as billed" in FAQ 5, which states "paid as billed . . . means that the TRICARE allowed amount (before reductions for copayments, OHI, etc.) was equal to the billed charge amount." Gov't's App'x at A10. The parties dispute the meaning of "paid as billed" on the basis of: (1) textual arguments, (2) results-based arguments, and (3) purpose-based arguments. The Court addresses each in turn.

Reviewing the parties' textual arguments first, plaintiffs argue "paid as billed" means "the amount [TRICARE] paid was equal to the billed charge amount." Pls.' Resp. at 10

---

[7] Plaintiffs advocate focusing on what TRICARE paid (rather than what TRICARE allowed) based on their own, unsupported statement of the DPP's purpose: "The intent of the DPP 'was to compare (i) what TRICARE paid . . . to (ii) that which would have been paid for the same services applying Medicare principles." Pls.' MPSJ at 9 (quoting Pls.' Mot. to Compel at 4, ECF No. 296). To substantiate this statement, plaintiffs also cite the Gustafson Report as evidence the government's expert agrees: "[t]he purpose of the DPP was to bring payments made for hospital outpatient radiology services in line with what Medicare paid for the same services prior to DHA's implementation of the TRICARE [OPPS]." *See* Pls.' MPSJ at 9 (quoting Gustafson Report ¶ 18). Plaintiffs neglect to mention the same paragraph in the Gustafson Report also quotes a clarifying statement from the DPP: "TRICARE is now offering hospitals an opportunity for . . . payments [where] TRICARE allowable charges [misaligned with] Medicare fair rates")). Gustafson Report ¶ 18 (quoting Notice). Thus, while the Gustafson Report correctly stated the DPP sought to align TRICARE payments with Medicare payments, the Report also correctly stated the mechanism for aligning payments was ensuring the TRICARE allowed amount aligned with Medicare rates, not necessarily equating what TRICARE paid with Medicare rates. *See* Gustafson Report ¶ 18; Gov't's App'x at A6 (Notice).

(emphasis added).  The government argues plaintiffs' interpretation is wrong because it substitutes the "amount [TRICARE] *paid*" in for "TRICARE *allowed* amount" in the definition of "paid as billed" in FAQ 5.  *See* Gov't's Reply at 9 (emphasis added).  Plaintiffs' interpretation of "paid as billed" cannot be reconciled with the text of FAQ 5—FAQ 5 unambiguously calls for use of the TRICARE allowed amount, not the amount TRICARE paid.  *See* Gov't's App'x at A10 (defining paid as billed as "TRICARE allowed amount (before reductions for copayments, OHI, etc.) was equal to the billed charge amount").  Even if some ambiguity existed as to whether the TRICARE allowed amount could also be interpreted as the amount TRICARE paid, the text following "TRICARE allowed amount" in FAQ 5 eliminates this ambiguity: "TRICARE allowed amount" is an amount "before reductions for copayments, OHI, etc."  *Id.* As reductions for copayments and other health insurance are amounts paid by entities other than TRICARE, an amount before these reductions cannot be the amount TRICARE paid.  *See id.*

Plaintiffs then argue the government's approach produces absurd results because the government's use of the "allowed" field in the data as the "TRICARE allowed amount" would exclude "paid as billed" line items without reference to what TRICARE paid.  *See* Pls.' MPSJ at 28.  Plaintiffs assert the correct way to determine "paid as billed" line items when looking at the data is to identify line items where the "paid" field (the amount TRICARE paid hospitals) equals the "bill" field (amount the hospitals billed for a service).  *See id.* at 28–29; Pls.' Resp. at 10. Plaintiffs' argument from the data fails for the same flaw in its textual argument—plaintiffs seek to enforce a definition of "paid as billed" contrary to the text of FAQ 5 by using the amount TRICARE paid instead of the TRICARE allowed amount to identify "paid as billed" claims.  *See* Gov't's App'x at A10 (FAQ 5 (defining "paid as billed" claims as those where "the TRICARE allowed amount (before reductions for copayments, OHI, etc.) was equal to the billed charge amount.")).  Plaintiffs cannot argue the expected results of using the contractual definition of "paid as billed" are absurd results just because the contractual definition, when applied to the data, does not fit plaintiffs' desired interpretation.  *See, e.g.*, *Crooks*, 282 U.S. at 60 ("[T]o justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense.").

Plaintiffs also argue the value in the "allow" field sometimes exceeds the TRICARE *standard* allowed amount, so even if the government sought to exclude line items where the TRICARE allowed amount equals the billed amount, using the "allow" field would not achieve this result and would instead overstate TRICARE's payments.  Pls.' MPSJ at 28–29.  As the government clarified at oral argument, and as is clear from DPP Step 5, the TRICARE allowed amount is not the same as the TRICARE *standard* allowed amount.  *See* Gov't's App'x at A8 (DPP Step 5) ("TMA will adjust the 'Medicare' amount calculated in Step 4 on each claim using the ratio of the actual allowed amount on the claim to the TRICARE Standard allowed amount (the technical component of the CMAC)."); Tr. at 61:22–62:4 ("THE COURT:  So why are allowed amount and standard allowed amount different?  [THE GOVERNMENT]:  Because the allowed amount is what the hospital was actually allowed.  [W]hat is in the CMAC rate file is what the regulations say.  So if the hospital is offering . . . a discount off of the standard CMAC, whatever percentage, the Allowed field will reflect that.").  While the TRICARE *standard* allowed amount reflects the technical amount allowed for a service under TRICARE regulations, the TRICARE allowed amount could vary from the standard allowed amount based on discounts or premiums TRICARE may allow the hospital to charge.  *See id.*; *see also* Tr. at 71:4–11,

182:6–20 (counsel for the government explaining instances where "the government's record reflects that the hospital was paid some amount in excess of the CMAC[, which] gets taken into account in [TRICARE allowed amount] calculation."). While plaintiffs identified variance between the TRICARE allowed amount and the amount technically allowed in the regulations, plaintiffs did not specify how such a difference establishes breach of contract, given FAQ 5 defines "paid as billed" using the "TRICARE allowed amount," not the "TRICARE *standard* allowed amount." *See* Gov't's App'x at A10 (FAQ 5); Tr. at 68:12–69:19 (plaintiffs arguing the TRICARE allowed amount is the "paid" field, but agreeing this field is different from the "TRICARE standard allowed amount," which plaintiffs agree is the technical component of the CMAC). Plaintiffs' identification of these variances, without more, cannot establish breach, especially where the very terms of the contract plaintiffs entered acknowledge differences between the TRICARE allowed amount and the TRICARE standard allowed amount. *See* Gov't's App'x at A8 (DPP Step 5) ("To reflect the value of discounts at network hospitals, TMA will adjust the 'Medicare' amount calculated in Step 4 on each claim using the ratio of the *actual allowed amount* on the claim to the *TRICARE Standard allowed amount* (the technical component of the CMAC).") (emphasis added).

Similar to their purpose-based arguments regarding "paid as billed, with OHI," plaintiffs again argue the purpose of the DPP was to ensure TRICARE paid Medicare fair rates in full. *See* Section V.A.1, *supra*. According to plaintiffs, to conform with this stated purpose of the DPP, excluding "paid as billed" claims should only exclude claims where the amount TRICARE paid equals the amount the hospital billed, because "the purpose of the DPP was to rectify actual underpayments that were made, relative to payments that would have been made under Medicare." *See* Pls.' Reply at 6–7. In support, plaintiffs cite numerous provisions[8] of the contract referencing the amounts TRICARE actually paid to hospitals—as opposed to the TRICARE allowed amount. *See id.* at 6–8. According to plaintiffs, these references to paid amounts corroborate the purpose of the DPP is to ensure TRICARE paid full Medicare rates. First, as to the purpose of the DPP, as discussed in Section V.A.1, *supra*, plaintiffs' stated purpose of the DPP contradicts the purpose of the DPP described in the contract itself. The purpose of the DPP was to rectify the difference between the TRICARE allowed amount and the Medicare rates, not to provide the full difference between what TRICARE paid and the Medicare rates. *See* Section V.A.1, *supra*. Thus, plaintiffs advocate an interpretation of "paid as billed" contrary to both the text of the contract and the contractually-defined purpose of the DPP, so plaintiffs' purpose-based arguments fail. *See id*. Second, as to the provisions of the contract merely referencing actual TRICARE payments, none contradict the contractually-defined purpose of the DPP. Plaintiffs quote portions of the contract where TRICARE acknowledges it underpaid claims and describes the DPP as an opportunity for discretionary payments to more closely approximate Medicare payment methods. *See* Pls.' Reply at 6–8. While TRICARE represented it underpaid hospitals as a result of a flawed TRICARE allowed amount, TRICARE

---

[8] Plaintiffs quote the Notice ("some radiology services were underpaid") ("there is a basis for TRICARE to provide an opportunity to make some discretionary net payment adjustments to approximate more closely Medicare payment methods") ("[g]eneral TRICARE policy is that payment methodologies follow to the extent practicable Medicare payments"); FAQ 14 ("analysis compared TRICARE hospital outpatient services reimbursement with the intended comparable Medicare fair payment. In all cases, except radiology services, TRICARE payments for hospital outpatient services were either comparable to what Medicare would have paid or TRICARE paid more."); FAQ 3 ("there will not be any recoupments"); and FAQ 10 ("If the actual allowed amounts equal or exceed the adjusted 'Medicare' amounts, no additional payments shall be made").

was not the only entity making payments towards the amount allowed under TRICARE regulations. *See, e.g.*, Gov't's App'x at A10 (FAQ 5) ("TRICARE allowed amount (before reductions for copayments OHI, etc."), A9 (DPP Step 7 (referencing cost sharing)). For this reason, broad contractual references to TRICARE underpayments do not require TRICARE to pay the applicable Medicare fair rate in full regardless of contributions from other sources—these references merely confirm TRICARE may have owed a larger share of total contributions toward an allowed amount more closely approximating Medicare fair rates. *See id.* Considering plaintiffs misstate the purpose of the DPP and misconstrue contractual references to what TRICARE actually paid as corroborating this misstatement, plaintiffs' purpose-based arguments as to the definition of "paid as billed" fail. *See McAbee*, 97 F.3d at 1435 (If a contract's provisions are "clear and unambiguous, they must be given their plain and ordinary meaning, and the court may not resort to extrinsic evidence to interpret them." (cleaned up)). Accordingly, because "paid as billed" claims are contractually defined in FAQ 5 through use of the "TRICARE allowed amount," which is not the amount TRICARE ultimately must pay, plaintiffs' arguments the amount TRICARE paid should be used fail. *See id.*

### 3.    Which Line Items Are "with OHI"

In yet another dispute regarding Step 3 exclusions for radiology claims, the parties dispute which radiology line items in the data are "with OHI" line items. While the parties agree radiology claims "with OHI" means radiology claims "with other health insurance," the parties differ as to which data fields should be used to identify "with OHI" line items. *See* Pls.' MPSJ at 24. At the outset of the disagreement, plaintiffs re-assert their argument the "with OHI" exclusion should be combined with "paid as billed" to form one narrower exclusion for claims "paid as billed, [after factoring in] OHI." *See* Pls.' Resp. at 8; *see also* Section V.A.1, *supra* (rejecting this argument as contrary to the text of the contract). For this reason, plaintiffs argue only line items with a non-zero dollar amount in the OHI column of the data are "with OHI" line items because these are the only line items where payments from other health insurance could factor into a calculation to determine which claims are "paid as billed, with OHI." *See* Pls.' MPSJ at 27; Tr. at 40:23–41:6. The government argues "with OHI" is a standalone exclusion which applies to exclude any line items processed with other health insurance, regardless of whether there is a non-zero dollar value in the OHI column. *See* Gov't's Resp. at 40.

At oral argument, the Court asked plaintiffs which line items would be excluded as "with OHI" claims if a standalone "with OHI" exclusion applied instead of a combined "paid as billed, with OHI" exclusion. Plaintiffs responded only those line items with a dollar value in the "T_OHI" column (*i.e.*, total OHI) would be excluded because "T_OHI" reflects total other health insurance contributions across all line items on the claim. *See* Tr. at 115:21–116:13 ([PLAINTIFFS]: [T]his step is performed on a claim-wide basis, so it would be the T_OHI field. . . . [Mr. Berg] said that he excluded line items paid as billed with OHI on a claim or TED basis, and since it's the T_OHI field, that applies on the claim-wide basis. That's why I believe that was the field that he used."). In this way, the parties narrowed the "with OHI" dispute substantially, because, of the thousands of line items plaintiffs originally argued were improperly excluded as improper "with OHI" standalone exclusions, only 50–60 lack a dollar amount in the total OHI column. *See* Gov't's App'x at A293–A404 (Claims Data with OHI Plaintiffs Contend Should Have Been Adjusted) (tallying line items); *see also* Tr. at 119:22–120:4 ("[PLAINTIFF:]

It's not our position that a claim should be excluded just because T_OHI is non-zero. You would look at that together with the paid amount and you would compare that with the billed amount. Our point is that the fact that under the government's interpretation of the language, there would be an exclusion if there could be an exclusion for OHI, even if T_OHI were zero, or nominal, that is at cross purposes with the purpose of the DPP.").

For the remaining line items, further discussion revealed the only outstanding "with OHI" dispute relates to which line items can be properly excluded as "TRICARE for Life." *See* Tr. at 118:13–17 ("[THE COURT:] [T]he other fields that [counsel for plaintiffs] references, those are all related to TRICARE for Life, correct? [THE GOVERNMENT]: Yes, other than what you mentioned, the OHI and the subcode and the T_OHI."). Of the remaining line items lacking dollar amounts in the OHI columns, the government argues all are properly excluded as part of the TRICARE for Life exclusion described in the contract FAQs. *See id.* FAQs 6 and 13 confirm the "with OHI" exclusion also excludes "TRICARE for Life" claims. *See* Gov't's App'x at A10 (FAQ 6 ("Will TRICARE-for-Life Claims be included in the analysis? Response: No, they will not.")), A12 (FAQ 13 ("Why are TRICARE-for-Life claims excluded from this analysis and potential adjustment. Response: On TRICARE-for-Life claims, TRICARE predominately picks up the beneficiary cost share, so including TFL claims would not lead to any additional payment to the hospital.")). Plaintiffs argue line items with a "T" data value in the "TFLFLAG" column are the only line items to be excluded as "TRICARE for Life." *See* Tr. at 86:21–87:8. The government argues, even if there is a zero dollar amount in the total OHI column and even if a line item lacks a "T" in the "TFLFLAG" column, other data fields may indicate a line item should be excluded as a "TRICARE for Life" line item. *See* Gov't's MPSJ at 43–44. According to the government these data fields include the following columns: "CVGCAT," "CONTYPE," "ENRSTAT," "GOVINS," "GOVINBEG," "KONUM," "TFLFLAG," "PRICERT," "SPROCD1," "SPROCD2," "SPROCD3," and "SPROCD4."[9] *See*

---

[9] For each column cited by the government, the government argues the following data values indicate TRICARE for Life:

| Data Field Name in the Military Health Systems Data Repository ("MDR") | Tricare for Life or Other Government Insurance Indicator |
|---|---|
| Coverage Category (CVGCAT) | T = TRICARE for Life |
| Contract Type (CONTYPE) | 4 = TDEFIC |
| Enrollment Status (ENRSTAT) | FE and FS are TFL (network and nonnetwork)<br>ME = Medicare/TRICARE Dual Eligible<65, Network<br>MS = Medicare/TRICARE Dual Eligible<65, Non-Network |
| Type of Other Government Health Insurance (GOVINS) | A = Medicare Part A<br>B = Medicare Part B<br>C = Medicare Part A and B<br>H = Medicare HMO<br>I = Medicare Part A and D<br>J = Medicare Part B and D<br>L = Medicare Part A, B and D<br>V = CHAMPVA |
| Begin Reason Code for Other Government Health Insurance (GOVINBEG) | A = Eligibility for Medicare began after age 65<br>B = Enrollment in Part B<br>D = Eligible for Medicare due to disability<br>E = Medicare eligibility at age 65<br>F = Medicare eligibility defaulted at age 65; confirmation not received from CMS |

Gov't's MPSJ at 43–44.  While plaintiffs broadly dispute the exclusion of any line item lacking a "T" in the "TFLFLAG" field or dollar amounts in the total OHI column, plaintiffs' only specific objections to the government's "TRICARE for Life" exclusions concern Medicare Part A in the "govins" field and "TDEFIC" (*i.e.*, "TRICARE Dual Eligible Fiscal Intermediary Contract," *see PGBA*, 389 F.3d at 1221), in the "contype" and "konum" fields.  *See* Pls.' Resp. at 15–16.

As to plaintiffs' first objection, regarding Medicare Part A, plaintiffs argue TRICARE for Life is limited to only those beneficiaries with dual eligibility who satisfy the following requirements:  "retirees, dependents of retired members and members who died while on active duty, and certain former spouses:  (a) who are entitled to Medicare Part A based on age (age 65 or older) and enrolled in Medicare Part B; and (b) who are under the age of 65, who are entitled to Medicare Part A based on disability or end stage renal disease and enrolled in Medicare Part B."  Pls.' MPSJ at 20–21 (citing 10 U.S.C. § 1086(d)(2)) (emphasis removed).  Plaintiffs assert the government excluded line items outside these statutory TRICARE for Life limitations by considering "additional categories of dual eligible beneficiaries, such as active duty family members who have Medicare Part A based on disability *but not Medicare Part B*."  Pls.' Resp. at 15 (emphasis added); *see also id.*  As the government points out, however, the term "TRICARE for Life" was not statutorily limited to only the dual eligible beneficiaries described in 10 U.S.C. § 1086(d) until 2016.  *See* Gov't's Reply at 15 (citing 10 U.S.C. § 1072(13) (2016)).  Before 2016, TRICARE for Life was not statutorily defined in this way, *see* 10 U.S.C. § 1072(13) (2015) (no "TRICARE for Life" definition), and instead comprised a catch-all phrase for, according to the Federal Circuit, "individuals qualifying for both TRICARE and Medicare benefits—individuals known as 'dual eligible beneficiaries,'" *PGBA, LLC v. United States*, 389 F.3d 1219, 1221 (Fed. Cir. 2004).  In 2016—years after the contract at issue here—Congress amended 10 U.S.C. § 1072 to specifically define "TRICARE for Life" as "the Medicare

| | |
|---|---|
| | G = Enrollment in Medicare Part B declined by beneficiary<br>P = Eligible for Medicare because of purchase, Part A only<br>R = Eligible for Medicare under age 65 because of end-stage renal disease<br>V = Eligible for CHAMPVA |
| Contractor Number (KONUM) | 65 = TDEFIC (processor for TRICARE for Life)<br>71= TDEFIC (processor for TRICARE for Life)<br>74 = TDEFIC (processor for TRICARE for Life)<br>75 = T-5 TMEP (aka TDEFIC, took over the TDEFIC contract, started May 2022) |
| MERHCF Flag (TFLFLAG) | T = TFL<br>U = Under 65 Medicare Eligible |
| Pricing Rate Code (PRICERT) | V = Medicare |
| Special Processing Codes<br><br>SPROCD1, SPROCD2, SPROCD3, SPROCD4 | R = dual entitlement TRICARE first payor not Medicare benefit<br>T = dual entitlement TRICARE second payor/normal COB processing<br>FF = TFL first payor not Medicare benefit<br>FG = TFL first payor (no TRICARE provider certif/Medicare benefits exhausted)<br>FS = TFL second payor RS = dual entitlement TRICARE first payor (no TRICARE provider cert/Med ben exh) |

*See* Gov't's MPSJ at 43–44.

wraparound coverage option of the TRICARE program made available to the beneficiary by reason of section 1086(d) of this title." *See* 10 U.S.C. § 1072(13) (2016). Sensing friction between the Federal Circuit's 2004 explanation of TRICARE for Life in *PGBA* and the 2016 statute's definition, plaintiffs insist "the Federal Circuit's explanation . . . is [only] partially accurate" and cite the 2016 statute to support this distinction.[10] *See* Pls.' Resp. at 14. As the TDEFIC manual prior to the 2016 statute noted, however, dual eligible beneficiaries could include "Active Duty Family Members (ADFMs) who are 65 or older and who are entitled to premium-free *Medicare Part A only*." *See* TRICARE Operations Manual 6010.51-M, ch. 22, § 1 (Aug. 1, 2002) (modified Sept. 7, 2010) (emphasis added), https://manuals.health.mil/pages/DisplayManualFile.aspx?Manual=TO02&Date=2010-09-07&Type=AsOf&Filename=C22S1.pdf. Considering plaintiffs' argument (to narrow TRICARE for Life eligibility) is based on a statutory definition enacted years after the DPP, plaintiffs fail to establish TRICARE for Life excluded dual eligibility for beneficiaries of only Medicare Part A under the contract executed prior to 2016. *See PGBA*, 389 F.3d at 1221 ("TRICARE for Life . . . addressed a problem confronting individuals qualifying for both TRICARE and Medicare benefits—individuals known as 'dual eligible beneficiaries.'").[11]

As to the second dispute, regarding TDEFIC indicators, plaintiffs reject the government's argument claims processed by TDEFIC contractors should be excluded as "TRICARE for Life" claims because plaintiffs argue the DPP does not outline any exclusions based on the contractor who handled the claim. *See* Pls.' Reply at 10. The government argues: (1) the DPP was limited to claims processed only by TRICARE MCSC intermediaries, to exclude the TDEFIC contractor or any other contractor; and (2) the TRICARE for Life exclusion in FAQs 6 and 13 excluded TDEFIC claims because the TDEFIC contractor only processed TRICARE for Life claims. *See* Gov't's Resp. at 40–41. As the contract explicitly states TRICARE for Life claims are excluded from the DPP, *see* Gov't's App'x at A10 (FAQ 6), A12 (FAQ 13), the question for the Court is whether TDEFIC contractors processed claims other than TRICARE for Life claims.

In *PGBA*, the Federal Circuit explained the TDEFIC contract was adopted as "one standalone contract for processing all dual eligible beneficiary [*i.e.*, TRICARE for Life] claims"

---

[10] Plaintiffs filed their first complaint in 2013, disputing the implementation of the DPP initiated well before 2016. *See generally* Compl.; *see also* Gov't's App'x at A1 (Notice) ("The Department of Defense (DoD) is currently analyzing whether your institution qualifies for any net adjustments to payments for hospital outpatient radiology services for the period August 1, 2003, until the TRICARE hospital Outpatient Prospective Payment System (OPPS) began on May 1, 2009.").

[11] When the Court asked plaintiffs about the applicability of a 2016 statute to the definition of TRICARE for Life claims prior to 2016, plaintiffs merely reiterated the language of the 2016 statute and argued the definition applied prior to 2016 as well, without citing any sources to support this proposition. *See* Tr. at 100:8–25, 101:1–17 ("THE COURT: In support, the statute that you cite, the government notes that it was not enacted until 2016. Why would that be applicable? . . . [PLAINTIFFS:] TRICARE for Life would have applied to spouses and children, that's why that date distinction matters, but that's not – that's not our issue with this. Our issue with this is that TRICARE for Life requires both entitlement to Medicare Part A and enrollment in Medicare Part B, which I believe was the case even before the statute changed."). As already noted, the parties have not presented—and the Court is unaware of—any such definition of TRICARE for Life prior to 2016. *Compare* 10 U.S.C. § 1072(13) (2016) (defining "TRICARE for Life" as "the Medicare wraparound coverage option of the TRICARE program made available to the beneficiary by reason of section 1086(d) of this title"), *with* 10 U.S.C. § 1072(13) (2015) (no "TRICARE for Life" definition).

in order to "address[] a problem confronting individuals qualifying for both TRICARE and Medicare benefits—individuals known as 'dual eligible beneficiaries." *PGBA*, 389 F.3d at 1221. Considering TDEFIC is the contractor responsible for processing TRICARE for Life claims, *see PGBA*, 389 F.3d at 1221,[12] at oral argument the Court asked plaintiffs what basis there is to conclude TDEFIC claims are not TRICARE for Life claims. *See* Tr. at 105:9–10. Plaintiffs responded: "this goes back to the question you asked me earlier that I didn't know the answer to, which is[:] is it possible that TDEFICs are paying non-TFL claims. I don't know the answer[—]if TDEFICs are paying claims that are not TRICARE for Life claims, then the fact that it was paid by a TDEFIC does not necessarily imply that it's a TFL claim."[13] *See* Tr. at 105:12–18. Thus, plaintiffs have no specific basis to dispute TDEFIC claims are "TRICARE for Life" claims. *See id.* While the Court is skeptical of the government's maximalist position any claim processed by a non-MCSC intermediary should be excluded,[14] *see* Gov't's Resp. at 40–41, when looking more narrowly at just TDEFIC intermediaries, plaintiffs fail to establish TDEFIC intermediaries process anything other than TRICARE for Life claims, *see* Tr. at 105:9–18 ("[THE COURT:] [D]o plaintiffs have any reason to dispute claims paid by TDEFICs or as not being [TRICARE for Life]? [PLAINTIFFS:] Potentially, and the reason I say that is because I don't -- this goes back to the question you asked me earlier that I didn't know the answer to . . . ."). Considering: (1) TRICARE for Life claims are claims for *dual-eligible* beneficiaries, *see PGBA*, 389 F.3d at 1221; (2) TDEFIC contractors, by definition, process claims under the "TRICARE *Dual Eligible* Fiscal Intermediary Contract," *see PGBA*, 389 F.3d at 1221 (emphasis added); and (3) plaintiffs have not presented any basis to dispute TDEFIC claims are TRICARE for Life claims, the Court holds claims processed by TDEFIC contractors are properly excluded as TRICARE for Life claims under the contract, *see* Gov't's App'x at A10 (FAQ 6), A12 (FAQ 13).

In summary, the parties agree any line item with a nonzero dollar amount in the total OHI column is a claim "with OHI," but for those line items with a zero-dollar amount in the total OHI column, the parties dispute whether other data fields establish these line items should be excluded as "TRICARE for Life" claims. Though plaintiffs contest two of the other data fields—Medicare Part A eligibility and TDEFIC indicators—establish line items are TRICARE for Life claims, plaintiffs' Medicare Part A arguments rely on statutes inapplicable to DPP at the relevant time and contradict TRICARE Operations Manuals delineating TRICARE for Life eligibility at the time. Similarly, plaintiffs' argument concerning TDEFIC indicators runs counter to the Federal Circuit's *PGBA* opinion and the plain language of the contract. As a result, plaintiffs fail to demonstrate the government improperly excluded radiology claims by

---

[12] "In 2002, TMA announced that it would restructure TRICARE under a plan known as 'TRICARE Next Generation' or 'T–Nex.' . . . T–Nex also calls for replacing the subcontracting scheme for dual eligible beneficiaries with one standalone contract for processing all dual eligible beneficiary claims, irrespective of geographic region. This new contract is called the "TRICARE Dual Eligible Fiscal Intermediary Contract" or 'TDEFIC.'" *PGBA*, 389 F.3d at 1221

[13] Plaintiffs suggest this issue may pose a genuine issue of material fact, but likewise neglect to substantiate their suggestion TDEFIC contractors process claims other than TRICARE for Life claims. *See* Tr. at 105:20–21.

[14] The Court's skepticism stems from the releases each plaintiff signed which protect the government from claims against entities other than the MCSC contractors. *See, e.g.*, Gov't's App'x at A19 (Ingham Regional Medical Center Release ("[The hospital] shall completely release, acquit, and forever discharge the Government, TRICARE beneficiaries, and any MCSCs")).

incorrectly categorizing dual eligible Medicare Part A claims and TDEFIC claims as "TRICARE for Life" claims.[15]  *See McAbee*, 97 F.3d at 1434–35; *see also PGBA*, 389 F.3d at 1221; Gov't's App'x at A10 (FAQ 6), A12 (FAQ 13).

### 4.    Whether Including TC Modifier Claims Requires Including Radiology Line Items Which Lack a TC Modifier But Appear in a Claim with Other TC Modifier Line Items

In another Step 3 interpretation dispute, the parties offer differing implementations of Step 3's no-TC-modifier exclusion, which notes:  "if the TC CMAC amount is less than the global CMAC and the *claim* does not have a TC modifier, it will be excluded."  Gov't's App'x at A7–A8 (DPP Step 3) (emphasis added).  Plaintiffs argue the word "claim" in Step 3 could comprise multiple "line items," so radiology line items can only be excluded if all line items in the claim lack a TC modifier.  *See* Pls.' MPSJ at 30 ("The DPP's clear use of the term 'claim' – as opposed to 'line item' – makes clear that this exclusion category be applied on a per claim basis.").  Thus plaintiffs argue the correct implementation of this exclusion should identify an otherwise eligible radiology line item with a TC CMAC amount less than the global CMAC and only exclude that line item if it and all other line items in the same claim—radiology or not—also lack TC modifiers.  *See id*.  The government contends the word "claim" in the context of Step 3 is used interchangeably with "line item" and argues the Step 3 exclusion (if a "claim does not have a TC modifier") applies to exclude radiology line items without a TC modifier, regardless of whether other line items in the same claim have a TC modifier.  *See* Gov't's Resp. at 44–46.

The Court next evaluates whether the no-TC-modifier exclusion in the DPP is ambiguous as to whether it applies on a per-claim or per-line item basis.[16]  Step 3 provides instructive context:

> TMA will extract the claims for each hospital for claims for outpatient radiology services during the relevant period (either the August 2003 – April 2009, August 2003 – December 2009, or August 2003 – November 2010 period).  All hospital outpatient department claims for radiology paid as billed, with OHI, or with a professional modifier (-26) will be excluded.  Radiology claims will include codes within the CPT range of 70000-79999 and which were codes with a non-zero rate

---

[15] In its 2022 summary judgment decision, the Court found the government breached the contract by failing to adjust thirteen line items, because, at the time, the government was unable to articulate what contractual basis it had to exclude these line items.  *See Ingham*, 163 Fed. Cl. at 412.  At oral argument, the government stated it now knows these line items were properly excluded as TRICARE for Life—but the government noted it would respect the Court's initial ruling and stipulate to compensation of these line items notwithstanding its subsequent discovery of the reasons for exclusion.  *See* Tr. at 103:15–21; *see also* Section V.F, *infra*.

[16] The government's first Motion for Summary Judgment stated "TMA did not violate Step 3 by excluding line items without TC modifiers," but plaintiffs' responsive briefings did not raise the distinction they raise now.  *See* Gov't's First MSJ at 43.  Though this would have constituted waiver in the first round of summary judgment briefing, because the parties submitted fully briefed Cross-Motions for Summary Judgment with supporting expert opinions on the distinction, unfair procedure does not exist in this round of summary judgment briefing to justify the application of waiver doctrine.  *See* Section IV, *supra*.

in the Technical Component (TC) field of the CMAC rate file.  Within this group of claims, if the TC CMAC amount is less than the global CMAC and the claim does not have a TC modifier, it will be excluded.

Gov't's App'x at A7–A8 (DPP Step 3).  The language of Step 3 defines "[r]adiology claims" with reference to specific "codes with the CPT range of 70000-79999":  these codes vary for every *line item* within an insurance claim based on the medical procedure.  *See* Gov't's App'x at A7 (DPP Step 3); *see also* Pls.' App'x at APP0219 (differing CPT codes for each line item within a claim).  Immediately following the line-item specific CPT-code identification of "radiology claims," Step 3 requires checking the line items within the relevant CPT range (*i.e.*, "this group of claims") to determine whether a TC modifier is present.  *See* Gov't's App'x at A7–A8 (DPP Step 3) (emphasis added).  In doing so, the language of Step 3 identifies specific line items as "radiology claims."  *Id.*  Step 3 also excludes "claims for radiology" with certain attributes, such as "a professional modifier (-26)," "CMAC" rates, "a TC modifier."  *Id.*  All of these attributes manifest on a line-item basis—not on a claim basis—further confirming Step 3's use of the term "claim" is synonymous with "line item."  *Id.*  Other portions of the contract verify, when specifying eligible "radiology claims" (as opposed to claims generally), the DPP uses the term "claim" interchangeably with the term "line item."  *See* Gov't's App'x at A8 (DPP Steps 4–5).  For example, Step 4 directs calculation of the "'Medicare' *allowed amount* for *each hospital radiology claim*" with reference to the "billed charge *for that line item*" and the "CPT code (*line item*)."  *See* Gov't's App'x at A8 (DPP Step 4) (emphasis added).  Given Step 4's reference to "CPT code (line item)," *id.*, and CPT codes varying for every line item within an insurance claim based on the medical procedure, *see, e.g.*, Pls.' App'x at APP0219 (differing CPT codes for each line item within a claim), the contract's identification of "radiology claims" based on CPT codes clarifies "radiology claims" are, in fact, radiology line items.  As further evidence, FAQ 18 asks:  "Can the government provide the individual claims records, including patient identifiers and CPT codes, for each of the radiology claims that were subject to adjustment?"  *See* Gov't's App'x at A14.  As CPT codes are line-item specific, FAQ 18's reference to "CPT codes" for "individual claims records" and "each of the radiology claims" reveals contractual references to "radiology claims" are synonymous with radiology line items.  *See id.*  Moreover, the answer to FAQ 18 provides "the [adjustment] worksheet provided to each hospital includes the number of claims."  *Id.*  The adjustment worksheets, however, provide only a "Number of Radiology Line Items," further corroborating FAQ 18's reference to "radiology claims" means "Radiology Line Items."[17]  Gov't's App'x at A18, A20, A22, A24, A26, A28 (Adjustment Worksheets).  Considering Step 3, Step 4, FAQ 18, and the Adjustment Worksheets define "radiology claims" with reference to specific "radiology line items," the exclusion of

---

[17] The only other reference to "line item" in the DPP appears in Step 7's statement, "[the cost sharing] ratio shall be calculated for claims with only one line item."  *See* Gov't's App'x at A9 (DPP Step 7).  The phrase, "claims with only one line item," appears at first to suggest the terms "claim" and "line item" should be viewed as distinct terms.  Upon further inspection of the full text, however, Step 7 confirms specific references to "radiology claims" refers to singular radiology line items, while reference to claims more broadly is not so limited.  Step 7 calculates a "hospital-specific offset" based on "the ratio of cost sharing amounts on the *radiology claims* . . . relative to the allowed amounts on these claims"—in other words, Step 7 totals the cost sharing amounts and allowed amounts across radiology claims to approximate the proportion of radiology-specific cost sharing across the entire hospital.  *See id.*  Limiting the calculation to "claims with only one line item" ensures the amounts used to calculate cost sharing only reflect cost sharing ratios for "*radiology* claims" and remain unimpacted by cost sharing across a broader claim with non-radiology services.  *See id.*

claims lacking a TC modifier "within this group of claims" is a line-item specific exclusion.  *See also* Gov't's App'x at A7 (DPP Step 3) ("TMA will extract *the claims* for each hospital *for claims for outpatient radiology services*" (emphasis added)); *Gould*, 935 F.2d at 1274 ("[A]n interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.").

Even if Step 3's reference to "[r]adiology claims" were ambiguous, the purpose of the DPP and the nature of the data to which the DPP applies both corroborate the Court's textual analysis.  The Notice stated the purpose of the DPP was to address an issue where "TRICARE may have directed payment . . . less . . . than the comparable Medicare fair payment" because TRICARE "limited reimbursement for individual outpatient radiology services to the technical component portion of the CHAMPUS Maximum Allowable Charge (CMAC)."  *See* Gov't's App'x at A1, A6 (Notice).  As plaintiffs noted at oral argument, the reason a TC modifier is added to a line item "is to indicate . . . the amount that is being billed for is the technical component," so logically the purpose of requiring a TC modifier is to ensure eligible line items actually used the flawed "technical component" which the DPP sought to fix.  Tr. at 120:24–121:4; *see* Gov't's App'x at A7–A8 (FAQ 3); Gov't's App'x at A6 (Notice).  Plaintiffs' interpretation, however, would include radiology line items even if there is no TC modifier and therefore no flawed TC CMAC rate on that line item.  *See* Pls.' MPSJ at 29–30.  Thus, plaintiffs' interpretation advocates adjusting payments for line items which did not suffer the issues the DPP sought to rectify.  *See id.*  The parties discussed one such example at oral argument:  a TRICARE claim with fourteen line-items found in plaintiffs' appendix.  *See* Tr. at 126:4–128:21; Pls.' App'x at APP0219.  Of the fourteen line-items, only one non-radiology ineligible line-item has a TC modifier, but plaintiffs argue the presence of that line item makes a separate radiology line-item in the same claim eligible for payment.  *See* Pls.' MPSJ at 29–30.  Apart from plaintiffs' flawed textual argument analyzed above, plaintiffs argue this approach also makes sense because the government previously stipulated to erroneously absent TC modifiers in the data.[18]  *See* Tr. at 124:17–126:1 ("[PLAINTIFFS:]  [A]s the government has previously

---

[18] The government's factual stipulation stated:

> As set forth above, Step 3 of the discretionary payment process provided that "if the TC CMAC amount is less than the global CMAC and the claim does not have a TC modifier, it will be excluded."  [Gov't's First App'x at] A7-8.  On August 19, 2011, Humana, TMA's fiscal intermediary for the South, confirmed a "processing error in [its] claim system," explaining that, in the 2008-2009 time frame, "we corrected a system problem related to outpatient hospital pricing and reprocessed all affected claims.  Unfortunately the reprocessed claims, while ultimately priced correctly, did not post the TC modifier on the final adjustment."  [Gov't's First App'x at] A509.  When pressed, Humana further explained, on August 22, 2011, that:
>
> > At times, our claim system would drop the -TC modifier and incorrectly process an outpatient hospital claim based upon a provider's billed charges . . . .  When/if these errors were found, claims were identified and reprocessed.  Unfortunately the claims would be reprocessed without the –TC modifier . . . .  How these misunderstandings, errors, and evolutions have manifested in our claim processing history files is unpredictable.
>
> [Gov't's First App'x at] A508.  The Government stipulates that all three of TMA's fiscal intermediaries at times dropped TC modifiers from the records that they created for TMA.  The Government further stipulates that varying numbers of line items for each of the plaintiffs (including

- 29 -

stipulated for purposes of the last summary judgment, there have been issues with TC modifiers going missing on line items, and so this is a known issue in the data."). Beyond a bald assertion of likelihood, plaintiffs do not explain why the presence of a TC modifier on one line item in a multi-line-item claim indicates a different line item in the same claim would be more likely to have used the technical component of the CMAC. *See* Tr. at 125:1–5 ("[PLAINTIFFS:] [A] TC modifier might be missing from that claim just by accident because of this known issue we have with the TC modifiers."). Even accepting plaintiffs' argument from likelihood based on the presence of TC modifiers on other line items in the same claim, the absence of TC modifiers on, for example, the twelve other line items in the exemplary claim in plaintiff's appendix would weigh against plaintiffs' assertion a TC modifier likely should have appeared on the radiology line item. *See, e.g.*, Tr. at 125:23–126:1 ("[PLAINTIFFS:] [T]he fact that there's a TC modifier on one line item with that encounter is indicative of the fact that this was a claim for TC services."); *see also* Tr. at 126:22–127:21 ("[GOVERNMENT:] [H]ow does the presence of a TC modifier on . . . an electrocardiogram[] make it any more likely that someone receiving a CT scan of a head or brain just got only the technical service. . . There's a TC on a line item within the claim, but there's no global designation of TC on the claim."). More importantly, in the Court's previous Opinion and Order granting summary for the government, the Court noted a contractual promise to include or exclude line items based on a specific data field in contractually-defined data sources does not bind the government to also change values in the data source to correct for errors. *See Ingham*, 163 Fed. Cl. at 403–05.[19] In other words, the contract requires excluding claims without a TC modifier based on the data before the government—it does not require the government to check and fix each line of data where a TC modifier was missing. *See id.*

In summary, considering the text of the contract unambiguously excludes radiology line items without a TC modifier, the government did not breach the contract by excluding such claims. *See McAbee*, 97 F.3d at 1434–35. Even if the contractual language were ambiguous, plaintiff's arguments fail because they advocate for adjusting payments for line items which did not suffer the issues the DPP sought to rectify and seek an interpretation based on fixing data errors beyond the government's contractual duties. *See NVT Techs.*, 370 F.3d at 1159 ("To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'") (citation omitted).

### 5.    Whether All TRICARE OPPS Claims Are Excluded

---

Ingham) were not adjusted during the discretionary payment process because the corresponding TMA records for those line items lacked a TC Modifier. [Gov't's First App'x at] A345-46, A499-500.

Gov't's First MSJ at 28–29.

[19] Specifically, the Court held the contract did not require the government to cross-check its own data with plaintiffs' data to correct errors: "Plaintiffs argue TMA should have corrected errors with the data '(*e.g.*, . . . a fiscal intermediary advising of erratic TC modifier practices in May 2011).' . . . As the ordinary meaning of the Step 3 exclusions merely narrow the universe of considered data from what "TMA will extract," the claims data "TMA will extract" is the largest universe of data TMA was obligated to consider. Excluding existing database data is the plain meaning of excluding data TMA extracts in Step 3." *Ingham*, 163 Fed. Cl. at 403–05.

In yet another contract interpretation dispute related to Step 3, the parties differ on the correct way to exclude TRICARE Outpatient Prospective Payment System ("OPPS") claims. The government argues all TRICARE OPPS claims should be excluded because the adjustment worksheets note "*[b]ecause radiology claims paid under OPPS are excluded*, most hospitals will not have any line items included after April 30, 2009." *See* Gov't's Second MSJ at 45–46; *see also, e.g.*, Gov't's App'x at A18 (Ingham Adjustment Worksheet). Plaintiffs argue the only DPP exclusion mechanism related to OPPS line items is the date range in Step 3, noting "TMA will extract the claims for each hospital for claims for outpatient radiology services during the relevant period (either the August 2003 – April 2009, August 2003 – December 2009, or August 2003 – November 2010 period)." *See* Pls.' MPSJ at 30; *see also* Gov't's App'x at A5 (DPP Step 3). Thus, plaintiffs maintain only OPPS claims falling outside the date range can be excluded, so twenty-five OPPS claims falling within the date ranges should be eligible for reimbursement under the DPP. *See* Pls.' MPSJ at 30; Tr. at 137:9–12 (counsel for plaintiffs confirming only twenty-five OPPS claims identified within the date ranges). Plaintiffs further argue excluding the twenty-five claims with an OPPS payment status indicator code is incorrect "because the TRICARE regulations implementing OPPS were not yet in effect" during the time periods listed in Step 3. *See* Pls.' Reply at 13.

The issue before the Court is whether the government was correct to exclude OPPS claims falling within the time range defined in Step 3. The adjustment worksheets state, "radiology claims paid under OPPS are excluded." *See* Gov't's App'x at A18, A20, A22, A24, A26, A28 (Adjustment Worksheets). The language in the adjustment worksheets is binding—the adjustment worksheets are part of the contract, and plaintiffs had to review the adjustment worksheets before signing a release to enter the contract. *See* Section V, *supra*; *Ingham*, 874 F.3d at 1345 ("[DPP] Step 8 explained that the hospitals would receive a written response (the Payment Adjustment Worksheet. . . . Step 9 explained that TRICARE's response would include a release and agreement to accept the discretionary adjusted payment by the hospital.") (internal quotations and citations omitted); *Ingham*, 163 Fed. Cl. at 393 ("Step 9 specified TMA's written response mentioned in Step 8 included a release and agreement to accept the discretionary adjusted payment by the hospital. . . . After TMA received the signed release and agreement, payment would be made to the hospital.") (cleaned up); *see also* Gov't's App'x at A19, A21, A23, A25, A27, A29 (signed Releases). Accordingly, regardless of Step 3's reference to time periods for eligible claims, the adjustment worksheets noted OPPS claims would be excluded, and the government was not required to adjust these claims.

Other provisions of the contract and statements at oral argument confirm this understanding of the exclusions of OPPS claims. First, as the contract notes, and as plaintiffs agree, TRICARE adopted the OPPS procedure to fix the very issue necessitating the discretionary payment process. *See* Gov't's App'x at A6 (Notice) ("[P]rior to adopting OPPS, Medicare used a blended rate while TRICARE limited reimbursement to the TC CMAC and [TMA] determined that discretionary adjusted payments may better reflect the Medicare payment."); *see also* Tr. at 137:16–24 ("THE COURT: [T]he TRICARE OPPS system was the new system which fixed the issue addressed by the DPP, correct? [PLAINTIFFS]: Yes, Your Honor. . . . it fixed the issue that the DPP was offering an adjustment to correct for."). At oral argument, when the Court asked plaintiffs how it would be possible to determine TRICARE owed them money on OPPS claims if the OPPS procedure rectified the issue causing

underpayments, plaintiffs could not offer any explanation beyond suggesting errors were present in the data. *See* Tr. at 141:21–142:5 ("THE COURT: [I]f plaintiffs are adjusting the [OPPS] line items according to the DPP, and then finding that they're owed money, doesn't that suggest the plaintiffs' contract interpretation is incorrect . . . ? [PLAINTIFFS]: Well, it could also mean that there's a problem, though, with those data fields that are saying that something was paid under TRICARE OPPS when it's outside the state[d time] range in step 3."). Beyond making unsupported claims of data errors, plaintiffs also did not provide the Court with any basis to dispute the government's explanation for why OPPS was implemented early: "there was an interim rule and people started paying early a little bit." *See* Tr. at 137:5–11. In short, plaintiffs have not provided any legal or factual basis for the Court to determine the contractual statement "radiology claims paid under OPPS are excluded" should be ignored to instead include OPPS claims falling within the time range in Step 3. Moreover, claims processed through OPPS do not suffer the same issues as non-OPPS claims, and plaintiffs have not provided any basis to conclude these claims were instead processed through the non-OPPS methodology. Considering the contract specified OPPS claims would be excluded and claims processed through OPPS did not suffer from the same issued addressed by the DPP, the government properly excluded all OPPS claims. *Gould*, 935 F.2d at 1274 ("Contract interpretation begins with the plain language of the agreement."); *Hunt Const. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("A contract is ambiguous only when it is susceptible to two reasonable interpretations.") (citations omitted).

### 6. Whether Plaintiffs Maintain the Government Improperly Excluded Radiology Line Items with a Non-Zero Rate for the TC CMAC

The last Step 3 dispute concerns plaintiffs' contention the government improperly excluded line items with a non-zero rate in the Technical Component field of the CMAC rate file. Pls.' MPSJ at 29. While Step 3 states, "[r]adiology claims [to be adjusted] will include codes within the CPT range of 70000-79999 and which were codes with a non-zero rate in the Technical Component (TC) field of the CMAC rate file," *see* Gov't's App'x at A7 (DPP Step 3), the government's expert report noted the *exclusion* of line items with a non-zero rate for the TC CMAC, *see* Gustafson Report ¶ 42. The government's expert confirmed in his deposition the reference to excluding line items with a "non-zero rate" was merely a typo: "It should just say zero rate." *See* Gustafson Dep. at 9:13–21. At oral argument, plaintiffs agreed this was a non-issue. *See* Tr. at 136:12–23 ("I think there was effectively a typo . . . I don't think that is something that is in dispute anymore."). Accordingly, as plaintiffs no longer argue the government expert's typo constitutes breach of contract, the Court denies as moot plaintiffs' motion for summary judgment as to breach of contract stemming from the government expert's erroneous statement he excluded line items with a non-zero rate for the TC CMAC.

### B. Whether TRICARE Properly Implemented DPP Step 5

The next major contract provision in dispute is DPP Step 5, which details a formula for approximating hospital discounts.[20] In Step 4, the DPP estimates the appropriate Medicare rate

---

[20] In full, DPP Step 5 states:

> To reflect the value of discounts at network hospitals, TMA will adjust the "Medicare" amount calculated in Step 4 on each claim using the ratio of the actual allowed amount on the claim to the

for each claim, and Step 5 "adjust[s this] 'Medicare' amount . . . using the ratio of the actual allowed amount on the claim to the TRICARE Standard allowed amount" "[t]o reflect the value of discounts at network hospitals." *See* Gov't's App'x at A8 (DPP Step 5). Plaintiffs argue applying the text of Step 5 literally would cause absurd results not reflective of true hospital discounts, so plaintiffs instead advocate an alternative methodology employing a "'median value across the entire population of line items' to determine a uniform discount rate for each hospital." *See* Pls.' MPSJ at 30–32 (quoting Berg Report ¶ 31). The government argues it is entitled to summary judgment because plaintiffs' damages are based on an improper re-write of Step 5. *See* Gov't's Second MSJ at 46.

Considering plaintiffs argue the plain text of Step 5 causes absurd results, the question for the Court is whether applying the text of Step 5 literally "achieves a weird and whimsical result" meriting an interpretation deviating from the text of the contract. *Gould*, 935 F.2d at 1274. Plaintiffs contend strictly applying the text of Step 5 ignores Participation Agreements, leading to "numerous outliers with ratios either too high or too low to actually reflect a true discount rate." *See* Pls.' MPSJ at 30–32. At oral argument, however, plaintiffs conceded the text of step 5 does not require the government to collect and analyze Participation Agreements. *See* Tr. at 144:19–145:6. Indeed, plaintiffs further confirmed a network agreement "is the same as a participation agreement," Tr. at 145:7–13, and the text of Step 5 expressly notes "for purposes of this discretionary adjustment, this process will level discounts . . . *even if the hospital may not have had a network agreement in effect*," Gov't's App'x at A8 (DPP Step 5). Thus Step 5 expressly ignores Participation Agreements, so ignoring Participation Agreements according to the text of Step 5 is not "a weird or whimsical result." *See Gould*, 935 F.2d at 1274; Tr. at 146:4–7 (Counsel for plaintiffs agreeing "step 5 does not call for reference to the network agreements in its computation"). Furthermore, Step 5 implicitly acknowledges outliers by imposing a cap on the discount ratio, noting "the ratio could not exceed a value of 1.0." *See* Gov't's App'x at A8 (DPP Step 5). Other language in Step 5 also makes clear the methodology is an approximation of hospital discounts, not an exercise in precision. For example, Step 5 notes its purpose is "[t]o reflect the value of discounts" but states the value used to approximate discounts "*could* occur because of a hospital discount." *Id.* (emphasis added). A contractual methodology to reflect hospital discounts using values which "could" reflect those discounts is not a promise to determine discounts with precision. *See id.* Thus, the results of hospital discount approximations in Step 5 are not "weird or whimsical," but merely reflect unambiguous contract language plaintiffs accepted. *See Gould*, 935 F.2d at 1274.

Having construed the language of Step 5, the Court now assesses how its interpretation of Step 5 affects plaintiffs' breach of contract claim and their expert's methodology. At oral

---

TRICARE Standard allowed amount (the technical component of the CMAC). For example, if the TRICARE Standard technical portion of the CMAC for a radiology claim was equal to $100 and the actual allowed amount on the claim was equal to $95, the ratio is 0.95. This difference could occur because of a hospital discount. In this example, the adjusted "Medicare" amount would be equal to 0.95 multiplied by the "Medicare" amount prior to adjustment. If both the actual and the TRICARE Standard amounts were equal (for example, because there were no discounts), the ratio would be equal to 1.0 (the ratio could not exceed a value of 1.0). For purposes of this discretionary adjustment, this process will level discounts over the period even if the hospital may not have had a network agreement in effect at the time of any individual service claim.

Gov't's App'x at A8 (DPP Step 5).

argument, the Court asked what language in Step 5 plaintiffs argue the government breached, and plaintiffs responded the government's approach does not "level discounts over the period." *See* Tr. at 143:17–144:2 (quoting Gov't's App'x at A8 (DPP Step 5) ("this process will level discounts over the period . . . ")).  When the Court asked for a substantive example, plaintiffs responded the government's "method doesn't [l]evel the result because you end up with a different result for each line item," but "the only way you can level a result is to do something like what [plaintiffs'] expert did . . . to take the median across a number of line items."  *See* Tr. at 144:3–15.  While plaintiffs argue "the only way you can level a result" is by applying their expert's proposed new methodology, such an argument contradicts the plain language of Step 5 describing exactly how to "level discounts."  *See* Gov't's App'x at A8 (DPP Step 5).  Indeed, plaintiffs' expert himself applied the plain language of Step 5 to compare the results of his proposed alternative methodology to the results of applying the literal text of Step 5.  *See* Berg Report ¶ 31 ("In order to estimate the discount rate on a particular line item, I used the formula [described in Step 5.] . . . I was surprised to see that the result is not consistent from line item to line item. . . . In order to best estimate the true discount rate for each hospital, I utilized the median value across the entire population of line items."); Berg Supp. Report ¶ 47 ("If Step 5 of the DPP should be computed on a line item basis as the Gustafson Report did, capping any values >1 at 1, this would be the impact . . .").  Moreover, plaintiffs agreed Step 5 lacks any language supporting the alternative methodology which their expert proposed.  *See* Tr. at 144:16–23 ("THE COURT:  Where in the text of step 5 does it use the word "median?" [PLAINTIFFS]:  It does not.  THE COURT:  Where in the text of step 5 does it require the government to collect and analyze participation agreements to determine a true discount rate? [PLAINTIFFS]:  It does not in step 5.").  Accordingly, considering plaintiffs' agreement their proposed methodology deviates from the text of the contract and considering plaintiffs' failure to identify how the government breached Step 5, the government did not breach Step 5 of the DPP by following its text.  *Gould*, 935 F.2d at 1274 ("Contract interpretation begins with the plain language of the agreement."); *Hunt Const. Grp.*, 281 F.3d at 1372 ("A contract is ambiguous only when it is susceptible to two reasonable interpretations." (citations omitted)).

### C.      Whether TRICARE Properly Implemented DPP Step 6

The parties next dispute the proper interpretation of Step 6.[21]  Considering the government's implementation of Step 6 uses the same "allowed amount" field as used in Step 3, the parties' Step 6 arguments essentially rehash the parties' Step 3 "allowed amount" interpretation arguments.  Plaintiffs again advocate the use of the "paid" field in the data for the "actual allowed amount" in Step 6.  *See* Pls.' MPSJ at 32–34.  The government again advocates

---

[21] In full, Step 6 provides:

> TMA will then compare the adjusted "Medicare" amount for each claim with the actual allowed amounts on that claim.  TMA will calculate the difference between the two amounts. The positive and negative differences will be summed over the entire 2003 - 2009 period (or the 2003 - 2010 period for hospitals not subject to OPPS).  If the sum of the differences is positive (because the adjusted "Medicare" allowed amounts exceed the actual allowed amounts) then this information will be used in determining the level of the additional payment to the hospital.  If the actual allowed amounts are equal to or exceed the "adjusted Medicare" amounts, then no additional payment shall be made.

Gov't's App'x at A9 (DPP Step 6).

the use of the "allowed" field. *See* Gov't's Second MSJ at 48. As determined in Section V.A.2, *supra*, the correct field to use for the "TRICARE allowed amount" or the "actual allowed amount" is the "allowed" field in the data. *See also* Tr. at 68:12–17 (plaintiffs arguing the TRICARE allowed amount is the "paid" field, but agreeing the "TRICARE allowed amount" and the "actual allowed amount" refer to the same value). While plaintiffs argue Step 6's reference to "actual allowed amount" should warrant using the amount TRICARE paid, TRICARE does not always pay the allowed amount in full—other entities contribute to the allowed amount and TRICARE pays the difference. *See* Section V.A.2, *supra*. Of note, plaintiffs' own expert used the "allowed" field for the "actual allowed amount" when calculating hospital discounts according to the text of Step 5, but switched to the "paid" field in Step 6. *See* Berg Report ¶ 31; Berg Supp. Report ¶ 30. When confronted with this discrepancy at oral argument, plaintiffs responded "the purposes of those steps are different." *See* Tr. at 151:25–152:1. According to plaintiffs, "the purpose of Step 5 is to figure out a discount," but "[t]he purpose of step 6 is to calculate what the actual underpayment is," so it is appropriate to use different data fields for the same phrase referenced in the DPP. *See* Tr. at 152:1–4.

First, the purpose of Step 6 is not to calculate "the actual underpayment." *Cf. id.* Step 6 notes it will "calculate the difference" between "the adjusted 'Medicare' amount for each claim" and the "actual allowed amounts on that claim." *See* Gov't's App'x at A9 (DPP Step 6). After totaling the results of these differences across all claims for a hospital, Step 6 notes "*this information will be used in determining* the level of the additional payment to the hospital," Gov't's App'x at A9 (DPP Step 6) (emphasis added), and then in Step 7, the DPP ultimately applies a "hospital-specific offset for cost sharing" to calculate payment, *see id.* (DPP Step 7) ("This additional amount will be paid to the hospital."). This two-step process accords with the purpose of the DPP to pay out only the *portion* of the variance between Medicare rates and allowed amounts which would have been paid had it followed comparable Medicare fair payment methods. *See* Section V.A.1, *supra*; Gov't's App'x at A6 (Notice). In view of the contractual text and the DPP's contractually-defined purpose, Step 6 does not calculate TRICARE's underpayment, but calculates the variance between the flawed "allowed amount" and the appropriate "Medicare rate," which would later be reduced to account for cost sharing to calculate what TRICARE should ultimately have paid in Step 7. *See* Gov't's App'x at A9 (DPP Steps 6–7). Second, even if the purpose of Step 6 were as plaintiffs argued, plaintiffs do not explain how differing purposes of DPP Steps 5 and 6 transform the plain meaning of "actual allowed amount" in Step 5 to mean something entirely different from "actual allowed amount" in Step 6. Accordingly, considering Step 6 uses the term "actual allowed amount" and because "actual allowed amount" means the amount TRICARE allowed rather than the amount TRICARE paid, the government correctly used the "allowed" field in its calculations. *See* Sections V.A.1–2, *supra*; *Gould*, 935 F.2d at 1274 ("[A]n interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.").

## D.    Whether TRICARE Properly Implemented DPP Step 7

The final contract interpretation dispute[22] concerns which line items should be used to calculate a hospital-specific offset for cost-sharing in Step 7.[23]  The government argues all single line-item claims requiring additional payment under Step 6 should be used to calculate the cost-sharing ratio in Step 7.  *See* Gov't's Second MSJ at 52–53.  Plaintiffs argue only those single line-item claims requiring additional payment under Step 6 *with patient responsibility* should be used to calculate the cost-sharing ratio in Step 7.  *See* Pls.' Resp. at 21.  While plaintiffs assert patient responsibility should be considered in Step 7, the text of Step 7 does not mention patient responsibility.  *See* Gov't's App'x at A9 (DPP Step 7).  Plaintiffs contend, despite no reference to patient responsibility, Step 7's reference to cost sharing implies only line items with patient responsibility should be used because cost sharing only occurs on claims with patient responsibility.  *See* Pls.' Resp. at 21.  Step 7, however, calculates a cost sharing ratio to be applied to the whole amount calculated in Step 6.  *See* Gov't's App'x at A9 (DPP Step 7) ("If the calculations in Step 6 indicate that an additional payment shall be made to the hospital, then a hospital-specific offset for cost sharing shall be calculated. . . . The amount calculated in Step 6 would then be multiplied by a factor equal to 1.0 minus this ratio (in this example, 0.97).").  Even if the term "cost sharing" implies patient responsibility, Step 7 does not calculate "cost sharing" *per se*:  rather, Step 7 calculates a ratio to approximate cost sharing levels across all claims eligible for payment in Step 6—cost sharing or not.  *See id.*  Even if only some single line-item claims reflect cost sharing, the text of Step 7 requires applying a ratio used to approximate cost sharing across *all* claims, not just those with cost sharing.  *See id.*  In this way, plaintiffs' patient responsibility requirement would not only contradict the text of Step 7 (which does not mention patient responsibility), it would also alter the textual goal of Step 7:  "a hospital-specific offset for cost sharing" to "be multiplied by" "[t]he amount calculated in Step 6."  *See id.*  Accordingly, considering plaintiffs seek to add a "patient responsibility" restriction to Step 7 not reflected in the text, the government did not breach the contract by calculating a cost sharing ratio without this restriction.[24]  *See Gould*, 935 F.2d at 1274 ("Contract interpretation begins with the plain language of the agreement.").

---

[22] As Step 7 uses line items determined to be eligible for reimbursement in Step 3 (through use of eligible line items in Step 6), the parties incorporate Step 3 interpretation issues in briefing for Step 7.  *See, e.g.*, Pls.' Resp. at 20–21.  In Section V.A, *supra*, the Court determined plaintiffs' Step 3 interpretation arguments lack merit, and considering the parties do not raise any new arguments regarding Step 3, the Court need not re-examine those issues here.

[23] In full, Step 7 states:

> If the calculations in Step 6 indicate that an additional payment shall be made to the hospital, then a hospital-specific offset for cost sharing shall be calculated.  The offset shall be equal to the ratio of cost sharing amounts on the radiology claims processed during this period relative to the allowed amounts on these claims.  For example, if cost sharing amounts equaled $3,000 and the allowed amounts were $100,000, then the ratio would be equal to 0.03.  This ratio shall be calculated for claims with only one line item.  The amount calculated in Step 6 would then be multiplied by a factor equal to 1.0 minus this ratio (in this example, 0.97).  This additional amount will be paid to the hospital.

Gov't's App'x at A9 (DPP Step 7).

[24] Plaintiffs also noted the government's expert initially employed erroneous methodologies to identify claims with only one line item for Step 7.  *See* Pls.' MPSJ at 35.  As the government's expert rectified these issues in his supplemental report and plaintiffs concede these corrections resolved the issue, the Court need not address this item for purposes of this decision.  *See* Tr. at 157:7–17 ("[THE COURT:]  do you agree, again related to Mr. Gustafson's error, that he rectified the initial error including claims with more than one line item through a fix in his supplemental report, related to Step 7?  [PLAINTIFFS:]  Yes, your honor.").

E.      **Whether "Document One" Is Necessary to Decide the Contract Interpretation Disputes**

Plaintiffs argue a 30 September 2011 memo ("Document One") prepared by the government's former expert witness, David Kennell, corroborates their breach of contract claims because it documents "five major problems" with TMA radiology data leading to a 17–20 percent understatement of radiology adjustments for hospitals. *See* Pls.' MPSJ at 35–36 (citing Pls.' App'x at APP0197 (30 September 2011 Memo. titled Data Problems Related to Payment Adjusunents [sic] for Duane Morris Hospitals from P. Hutter to D. Kennell) ("Document One")). The government argues it is improper for plaintiffs to rely on Document One because it was prepared in "the context of settlement . . . completely separate and apart from the discretionary payment process." *See* Gov't's Resp. at 55. The government previously moved to exclude Document One as inadmissible under Federal Rule of Evidence 408, but the Court stayed this motion. *See* Gov't's Mot. to Strike Rule 408 Evidence, ECF No. 238; *Ingham*, 163 Fed. Cl. 384 at 390; *see also* Tr. at 179:2–5 ("THE COURT: So just to clarify, then, that motion to strike would only be applicable to the extent that there is the need for a trial, then, at that point? [THE GOVERNMENT]: That's correct."). Accordingly, the Court next determines whether consideration of Document One is necessary for the present breach of contract analysis.

Plaintiffs confirmed in their briefs and at oral argument, Document One is not necessary for a decision in plaintiffs' favor on their contract interpretation disputes. *See* Pls.' Reply at 16 ("Plaintiffs do not need Document One to establish the Government's breach of the DPP."); Tr. at 177:16–23 ("[PLAINTIFFS:] Your Honor can . . . deny the government's motion for summary judgment, without having to refer to document 1. That's particularly true given . . . it's a stipulated fact . . . there were issues with the TC modifiers being missing"). The only contract interpretation issue before the Court which plaintiffs argue Document One corroborates is the erroneous absence of TC modifiers on certain radiology claims. *See id.*; Tr. at 177:178:3–14. As plaintiffs note, however, the government already stipulated to the TC modifier issue. *See id.* As the Court already determined in the TC modifier analysis, *supra*, the TC modifier issue does not impact the Court's contract interpretation holdings. *See* Section V.4, *supra*. Accordingly, considering Document One does not impact the Court's contractual interpretation analysis beyond corroborating an inconsequential, stipulated fact—and considering plaintiffs themselves state Document One is not needed for a summary judgment decision in their favor—the parties agree Document One would not impact the Court's analysis and the Court declines to consider Document One in this decision.

F.      **Whether Plaintiffs Have Proven Damages as a Matter of Law**

Having interpreted the text of the contract, the Court turns to the issue of damages stemming from the government's breach of contract. In calculating damages, plaintiffs applied their interpretation of the contract. Considering the Court found plaintiffs' contractual interpretations unavailing in Section V, however, the Court now reviews the damages calculations for the named plaintiffs and details the processes for calculating damages for putative class members in accordance with this decision. Prior to expert discovery and the Cross-Motions for Summary Judgment, the Court determined the government's liability to

named plaintiffs included two failures constituting breach of contract: "(1) [failure to] adjust five line items for Integris Baptist during the DPP because of an alternate zip code; and (2) [failure to] extract thirteen line items meeting the criteria for extraction for Integris Baptist and Integris [Grove Hospital[25]]." *Ingham*, 169 Fed. Cl. at 16 (quoting *Ingham*, 163 Fed. Cl. at 409–10, 412) (cleaned up). The Cross-Motions for Summary Judgment were then allowed in order to narrow the areas of potential liability ahead of class certification. Accordingly, in view of the findings in this decision, the Court identifies four criteria relevant for damages calculations and provides below in tabular form:

| Damages Criteria | Named Plaintiffs | Putative Class Members |
|---|---|---|
| **Alternate Zip Codes & Additional Data Sources** | $13,993 – Calculated by the government's expert and adopted by the Court herein | Damages estimate to be determined |
| **Thirteen Line Items Excluded for Unknown Reasons** | $486 – Calculated (and stipulated to) by the government after the Court's 2022 Opinion and Order | Damages foreclosed by this Opinion and Order |

First, regarding the alternate zip code issues, the government's expert quantified damages stemming from those issues for the named plaintiffs by (a) using hospital identifiers which looked at all the hospital's claims, regardless of zip codes; and (b) expanding the data sources it analyzed to include everything produced to plaintiffs.[26] *See* Gustafson Report ¶¶ 10, 37–40, 89, Ex. 1 at n.1. Based on the findings of this analysis, the government conceded, "in light of the zip code issue and additional records produced from the PCDW, Integris Baptist Medical Center could have received $13,914 more than it did." *See* Gov't's Resp. at 32. The government's expert adjusted this number upward by $79 in a Step 7 fix in his supplemental report, which the government further acknowledged in its reply brief. *See* Gov't's Reply at 8 n.2 (citing Gustafson Supp. Report at Table S.1). The government's expert also found the other named plaintiffs were not entitled to any damages. *See* Gustafson Report ¶¶ 12(e), 38, 65. Apart from asserting additional damages tethered to their flawed contract interpretation arguments, plaintiffs do not dispute this concession by the government. *See* Pls.' MPSJ at 22–23. Accordingly, the Court finds the government breached the contract in failing to properly adjust line items for Integris Baptist Medical Center in the amount of $13,993. *See Ingham*, 163 Fed. Cl. at 409 ("The Court

---

[25] The Court originally identified this named plaintiff as "Integris Bass Baptist," but, as the government notes, the correct named plaintiff is Integris Grove. *See* Gov't's Resp. at 30 ("In contrast, Mr. Kennell found that including the unextracted line items in the adjustment calculation for Integris Grove (misidentified in the text of Government's motion for summary judgment as Integris Bass Baptist Medical Center, ECF No. 203 at 30, 34, but identified correctly in the appendix to that motion, ECF No. 203-2 at 29 (same as current A434) would have *decreased* that hospital's adjustment calculation by $80.").

[26] Prior to the first decision at summary judgment, the parties conducted analyses based on "radiology1," an extract of claims from the Military Health Systems Data Repository ("MDR"). *See* Gustafson Report at 25 n.78. Following the Court's decision allowing additional discovery into all class members, the parties conducted analyses on the full universe of data, including MDR, TRICARE Encounter Data ("TED"), and the Purchased Care Data Warehouse ("PCDW"). *See* Berg Report ¶ 4.

accordingly finds TMA did have a duty under the plain language of Step 3 to extract, analyze, and adjust radiology data from its database.").

While the government's expert calculated damages for the named plaintiffs, the government did not quantify the impact of the zip code issue on the putative class of hospitals. *See generally* Gustafson Report; Gustafson Supp. Report. Given the Court agreed with the government's interpretation of the contract and because the government's expert already calculated damages for the named plaintiffs according to the government's interpretation, the Court notes the government's expert is best situated to approximate the impact of the government's breach on a putative class ahead of briefing on class certification. Accordingly, consistent with this decision, the Court orders: (1) the government to confer with its expert to determine the information, methodology, and duration of time required to approximate the impact of its breach on a potential class; (2) the government to relay its findings to, and confer regarding next steps with, plaintiffs; and (3) the parties to file a joint status report within 30 days of this decision detailing next steps for class certification in light of the government's findings.

*Second*, related to the thirteen line items excluded for Integris Baptist and Integris Grove, the government initially did not know why these claims were excluded. Before the Gustafson Report, the government's previous expert quantified the impact of the excluded line items as $486 in additional damages for Integris Baptist Medical Center, but no additional damages for the other named plaintiffs. *See* Gov't's Resp. App'x at A434 (19 July 2019 Expert Report of David Kennel). As the Court's 2022 decision concluded the government improperly excluded these thirteen line items, the government stipulated to $486 in additional damages for Integris Baptist Medical Center. In 2023, however, the government learned these line items were properly excluded as TRICARE for Life claims. *See* 25 Oct. 2023 JSR at 6–7, ECF No. 284; Gustafson Report ¶¶ 51–52; Section V.A.3, *supra*. Consistent with the government's interpretation TRICARE for Life claims should be excluded, the government's expert did not quantify damages stemming from the thirteen line-item issue when he re-ran the DPP across all data. *See* Gustafson Report ¶¶ 51–52. Given the government stipulated to $486 in damages for Integris Baptist Medical Center—notwithstanding its later conclusion and this decision finding the TRICARE for Life line items were correctly excluded, *see* Gov't's Resp. at 32 (citations omitted)—the Court finds the government liable for an additional $486 in damages to Integris Baptist Medical Center for line items excluded from the DPP for unknown reasons at the time of the Court's 2022 order. *See Ingham*, 163 Fed. Cl. at 412. Considering the Court finds in favor of the government's TRICARE for Life contract interpretation disputes and agrees TRICARE for Life claims are properly excluded, *see* Section V.A.3, *supra*, no further action is necessary on this issue.

Finally, the Court notes the case caption currently reflects plaintiffs who were previously dismissed from this suit but does not include the named plaintiffs appearing on the second amended complaint. *See* note 5, *supra*. In the parties' JSR, the Court orders the parties to (1) modify and update the current case caption to include the named plaintiffs and (2) include a list of named plaintiffs in light of this decision.

## VI.    Conclusion

For the foregoing reasons, the Court: (1) **GRANTS-in-PART** and **DENIES-in-PART** the government's Motion for Summary Judgment, ECF No. 325; and (2) **GRANTS-in-PART** and **DENIES-in-PART** plaintiffs' Motion for Partial Summary Judgment, ECF No. 326. Specifically, the Court (1) determines plaintiffs did not waive contract interpretation arguments not raised in response to the government's first motion for summary agreement; (2) agrees with the government's interpretations of the contract; (3) declines to consider Document One in interpreting the contract; and (4) grants summary judgment for plaintiffs in the amount of $14,479 for Integris Baptist Medical Center.

The government, after consulting with its expert, **SHALL** determine the information, methodology, and duration of time required to estimate a potential class of hospitals impacted by the government's breach and the amount each hospital was underpaid. Thereafter, the parties **SHALL** confer in light of the government's findings and **SHALL FILE** a Joint Status Report **on or before 13 July 2026** with:

(1) a summary of the government's findings after conferring with its expert to determine the information, methodology, and duration of time required to approximate the impact of its breach on a potential class;

(2) plaintiffs' response to the government's findings;

(3) the parties' positions on appropriate next steps for class certification; and

(4) the correct list of named plaintiffs to be reflected on the case caption for this case in light of the plaintiffs named on the Second Amended Complaint, ECF No. 74.

**IT IS SO ORDERED.**

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge

- 40 -